## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ASCENT AEROSYSTEMS INC. | : | |
| | : | Civil Action No.: 3:24-cv-01075 |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| JEFFREY T. HILL | : | |
| ANDREW G. MICHAEL | : | |
| OVERWATCH AEROSPACE LLC | : | |
| OVERWATCH AEROSPACE LTD | : | |
| OVERWERX LTD | : | |
| | : | |
| Defendant. | : | JUNE 21, 2024 |

## <u>MEMORANDUM OF LAW IN SUPPORT OF</u>
## <u>PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION</u>

John R. Horvack, Jr.
Fatima Lahnin
Damian K. Gunningsmith
Meghan F. Buckley
Carmody Torrance Sandak & Hennessey, LLP
195 Church Street
P.O. Box 1950
New Haven, Connecticut 06509-1950

{N6004594}

## FACTUAL BACKGROUND

### A.    Ascent is an Innovator and Market Leader

Ascent has been engaged in the business of designing, making, and selling Unmanned Aerial Vehicles ("UAVs"), or "drones," since 2014. (Founders Decl., ¶4.) With an investment of millions of dollars and many years of effort, Ascent created a coaxial drone with a unique design and configuration. (Founders Decl., ¶¶5, 6.)  Coaxial drones resemble cylinders with two counter-rotating rotors that share the same central axis. (Founders Decl., ¶5.) Most drones do not have a coaxial configuration, but instead use a multirotor, helicopter or fixed wing configuration. (Founders Decl., ¶7.) Additionally, all drones within the limited universe of coaxial drones have employed a very different configuration when compared to Ascent's coaxial drone. (*Id.*) The uniqueness of Ascent's coaxial drone configuration is detailed in Appendix A to the Founders Declaration.

Due to their sophisticated design, Ascent's coaxial drones are compact, portable, rugged, fast, efficient, quiet, and agile, and are also readily adaptable to a wide range of uses, including industrial, public safety, and military applications. (Founders Decl., ¶5.)  Unlike other drones, the unique configuration of Ascent's coaxial drones allow the drones to be flown efficiently at low and high speeds, with outstanding maneuverability, for long distances, while carrying relatively heavy payloads. (Founders Decl., ¶8.)  Ascent's coaxial drones are also highly versatile because of their cylindrical shape, compactness, and modularity – features that (1) make the drones more rugged and resistant to damage, (2) allow use of a wide variety of payloads, (3) enable easy storage and handling, (4) support operations in adverse weather conditions and austere operating environments, and (5) make possible launches from confined areas and/or moving platforms. (Founders Decl., ¶9.)  Ascent's coaxial drones can also be equipped with sophisticated equipment

and sensors, including global positioning and imaging systems, which allow for precision control even from extended distances. (Founders Decl., ¶10.)

**B.      Overwatch Defense Approaches Ascent**

In September 2017, Jeffrey Hill ("Hill") – on behalf of Overwatch Defense and Overwatch Optics – directed an unsolicited communication to Ascent inquiring about Ascent's coaxial drones. (Founders Decl., ¶11.)  Overwatch Defense held itself out as a supplier of a weapon system that could be incorporated into Ascent's coaxial drones. (Founders Decl., ¶12.)

On September 23, 2017, Hill represented to Ascent: "We have been working on this project for some time and have patented it, but the development of the coaxial drone with a decent payload isn't easy (as Im sure you are aware). Your units fit the bill for what we need." (Founders Decl., ¶13.)  Believing Hill was acting in good faith, Ascent entered a Mutual Non-Disclosure Agreement ("NDA") with Overwatch Optics on September 27, 2017, effective September 23, 2017. (Founders Decl., ¶14.)

The NDA provides for the protection of confidential, proprietary and/or trade secret information shared by the parties, so that a possible business relationship could be explored. In addition, the NDA ensured that any equipment, components, software, or other items would not be reverse engineered, disassembled, or decompiled. Nor would any such item be otherwise analyzed to determine its physical construction. The NDA provides for the application of law of the State of New York and that all disputes be resolved in the state or federal courts covering Sandy Hook, Connecticut. (Founders Decl., ¶15.)

Thereafter, on or about November 12, 2017, Ascent and Overwatch Defense entered into a Commercial Teaming Agreement, wherein the parties agreed to jointly pursue the business initiative of making and selling a weaponized UAV. The parties expressly agreed to be bound by

the NDA. The parties further agreed that each party owned the rights to any technology it would independently develop or had already developed, and that no transfer, grant, or license was made or implied because of the agreement. (Founders Decl., ¶¶16-18.)

### C. "PHOLOS" comprises unique coaxial drone technology owned by Ascent.

"PHOLOS" is the name given to the proposed system in "Initiative 1" of the Teaming Agreement by and between Ascent and Overwatch Defense. (Founders Decl., ¶19, citing to Ex. A) The PHOLOS initiative comprised Ascent's coaxial drone armed with an explosive warhead that was to be provided by Overwatch Defense. (Founders Decl., ¶20.) Exhibit 1 of the Teaming Agreement specifically provides: "INITIATIVE 1: "PHOLOS" KINETIC UAS COAXIAL WEAPON SYSTEM" and then details PHOLOS as "a coaxial vehicle, explosive warhead, onboard imaging system, ground control station(s) and software necessary for remote operation and real-time remote viewing." (Founders Decl., ¶21.)

An article written for "Tactical World" magazine for Overwatch Defense confirmed that the parties' joint venture was to develop "Pholos" – a coaxial "drone bomb" using the drone "created" by Ascent. (Founders Decl., ¶22, citing to Ex. C) The article describes Ascent's coaxial drone as "agile" with "powerful lift" and the overall system as a "revolutionary weapon." (Founders Decl., ¶23.)

Marketing materials created by Overwatch Defense for "The Pholos Weapons System" likewise confirm that "Pholos" was the teaming effort of Overwatch and Ascent, and that "Pholos" includes the "agile" and "powerful" coaxial drone "created by" Ascent. (Founders Decl., ¶24, citing to Ex. D, pg. 4.) Overwatch Defense's Pholos marketing materials also tout that "[t]his new weapon will change warfare forever." (Founders Decl., ¶25.)

