# EXHIBIT A

**COMMERCIAL TEAMING AGREEMENT**

ASCENT AEROSYSTEMS INC.

OVERWATCH DEFENSE LLC

## A.    BASIS OF THE AGREEMENT

This non-exclusive Teaming Agreement (hereinafter referred to as the "Agreement"), entered into by Ascent AeroSystems Inc., a Delaware corporation having a principal office at 235 Harrison Street, Syracuse, New York 13202, and Overwatch Defense LLC, a Florida limited liability company having a principal office at 1301 Gleneagles Lane, Davenport, Florida 33896, herein referred to as "Overwatch" (may hereinafter be referred to collectively as the "Parties" or individually as a "Party"), concerns the Parties' pursuit of various potential business opportunities hereinafter referred to as "Business Initiatives".  It is anticipated that efforts relating to specific Business Initiatives, identified in Exhibit I, will ultimately result in contract(s) between the Parties.

The Parties agree as follows:

## B.    DEFINITIONS

1.    "Customer" means one who buys goods and/or services.

2.    "Teaming Arrangement" means the business relationship between Ascent and Overwatch, established pursuant to this Agreement.

3.    "Workshare" means allocation of work between the Parties developed by the Parties as each initiative is developed.

4.    "Business Initiative" means a bona-fide business opportunity described by a Statement of Work and with potential customers or markets identified and a general statement of the roles envisioned for each Party.  The Party proposing the Business Initiative pledges to expend effort to research, develop, and otherwise pursue that Business Initiative.

## C.    PURPOSE AND FORMATION OF TEAMING AGREEMENT

The purpose of this Agreement is to establish a teaming relationship by aligning resources between the Parties for the express purpose of pursuing specific Business Initiatives.  Nothing in this Agreement shall constitute, create, give effect to, or otherwise imply a joint venture, pooling arrangement, partnership, or formal business organization of any kind.  The Parties shall remain independent contractors at all times, and no Party shall act as the agent for the other.  The rights and obligations of the Parties shall be limited to those expressly set forth herein.  Nothing herein shall be construed as providing for the sharing of profits or losses arising out of the efforts of either or both of the Parties.

Neither Party will be liable to the other for any of the costs, expenses, risks, or liabilities arising out of the other's efforts in connection with the performance of this Agreement. The Teaming Agreement shall apply only to opportunities specifically agreed to by the Parties on a case-by-case basis. The Parties shall identify, in Exhibit I, any projects in which the Parties are potentially discussing teaming arrangements pursuant to this agreement. For each of the projects identified in Exhibit I, the Parties shall seek to work toward a mutually acceptable agreement, for a period not to exceed two years from the date of this agreement for each project. Unless and until a business agreement between the Parties is reached for any the projects identified in Exhibit I, there shall be no obligation to partner with the other party or to provide remuneration or otherwise provide compensation to the other party. No modification to this Agreement may be made without the consent in writing of all Parties hereto.

**D.     TERM, TERMINATION AND BREACH OF THIS AGREEMENT**

1) This agreement, except for Section H, shall expire 2 years from the date of this agreement with year to year options thereafter unless terminated earlier by one of the following events:

   a) Written agreement by the Parties to terminate this agreement, or

   b) If any team member petitions for bankruptcy or reorganization under bankruptcy laws, or makes an assignment of the benefit of creditors, or

   c) The Government's debarment or suspension of any team member which would preclude any team member's participation in contracts with the Government, or

   d) By written notification by either party.

2) If any Party breaches or defaults any of the provisions of this Agreement, the other Parties may provide written notice of such breach in accordance with the NOTICES provision of this agreement. If said Party does not cure its performance within 15 days from the date it receives notice, then any time after the expiration of such cure period, the non-breaching Party may give written notice to the other(s) of its election to terminate this Agreement. Should there be any dispute arising under or related to this Agreement, such dispute may be resolved as provided under provisions of the Alternate Disputes Resolution process as defined by this Agreement.

3) In the event that this Agreement is terminated, any contracts or subcontracts resulting from efforts under this Agreement shall remain in effect, subject to the terms and conditions therein.

**E.     PARTIES RESOURCES**

Contracts that result from a Business Initiative will express the responsibility of each Party for providing the resources necessary to perform the contract.

**F.     MARKETING EFFORT**

1) Roles

   a) During the course of this Agreement, the Parties shall be responsible for and reasonably cooperate in planning and executing the Business Initiatives. Both Parties shall share marketing

intelligence and shall identify specific opportunities and determine appropriate strategies to acquire contracts for the Business Initiatives under this Agreement.

b) Parties shall use their best efforts to secure prime contracts for the Business Initiatives and Parties shall support and assist each other in securing subcontracts for the defined Business Initiatives.

2) Marketing Expenses

Each Party shall be solely responsible for their own marketing expenses. Both Parties will make their best efforts to have personnel available for presentations, meetings, site visits, and other activities pursuant to the Business Initiatives.

