# EXHIBIT F

**From:** Peter Fuchs <peter@ascentaerosystems.com>
**To:** Peter Fuchs <peter@ascentaerosystems.com>
**Subject:** Fwd: License Agreement
**Date:** Tue, 18 Sep 2018 22:30:49 +0000
**Importance:** Normal
**Attachments:** final_Ascent_-_Overwatch_License_Agreement_Track_Changes_09.18.2018_(JHFR).docx
**Inline-Images:** small_si_block_defense.jpg

---

---------- Forwarded message ---------
From: **Jeff Hill** <jeff@overwatch-defense.com>
Date: Tue, Sep 18, 2018 at 5:08 AM
Subject: License Agreement
To: Peter Fuchs <peter@ascentaerosystems.com>
Cc: Andrew Michael <drew@overwatch-defense.com>

Peter,

Please find attached the final version of the License Agreement for your review.

For some reason it is not showing all edits so you may have to merge with old doc. But I thin better to read with fresh eyes.

Let me know if you have any other questions. MOU, etc… still incoming to you

Best

Jeff



(W): (888)698-1333
(M): (321)506-8770
jeff@overwatch-optics.com
www.overwatch-optics.com

**Jeff Hill**
Chief Executive Officer
1301 Gleneagles Lane
Davenport, FL 33896

### LICENSE AND MANUFACTURING AGREEMENT

This LICENSE AND MANUFACTURING AGREEMENT (this "Agreement") is effective this 28th day of August, 2018 (hereafter, the Effective Date) by and between Ascent AeroSystems, Inc., a Delaware corporation whose principal office is at 235 Harrison Street, Syracuse, New York 13202 ("Licensor"), and Overwatch Defense LLC., a limited liability company established under the laws of the State of Florida, whose principal office is at 1301 Gleneagles Lane, Davenport, FL 33896 USA ("Licensee"), (Licensor and Licensee are hereinafter collectively referred to as the "Parties," and each individually as a "Party.")

### RECITALS

**WHEREAS**, Licensor and Licensee desire to enter into a licensing and technology transfer arrangement , wherein Licensee shall be granted certain rights to manufacture, distribute and sell Licensed Products (as hereinafter defined) on the terms and conditions set forth herein.

**NOW, THEREFORE**, to effectuate the foregoing objectives, Licensor and Licensee agree to the following terms and conditions.

### AGREEMENT

### ARTICLE 1: DEFINITIONS

The following definitions of terms apply in this Agreement:

1.1 "Affiliate" means, with respect to any particular Person any other Person controlling, controlled by or under common control with such particular Person where "control" means the possession, directly or indirectly, of power to direct the management and policies of a Person whether through the ownership of voting securities, contract, family relationship or otherwise.

1.2. "Agreement" shall mean this Agreement.

1.3. "Automatic Renewal Targets" shall have the meaning given in Section 7.3 of this Agreement.

1.4. "Commercially Reasonable Efforts" means a commercially reasonable effort that a person would undertake to perform an obligation.

1.5. "Contract Year" means any given twelve (12) consecutive month period beginning with the Effective Date or any one-year anniversary of the Effective Date in either the Initial Term or a Renewal Term of this Agreement as defined in Section 7.1 hereof. For example, the first

Contract Year commences on the Effective Date and the second Contract Year commences twelve months after the Effective Date.

1.6. "Copyrights" means all registered and unregistered copyrights, copyrightable works, mask works, and writings and other works of authorship embodied in tangible form, in any Licensed Product, owned or controlled by Licensor during the Term in any jurisdiction, including any applications relating to any of the foregoing, as applicable, and any renewals of any of the foregoing.

1.7. "Force Majeure Event" means any natural disaster, decree of a governmental body  or any action(s) or occurrence(s) such as a storm, flood, or other act of God, fire, explosion, riot, war or civil disturbance, embargo and other governmental actions or regulation which, absent such Party's negligence or intentional misconduct, prevents or prohibits either party from performing an obligation under this Agreement.

1.8. "Improvement(s)" shall mean any enhancement, improvement, modification, derivative work or redesign relating to, or based on, a Licensed Product, or a method or process of manufacture or production of a Licensed Product.

1.9. "Indemnified Parties" has the meaning given in Section 10.1 of this Agreement.

1.10. "Indemnifying Parties" has the meaning given in Section 10.1 of this Agreement.

1.11. "Initial Term" has the meaning given in Section 7.1.

1.13. "Know-how" means all unpatented technical information, knowledge, know-how and data, including trade secret information, owed by or under the control of Licensor, useful or necessary to enable Licensee to manufacture Licensed Products in accord with all manufacturing specifications or product specifications provided by Licensor.

1.14. "Licensed Intellectual Property Rights" means collectively, all rights in Copyrights, Know-how and Patents licensed by the Licensor to the Licensee under this Agreement.

1.15. "Licensed Products" means those products referenced in Section A of Exhibit A of this Agreement, as such Section may be amended by the Parties from time to time.

1.16. "Licensee Confidential Information" means any and all information which concerns or relates to the business of the Licensee and is, for any reason, identified as, or otherwise treated as, confidential by the Licensee.

{W3038003;3}                                         2

1.17. "Licensor Confidential Information" means any and all information descriptive of the Licensed Products, including the Product and Process Documentation which concerns or relates to any aspect of the Licensed Products or the business of the Licensor and is, for any reason, identified or otherwise treated as confidential by Licensor,  except such information which the Licensee can prove was: (a) in the public domain prior to the Effective date of this Agreement; (b) became publicly known after Effective Date of this Agreement through no fault of Licensor; (c) was known and documented by Licensee prior to the start date of this Agreement, and with respect to which Licensee was not and is not under any obligation of confidentiality; or (d) was disclosed to Licensee, without restriction on disclosure or use, by a third party which is not under any obligation of confidentiality to Licensor.

1.18. "Patents" shall mean any and all patents and patent applications, related to Licensed Products, owned or controlled by Licensor during the Term in any jurisdiction, including, without limitation, (i) the patents and patent applications (and all patents issuing therefrom) listed on Exhibit D of this Agreement and; (ii) any continuing applications thereof including provisional, continuations, continuations-in-part, reissued and reexamined patents; and (iii) all corresponding foreign patents or patent applications.

1.19 "Person" means any individual or legal entity, including a partnership, joint venture, limited liability company, corporation or trust, any unincorporated organization, a group, or any government or department or agency thereof.

1.20. "Product and Process Documentation" means any and all documentation in the possession of Licensor (i) defining the Licensed Products or (ii) necessary or useful to facilitate manufacture of the Licensed Products in conformity with Licensor's specifications, including bills of material, approved vendor lists (AVLs), CAD files, assembly drawings, line layouts, process documentation, quality and inspection plans, test processes, all specifications and all packaging requirements.

1.21. "Renewal Term" has the meaning given in Section 7.2.

1.22. "Renewal Year" has the meaning given in Section 7.2.

1.23. "Royalty" means a running royalty payment for each Unit Transferred according to Exhibit B attached to this Agreement.