**D.      Ascent provided confidential, proprietary and/or trade secret information to Overwatch Defense under the Teaming Agreement and NDA.**

With the protections provided for in the NDA and Teaming Agreement, Ascent provided confidential, proprietary and/or trade secret information to Overwatch Defense, including the following:

a.      3D CAD STEP files for the Pholos 1 and Pholos 2 coaxial drone mockups. The 3D CAD STEP files are engineering models of the fully assembled drone concepts, including each module of each drone configuration, which provided Overwatch a technical head start in their reverse engineering effort.

b.      3D CAD files of the bulkhead payload module and the payload mounting ring of a functional Ascent coaxial drone. These are mating parts that provide a means for mating various drone modules and establish a three-legged landing gear configuration, which is replicated in Overwatch Group's PHOLOS drone.

c.      3D CAD files of the modular attachment ring of an operational Ascent drone that includes a particular radial bolt pattern, which is notably found in Overwatch Group's replicated PHOLOS drone.

d.      A pinout of the connector board of Ascent's drone that provides technical details of the electrical design elements of the drone's modularity – a feature touted by Overwatch Group in its replicated PHOLOS drone.

e.      A "bill of materials" (parts list) for each module (propulsion and rotor system, flight control, forward interface, battery, communications) of an operational Ascent drone that formed the basis of the Teaming Agreement's PHOLOS drone, which facilitates replication of Ascent's drone.

f.      A non-public specification sheet for one of Ascent's operational drones that Overwatch Group substantially copied when it created the specification sheet for its PHOLOS drone.

(Founders Decl., ¶26.)

In addition to the above, Ascent provided fully operable drones and other equipment to Overwatch Defense under the Teaming Agreement, which Overwatch Defense promised not to

reverse engineer, disassemble, decompiled, or otherwise analyze the physical construction. This included three fully operational coaxial drones and four PHOLOS mockups, as follows:

    a.  a Sprite 1 on or about October 30, 2017;

    b.  a Sprite 2 on or about June 22, 2018;

    c.  two (2) Pholos 1 mockups on or about August 30, 2018;

    d.  two (2) Pholos 2 mockups on or about August 30, 2018; and

    e.  a Sprite 2 on or about October 15, 2018.

(Founders Decl., ¶¶ 27-28.)

**E.**    **The existence and value of Ascent's confidential, proprietary and trade secret information is demonstrated by Overwatch Defense attempting to buy and/or license it for millions of dollars.**

On numerous occasions, Overwatch Defense sought rights to Ascent's intellectual property related to Ascent's coaxial drone technology. (Founders Decl., ¶30.) For example, on August 8, 2018, Hill of Overwatch Defense wrote:

> We would be keen on owning some IP and would like to discuss the development/design option where these are developed on our dime. We would also like a to know what a perpetual license (defense only) would be.
>
> Our IP attorney Fred Romano will be sending over the agreement. But we need to know which options we will be going with.

(Founders Decl., ¶¶30-31, citing Ex. E.)

On September 18, 2018, Hill of Overwatch sent a "final version of the License Agreement" for Ascent's review, wherein for yet unspecified royalties, Ascent would grant a non-exclusive, worldwide license to Overwatch Defense in all Copyrights, Know-how and Patents required to make and sell the coaxial unmanned aerial vehicles when used to carry an explosive payload. (Founders Decl., ¶32, citing Ex. F.)  In the proposed License Agreement,

"Know-how" is defined as "all unpatented technical information, knowledge, know-how, and data, including trade secret information, owned [sic] by or under the control of Licensor, useful or necessary to enable Licensee to manufacture the Licensed Products in accord with all manufacturing specification or product specifications provided by Licensor." (Founders Decl., ¶33.) Therefore, Overwatch Defense knew that Ascent owned all intellectual property (patented and unpatented) in the coaxial drone technology and Overwatch Defense was "keen" to acquire those rights in the technology for military applications. (Founders Decl., ¶34.)

Thereafter, on September 24, 2018, Overwatch Defense forwarded a draft Memorandum of Understanding ("MOU"). (Founders Decl., ¶35, citing Ex. G.) Overwatch Defense's MOU set forth the terms and conditions pursuant to which the parties would enter the License Agreement detailed above. (Founders Decl., ¶36, citing Ex. G.) Specifically, the MOU proposed that Overwatch Defense would pay Ascent a License Fee of $5 Million for Ascent's know-how and licenses, with $1 Million paid at signing of the License Agreement. (Founders Decl., ¶37, citing Ex. G, pg. 6.) The MOU also included Overwatch Defense paying Ascent additional royalties on individual units sold in the future. (Founders Decl., ¶38, citing Ex. G, pgs. 6-7.)

F.     **While the parties' negotiations reflected Overwatch Defense's knowledge and understanding that Ascent owned valuable intellectual property for which Overwatch was willing to pay Millions, Overwatch claimed, in bad faith, that it owned the intellectual property after the Teaming Agreement ended.**

The parties failed to reach agreement with respect to the MOU and License Agreement, and thereafter, on November 26, 2018, Ascent provided written notice to Overwatch Defense that it was terminating the Teaming Agreement. (Founders Decl., ¶39, citing Ex. H.) Having fulfilled its contractual obligations and given termination of the Teaming Agreement, Ascent demanded that Overwatch return the drones and mockups and all confidential and proprietary information. (Founders Decl., ¶40.)

{N6004594}                                    7

By letter dated December 11, 2018, Overwatch Defense – through counsel – took the position that the intellectual property for the coaxial drones and the PHOLOS mockups "belong to Overwatch." (Founders Decl., ¶41, citing Ex. I.) Overwatch Defense's letter also represented: "Certain other of the materials being requested, including the UAVs themselves, have been destroyed as a result of testing." (Founders Decl., ¶42, citing Ex. I)  Ascent responded by rejecting Overwatch's position concerning ownership of the IP and mockups and questioned the veracity of the representation that the UAVs had been destroyed during testing. As to the latter, Overwatch Defense never advised Ascent of any drone destruction and instead Overwatch Defense had recently sought to purchase 15-30 drones for destructive testing. (Founders Decl., ¶43.)

By letter dated January 17, 2019, Overwatch Defense repeated its representation that the drones "have been destroyed" and indicated that it would respond with a further update as to what Overwatch was willing to return. (Founders Decl., ¶44, citing Ex. J.) Thereafter, Overwatch Defense responded to Ascent's continued demands in a letter dated February 4, 2019.  Therein, Overwatch again challenged Ascent's ownership in the IP (even though it had sought to license it for millions of dollars), now claimed two drones were destroyed/wrecked, and entirely refused to return the PHOLOS mock-ups. (Founders Decl., ¶45, citing Ex. K.)

On February 12, 2019, Ascent commenced a lawsuit against Overwatch Defense in the District Court for the District of Connecticut, for breach of contract, conversion, trade secret misappropriation, and patent infringement. (Founders Decl., ¶46, citing Ex. L) On February 15, 2019, Overwatch Defense agreed to return the four PHOLOS mockups and two of the Sprite drones. However, now, Overwatch Defense claimed that one drone was "destroyed during electrical testing internationally; wreckage is located internationally, but Overwatch can

endeavor to recover if so desired." (Founders Decl., ¶47, citing Ex. M.) Overwatch Defense also attested, under oath, that all printed and electronic information defined by the NDA provided by Ascent or derived from Ascent's disclosures had been or will be destroyed. (Founders Decl., ¶48.) Overwatch Defense further promised that it would not use any information provided by Ascent or derived from Ascent's disclosure in any manner in the future. (Founders Decl., ¶49.)