3) Status Information

Each party shall keep the other party informed as to the status of all marketing and sales issues, activities, and opportunities relating to potential Business Initiatives during the term of this Agreement.

4) Advertising and Publicity

Publications or releases to news media or to the general public, including commercial advertising relating to this teaming agreement shall require all Parties' prior written notice as well as approval by all Parties.

5) Service Names and Logos

Use of service names and logos shall be coordinated between the Parties and require the agreement of the Parties.

## G.    OWNERSHIP OF TECHNOLOGY/RIGHTS IN INVENTION PATENTS, COPYRIGHTS AND TRADE SECRETS AND OTHER INTELLECTUAL PROPERTY

1) Each Party shall own rights to any technology it independently develops or has already developed.

2) Each Party agrees to provide to the other Party all of the proprietary information as it relates to each customer contract when the technology is released to either Party.  This agreement shall be modified with an attached addendum to reflect the technology released.

3) Each Party shall mark all independently owned proprietary materials with designation of "proprietary" prior to the release to either Party.

4) No transfer, grant or license of rights under any patent or copyright or to any proprietary information or trade secret is made or is to be implied by this Agreement.

## H.    CONFIDENTIALITY AND NON-DISCLOSURE

1) Non-Disclosure

The Parties agree to be bound by the terms of the existing Non-Disclosure Agreement between the parties, dated 27 September 2017.

2) Applicable Law

This Agreement shall be construed, interpreted, and enforced in accordance with the laws of the State of New York.

## I.     WARRANTIES

Each of the Parties agrees to perform their responsibilities under this Agreement and any contract resulting from Business Initiatives consistent with good commercial practices.  No other warranties, expressed or implied, will be provided by the Parties to the customers under said agreement unless otherwise agreed to by the Parties.

## J.     SET-UP AND TRAINING

If set-up and training is required, the Parties shall mutually decide which party shall be responsible for operation set-ups and training of personnel in order to perform any contracts resulting from this Agreement.   Training may be conducted at any of the Parties' sites depending on the nature of the training.

## K.     TRAVEL EXPENSES

All Parties shall be responsible for their own travel expenses under this agreement.

## L.     EQUIPMENT/MATERIALS

For each Business Initiative, the Parties will identify the equipment and materials required as this information becomes known.  Responsibility for the provisioning of the required equipment and materials will be decided by the Parties as part of contract negotiations.

## M.     PROPOSAL ACTIVITIES AND ISSUES

1) Prime Contract Proposals

The Parties will agree upon which party shall be responsible for preparation of proposals to the customer.  Each Party shall provide support and assistance as may reasonably be requested by the other Party.

2) Prime Contract Negotiations

Prime Contract negotiations shall be the primary responsibility of the Party who has been mutually agreed to be the prime contractor, or who has been mutually agreed to negotiate the prime contract.  The Parties agree to support each other as may be reasonably required by either Party.  The Parties agree to keep each other reasonably advised as to the status of any prime contract

negotiations.  In the event that the Prime Contract customer requests clarification and/or changes that impact a Party's portion of the proposal, that Party agrees to promptly respond to same.

## N.    ALTERNATIVE DISPUTE RESOLUTION

The Parties to this agreement agree to attempt in good faith to resolve any conflicts disputes, or claims arising out of this Agreement by negotiation between senior executives.  If applicable, Parties agree to consider the utilization of Alternative Dispute Resolution (ADR) procedures in situations concerning disputes between the Parties.

## O.    NOTICES

Any notice, demand, request, statement or other writing required or permitted by this Agreement shall be deemed to have been sufficiently provided when received by confirmed telephonic facsimile or sent via registered mail as follows:

Ascent AeroSystems Inc.            Overwatch Defense LLC
Attn: Chief Commercial Officer     Attn: Jeffrey Hill
235 Harrison Street MS14           1301 Gleneagles Lane
Syracuse, NY 13202                 Davenport, FL 33896

## P.    SELLING TO THIRD PARTIES

In no event does this Agreement limit or restrict the rights of the Parties in quoting, offering to sell or selling to others, any items/services or standard regularly offered products/services not specifically stated in this Agreement.   This Agreement is intended to protect the Business Initiatives arising from the combined efforts of the Parties and proprietary or confidential information of this Teaming Agreement.

## Q.    ASSIGNMENT OF AGREEMENT

This agreement may not be assigned or otherwise transferred by any party in whole or in part without the express prior written consent of the other parties.  In the event any Party shall change its corporate name or merge with another corporation, assignment shall be mutually agreed upon by all Parties.