1.24. "Sales Report" has the meaning given in Section 4.2 of this Agreement.

{W3038003;3}                    3

1.25. "Sold" shall have the meaning given in Section 1 of Exhibit B.

1.2 **"Sublicense"** means any sublicense granted under the licenses granted Licensee herein.

1.26. "Term" means the time period during which this Agreement is effective, as set forth in Article 7, and includes the Initial Term and, when applicable, the Renewal Term.

1.27. "Territory" means the geographic area(s) in which this Agreement shall be effective, as set forth in Exhibit A hereto.

1.28. "UAV" means an unmanned aerial vehicle.

1.29. "Unit" means a single Licensed Product.

**"Unit Transferred"** means any Licensed Product sold, leased or otherwise transferred or put into use by Licensee or a Sublicensee, and Units Transferred refers to more than one Unit Transferred.

1.30. "Work" means all labor, equipment, materials, methods, engineering and services required by or reasonably inferable from this Agreement, and the exercise of its rights and carrying out of all obligations imposed by this Agreement.

## ARTICLE 2: LICENSE GRANTS

2.1(a). Patent License. Subject to the terms and conditions of this Agreement, Licensor hereby grants to Licensee a worldwide exclusive, non-transferable, non-assignable license, including the right to sublicense others, to use the Licensed Intellectual Property to make, have made, use, sell, offer to sell and promote the Licensed Products in the Territory; the foregoing license shall include non-exclusive rights to develop or produce improvements.

2.1(b). Other Licenses. Subject to the terms and conditions of this Agreement, Licensor hereby grants to Licensee a worldwide exclusive, non-transferable, non-assignable license, including the right to sublicense others, in the Copyrights and Know-how to use the Licensed Intellectual Property to make, have made, use, sell, offer to sell and promote the Licensed Products in the Territory; the foregoing license shall include non-exclusive rights to develop or produce improvements.

2.2. License Term. All licenses granted in this Article 2 shall be for the Term of this Agreement, unless earlier terminated as set forth herein.

{W3038003;3}                    4

2.4. Branding. Except as reasonably requested by Licensor, no Licensed Products marketed, promoted and Sold by Licensee or any Sublicensee shall be marketed, promoted and Sold under Licensor's branding or trademarks in use as of the Effective Date, including any advertising or marketing materials of Licensee relating to the Licensed Products and no related packaging of Licensee or any Sublicensee for the Licensed Products shall contain or bear any branding or trademarks of Licensor, or any marks that are confusingly similar to any branding or trademarks of Licensor.

2.5. Licensee's Duty to Not Authorize Third Party Use of Licensed Intellectual Property. Except to the extent consistent with the terms set forth in this Article 2, Licensee shall not authorize use of the Licensed Intellectual Property Rights by any third party.

2.6. Compliance with Law. In connection with its performance hereunder, Licensee agrees not to make any payment or gift to government officials or employees in violation of local laws or the United States Foreign Corrupt Practices Act. In addition, the Parties shall comply with all applicable export laws and regulations (including U.S. export laws and regulations) in connection with the Licensed Products and each Party agrees that it will obtain all necessary licenses or approvals from the U.S. Government prior to the: (i) transfer, export or re-export, directly or indirectly, of any Licensed Products or technical data or any direct product of that technical data, or (ii) disclosure of any technical data acquired from Licensor to any Third Country National, which shall mean any person or company who is a citizen or permanent resident of any country that is subject to U.S. economic sanctions or that is subject to restrictions under the U.S. Export Administration Regulations. Licensee will obtain Licensor's written consent for any re-export or re-transfer of Licensed Products and/or technical data, as well as for any disclosure of technical data to a Third Country National. Under no circumstances may Licensee export or re-export any Licensed Products or technical data to countries, persons, or entities that are subject to U.S. economic sanctions or that are subject to restrictions under the U.S. Export Administration Regulations. Countries subject to broad economic sanctions on the Effective Date include Cuba, Iran, Libya, North Korea, Sudan and Syria. Each Party shall comply with any and all laws, rules and regulations applicable to such Party, except to the extent noncompliance therewith could not materially and adversely affect such Party, its obligations under this Agreement, its respective business or its respective financial position.

**Commented [FR1]:** Please clarify this sentence.

## ARTICLE 3: MANUFACTURING, QUALITY AND STANDARDS

3.1. As a condition for receiving license fees under Section 5 herein:

(i) Licensor shall make all commercially reasonable efforts to deliver to Licensee within one week after the Effective Date all Product and Process Documentation in Licensor's possession, including all product specifications, all manufacturing documentation, and all software associated with operation of all Licensed Products, in the form of both object code and source code, in as complete form as possible to enable Licensee, Sublicensees and contractors to manufacture the Licensed Products; and

(ii) Licensor agrees to share all Know-how in the possession of Licensor and its employees to facilitate efficient, cost effective and successful manufacture of Licensed Products in accord withal manufacturing and product specifications.

3.2 Licensor agrees to meet with Licensee and its representatives to transfer all Know-how and facilitate successful fabrication and evaluation of Licensed Products, including Vehicle 1 and Vehicle 2 as identified in Exhibit C.

3.3. High Standards of the Licensed Products. Licensee shall make Commercially Reasonable Efforts to maintain the high-quality standards of the Licensed Products, in accord with all specifications, in all aspects of manufacturing, advertising, packaging and promotion of the Licensed Products. Licensee shall ensure that the manufacturing, advertising, packaging and promotion of the Licensed Products are carried out in accordance with the relevant laws, standards, regulations, rules and codes of practice valid for the Licensed Products in the Territory. Licensee agrees that, with respect to all Licensed Products manufactured or Sold by it, the same will be of high-quality workmanship, fit, design and materials used therein, and shall be at least equal in quality, workmanship, fit, design and materials to the samples of Licensed Products approved by Licensor pursuant to this Agreement.

3.4. Changes. Licensor shall have the right to make reasonable changes in the Product and Process Documentation of the Licensed Products.

3.5. Licensor's Duty to Provide Samples. Licensor shall prove at least two samples of the Licensed Product to the Licensor. All such samples shall be dated and kept at the Licensor's facilities.

{W3038003;3}                                    6

3.6. Objection to Manufacturing Location. Licensee shall inform Licensor of all intended countries in which Licensee or Sublicensees will manufacture or have manufactured the Licensed Products, and Licensor may object to a location of manufacture based on whether there is, at the time, an embargo by the U.S. Government in a country of proposed manufacture. To the extent there is such an embargo, Licensee shall respond to Licensor's objection by either (i) not going forward with such manufacture or (ii) by providing Licensor an opinion of counsel showing that the planned manufacture and sale of Licensed Products shall not be in violation of the embargo.

## ARTICLE 4: SALES AND MARKETING

4.1. Sales/Marketing and Production Plans. On the dates marking the commencement of the first and third quarters of each Contract Year during the Term, Licensee will submit to Licensor, for Licensor's review, a schedule showing in reasonable detail the projected sales and marketing plans for each of the Licensed Products for each of the next two quarterly periods (the "Sales Plan"). Licensee shall use Commercially Reasonable Efforts to comply with the Sales Plan. Some information may be redacted from the Sales Plan for National Security purposes (e.g., names of countries or customers).