By letter dated March 22, 2019, Overwatch Defense represented that it did endeavor to recover the drone wreckage, but it allegedly could not be returned because it had already been disposed of. (Founders Decl., ¶50, citing Ex. N.) Overwatch Defense further represented that the battery melted into the unit during testing, which would have made shipping impossible even if the wreckage could have been recovered. According to Overwatch, the testing allegedly involved an illumination warhead, and the power was allegedly supplied through a tether causing a fire. (Founders Decl., ¶51, citing Ex. N.)

Finally, in response to Ascent's challenges, Overwatch Defense repeated in a letter dated April 11, 2019, that the UAV "has been destroyed and cannot be retrieved; as such, it is impossible to provide 'photographic evidence.'" (Founders Decl., ¶52, citing Ex. O.) In addition, Overwatch represented that "no other parties were involved in the testing or destruction of the UAV in question." (*Id.*) As a result of these promises and representations, Ascent filed a dismissal without prejudice of the lawsuit on April 24, 2019. (Founders Decl., ¶53.)

**G.** **In a bad faith effort to avoid its obligations to Ascent, Overwatch Defense dissolved and assigned its assets to a newly formed company in the United Kingdom called Overwerx Ltd. with a wholly owned subsidiary called Overwatch Aerospace LTD.**

Only months later, in January 2020, Michael and Hill founded Overwerx Ltd in the United Kingdom. (Founders Decl., ¶55, citing Ex. P.) Overwatch Aerospace LTD was established on February 7, 2020, as a wholly owned subsidiary of Overwerx. (Founders Decl., ¶56, citing

Ex. Q.) Hill was appointed a Director of Overwerx on March 17, 2020. (Founders Decl., ¶57, citing Ex. R.)  On that very same day (March 17, 2020), Hill caused Overwatch Defense to assign its patents to Overwerx according to the records of the U.S. Patent Office. (Founders Decl., ¶58, citing Ex. S.)

On September 25, 2020, the Florida Secretary of Defense administratively dissolved Overwatch Defense for failing to file an annual report for that year. (Founders Decl., ¶59, citing Ex. T.) According to corporate filings, Michael owned 4800 shares of Overwerx, and Hill owned 3700 shares of Overwerx, as of January 13, 2021 (Founders Decl., ¶60, citing Ex. U.)

On August 19, 2021, Hill and Michael organized Overwatch Aerospace LLC in Florida, with a registered address of 505 Brevard Avenue, Suite 104, Cocoa, Florida. (Founders Decl., ¶61, citing Ex. V.)  Public records show that Overwatch Defense's lawyer, Fred Romano, maintains a law office at 505 Brevard Avenue, Suite 104, Cocoa, Florida, which is now the registered address for Overwatch Aerospace LLC. (Founders Decl., ¶62, citing Ex. W.)

**H.     After dissolving Overwatch Defense in hopes of dissolving its obligations to Ascent, the Defendants, Hill, Michael, Overwerx, and Overwatch Aerospace misappropriated Ascent's confidential, proprietary and/or trade secret information, and reverse engineered and replicated Ascent's unique drone technology.**

First, internet research produced the following information:

a.   A posting dated September 23, 2021, was found on the Soldier Systems website, which states that "Overwatch Defense showed their PHOLOS VTOL UAS" at the Edgar Brother stand at DSEi 21. (Founders Decl., ¶63, citing Ex. X.) https://soldiersystems.net/2021/09/23/dsei-overwatch-defense-pholos/

b.   The posting includes a picture of the replicated PHOLOS drone and a placard "Overwatch Aerospace." (Founders Decl., ¶63.)

c.   DSEi 21 was a trade show for the defense community that took place in London England from September 14, 2021 to September 17, 2021. (*Id.*)

Therefore, it now appears that the Defendants replicated Ascent's drone at some point before September 2021. (Founders Decl., ¶64.)

Second, in late spring of 2023, Ascent began collaborative discussions with a company called Sierra Nevada Corporation Mission Systems UK ("Sierra Nevada MS UK"). (Founders Decl., ¶65.) The subject of Overwatch was discussed, and the Managing Director of Sierra Nevada MS UK advised an Ascent employee, first verbally and then in writing, that Overwatch had approached Sierra Nevada MS UK at some earlier unspecified time, and that Sierra Nevada MS UK stopped all discussions with Overwatch because Sierra Nevada had "concerns around reverse engineering." (Founders Decl., ¶66.)

Sierra Nevada MS UK is in England as are Michael, Overwerx and Overwatch Aerospace LTD. (Founders Decl., ¶67.) Therefore, it now appears that after Sierra Nevada MS UK rejected Overwatch's requests to reverse engineer Ascent's coaxial drone, Overwatch found someone else to do so. (Founders Decl., ¶68.)

On or about May 2, 2024, the Overwatch Group announced that it was launching "their unique drone technology" into the US market at SOF 2024, (Founders Decl., ¶69, citing to Ex. Z, Overwatch Press Release). Overwatch Group's website indicates that the system is called "PHOLOS." (Founders Decl., ¶69, citing to Ex. AA, https://www.overwatch-group.uk/aerospace/pholos/.) SOF 2024 is an annual conference for Special Operations Forces, which took place in Tampa, Florida, from May 6, 2024 to May 10, 2024. (Founders Decl., ¶70, citing to Ex. BB, https://www.sofweek.org/.)

Overwatch Group's announcement also included a statement from Drew Michael, the former COO of Overwatch Defense and the current CEO at Overwatch Group, which provided:

[W]e are now well placed to extend our precision strike capabilities to wider markets. We are delighted that US SOF 2024 provides us with this opportunity and we look forward to meeting people at the event.

(Founders Decl., ¶71, citing to Ex. Z)

The Overwatch Group's coaxial drone bomb is not only called "PHOLOS" – the same name as the Teaming Agreement initiative – but the coaxial drone is a studied replica of Ascent's coaxial drone that was part of the Teaming Agreement, the "PHOLOS" initiative. (Founders Decl., ¶72.) While Ascent's drone configuration was found nowhere in the market, it has now been replicated by the Overwatch Group. (Founders Decl., ¶73.) A comparison of Ascent's drone with other coaxial configurations and the replicated "PHOLOS" drone offered by Overwatch Group is found in Appendix B to the Founders Declaration.

Moreover, Overwatch Group knows that it replicated Ascent's drone because it has used images of the Teaming Agreement's PHOLOS drone to market its replicated PHOLOS drone. (Founders Decl., ¶74.) Specifically, Overwatch Defense used information provided by Ascent under the Teaming Agreement to create images of the PHOLOS drone for marketing and promotional purposes. (Founders Decl., ¶75.) Those images are compiled in Appendix C to the Founders Decl.) Now Overwatch Group uses some of the very same images to market the replicated PHOLOS drone. This is detailed in Appendix D to the Founders Declaration and confirms that the Defendants have knowingly misappropriated Ascent's unique drone technology. (Founders Decl., ¶76.)