This agreement shall be effective upon execution by all Parties.

| | For Ascent AeroSystems: | For Overwatch Defense: |
|---|---|---|
| Sign: | Peter Fuchs 2017.11.15 08:28:42 -05'00' | |
| By: | Peter Fuchs | Jeffrey Hill |
| Title: | Cofounder | President & CEO |
| | | |
| Address: | Ascent AeroSystems Inc. 235 Harrison Street MS14 Syracuse, NY 13202 | Overwatch Defense LLC Jeffrey Hill 1301 Gleneagles Lane Davenport, FL 33896 |
| Date: | 12 November 2017 | 12 November 2017 |

**EXHIBIT I - BUSINESS INITIATIVES**

This Exhibit represents the project(s)s currently being pursued by the Parties pursuant to this Teaming Agreement. Unless and until a business agreement is reached between the Parties regarding the identified project(s), there is no obligation by either party to provide remuneration or compensation to the other party. Any business agreements agreed by the Parties shall specify the arrangements between the Parties for each project identified.

**INITIATIVE 1: "PHOLOS" KINETIC UAS COAXIAL WEAPON SYSTEM**

**A.    Scope & Purpose**

A Small Unmanned Aerial System (UAS) Including a coaxial vehicle, explosive warhead, onboard imaging system, ground control station(s) and software necessary for remote operation and real-time remote viewing. It includes the 360-degree camera (Thermal and/or HD), mounting hardware, wiring, antenna, data transmitters and receivers, and any other components required for operation according to the UAS Design Specifications.

**B.    Definitions**

**Mission Equipment**: All of the necessary airborne and ground-based hardware and software necessary for the Payload to operate in accordance to the UAS Design Specifications, excluding those that are required for a mission with another payload or a mission with no payload.

**Payload**: The hardware that is attached to the Vehicle for the purpose of completing a mission, excluding the Vehicle.

**UAS Design Specifications**: (This needs to be established...includes dimension, performance, environmental limitations, etc., for the Vehicle and the Mission Equipment.)

**Vehicle**: The aircraft, including all hardware and software necessary to operate it according to the UAS Design Specifications. The Vehicle excludes the Mission Equipment.

**C.    Statement of Work**

The Parties agree as follows to develop the hardware and software necessary to meet the UAS Design Specifications.

    a) By Ascent
        i) Hardware
            (1) A customer-ready Vehicle capable of carrying the Payload, as defined above
            (2) A Basic Ground station(s) required to operate the Vehicle, excluding the Mission Equipment
            (3) The mechanical interface required to attach the Payload to the Vehicle
        ii) Software

(1) Flight control software necessary to operate the Vehicle in manual and automated guidance modes, excluding the Mission Equipment.  Models required include:
  (a) APM/Pixhawk
b) By Overwatch
  i) Hardware
    (1) Warhead, including all trigger, fuse and safety components
    (2) A 360-Degree Camera and all necessary Payload hardware
    (3) An Advanced Ground Station necessary to operate the Mission Equipment
  ii) Software
    (1) Command, control and communications software required to operate the Mission Equipment and view the 360-degree imagery on the Basic and Advanced Ground Control Stations
    (2) Software for targeting, arming and recall of the explosive payload

## D.    PRICING & MINIMUM ORDER QUANTITIES

a) Each Party will establish a "Teaming Agreement Price" for each element of their respective Workshare
b) The other Party will be required to purchase a Minimum Order Quantity each quarter during the Term of the Agreement
c) The pricing and MOQ will be revised quarterly as necessary

## E.    RETAIL PRICING

a) The Parties will agree on a Resale Price List for the products and services to be sold under this Initiative.
b) Each Party will establish a Resale Price for each component or subassembly that may be required by customers as accessories or for repair.
c) The Parties will establish standard bundling options.
d) A Minimum Authorized Resale Price and bundling will also be established

## F.    CUSTOMER RELATIONSHIPS & PROCEEDS OF SALES

a) Each Party will be the Prime Contractor for the opportunities it identifies.  Once an opportunity is identified, each Party will notify the other of the organization, principal contact and the nature of the opportunity.

b) Each Party will keep the proceeds of the sales for which they are the Prime Contractor.

c) The Parties will establish a common CRM platform with which to share pursuit data in real time, and agree to communicate regularly to ensure alignment.

d) Upon execution of this Agreement, each Party will provide an initial list of accounts for which it has existing relationships that can reasonably be expected to opportunities for future sales of products and services under this Business Initiative.

e) If two or more separate opportunities are identified with a common parent organization, the Parties will confer to determine how best to proceed.

    i) In the event that it is determined that the separate opportunities are best kept separate, each Party will retain Prime Contractor status with the entity in each opportunity

    ii) In the event that it is determined that the opportunities are best merged into a single pursuit, the Parties will determine which shall be the Prime Contractor.  The Parties agree to share the profit of the combined opportunities proportionally, based on the Teaming Agreement Pricing for the resulting sale.

f) To prevent confusion and channel conflicts, the parties agree to review the need to establish territories or other areas of sales responsibility as necessary if and when the need arises.

## G.    SHIPPING, SERVICE & SUPPORT

a) Product shipments to customers will be made by Overwatch.

b) To allow each Party to remain the primary point of contact for each customer, each Party will service its respective workscope on behalf of the other Party as if the other Party was a retail customer.   Repairs and other services will include an administrative discount from one Party to another to ensure retail customers would have the same support pricing whether they would go directly to one Party or the other.