4.2. Sales Reports. Within sixty (60) calendar days after the end of each quarter within a Contract Year, Licensee shall provide to Licensor a detailed listing of all sales made by Licensee and each Sublicensee of Licensed Products, broken out by Licensed Product, customer, sales region and showing the dollar amount of each sale and the relationship of sales for such quarter as compared to the same quarter for the preceding Contract Year ("Sales Report"). Sales information reported in each Sales Report furnished by Licensee shall be certified by Licensee's Chief Financial Officer or Controller or a retained accounting firm of Licensee or a Chief Financial Officer or Controller or retained accounting firm of each Sublicensee.

## ARTICLE 5: LICENSE FEES AND ACCOUNTING

5.1. Up-Front License Fee. Licensee shall pay to Licensor a license fee equal to _____ Dollars ($_____) with one half (1/2) (_____) to be sent by Licensee within ten (10) business days after the Effective Date, by wire transfer to an account designated

{W3038003;3}                                7

by Licensor. The remaining one half will be transferred in two equal payments of

_____ Dollars ($_____), with the first such equal payment of

_____ Dollars ($_____) to be sent by Licensee by wire

transfer to an account designated by Licensor within ten (10) business days after receipt of all

Product and Process Documentation in Licensor's possession for a coaxial UAV meeting in all

material respects the minimum specifications for Vehicle 1 as described in Exhibit C of this

Agreement, and the final payment of _____ Dollars ($_____) to be

sent by Licensee by wire transfer to an account designated by Licensor within ten (10) business

days after receipt of all Product and Process Documentation in Licensor's possession for a

coaxial UAV meeting in all material respects the minimum specifications for Vehicle 2 as

described in Exhibit C of this Agreement.

    5.2. Running Royalties. The Licensee shall pay the Licensor a Royalty under the Patent

License, granted in Section 2.1(a) herein, as set forth in Exhibit B of this Agreement for each

Unit Transferred. Each Royalty shall be paid after the end of each calendar quarterly period,

commencing with the first calendar quarterly period of the second of the three Contract Years.

Each Royalty shall accrue at the time the Licensed Product becomes a Unit Transferred.

The Total Royalty Payment due for each calendar quarterly period shall be (i) determined by

applying the applicable Royalty Fee(s) to all the Units Transferred during the calendar quarterly

period; and (ii) demonstrably calculated by applying each applicable Royalty Fee to the number

of Units Transferred. The Royalty Payment based on the sum total of all Royalty Fees accrued

during each calendar quarterly period shall become due and payable on the first day following

the end of the calendar quarterly period and shall be paid within ninety (90) days after the end of

the calendar quarterly period.

    5.3. Method of Paying Fees to Licensor. All License fees and the Total Royalty Payment

due for each calendar quarterly period shall be paid to the Licensor via wire transfer in United

States dollars without any transfer charges. Licensor shall have the right to require the Licensee

to make payment to any bank designated by Licensor. If any payment is rejected by the

Licensee's bank, the Licensor may demand subsequent payments be made by certified checks.

    5.4. Penalty on Delinquent Payments. If the payment of any installment of Royalties or any

other fee due under this Agreement is delinquent, interest shall accrue on the unpaid principal

{W3038003;3}                    8

amount of such installment from and after the date which is ten (10) calendar days after the date the same became due at five percent (5%) per annum.

5.5. Accounting. For the entire term of this Agreement, Licensee shall keep and maintain appropriate books and records of account, in accordance with GAAP (as defined in Section 9.2 below), sufficient to enable accurate calculations of Royalties due to Licensor and to audit the quarterly Sales Reports.

5.6. Identification Number on Licensed Products. Licensed Products shall have a number that is unique from Licensee's other products, and such unique identification shall be used in Licensee's accounting system. If any unit numbers of Licensee's other products are the same as those used on Licensor's products, Licensee, at its sole cost and expense, shall promptly change the numbering system on Licensee's other products to eliminate such duplication.

5.7. Licensor's Authority to Audit Licensee. Licensor and its duly authorized representatives, at Licensor's own expense, on ten (10) calendar days' prior written notice, shall have the right for the duration of the Agreement and for three (3) years thereafter, during regular business hours, to examine the books of account and records and all other documents, materials, and inventory in the possession or under the control of Licensee with respect to all subject matters relevant to this Agreement. All such books of account, records and documents shall be maintained and kept available by Licensee for at least the duration of this Agreement and for at least three (3) years thereafter. Licensor shall have access thereto as reasonably required by Licensor and shall have the right to make copies therefrom. If as a result of any examination of Licensee's books and records it is shown that Licensee's payments to Licensor hereunder with respect to any twelve (12) month period were less than the amount which should have been paid to Licensor by greater than Five Percent (5%) of the amount which would have been paid during such twelve (12) month period, Licensee shall, in addition to reimbursement of any underpayment with interest from the date on which each payment was due at the rate set forth in Section 5.5 hereof, promptly reimburse Licensor for the cost of such examination without prejudice to any other rights, remedies or claims of Licensor.

### ARTICLE 6: REPRESENTATIONS, WARRANTIES AND COVENANTS

6.1. Licensor's Express Warranties.

Licensor hereby expressly represents and warrants all of the following as of the Effective Date:

A.

(i) Licensor owns all right, title and interest in United States Provisional Patent Application No. 62/077,783 filed 10 November 2014 (hereafter, the '783 Patent) and all patent applications based thereon, including but not limited to all United States Patents, PCT patent applications, and foreign Patents claiming priority to the '783 Patent, including any and all continuing applications thereof including all continuations, continuations-in-part, reissued and reexamined patents; and Licensor is the legal, entire and sole owner of the foregoing Patents and all other Licensed Intellectual Property; and

(ii) Licensor has the right to license the rights granted under this Agreement; and, except as stated in Section 6.1.G. below, has obtained any and all necessary permissions from third parties to license the Licensee to use the Licensed Intellectual Property to make, use, sell, offer to sell and promote the Licensed Products, and

(iii) the Licensed Intellectual Property does not infringe the copyright, patent, trade secret, or trademark of any third party.

B.

To Licensor's knowledge, there are no pending or threatened claims that alleged use of the Licensed Intellectual Property or Product and Process Documentation by Licensee in accordance with the provisions of this Agreement infringes upon the copyright, patent, trade secret, or trademark rights of any third party. For purposes of this Section, "Licensor's knowledge" means the personal knowledge of Licensor's CEO, Peter Fuchs and Jonathan R. Meringer and Nathaniel R. Meringer.