Finally, Overwatch Group took a non-public specification sheet for Ascent's drone, which Ascent provided to Overwatch Defense, and copied it to create a specification sheet for the replicated PHOLOS drone. (Founders Decl., ¶77.) This is detailed in Appendix E to the Founders

{N6004594}                                                    12

Declaration and further confirms the knowing misappropriation of Ascent's intellectual property by the Defendants. (*Id.*)

## LEGAL ARGUMENT

### I.    Legal Standard for a Preliminary Injunction.

The Court has the authority to issue a preliminary injunction under Fed. R. Civ. P. 65 and its inherent authority. Such relief requires the Court to assess (1) Ascent's likelihood of success on the merits; (2) the irreparable harm Ascent will suffer if the injunction is not granted; (3) the balance of hardships between the parties; and (4) the public interest. *See Sunward Elecs., Inc. v. McDonald,* 362 F.3d 17, 24 (2d Cir. 2004). "Likelihood of success on the merits does not require that the party demonstrate that success is an absolute certainty, rather the party need only show that the probability of his prevailing is better than fifty percent." *United Rentals (North America), Inc. v. Myers*, 2003 WL 23507021, *1 (D. Conn. Apr. 22, 2003) (Citation omitted.). Here, the factors, both individually and collectively, weigh heavily in favor of granting preliminary injunctive relief.

"[T]he court need only find that [Ascent] is likely to prevail on the merits of one of [its] claims to issue the preliminary injunction, provided that the claim is related to the irreparable harm [Ascent] is likely to suffer." *See A.H. Harris & Sons, Inc. v. Naso*, 94 F. Supp. 3d 280, 300 (D. Conn. 2015) (noting plaintiff brought several claims, but court need only find plaintiff was likely to succeed on one to issue preliminary injunction).

Finally, at the preliminary injunction stage, the Court may consider hearsay evidence. *See Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010) (holding the district court committed no error in considering, and relying on, hearsay testimony). Instead of preclusion, the admissibility of hearsay evidence merely goes to the weight at the preliminary injunction stage.

*Id.* The Second Circuit reasoned: "To hold otherwise would be at odds with the summary nature of the remedy and would undermine the ability of courts to provide timely provisional relief." *Id.*

## II.    ASCENT IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS.

### A.    Ascent is likely to succeed on its Breach of Contract claims.

#### 1.    Overwerx, Overwatch Aerospace, and Overwatch Aerospace USA Are Liable for Overwatch Defense's Breach of Contract Pursuant to the Doctrine of Successor Liability.

Government records prove that Overwerx, Overwatch Aerospace and Overwatch Aerospace USA are the successor of Overwatch Defense, and therefore, they are liable for all breaches of the NDA, the Teaming Agreement and the Settlement Agreement (collectively "the Agreements"). Successor liability is important doctrine that elevates substance over form to ensure that corporate liabilities are not evaded through the manipulation of corporate identities. *See Lab. Corp. of America v. Prof. Recovery Network*, 813 So.2d 266, 269 (Fla. 5th DCA 2002); *see also Chicago Title Ins. Co. v. Alday-Donalson Title Co. of Florida, Inc.*, 832 So.2d 810, 815 (Fla. 2nd DCA 2002) ("The key is that there is a change in form, but not in substance"). Imposing liability upon a successor is premised on the notion that no corporation should be permitted to commit a tort or breach of contract and avoid liability through corporate transformation. *See Lab. Corp. of Am. v. Prof'l Recovery Network*, 813 So. 2d 266, 269 (Fla. Dist. Ct. App. 2002).

Under Florida, New York and Connecticut law, successor liability provides four exceptions to the general rule that a corporation that acquires the assets of another is not liable for the debt of its predecessors. These include when the successor (1) expressly or impliedly assumes the obligations of the predecessor, (2) when the transaction is a *de facto* merger, (3) when the successor is a mere continuation of the predecessor, and (4) when the transaction is a

fraudulent effort to avoid liabilities of the predecessor. *Infra-Metals, Co. v. Topper & Griggs Group, Inc.*, 2005 WL 3211385 (D.Conn. 2005) (citing *Ricciardello v. J.W. Gant & Company*, 717 F.Supp. 56, 57-58 (D.Conn. 1989)); *Bernard v. Kee Manufacturing Company, Inc.*, 409 So.2d 1047, 1049 (Fla. 1982); *New York v. Nat'l Svc. Ind., Inc.*, 460 F.3d 201, 209 (2d Cir. 2006), *citing Schumacher v. Richards Shear Co., Inc.*, 59 N.Y.2d 239, 244-45 (1983).

Here, Overwerx, Overwatch Aerospace and Overwatch Aerospace USA are liable under the *de facto* merger, mere continuation, and/or fraud exceptions.

### a) Overwerx, Overwatch Aerospace and Overwatch Aerospace USA Have Successor Liability Under the *De Facto* Merger and/or Mere Continuation Doctrines.

Many jurisdictions, including Florida, New York, and Connecticut, treat the "mere continuation" and "*de facto* merger" doctrines as essentially similar. Both doctrines are applied "in a flexible manner that disregards mere questions of form and asks whether, in substance, it was the intent of the successor to absorb and continue the operation of the predecessor." *Nettis v. Levitt*, 241 F.3d 186, 193-94 (2d Cir. 2001); *Ortiz v. Green Bull, Inc.*, 2011 WL 5554522, at *11 (E.D.N.Y. Nov. 14, 2011) (courts may "read the standard flexibly so that 'other indicia of control over or continuing benefit from the sold assets might ... be sufficient to satisfy the continuity of ownership factor'"); *Patin v. Thoroughbred Power Boats, Inc.*, 294 F.3d 640, 650 (5th Cir. 2002) (applying Florida law and citing *Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623, 630 (11th Cir. 1996). Under both doctrines, the key is a change in form, but not in substance, where there is continuity of management, employees, and ownership between the corporations. *See Chi. Title Ins. Co. v. Alday-Donalson Title Co. of Fla.*, 832 So. 2d 810, 815 (Fla. 2d DCA 2002) ("The key element of a continuation is a common identity of the officers, directors and stockholders in the

selling and purchasing corporation."); *Miller v. Forge Mench P'ship Ltd.*, 2005 WL 267551, at *8 (S.D.N.Y. Feb. 2, 2005).