C. Licensor is financially capable of undertaking the business operations which it conducts and of performing its obligations hereunder;

D. Licensor is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation;

E. All necessary corporate acts have been effected by Licensor to render this Agreement valid and binding upon it;

{W3038003;3}                                    10

F.  The entering into this Agreement by Licensor and the carrying out of its obligations under this Agreement do not violate the provisions of any other agreement, instrument or document to which it is a party; and

G.  Licensor is in compliance with all applicable laws, rules and regulations the violation of which could reasonably be expected to materially and adversely affect Licensor or Licensee's freedom to exercise the rights granted under this Agreement or which could reasonably be expected to materially and adversely affect, or Licensor's obligations under this Agreement, Licensor's business or its financial position, except that, as of the Effective Date, Licensor has not obtained any license, permit or approval relating to United States (U.S.) government export control and economic sanctions laws, rules and regulations for licensing the Licensed Intellectual Property to Licensee under the provisions of this Agreement.

H.  When built to specifications set forth in the Product and Process Documentation, the License Products shall conform to all Vehicle Specifications set forth in Exhibit C, including: for Vehicle 1, operation with a minimum hover time of twenty minutes when 20 percent of the Useful Load is dedicated to payload; and, for Vehicle 2, operation with a minimum hover time of five minutes when 20 percent of the Useful Load is dedicated to payload.

6.2. Licensee's Express Warranties. Licensee hereby expressly represents and warrants all of the following as of the Effective Date:

A. Licensee has the full right, power and authority to enter into this Agreement and to perform all of its obligations hereunder;

B. Licensee is financially capable of undertaking the business operations which it conducts and of performing its obligations hereunder;

C. Licensee is a limited liability company duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, duly qualified to conduct business wherever the ownership of its properties, the conduct of its business or both require such qualification;

D. Entering into this Agreement by Licensee and carrying out of its obligations under this Agreement do not violate the provisions of any other agreement, instrument or document to which Licensee is a party; and

{W3038003;3}                    11

E. Licensee is in compliance with all applicable laws, rules and regulations the violation of which could reasonably be expected to materially and adversely affect Licensee, its obligations under this Agreement, its business or its financial position;

F. All necessary limited liability company acts have been effected by Licensee to render this Agreement valid and binding upon Licensee ;

G. To Licensee's knowledge, there are no pending or threatened claims that use of the Licensed Intellectual Property or Product and Process Documentation by Licensee in accordance with the provisions of this Agreement infringes the copyright, patent, trade secret, or trademark rights of any third party. For purposes of this Section, "Licensee's knowledge" means the personal knowledge of Licensee's CEO, Jeffrey Hill; and

H. Licensee has obtained any and all licenses, permits and approvals relating to United States (U.S.) government export control and economic sanctions laws, rules and regulations for use of the Licensed Products and Product and Process Documentation by Licensee or any Sublicensee under the provisions of this Agreement.

6.3. Licensor's Covenants. Licensor hereby covenants and agrees with Licensee as follows:

A. The Licensed Intellectual Property shall not infringe the copyright, patent, trade secret, or trademark of any third party. The Licensor shall indemnify and hold Licensee harmless from and against any losses, claims, damages, awards, penalties, or injuries incurred, including reasonable attorney's fees and expenses, which arise from any claim by any third party of an alleged infringement, under any laws of copyright, patent, trade secret, or trademark rights or any other property right, by the Licensed Products, subject to a cap of One Million Dollars ($1,000,000.00). This indemnity shall survive the termination of this agreement.

B. Licensor shall maintain all Licensed Intellectual Property Rights during the term of this Agreement including, but not limited to, preparation, filing, prosecuting and maintaining of the Licensed Intellectual Property Rights, and Licensor shall indemnify any7 and all damages and losses incurred by Licensee which are caused by Licensor's failure to do such;

C. Licensor shall, upon reasonable request of Licensee, provide reasonable continuing support to assist Licensee in use of the Licensed Products and the Licensed Intellectual Property Rights; and Licensor shall respond by making its personnel available by email, phone or fax, from time to time, for feedback, problem-solving, or general questions. Licensor will provide reasonable training to Licensee staff relating to the use of the Licensed Products and the

{W3038003;3}                    12

Licensed Intellectual Property Rights. If Licensor determines at its sole discretion that more substantial engineering support is required to modify the as-delivered design files to meet new requirements proposed by the Licensee, to support integration of the payload and other mission equipment, etc., Licensor shall at its sole discretion have the option to provide those services and bill the Licensee for time and materials at prenegotiated agreed-upon rates; and

D. Licensor shall obtain any and all any licenses, permits and approvals relating to United States (U.S.) government export control and economic sanctions laws, rules and regulations for licensing of the Licensed Intellectual Property to Licensee under the provisions of this Agreement as and when required by applicable laws, rules and regulations and, in any event, before delivery of the design files for a coaxial UAV meeting in all material respects the minimum specifications for Vehicle 1 as described in Exhibit C of this Agreement. Notwithstanding anything in this Agreement to the contrary, the license granted under this Agreement shall become effective upon Licensor obtaining any and all such licenses, permits and approvals.

6.4. Licensee's Covenants. Licensee hereby covenants and agrees with Licensor as follows:

A. Licensed Products manufactured by Licensee under this Agreement shall be in material compliance with the Product and Process Documentation and Licensee shall require that that all Licensed Products manufactured by Sublicensees under this Agreement shall be in material compliance with specifications set forth in the Product and Process Documentation;

B. The Licensed Products shall be of good material and workmanship and will be free of defects in material and workmanship;

C. The Licensed Products and all Work shall comply with all applicable laws, rules and regulations in force on the date the Licensed Products are produced, including, without limitation, all laws, rules and regulations relating to United States (U.S.) government export control and economic sanctions laws.

{W3038003;3}                    13

### ARTICLE 7: TERM

7.1. Initial Term. Subject to termination as provided in this Agreement, the initial term of this Agreement is Five (5) Contract Years (the "Initial Term"). The Initial Term and the Renewal Term, if any, shall be referred to herein as the "Term."

7.2. Renewal Term. Subject to the Automatic Renewal Targets, if Licensee fully performs in accordance with all the terms and conditions hereof, Licensee shall have the option to renew this Agreement for five additional and consecutive Contract Years, (each a "Renewal Year" and collectively the "Renewal Term").

7.3. Loss of exclusive Licenses for failure to Meet Targets. Licensor shall have the right to convert all exclusive licenses granted under section 2.1 herein to non-exclusive licenses after the third Contract Year or after the fourth Contract Year, if the total of all Royalties paid to Licensor after the first Contract Year has averaged less than One Million Dollars ($1,000,000) annually (through the third Contract Year or through the fourth Contract Year, or has not increased at a compounded annual growth rate of 50% or greater during the third Contract Year over the second Contract Year or during the fourth Contract Year over the third Contract Year , before subtracting the exclusions from Royalties as set forth in Section 4 of Exhibit B of this Agreement (the "Automatic Renewal Targets").

### ARTICLE 8: INSOLVENCY

8.1. Effect of Proceeding in Bankruptcy, Etc. If either Party institutes for its protection or is made a defendant in any proceeding under bankruptcy, insolvency, reorganization or receivership law, or if either Party is placed in receivership or makes an assignment for benefit of creditors or is unable to meet its debts in the regular course of business, the other Party may elect to terminate this Agreement immediately by written notice to the other Party without prejudice to any right or remedy the terminating Party may have, including, but not limited to, damages for breach to the extent that the same shall be recoverable.