Here, there is continuity in ownership, management, and assets. The undisputed corporate record shows that Hill and Michael owned and controlled Overwatch Defense, and that they are the same actors who founded Overwerx in January 2020 and established Overwatch Aerospace as a wholly owned subsidiary of Overwerx. Moreover, just like Overwatch Defense, Hill and Michael owned and controlled Overwerx and Overwatch Aerospace. Additionally, Overwatch Defense was dissolved for failure to file an annual report in September 2020, which is mere months after Overwerx and Overwatch Aerospace were formed in January and February 2020. Further, Overwatch Aerospace LLC was organized by Hill and Michael in August 2021, and the registered office for that limited liability company is the law office of Overwatch Defense's lawyer. Finally, leaving no doubt, on March 17, 2020, Hill caused Overwatch Defense to assign patents to Overwerx, while on the very same day, Hill was appointed a Director of Overwerx. Therefore, the undisputed record proves that Overwatch Defense was *de facto* merged with Overwerx, Overwatch Aerospace and Overwatch Aerospace USA, and likewise, Overwerx, Overwatch Aerospace and Overwatch Aerospace USA are mere continuations of Overwatch Defense. Therefore, Overwerx, Overwatch Aerospace and Overwatch Aerospace USA are liable for breach of the Agreements and the wrongful conduct of Overwatch Defense.

**b) Overwerx, Overwatch Aerospace and Overwatch Aerospace USA Must Be Held to Accountable because They Were Created to Shield Overwatch Defense from Liability.**

Overwerx, Overwatch Aerospace and Overwatch Aerospace USA are also liable under the fraud exception of successor liability. To prove successor liability based on the fraud exception, a party must prove that the transaction was entered into fraudulently to escape

liability. *Lumbard v. Maglia, Inc.*, 621 F. Supp. 1529 (S.D.N.Y. 1985) (successor fraud claim properly pleaded where shareholders of company ceased operations, created new entity, and purchased assets of former company). "Fraud" is "a generic term, which is not limited to misrepresentations and misleading omissions, but which embraces all of the multifarious means which human ingenuity can devise and which are resorted to by one individual to gain advantage over another by false suggestions or by suppression of truth." *Mclellan v. Cantrell*, 217 F. 3d 890 (7th Cir. 2000). Consequently, any "surprise, trick, cunning, dissembling [or] any unfair way" that allows a party to obtain its objective, constitutes fraudulent conduct. *Id.*

Here, only months after Ascent entered into the Settlement Agreement with Overwatch Defense, Hill and Michael dissolved Overwatch Defense and transferred its assets to the newly founded Overwerx, Overwatch Aerospace and Overwatch Aerospace USA. The defendants then began their scheme to misappropriate and reverse engineer Ascent's unique technology – approaching Sierra Nevada MS UK to do so and then securing some party to do so after Sierra Nevada MS UK refused to engage in such illegal conduct.  Therefore, the dissolution of Overwatch Defense, the forming Overwerx, Overwatch Aerospace and Overwatch Aerospace USA, and the transfer of the assets to the new entities constitutes a fraudulent scheme, by which the defendants have attempted to escape their promises and obligations to Ascent. For that additional reason, Overwerx, Overwatch Aerospace and Overwatch Aerospace USA are liable under the doctrine of successor liability.

**2.    Defendants Have and Will Continue to Exploit Ascent's Confidential Information in Breach of the Non-Disclosure Agreement, the Teaming Agreement and the Settlement Agreement.**

To establish a claim for breach of contract, a plaintiff must prove (1) the existence of a contract; (2) performance of the contract by one party; (3) breach of contract by the defendant;

and (4) damages resulting from the breach. *Marks v. New York University*, F. Supp. 2d 81, 88 (S.D.N.Y. 1999); *K. Bell & Assocs. v. Lloyd's Underwriters*, 827 F. Supp. 985, 988 (S.D.N.Y. 1993).[1] Ascent can easily prove each element and is therefore likely to prevail on the merits.

First, valid and enforceable contracts exist in the form of the NDA, the Teaming Agreement, and the Settlement Agreement. Second, Ascent has performed fully under the Agreements. Third, the Defendants have breached the Agreements by misappropriating Ascent's confidential information and reverse engineering Ascent's drones. Specifically, the NDA expressly prohibited using or disclosing "Information" and the Defendants agreed to:

> (a) Hold all INFORMATION received from the [Ascent] in strict confidence: (b) Use such INFORMATION only for the purposes of [] evaluating the possibility of forming a joint business; (c) Reproduce such INFORMATION only to the extent necessary for such purpose; ... and (e) not disclose such INFORMATION to any third party, including, but not limited to, any affiliate, vendor, customer, manufacturer, overseas employee or independent contractor.... In addition, with respect to any equipment, component, software, or other items delivered to the Receiving Party by the Disclosing Party, the Receiving Party shall not reverse engineer, dissemble, decompile, or otherwise analyze the physical structure of, any such items.

(*See* Exhibit B.)

In violation of their express contractual obligations, the Defendants have used and plan to continue to use Ascent's Information, including trade secrets, to directly compete with Accent. The Defendants' contractual obligation to keep confidential information in confidence and not reverse engineer Ascent's coaxial drones by its very terms precludes the Defendants from using that Information for their benefit. Notably, the Defendants agreed that "any unauthorized disclosure or use of any INFORMATION in violation of this Agreement will cause the Disclosing Party irreparable injury for which it would have no adequate remedy at law. Accordingly, the Disclosing Party shall be entitled, without the necessity of posting bond or

---

[1] The NDA designates New York law as governing the NDA. (*See* Exhibit B).

other security, to immediate injunctive relieve prohibiting any violation of this Agreement....."

(*See* Exhibit B.) Thus, the element of a breach is satisfied.

Finally, Ascent would clearly suffer damages because of Defendants' breaches. For example, Ascent will suffer: (a) a loss of goodwill and damage to its reputation: (b) a loss of business and market share due to Defendants' unlawful competition; (c) price pressure from a competitor who stole its technology, and (d) the divergence of substantial profits and gains from the unauthorized uses of Ascent's Information. For all of these reasons, Ascent is likely to succeed on the merits of its breach of contract claim.

> **B.     Ascent has a strong likelihood of success on its Trade Secret Misappropriation claims.**

Ascent is also highly likely to prevail under the Federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, and Connecticut Uniform Trade Secrets Act ("CUTSA"), Conn. Gen. Stat. § 35-57(a), given Defendants' possession and use of Ascent's trade secrets.

A "trade secret" is defined by DTSA as follows:

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if-- (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1839(3).

Similarly, CUTSA defines a trade secret as:

> information, including a formula, pattern, compilation . . . method, technique, [or] process . . . that: (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or

{N6004594}                                    19

use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Ct. Gen. Stat. § 35-51(d).