8.2. Rights Granted Are Personal to Licensee. The licenses granted hereunder are personal to Licensee. No assignee for the benefit of creditors, receiver, trustee in bankruptcy, sheriff or any other officer or court charged with taking over custody of Licensee's assets or business, shall have any right to continue performance of this Agreement or to exploit or in any way use of

Licensed Intellectual Property Rights or other rights hereby licensed if this Agreement is terminated pursuant to Section 8.1, except as shall be required by law.

### ARTICLE 9: TERMINATION

9.1. Termination. Either Party may terminate this Agreement:

A. Pursuant to Section 9.3.D below;

B. Pursuant to Section 15.1 below;

C. Upon notice to the other Party in accordance with Section 15.4 below if any representation or warranty of the other Party is false or misleading in any material respect when made or if the other Party violates any covenant or agreement herein, or defaults or fails to perform any of its obligations or agreements hereunder in any material respect, which false or misleading representation or warranty, violation, default or failure is not cured within thirty (30) calendar days after notice thereof from the non-defaulting Party in accordance with Section 15.4 below stating its intention to terminate this Agreement by reason thereof; or

D. If manufacture or use of a Licensed Product or the licensed Intellectual Property Rights or the Product and Process Documentation by Licensee in accordance with the provisions of this Agreement infringes the copyright, patent, trade secret, or trademark rights of any third party due to matters other than those referenced in Section 6.3.A above, and, despite Commercially Reasonable Efforts of the Parties to prevent such use from infringing the copyright, patent, trade secret, or trademark of any third party, such use would continue to infringe the copyright, patent, trade secret, or trademark of the third party, either Party may terminate this Agreement effective upon notice to the other Party in accordance with Section 15.4 of this Agreement.

9.2. Effect of Termination.

A. All rights and obligations of the Parties shall cease to have effect immediately upon termination of this Agreement except that termination shall not affect:

(i) the accrued rights and obligations of the Parties at the date of termination; and

(ii) the continued existence and validity of the rights and obligations of the Parties under those clauses which are expressed to survive termination and any provisions of this Agreement, are required to comply with applicable laws, rules, regulations and protocols

regarding national security or NATO protocol, or are necessary for the interpretation or enforcement of this Agreement.

B. Immediately upon termination, for any reason whatsoever, or expiration, of this Agreement, Licensee agrees to cease all manufacture and sale of the Licensed Products and use of Licensed Intellectual Property and deliver a list detailing the entire Inventory ("Inventory List") to Licensor. The Inventory List shall be prepared as of the close of business on the date of such termination and shall reflect the landed, duty paid cost of each such item, as accounted for in Licensee's books according to the generally accepted accounting principles ("GAAP"). Except for termination of this Agreement pursuant to Section 8.1, above, notwithstanding the other provisions of this Article 9, Licensor thereupon shall have the option exercisable by notice in writing delivered to Licensee within thirty (30) calendar days after its receipt of the Inventory List, to purchase any or all of the Inventory for an amount equal to the landed, duty paid cost. If Licensor sends such notice to Licensee, Licensor shall collect and pay for the Licensed Products within thirty (30) calendar days of such notice being received by Licensee. If Licensor does not exercise the option (or only exercises it partially) Licensee has the non-exclusive right to sell such remaining Licensed Products within the Territory until all remaining Inventory is consumed ("Sell-off Period.") All applicable provisions of this Agreement, including the obligation to pay Royalties, shall continue to be in force for such period.

C. Upon termination of this Agreement Licensee shall promptly return to Licensor or otherwise dispose of as Licensor may instruct, all samples, molds, instruction books, technical pamphlets, catalogues, advertising materials, Product and Process Documentation and other materials, documents or papers whatsoever relating to the intellectual property rights of Licensor or the Licensed Products (other than correspondence which has passed between the Parties) which Licensee may have in its possession or under its control. Materials deemed necessary under national security laws, rules, regulations and protocols and NATO protocol, and deemed necessary for archive will be allowed to be archived by Licensee for future review or analysis.

9.3. Force Majeure Event.

A. Neither Party shall be responsible for any failure to perform due to a Force Majeure Event provided that such Party gives notice to the other Party of the Force Majeure Event as soon as reasonably practicable, but not later than five (5) calendar days after the date on which

such Party knew or should reasonably have known of the commencement of the Force Majeure Event, specifying the nature and particulars thereof and the expected duration thereof; provided, however, that the failure of a Party to give notice of a Force Majeure Event shall not prevent such Party from relying on this Section except to the extent that the other Party has been prejudiced thereby.

B. The Party claiming a Force Majeure Event shall use Commercially Reasonable Efforts to mitigate the effect of any such Force Majeure Event and to cooperate to develop and implement a plan of remedial and reasonable alternative measures to remove the Force Majeure Event; provided, however, that neither Party shall be required under this provision to settle any strike or other labor dispute on terms it considers to be unfavorable to it. Upon the cessation of the Force Majeure Event, the Party affected thereby shall immediately notify the other Party of such fact and use its Commercially Reasonable Efforts to resume normal performance of its obligations under the Agreement as soon as possible.

C. Notwithstanding that a Force Majeure Event otherwise exists, the provisions of this Section shall not excuse any obligation of either Party, including the obligation to pay money in a timely manner for Royalties earned hereunder or other liabilities actually incurred, that arose before the occurrence of the Force Majeure Event causing the suspension of performance.

D. Subject to the other provisions of this Section 9.3, applicable time periods for performance under this Agreement shall be extended to the extent a Force Majeure Event is preventing performance.   In the event a Party fails to perform any of its obligations due to a Force Majeure Event for a period of ninety (90) consecutive calendar days or more from the date of such Party's notification to the other Party then the other Party at its option may terminate this Agreement upon notice to the other Party in accordance with Section 15.4 of this Agreement.

9.4. Equitable Relief. The Parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity.

9.5. Termination Without Prejudice. Termination of this Agreement pursuant to the terms and conditions hereof shall be without prejudice to the terminating Party's other rights and remedies at law or in equity.

{W3038003;3}                                17

**ARTICLE 10: INDEMNIFICATION AND LIMITATION OF LIABILITY**

10.1. Licensee. Each Party (the "Indemnifying Party") shall indemnify and hold the other Party, its officers, agents and employees (collectively, the "Indemnified Parties") harmless from and against any and all liability, claims, causes of action, suits, damages and expenses, including reasonable attorneys' fees and expenses in actions involving any third parties, which the Indemnified Parties, or any of them are or become liable for, or may incur, or be compelled to pay by reason of any acts, whether of omission or commission, that may be committed or suffered by the Indemnifying Party or any of its servants, agents or employees in connection with the Indemnifying Party's performance under this Agreement.