Ascent's trade secrets clearly meet both these definitions. As detailed in the Founders Declaration, Ascent's coaxial drones are designed and built using proprietary technical and confidential information. Ascent, therefore, derives independent economic value from its trade secrets as the foundation of its proprietary drones. Indeed, Overwatch Defense offered to license Ascent's know-how and secrets for over $5 Million. Additionally, Ascent takes measures to ensure the secrecy of its trade secrets, including requiring third parties, like the Overwatch Defense itself, to sign non-disclosure agreements to have access to its information, and by not divulging its trade secrets to anyone who is not obligated to maintain their secrecy. Moreover, Ascent promptly went to Court to ensure Overwatch Defense's compliance with the NDA and Teaming Agreement.

Further, the Defendants' actions meet the definition of "misappropriation" of trade secrets under DTSA and CUTSA. Under DTSA, the definition of misappropriation includes:

(A) *acquisition* of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(B) *disclosure* or use of a trade secret of another without express or implied consent by a person who--

(i) used improper means to acquire knowledge of the trade secret;

(ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was--

(I) derived from or through a person who had used improper means to acquire the trade secret;

(II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or

   (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret;

18 U.S.C. § 1839 (emphasis added).

Similarly, CUTSA defines misappropriation as unauthorized use or disclosure of a trade secret.[2] Both CUTSA and DTSA define "improper means" as including "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." 18 U.S.C. § 1839(6)(a); Conn. Gen. Stat. § 35-51(A). Because Defendants had a duty to maintain the secrecy of Ascent's trade secrets, both Defendants' disclosure of Ascent's trade secrets, as well as Defendants' acquisition and use of Ascent's trade secrets are "misappropriation" under DTSA and CUTSA. *See e.g. Avery Dennison Corp. v. Finkle*, 2002 WL 241284, at *3 (Conn. Super. Ct. Feb. 1, 2002)(granting a temporary injunction under CUTSA because "[a]cquisition of [plaintiff's] trade secret information by [former employee's new employer] and disclosure of the information by [former employee] would constitute misappropriation, in that the information was obtained by [former employee] while he was employed by [plaintiff] and in which he had a duty to [plaintiff] to maintain its secrecy."); *Allstate Ins. Co. v. Fougere*, 2019 WL 4776986, at *24 (D. Mass. Sept. 30, 2019) ("As a matter of law, an individual who breaches contractual duties to obtain trade secrets has used improper means [under DTSA]."). Furthermore, both CUTSA and DTSA

---

[2] "Misappropriation" means: (1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (2) disclosure or use of a trade secret of another without express or implied consent by a person who (A) used improper means to acquire knowledge of the trade secret; or (B) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was (i) derived from or through a person who had utilized improper means to acquire it; (ii) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, including but not limited to disclosures made under section 1-210, sections 31-40j to 31-40p, inclusive, or subsection (c) of section 12-62; or (iii) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or (C) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake. Conn. Gen. Stat. § 35-51(B)

provide for injunctions to prevent "threatened," as well as actual, misappropriation. See Conn. Gen. Stat. § 35-52(a); 18 U.S.C. § 1836(b)(3)(A)(i).

Here, the information misappropriated by Defendants is the culmination of years of work and millions of dollars of investment. *See, e.g., Bancorp Servs., LLC v. Am. Gen. Life Ins. Co.,* 2016 WL 4916969, at *11 (S.D.N.Y. Feb. 11, 2016) (plaintiff demonstrated information was a trade secret upon showing that, among other things plaintiff "spent five years and $10 million to develop the information"); *Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.*, 732 F. Supp. 370, 374 (S.D.N.Y. 1989), aff'd 920 F.2d 171 (2d Cir. 1990) (noting that plaintiff had "expended substantial time and money in trial and error with different formulations" and that the defendants had made "use of the knowledge gained through that 'blind alley' process"). There can be little dispute that Defendants breached the Agreements by using Ascents' trade secrets and proprietary technology to design and launch a competing "PHOLOS" drone. *See KCG Holdings, Inc. v. Khandekar*, 2020 WL 1189302, at *16 (S.D.N.Y. Mar. 12, 2020) (finding a presumption of irreparable harm with regard to a trade secret "is particularly appropriate when information at risk of disclosure is highly technical or can be used only by a few specialized businesses.").

As explained above, Ascent's trade secrets are highly confidential and neither publicly available nor readily ascertainable without access to Assent's confidential information. Indeed, Ascent refused to share its trade secrets with Defendants until it fully protected the confidentiality of such information by entering the NDA. Accordingly, Ascent has established that it is likely to prevail on the merits of its claim against Defendants for the misappropriation of trade secrets.

III.    **The Defendants Have Admitted Irreparable Harm.**

"An injunction should be granted when the intervention of a court of equity is essential to protect a party's property rights against injuries that would otherwise be irremediable." *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 68 (2d Cir. 1999). "The basic requirements to obtain injunctive relief have always been a showing of irreparable injury and the inadequacy of legal remedies." *Id.* Here, Overwatch Defense, and thus the Defendants as its successor, agreed that irreparable damage would occur if the NDA was not honored:

> The parties agree that any unauthorized disclosure or use of any INFORMATION in violation of this Agreement will cause the Disclosing Party irreparable injury for which it would have no adequate remedy at law.

(*See* Exhibit B.)

Such a provision is an admission that irreparable injury will result if an injunction is not entered. *See North Atlantic Instruments, Inc. v. Haber*, 188 F.3d 38, 49 (2d Cir. 1999) (relying on similar clause in determining irreparable injury); *Krispy Kreme Doughnut Corp. v. Satellite Donuts, LLC*, 725 F. Supp. 2d 389, 398 (S.D.N.Y. 2010) (provision in franchise agreement where franchisee acknowledges that violation of particular provision of the agreement would result in irreparable injury to the franchiser constituted "express agreement" that the conduct would cause irreparable injury to the franchisor). Accordingly, consistent with the Defendants' acknowledgement, this Court should conclude that Ascent will be irreparably harmed unless a preliminarily injunction enters.

Moreover, even without the Defendants' contractual agreement, irreparable harm is proven when a plaintiff has asserted that a defendant has breached a contract or misappropriated trade secrets. First, a "breach of contract … in a manner that is directly competitive with [plaintiff's] core business … threatens imminent injury to the economic value of the goodwill

and reputation associated with [plaintiff's] product." *Muze, Inc. v. Digital On-Demand, Inc.*, 123 F. Supp. 2d. 118, 130 (S.D.N.Y 2000). That is exactly the harm that Ascent will suffer because of Defendants' conduct. Among other things, Ascent has been and will continue to be deprived of the exclusive benefit of its years of development work undertaken to design, build, and optimize Ascent's coaxial drone technology. Courts have recognized that "the potential loss of an industry leader's present market and loss of the advantage of being the pioneer in [a] field and [a] market leader, may constitute irreparable harm." *Anacomp, Inc. v. Shell Knob Servs., Inc.*, 1994 WL 9681, *5 (quoting *Computer Assoc. Int'l, Inc. v. Bryan*, 784 F. Supp. 982, 986 (E.D.N.Y. 1992)); *Broker Genius, Inc. v. Volpone*, 313 F. Supp. 3d 484, 496 (S.D.N.Y. May 11, 2018) (quoting *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) ("'[I]rreparable harm through the loss of reputation, goodwill, business opportunities,' or the loss of customer relationships can justify injunctive relief on a breach of contract claim.")