10.2. Limitation of Liability. EXCEPT AS PROVIDED HEREIN, NO PARTY SHALL BE LIABLE TO ANY OTHER PARTY BY REASON OF THIS AGREEMENT OR ANY BREACH OR TERMINATION OF THIS AGREEMENT, FOR ANY INCIDENTAL, CONSEQUENTIAL, INDIRECT, PUNITIVE, EXEMPLARY OR SPECIAL DAMAGES WHETHER ARISING OUT OF TORT (INCLUDING NEGLIGENCE), PRODUCT LIABILITY, OR OTHERWISE, AND WHETHER OR NOT SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGE FOR ANY LOSS OF PROSPECTIVE PROFITS OR INCIDENTAL, CONSEQUENTIAL INDIRECT, PUNITIVE, EXEMPLARY OR SPECIAL DAMAGES.

10.3. Independent Covenants. The foregoing indemnity provisions of Section 10.1 hereof shall be deemed independent covenants and shall survive completion of or any termination or cancellation of this Agreement, or any claimed breach thereof. The Indemnified Parties shall be entitled to be reimbursed by the Indemnifying Party for all expenses, including reasonable attorneys' fees paid or otherwise incurred to enforce the provisions of this Section.

**ARTICLE 11: INSURANCE**

11.1. Insurance to Be Obtained by Licensee.

A. Licensee, for itself and for its Affiliates to whom it sublicenses rights under this Agreement in accordance with the provisions of Section 15.3 below, shall maintain in effect at all times during the term of this Agreement insurance, including without limitation workers' compensation, comprehensive general liability, product liability, property damage, advertising liability, and automobile liability insurance against all losses, claims, demands, proceedings, damages, costs, charges and expenses for injuries or damages, costs, charges and expenses for injuries to any person or property arising out of or in connection with the acts or omissions of Licensee, its agents and Affiliate sublicensees. Licensee also shall maintain property and casualty insurance covering Licensee's and Affiliate sublicensees' business premises against injuries and crimes against their respective business premises and covering losses to Licensee's and its Affiliate sublicensees' land, building, equipment and/or goods. Such insurance shall be for coverage on an occurrence basis in the amount of not less than Three Million Dollars ($3,000,000) for personal injury and One Million Dollars ($1,000,000) for property damage. Property and casualty insurance shall cover the replacement cost of applicable property, equipment and/or goods.

B. The specification of liability coverages and limits herein shall not relieve or limit the responsibilities of Licensee under this Agreement.

C. Licensee is solely responsible for determining whether additional coverage or greater limits are required to protect Licensee's and its Affiliate(s) or Sublicensees' interests from hazards or claims in excess of the specified minimum insurance. Where special or unusual hazards peculiar to the Work are foreseeable, Licensee shall take such steps as are necessary to insure itself and its Affiliate(s) or Sublicensees against such hazards and be responsible for any damage which results from the occurrence of such hazards prior to the start of Work by Licensee.

D. Licensee shall give thirty (30) calendar days' advance written notice to Licensor in the event of cancellation or expiration of any policy or of any material and substantial change in any policy. Licensee shall use commercially reasonable efforts to cause its insurers to provide thirty (30) calendar days' advance written notice to Licensor in the event of cancellation or

expiration of any policy or of any material and substantial change in any policy required under this Agreement.

E. Licensee will have indemnity through the sovereign nations purchasing and utilizing the end product. Such indemnity will be in effect for all sales, and thereby rendering licensor with no liability.

F. Licensor or its successor or assign shall be named as additional insureds on all liability insurance policies.

### ARTICLE 12: OWNERSHIP

12.1. Licensed Intellectual Property. Licensee acknowledges and agrees that Licensor is and shall remain the sole and exclusive owner of all Licensed Intellectual Property Rights and Licensee acquires no right, title or interest in the Licensed Intellectual Property. Except for those rights expressly granted in this Agreement, no other rights are granted, either express or implied, to Licensee. Licensee shall not, during the term of this Agreement or thereafter, (a) attack Licensor's title or rights in and to Licensed Intellectual Property, or (b) contest the fact that Licensee's rights under this Agreement are solely those of a licensee, manufacturer and distributor and such rights shall cease upon termination of this Agreement. The provisions of this Section shall survive the termination of this Agreement.

12.2. Copyright. Licensee hereby agrees that any Copyright which shall have arisen under this Agreement in any sketch, design, advertising materials or the like, used on or in connection with any Licensed Product is the sole and exclusive property of the Licensor. Licensee shall not, at any time, do any act or thing which shall adversely affect any of the Licensor's rights in such sketches, designs, advertising materials and the like, and shall, at Licensor's request, do all things reasonably required by Licensor to preserve and protect said rights.

12.3. Designs Used Only on Licensed Products.

A. Licensee acknowledges and agrees that:

i. except as provided in Section 12.3.B below, Licensor owns or shall own all rights in designs relating to the Licensed Products;

ii Licensee shall not do or allow to be done anything which may adversely affect any of Licensor's design rights; and

iii. all designs used by Licensee for the Licensed Products shall be used exclusively for the Licensed Products.

B.  If Licensor performs design modifications pursuant to the last sentence of Section 6.3.C, upon payment in full therefor by Licensee, Licensee shall own the intellectual property, if any, relating to such modification, subject to Licensor having a perpetual, fully paid license to use such intellectual property for any purpose.

### ARTICLE 13: INFRINGEMENT OR DILUTION

13.1. Notice of Infringement. Licensee shall notify Licensor in writing of any reasonable belief there is an infringement of Licensor's patent rights that form a portion of the Licensed Intellectual Property Rights, licensed under Article 2 herein by any third party, promptly when the same shall come to the attention of the Licensee. Licensor will thereupon take such action as it deems advisable, and Licensee shall cooperate with and assist Licensor in the prosecution of any such action or suit, as Licensor may reasonably request, provided that Licensor shall bear all reasonable costs and expenses reasonably incurred by Licensee in giving information and assistance pursuant to such request. In no event, however, will Licensor be required to take any action if it deems it inadvisable to do so and Licensee will have no right to take any action without the prior written consent of Licensor, which consent may be granted or withheld in Licensor's sole discretion. If the conduct of the third party, for which the Licensee has reported to Licensor a reasonable belief of the infringement activity causes a loss of present or future sales during the Term of this Agreement, then Licensor shall refund a pro rata portion of the fee required under Section 5.1 based on the ratio of the number of months before loss of sales is identified divided by the number of months in the Term as defined in Article 7 and, after the initial term, all royalties due under Section 5.2 shall be reduced by fifty (50) percent.

13.2. Licensor Control Over Litigation.  Licensor shall have full control over any such action or suit arising under Section 13.1 including, without limitation, the right to select counsel, to settle on any terms it deems advisable in its discretion, to appeal any adverse decision rendered in any court, to discontinue any action taken by it, and otherwise to make any decision in respect thereto as it deems advisable in its sole discretion. Licensor shall bear all of its own fees, costs and out-of-pocket expenses connected with the foregoing. Any recovery as a result of such action shall belong to Licensor. Licensee may, upon receiving the prior written consent of

{W3038003;3}                    21

Licensor (which consent may not be unreasonably withheld, conditioned or delayed), participate in any action taken by or proceeding instituted by Licensor through separate counsel of Licensee's own choosing and at Licensee's sole expense, provided that Licensor at all times shall retain full control over such action in accordance with this Section.