Second, "the Second Circuit has held that the loss of a trade secret is not measurable in terms of money damages because "[a] trade secret once lost is, of course, lost forever." *FMC Corp. v. Taiwan Tainan Giant Indus. Co.*, 730 F.2d 61, 63 (2d Cir. 1984) (per curiam); *Weseley Software Dev. Corp. v. Burdette*, 977 F. Supp. 137, 146 (D. Conn. 1996) (finding irreparable harm results from disclosure of confidential and trade secret information); *Syfact, Inc.*, 2007 WL 9757694, at *6-7 (finding irreparable harm where defendant possessed plaintiff's confidential information, "even if there is some dispute about how much of the information he possesses is truly confidential or proprietary"); *United Rentals (N. Am.), Inc. v. Myers*, 2003 WL 23507021, at *4 (D. Conn. Apr. 22, 2003) (finding irreparable harm because "the potential loss of a trade secret constitutes irreparable harm"). Moreover, the law is clear that an owner of a trade secret is irreparably harmed each day that a trade secret remains in the possession of one who

misappropriated the secret. The reason is that the trade secret continues to be at risk of dissemination and misappropriation. *See IDG USA, LLC v. Schupp*, 416 F. App'x 86, 88 (2d Cir. 2011) ("Threatened dissemination of trade secrets generally creates a presumption of irreparable harm."). For each of these reasons, irreparable harm is established.

Moreover, here, there are additional compelling reasons for irreparable harm. Whereas Ascent was required to invest years and millions of dollars to develop its unique, proprietary technology and confidential information to provide highly technical and specialized drones, the defendants have entered the market with a replicated PHOLO drone in substantially less time. Indeed, Ascent was the exclusive supplier of this critical technology prior to the misappropriation by defendants. Because of the misappropriation, Ascent has lost its exclusive supplier status (*see* Founders' Decl. ¶¶ 78-86), which causes several forms of irreparable harm. For example, the entry of defendants into the market with misappropriated trade secrets will likely result in Ascent losing market share. The loss of market share is not easily quantifiable, and therefore, it is difficult to compensate with monetary damages. In addition, the presence of an additional supplier using misappropriated technology creates downward pressure on prices. Price pressure disrupts the established market dynamics in ways that are complex and multifactorial, making precise calculation of damages nearly impossible.

Finally, Ascent's reputation as the leading and exclusive supplier of this critical technology will be irreparably damaged. Such reputational harm extends beyond immediate financial loss and affects long-term business relationships and brand value, both of which are notoriously difficult to quantify and compensate. The potentially inferior quality of defendants' product exacerbates the harm to Ascent. The market's association of poor drone quality in the coaxial drone category harms Ascent's reputation for excellence and reliability. Customers

encountering substandard coaxial drones are likely to mistakenly attribute the defects to Ascent, leading to loss of customer trust and long-term damage to Ascent's brand.

The combined effect of losing exclusive supplier status, market share, price stability, reputation, and customer trust constitutes irreparable harm because these damages extend beyond straightforward economic loss and touch upon aspects of business sustainability and strategic market positioning. Consequently, whether examined as a breach of contract or misappropriation of trade secrets, defendants conduct will cause is devastating, immediate and irreparable harm to Ascent if defendants are allowed to engage in their pattern of unlawful behavior.

## IV.    THE BALANCE OF HARMS WEIGHS HEAVILY IN FAVOR OF ASCENT AND ANY ALLEGED HARM WAS SELF-INFLICTED.

The evidence set forth above also clearly demonstrates that there are serious questions going to the merits of Ascent's claims. In addition, there can be little doubt that the balance of harms weighs heavily in Ascent's favor. Ascent has far more to lose if a preliminary injunction is not granted than defendants will lose if an injunction issues. In similar situations, where a plaintiff will suffer irreparable harm and a defendant will suffer less or no immediate harm, courts in this Circuit have granted an injunction based upon the balance of hardships. *See Jacobson & Co., Inc. v. Armstrong Cork Co.*, 548 F.2d 438, 445 (2d Cir. 1977) (where continuation of injunction would cause defendant less harm than plaintiff, there was a clear showing of "a balance of hardships" in plaintiff's favor); *see also C.D.S. Inc. v. Bradley Zetler, CDS, LLC*, 691 Fed. Appx. 33 (2d Cir. 2017) (affirming grant of preliminary injunction where plaintiff would suffer loss of business reputation whereas defendant would suffer no harm).

In addition, entry of an injunction will only have the effect of requiring defendants to comply with their contractual obligations; any harm flowing from a requirement to abide by an

existing contractual duty is afforded no weight. *See, e.g., Uni-World Capital L.P. v. Preferred Fragrance, Inc.*, 73 F. Supp. 3d 209, 237 (S.D.N.Y. 2014) ("The injunction that plaintiffs seek would merely bar [defendant] from violating his non-compete agreements. It would not impose any new legal duty on him; instead it would give necessary teeth to an existing contractual duty.").

Furthermore, defendants are fully aware of Ascent's intellectual property ownership and Ascent's willingness to enforce its legal rights. For example, Overwatch Defense offered over $5 Million to license Ascent's intellectual property rights for military purposes. Therefore, there is no doubt that Ascent owns valuable intellectual property. When the parties failed to reach a business agreement, Ascent sued Overwatch Defense for failing to fully honor its obligations under the NDA and Teaming Agreement. That case settled only because of the additional promises and representations by Overwatch and Hill that there was and would be full compliance with the Agreements.

But thereafter, Hill and Michael – likely ignorant of the law of successor liability – schemed to dissolve Overwatch Defense and organize new companies to misappropriate Ascent's intellectual property. Given these circumstances, the defendants cannot be heard to complain that an injunction would be an unfair burden. Any harm to them is self-inflicted. *See, e.g., Leong v. The Goldman Sachs Grp. Inc.*, 2016 WL 1736164, at *3 (S.D.N.Y. May 2, 2016) ("Any harm suffered by Plaintiff is self-inflicted by his own — flagrant and continued — violation of the parties' agreement. . . . Defendant, on the other hand, would face significant hardship if its contractual expectations were ignored. . . ."); *Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 805–06 (3d Cir. 1998) (finding balance of harms favored franchisor because franchisee's difficulties were brought on by its own conduct in continuing to

use marks despite termination of franchise agreements); *see also Clear Channel Outdoor, Inc. v. City of N.Y.*, 594 F.3d 94, 110 (2d Cir. 2010) (finding harm to plaintiffs caused by their violations of City ordinance the result of a "self-inflicted wound").