13.3. Licensee Rights to Protect Its Interests when Licensed Intellectual Property Rights Are Infringed.

In the case that infringement, dilution or imitation of the Licensed Products damages  or poses a threat of damages to any and all interests, rights or revenues of Licensee in the Territory under this Agreement, including but not limited to its interest and rights and revenues arising from or relating to its license as provided in Article 2, Licensee shall have the right to take such action as it deems advisable, and Licensor shall cooperate with and assist Licensee in the prosecution of any such suit, as Licensee may reasonably request, provided that Licensee shall bear all reasonable costs and expenses reasonably incurred by Licensor in giving information and assistance pursuant to such request. Licensee shall have full control over any such action, including, without limitation, the right to select counsel, to settle on any terms it deems advisable in its discretion, to appeal any adverse decision rendered in any court, to discontinue any action taken by it, and otherwise to make any decision in respect thereto as it deems advisable in its sole discretion. Licensee shall bear all of its own fees, costs and out-of-pocket expenses connected with the foregoing. Any recovery as a result of such action shall belong to Licensee. Licensor may, upon receiving the prior written consent of Licensee (which consent may not be unreasonably withheld, conditioned or delayed), participate in any action taken by or proceeding instituted by Licensee through separate counsel of Licensor's own choosing and at Licensor's sole expense, provided that Licensee at all times shall retain full control over such action in accordance with this Section.   In the event of any conflict in the rights of Licensee under this Section 13.3 and the rights of Licensor under Section 13.2, the rights of Licensor under Section 13.2 shall control.

### ARTICLE 14: CONFIDENTIALITY

14.1. Confidentiality Obligations. The terms of the Mutual Nondisclosure Agreement by and between the Parties dated as of September 23, 2017, shall apply to and govern all Licensor

{W3038003;3}                    22

Confidential Information and Licensee Confidential Information exchanged under this Agreement, and is incorporated herein by reference, except that:

A. Licensee Confidential Information and Licensor Confidential Information need not be marked or otherwise identified in writing or orally as such in order to be subject to the restrictions of Section 1 of such Mutual Nondisclosure Agreement; and

B. The term of such Mutual Nondisclosure Agreement shall be extended as necessary to be coterminous with the Term of this Agreement.

C. Licensee may disclose Licensor Confidential Information to Sublicensees, including Product and Process Documentation, necessary to make, use or sell Licensed Products.

### ARTICLE 15: OTHER PROVISIONS

15.1. Severability. If any provision or any portion of this Agreement shall be construed to be illegal, invalid or unenforceable, such provision shall be automatically modified to extent necessary to render it enforceable, or if no modification thereto will render such provision or portion of this Agreement enforceable, such provision or portion of this Agreement shall be deemed stricken and deleted from this Agreement to the same extent and effect as if never incorporated herein. All other provisions of this Agreement and remaining portion of any provision which is not found to be illegal, invalid or unenforceable in part shall continue in force and effect; provided that if striking or deleting any provision or portion of this Agreement substantially impacts the rights and obligations of either Party under this Agreement, such Party may terminate this Agreement effective upon notice to the other Party in accordance with Section 15.4 below.

15.2. Non-waiver. No waiver, modification or cancellation of any term or condition of this Agreement shall be effective unless executed in writing by the party charged therewith. No written waiver shall excuse the performance of any acts other than those specifically referred to therein. The fact that the Licensor has not previously insisted upon the Licensee expressly complying with any provision of the Agreement shall not be deemed to be a waiver of the Licensor's future right to require compliance in respect thereof. Licensee specifically acknowledges and agrees that the prior forbearance in respect of any act, term or condition shall not prevent Licensor from subsequently requiring full and complete compliance thereafter.

{W3038003;3}                    23

15.3. Assignment. Neither Party may assign its rights or delegate its obligations under this Agreement without the prior written consent of the other Party, which consent may not be unreasonably withheld, conditioned or delayed. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. Licensee shall have no right to sublicense any rights licensed under this Agreement except to any of its Affiliates who agree in writing with Licensor to be jointly and severally liable for the obligations of Licensee under this Agreement.

15.4. Form of Notice to Parties. Wherever one Party is required or permitted or required to give notice to the other under this Agreement, such notice shall be in writing and shall be given by hand, by certified U.S. mail, return receipt requested, by overnight courier, or by email and addressed as follows:

| If to Licensor: | with a copy to: |
|---|---|
| Ascent AeroSystems, Inc.<br>235 Harrison Street, MS14<br>Syracuse, New York 13202<br>Attn: Chief Executive Officer<br>peter@ascentaerosystems.com | Ascent AeroSystems, Inc.<br>235 Harrison Street, MS14<br>Syracuse, New York 13202<br>Attn: Chief Operating Officer<br>jon@ascentaerosystems.com |
| If to Licensee: | with a copy to: |
| Overwatch Defense, LLC.<br>1301 Gleneagles Lane<br>Davenport, Florida 33896 USA<br>Attn: Chief Executive Officer<br>jeff@overwatch-defense.com | Overwatch Defense, LTD<br>52 Berkeley Square<br>London W1J 5BT U.K.<br>Attn: Chief Operating Officer<br>drew@overwatch-defense.com |

All such notices shall be effective upon receipt. Either Party may designate a different notice address from time to time upon giving ten (10) calendar days' prior notice thereof to the other Party in accordance with the provisions of this Section 15.4.

15.5. Notice of Actions Being Brought. Licensee agrees to notify Licensor immediately upon the commencement of any actions brought against Licensee whose outcome may affect the rights of Licensor herein granted, and Licensor shall have the right at its own expense to appear and defend such actions.

15.6. Precedence. In the event of conflict between the provisions of this Agreement and any other agreement, instrument or document between the Parties, the provisions of this Agreement shall govern, unless such other document expressly purports to modify this Agreement and is signed by the Parties.

15.7. Survival of Obligations. The provisions of this Agreement, which by their very nature survive expiration or earlier termination of this Agreement shall remain in full force and effect after such termination.

15.8. Integration. This Agreement, and the appendices hereto, represent the entire agreement between the Parties respecting the subject matter hereof and supersedes all prior discussions, agreements and understandings of every kind and nature between them respecting the subject matter hereof. No modification of this Agreement will be effective unless in writing, expressly purporting to modify this Agreement and signed by the Party against whom enforcement is sought.

15.9. Disputes/Choice of Law/Attorneys' Fees/Advice of Counsel. The Parties shall attempt to resolve any disputes between them arising out of this Agreement through good faith negotiations. In the event the Parties cannot resolve a dispute within thirty (30) days after one Party has given the other Party written notice of the existence of the dispute, such dispute shall be conclusively resolved by arbitration which shall be conducted in accordance with the Arbitration Rules of the United Nations Commission on International Trade Law ("UNCITRAL") in effect at the time of applying for arbitration if the issues in dispute involve international trade law; but, otherwise, the arbitration shall be conducted by the American Arbitration Association in accordance with its rules. The arbitral award shall be final and binding upon both Parties, This Agreement shall be construed in accordance with the substantive laws of the State of New York (excluding its conflicts of laws principles). The provisions of the United Nations Conventions on Contracts for the International Sale of Goods shall not apply to this Agreement. The prevailing Party shall be entitled to recover its costs and reasonable attorney's fees from the non-prevailing Party in any action brought to enforce this Agreement. Each Party acknowledges having has opportunity to consult with legal counsel before entering into this Agreement and acknowledges doing so with advice of counsel.