Considering the defendants' acts were committed knowingly and willfully, they proceeded at their peril, and accordingly, the balance of harms favors entry of a preliminary injunction.

## V.    The Public Interest Favors Injunctive Relief

Finally, the public interest supports a preliminary injunction. "In general, public policy holds competent contracting parties to bargains made by them freely and voluntarily, and requires the courts to enforce such agreements." *Rex Med. L.P. v. Angiotech Pharms. (US), Inc.*, 754 F. Supp. 2d 616, 626 (S.D.N.Y. 2010) (citation omitted); *see also Bank of Am., N.A. v. Won Sam Yi*, 294 F. Supp. 3d 62, 81-82 (W.D.N.Y. 2018) ("'There is a well-recognized public interest in enforcing contracts and upholding the rule of law'....The Court finds that the issuance of this injunction would serve the public interest by holding Defendants to their contractual obligations.") (collecting cases).

In addition, a preliminary injunction supports the public interest where it serves to uphold laws and other obligations requiring the protection of confidential and proprietary information. *See, e.g., Aventri, Inc. v. Tenholder*, No. 3:18-CV-02071, 2018 WL 7348013, at *1 (D. Conn. Dec. 18, 2018) (granting temporary restraining order and observing that "[t]here is a substantial public interest in the protection of … proprietary information as well as the enforceability of contracts"); *Intertek Testing Servs., N.A., Inc. v. Pennisi*, 443 F. Supp. 3d 303, 347 (E.D.N.Y. 2020) (granting preliminary injunction in part and observing that an injunction would serve the

public interest by, inter alia, "protecting plaintiff's legitimate interests in … confidential information").

Furthermore, granting a preliminary injunction is in the public interest in this case because it serves to protect national security. The trade secrets at issue involve technology with direct ties to national security because these drones are used for military purposes. Indeed, there is an enhanced focus on military use of drones given the war in Ukraine and Ascent's drone technology has passed the DIU's rigorous testing for military applications. (Founders' Decl., ¶¶78-85) If the defendants are not enjoined, there exists an unacceptable risk that Ascent's technology could be sold to governments or entities hostile to the United States, thereby compromising national security. The loss of control over such sensitive technology would have significant consequences for national defense and could significantly impair the United States' strategic advantage. Ensuring that such technology remains secure is paramount and aligns with the public's interest in maintaining national security.

Consequently, a preliminary injunction prohibiting defendants from further disclosing and using the confidential property of Ascent serves the public interest.

## VI.    The Equities in this Case Favor No Bond or a Nominal Bond.

Federal Rule of Civil Procedure 65(c) provides that "[t]he court may issue a preliminary injunction only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The Rule vests the district court with wide discretion in the matter of security. *See Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996). The district court may dispense altogether with the filing of a bond where there has been no proof of likelihood of harm. *Ferguson v. Tabah*, 288 F.2d 665, 675 (2d Cir. 1961). Notably, the defendants explicitly agreed

in the NDA that Ascent "shall be entitled, without the necessity of posting of bond or other security, to immediate injunctive relief prohibiting any violation of this Agreement...." (*See* Exhibit B.)

Due to the likelihood of success on the merits and each of the other equitable factors discussed above, including defendants' wanton disregard for contractual and statutory obligations, the Court should exercise its discretion to require no bond in this case. *See Clarkson Col. v. Shaheen*, 544 F.2d 624, 632 (2d Cir. 1976) ("[B]ecause, under Fed. R. Civ. P. 65[c], the amount of any bond to be given upon the issuance of a preliminary injunction rests within the sound discretion of the trial court, the district court may dispense with the filing of a bond.") (citations omitted).

## CONCLUSION

For the foregoing reasons, the Court should grant Ascent's motion for preliminary injunction and enjoin defendants, along with each party's officers, directors, principals, agents, servants, employees, successors, assigns, attorneys, and all other persons who are in active concert or participation with any one of them, from:

1.    Making, marketing, offering to sell and/or selling the PHOLOS drone;

2.    Using and/or disclosing Ascent's confidential, proprietary and/or trade secret information related to Ascent's coaxial drones;

3.    Using, publishing and/or republishing images of Ascent's drone and/or images derived from Ascent's confidential and proprietary information in its promotion of Overwerx, Overwatch Aerospace and/or Overwatch Aerospace LLC, or the PHOLOS drone; and

4.    Using, publishing and/or republishing PHOLOS product specification sheets that substantially copy, and/or are derived from, Ascent's product specification sheets.

5.    Turn over to the Court Ascent's drones, equipment, and confidential, proprietary and/or trade secret information, including documents, files and/or computer files that are in their possession or control.

{N6004594}                                              30

6. Turn over to the Court all PHOLOS drones that were created by reverse engineering, disassembling, decompiling or otherwise analyzing the physical construction of Ascent's drones, or using Ascent's confidential, proprietary and/or trade secret information.

7. A mandate that Defendants formally instruct, in writing, all third parties who (i) reverse engineered, disassembled, decompiled or otherwise analyzed the physical construction of Ascent's drones, (ii) replicated Ascent's coaxial drone, or (iii) who were afforded access to Ascent's drones, equipment, and/or confidential, proprietary and/or trade secret information:

   a) To not use, exploit or disclose any Ascent drone, equipment or information, or any information derived from such equipment, drones or information at any time for any reason in the future;

   b) To turnover to the Court, for accounting and destruction, Ascent drones, equipment, and confidential, proprietary and/or trade secret information, including documents, files and/or computer files in their possession or control; and

   c) To turnover to the Court, for accounting and destruction, all drones, including PHOLOS drones, that were created by reverse engineering, disassembling, decompiling or otherwise analyzing the physical construction of Ascent's drones, and/or by using Ascent's confidential, proprietary and/or trade secret information.

{N6004594}

31

Dated:  June 21, 2024

Respectfully submitted,

THE PLAINTIFF,
ASCENT AEROSYSTEMS, INC.

/s/ John R. Horvack, Jr.
John R. Horvack, Jr.
Federal Bar ct12926
Fatima Lahnin
Federal Bar ct24096
Damian K. Gunningsmith
Federal Bar ct29430
Meghan F. Buckley
Federal Bar ct31490
Carmody Torrance Sandak & Hennessey, LLP
195 Church Street
P.O. Box 1950
New Haven, Connecticut 06509-1950
Tel:  203-777-5501
Fax:  203-784-3199
jhorvackjr@carmodylaw.com
flahnin@carmodylaw.com
dgunningsmith@carmodylaw.com
mbuckley@carmodylaw.com

*Attorneys for Ascent AeroSystems Inc.*

{N6004594}

32