15.10. Responsibility for Taxes. The Parties shall be responsible for the payment of their own applicable taxes arising in connection with the transactions contemplated under this Agreement pursuant to the applicable taxation laws and regulation.

15.11. Headings. The headings of the Articles and Sections of this Agreement are for convenience only and shall in no way limit or affect the term or conditions of this Agreement.

15.12. Remedies Cumulative. All rights and remedies available at law, in equity and/or this Agreement for breach of this Agreement are cumulative and may be exercised concurrently or separately, and the exercise of any right or remedy shall not be deemed an election of such right or remedy to the exclusion of other rights or remedies.

15.13. Independent Contractor Status. It is expressly understood that Licensee and Licensor are contractors independent of one another, and that neither has the authority to bind the other to any third person or otherwise to act in any way as the representative of the other, unless otherwise expressly agreed to in a writing signed by both Parties hereto. Licensee shall maintain complete control over its employees and agents and assume liability for such actions as would occur under the provisions of this Agreement.

15.14. Rights of Licensor's Successors in Interest. The rights of Licensor and the obligations of Licensee under this Agreement shall inure to the benefit of Licensor's nominees, successors and assigns.

15.15. Construction. This Agreement has been submitted to the scrutiny of, and has been negotiated by, all Parties hereto and their counsel, and shall be given a fair and reasonable interpretation in accordance with the terms hereof, without consideration or weight being given to its having been drafted by either Party or its counsel and without it being construed against either Party, given that the Parties are of equal bargaining strength and have participated equally in the preparation of this Agreement.

15.16. Limitation on Rights of Others. This Agreement is entered into between the Parties for the exclusive benefit of the Parties. This Agreement is not intended for the benefit of any creditor of any Party or any other third party. Except to the extent provided by applicable laws, rules or regulations, and then only to that extent, no third party shall have any rights under this Agreement.

15.17. Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.  Facsimile and electronic copies of signatures shall be deemed original signatures

15.18. No Publicity. Each Party agrees not to publicize or disclose the existence or provisions of this Agreement to any third party without the prior written consent of the other Party (which consent may be granted or withheld in the other Party's sole discretion), except as required by law or applicable stock exchange regulations (in which case, the Party seeking to disclose the information shall give reasonable notice to the other Party of its intent to make such a disclosure). Neither Party shall make any press release or similar public statement regarding the existence or provisions of this Agreement or the Parties' relationship without the prior written consent of the other Party, which consent may be granted or withheld in the other Party's sole discretion.

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed on the 28th day of August 2018.

Licensor:                                      Licensee:

ASCENT AEROSYSTEMS, INC.       OVERWATCH
                                               DEFENSE, LLC.

By:                                            By:
Name: Peter Fuchs                          Name:          Jeffrey Hill
Title:  CEO                                    Title:          CEO

## EXHIBIT A

### LICENSED PRODUCTS AND TERRITORIES

A. <u>Licensed Products</u>. Coaxial unmanned aerial vehicles, but only when used to carry an explosive payload, except as excluded under <u>Section C</u> below.

B. <u>Territory</u>. Worldwide.

C. <u>Exclusions</u>. All coaxial unmanned aerial vehicles not carrying an explosive payload are excluded from this Agreement. In addition, coaxial unmanned aerial vehicles ("<u>UAV</u>") carrying an explosive payload that are used in counter-UAV applications are excluded from the Licensed Products. Defense related payloads will be considered and not unreasonably withheld.

{W3038003;3}                    28

**EXHIBIT B**

**ROYALTIES**

1.      Licensee shall pay to Licensor a Royalty equal to the net quantity of Licensed Products sold, distributed or otherwise disposed of (collectively "Sold") by Licensee, multiplied by the applicable Royalty rate below.  For purposes of determining when a Royalty payment is due, a Unit is considered Sold on the date of first shipment by Licensee or any of its Affiliates.

2. Definitions

A. Deployed Vehicle Weight.  The overall weight of the airborne vehicle as intended for operational use, including the payload, battery and all other airborne mission equipment.

3. Categories

A. Category A: under 2.0 kg Deployed Vehicle Weight: $200

B. Category B: under 7.5 kg Deployed Vehicle Weight: $1,000

C. Category C: above 7.5 kg Deployed Vehicle Weight: 10% of contracted system selling price to end customer.

4. Exclusions.  No Royalties are due for the Units Sold within 12 months after Licensee's receipt of the first vehicle design files as described in Section 5.1 of this Agreement.

**EXHIBIT C**

**VEHICLE SPECIFICATIONS**

1.  Vehicle 1

| Specification | Description | Target |
| --- | --- | --- |
| Length | Dimension of the Vehicle Core as measured from the upper-most rotating component of the Forward Rotor assembly to the bottom of the Main Module, excluding any components designed to attach to other modules. | Not more than 11.0 inches |
| Diameter | Dimension of the Vehicle Core as measured from the maximum dimension of the rotor system, with rotor blades in the stowed position. | Not more than 5.5 inches |
| Useful Load | The carrying capacity available for battery and payload, measured as the Maximum Recommended Takeoff Weight minus the Vehicle Core. | Not less than 8.0 lbs. |
| Endurance | With 80% of the Useful Load dedicated to battery and 20% to payload, the minimum hover time. | Not less than 20 minutes |
| Airspeed | | Not less than 30 mph |

Notes:

- All performance figures indicated assume Sea Level under ISA conditions and no wind.
- Each specification guaranteed within 10%

2. Vehicle 2

| Specification | Description | Target |
|---|---|---|
| Length | Dimension of the Vehicle Core as measured from the upper- most rotating component of the Forward Rotor assembly to the bottom of the Main Module, excluding any components designed to attach to other modules. | Not more than 7.0 inches |
| Diameter | Dimension of the Vehicle Core as measured from the maximum dimension of the rotor system, with rotor blades in the stowed position. | Not more than 4.0 inches |
| Useful Load | The carrying capacity available for battery and payload, measured as the Maximum Recommended Takeoff Weight minus the Vehicle Core. | Not less than 0.75 lbs. |
| Endurance | With 80% of the Useful Load dedicated to battery and 20% to payload, the minimum hover time. | Not less than 5 minutes |
| Airspeed | | Not less than 20 mph |

Notes:

- All performance figures indicated assume Sea Level under ISA conditions and no wind.
- Each specification guaranteed within 10%

**EXHIBIT D**

**LIST OF PATENTS AND PATENT APPLICATIONS OWNED OR CONTROLLED BY LICENSOR**

List here all patents and applications (US, PCT and Foreign) based on or related to Provisional Application No. 62/077,783 filed 10 November 2014.

{W3038003;3}                    32