# EXHIBIT G

**From:** Jeff Hill <jeff@overwatch-defense.com>

**To:** Peter Fuchs <peter@ascentaerosystems.com>

**Cc:** Andrew Michael <drew@overwatch-defense.com>

**Subject:** MOU

**Date:** Mon, 24 Sep 2018 00:09:25 +0000

**Importance:** Normal

**Attachments:** MOU_Ascent_OWD_09162018_(jh1).doc; Untitled_attachment_21240.txt; Untitled_attachment_21243.txt

**Inline-Images:** small_si_block_defense.jpg

---

Peter,

DRAFT MOU attached. I put in worst case scenarios to give us time, but not too much. We will complete well before then.

Please review and comment. Did this in an hour, so forgive any mistakes.

Jeff



(W): (888)698-1333
(M): (321)505-8770
jeff@overwatch-optics.com
www.overwatch-optics.com

**Jeff Hill**
Chief Executive Officer
1301 Gleneagles Lane
Davenport, FL 33896

## Memorandum of Understanding  Between
## Ascent Aerospace Inc and Overwatch Defense LLC

24 September 2018

Whereas Ascent AeroSystems, Inc., a New York corporation whose principal office is at 235 Harrison Street, Syracuse, New York 13202 ("Licensor"), and Overwatch Defense LLC., a company established under the laws of the State of Florida, whose principal office is at 1301 Gleneagles Lane, Davenport, FL 33896 USA ("Licensee"), (Licensor and Licensee are hereinafter collectively referred to as the "Parties," and each individually as a "Party.")

This Memorandum of Understanding ("MOU") sets forth the terms and conditions pursuant to which Parties will enter into a License Agreement for Ascent AeroSystems Coaxial UAV System (referred to as the "Transaction").

1.
It is the intention of AA and OWD (each, a "party," and collectively, the "parties") that definitive agreements evidencing the Transaction (the "Transaction Documents") be executed as expeditiously as possible (the "Closing"), with 20% of the agreed License Fee paid not later than 31 October 2018. If the parties do not enter into the Transaction Documents by 31 October, 2018, this Memorandum of Understanding shall terminate in accordance with its terms unless the parties agree in writing to extend the term of this Memorandum of Understanding.

2. Conditions

Non-binding Good Faith Efforts. So long as the parties' endeavor, to negotiate in good faith and execute the Transaction Documents in accord with the terms of this MOU, then, except as expressly provided herein, neither party shall have any liability or obligation with respect to the Transaction until, and the Transaction shall in all respects be subject to, execution and delivery of all Transaction Documents.

A.    Transaction Documents. Closing of the Transaction shall be contingent upon good faith effort of each of the parties to negotiate and execute the Transaction Documents and reach mutual agreement as to the other legal documents necessary to complete the Transaction, substantially in accord with the terms and conditions set forth in this MOU, including the Summary of Terms and Conditions (also referred to as the "Term Sheet") attached hereto as Exhibit A. The Transaction Documents shall be mutually satisfactory to the parties thereto and shall be in a form customary for transactions of this kind and will, among other things, (i) contain customary and reasonable representations, warranties, and covenants, and (ii) provide reasonable terms for indemnification against losses, claims or liabilities related to any infringement, misrepresentation, breach of warranty, or non-fulfillment of any agreement, subject to qualifications and limitations to be mutually agreed upon by the parties.

B.    Approvals. Closing of the Transaction shall be contingent upon receiving all necessary approvals and consents for consummation of the Transaction, as provided in the Transaction Documents, including contractual and governmental consents and corporate authorizations, shall have been received.

3. Confidentiality

In connection with the Transaction, the parties have disclosed and will disclose to each other certain confidential and proprietary information of each of them and one or more third parties. The parties to this MOU acknowledge that the confidential information, and any work product derived from the confidential information, is proprietary to and a valuable trade secret of the owner thereof. Each party agrees to hold in confidence any and all confidential information disclosed to it, directly or indirectly, and agrees not to disclose such information, without the prior written consent of each other party, other than (i) to those affiliates, parents, subsidiaries, directors, officers, employees, agents and advisors, including, without limitation, attorneys, accountants, consultants, bankers and financial advisors (collectively, "Representatives") who, as a condition of disclosure agree to maintain

-2-

the confidentiality of said information and who need to know such information in order to complete the Transaction, and (ii) as required by law or governmental or judicial proceeding or arbitration. The parties each further agree not to utilize the confidential information of the other of the parties for any purpose other than a purpose directly related to the Transaction, to take all reasonable precautions to safeguard such information and to return such information, including all copies and records thereof, to the other of the parties upon receipt of a written request therefor. Each party's Representatives shall be bound by the above obligations of such party. The terms "confidential and proprietary information" and "confidential information," as used herein, shall not include any information relating to a party which the party receiving such information can show: (i) to have been in its possession prior to its receipt from another party hereto; (ii) to be now or to later become generally available to the public through no fault of the receiving party; (iii) to have been available to the public at the time of its receipt by the receiving party; (iv) to have been received separately by the receiving party in an unrestricted manner from a person entitled to disclose such information; or (v) to have been developed independently by the receiving party without regard to any information received in connection with this Transaction.

4. Broker and Finder's Fees
The parties hereto represent that they have not dealt with any broker or finder in connection with this Transaction. If any brokerage commission or finder's fee is payable due to agreements or arrangements entered into by either party in connection with the subject matter of this Memorandum of Understanding or the Transaction, it shall be paid solely by the party having entered into any such agreement or arrangement.

5. Publicity
None of the parties shall make any public disclosure with respect to this Memorandum of Understanding or the Transaction contemplated hereby without the prior written consent of the other of the parties.

6. Term Sheet
The <u>Summary of Terms and Conditions</u> (Term Sheet) set forth in Exhibit A outlines the proposed terms and conditions relating to the

-3-

Transaction. The <u>Summary of Terms And Conditions</u> constitutes an integral part of this Memorandum of Understanding and is incorporated herein by reference.

7. Termination

This Memorandum of Understanding is a binding expression of intent and is a definitive and legally binding agreement. A legally binding obligation is created by this Memorandum of Understanding and Paragraphs 4, 5, 6, 9, 10, 12, 13 and 14 hereof, which paragraphs shall survive the termination of this Memorandum of Understanding. This Memorandum of Understanding shall terminate on the earlier of (i) the mutual execution by the parties hereto of the Transaction Documents, or (ii) October 31st, 2018 (unless extended by agreement of both parties in accordance with Paragraph 1 hereof).

8. Equitable Relief

The parties acknowledge and agree that, in the event any party shall violate or threaten to violate any of the restrictions of Paragraphs 4 or 6 hereof, the aggrieved party will be without an adequate remedy at law and will therefore be entitled to enforce such restrictions by temporary or permanent injunctive or mandatory relief in any court of competent jurisdiction without the necessity of proving damages and without prejudice to any other remedies which it may have at law or in equity.

9. Expenses

Other than outlined in this agreement, both parties shall separately bear their own expenses incurred in connection with this Memorandum of Understanding and the Closing of the Transaction.

10. Authorization

The execution and delivery of this Memorandum of Understanding by the parties hereto has been duly authorized and approved by all necessary action of the relevant parties. The parties acknowledge that additional authorization will be necessary prior to the execution and delivery of the Transaction Documents.

11. Damages

No party shall make a claim against, or be liable to, any other party or any such other party's affiliates or agents for any damages, including, without limitation, lost profits or injury to business or reputation, resulting from the continuation or abandonment of negotiations and the consequences thereof, except for actual damages (excluding consequential damages) to the extent that such damages arise out of a breach of a party's obligations under Paragraphs 4 or 6 hereof.

12. Governing Law
This Memorandum of Understanding shall be construed in accordance with, and governed by, the laws of the State of New York, applicable to contracts made and to be performed within such jurisdiction excluding choice of law principles thereof.

13. Entire Agreement
This Memorandum of Understanding sets forth the entire understanding of the parties with respect to the subject matter hereof and can be modified only by a writing executed by the party sought to be charged.

The terms of the foregoing Memorandum of Understanding are hereby agreed to and accepted by the parties as of this 24th day of September, 2018 as affirmed by the below signatures of

For Ascent AeroSpace Inc.

By: _____

Name: _____

Title: _____

For Overwatch Defense LLC.

By: _____

Name: _____

-5-

Title: _____

## EXHIBIT A

Overwatch Defense Ltd and Ascent AeroSystems Inc. have had discussions about the proposed License Agreement for production of the PHOLOS Weapons System and have agreed on the following points:

1. Ascent AeroSystems shall supply the technical know-how for production of The Co-Axial UAV System. The technical know-how shall comprise the complete documentation required for the production, deputation of professionals to the Czech Republic as required to ensure the fulfilment of the undertaking and training of the OWD professionals for the same purpose. AA will help the OWD in the materials required in the production of the UAV System. Complete know-how and documents shall be handed over to OWD.

2. Consistent with this Exhibit, AA shall be paid by OWD for its know-how and licenses, an overall fee of Five Million Dollars ($5,000,000) This amount will be paid in instalments (on or by example below) to be finalized in the License Agreement:

   - License Agreement:     $1,000,000    Oct 31, 2018
   - Delivery Pholos II:    $2,500,000    Nov 30, 2018
   - Pholos I:              $1,500,000    Dec 2018 (TBD)
   - Pholos III;            $1,000,000    Feb 2018 (TBD)

3. Licensee shall pay to Licensor a Royalty equal to Net Sales of each individual Unit sold, distributed or otherwise disposed of (collectively "Sold") by Licensee, multiplied by the applicable category below. For purposes of determining when a Royalty payment is due, a Unit is considered Sold on the date of

shipment by Licensee.
- Category A: under 2.0 kg deployed vehicle gross weight: $200
- Category B: under 7.5 kg deployed vehicle gross weight: $1,000 <<
- Category C: above 7.5 kg deployed vehicle gross weight: 10% of contracted system selling price to end customer
- (deployed vehicle gross weight is intended to mean the maximum capacity of the vehicle as determined by Ascent AeroSystems performance calculations, including the payload, battery and all other airborne mission equipment)
- No royalties due for vehicles delivered to end customers within 12 months after the second Up-Front License Fee becomes due under the License Agreement.

3. Licensed Segments - OWD becomes the exclusive licensee of AAs Coaxial unmanned aerial vehicle designs when used to carry an explosive payload.
   - Geography: Global - Defense
   - Customers: All. No restrictions.

4. Term
   a. OWD is granted an Initial exclusivity term of 36 months
   b. Exclusivity in the following years will be performance related and subject to terms negotiated in good faith in years 1-3; AA will not begin to negotiate with any other parties until 30 months after the signing of this agreement
   c. Unless extended, after initial 36 months the exclusive license converts to non-exclusive for existing customers only for an additional 24 months (so can continue to sell to existing clients and means investment is not stranded or at risk for at least 5 years)

5.  Other Terms and Conditions

    a.  No sub-licensing without AAs express consent or under license

    b.  No IP rights transferred to OWD except where explicitly granted in time and materials contract work

    c.  AA agrees do perform a live demonstration if necessary to finalize deal with manufacturer and OWD. Time/Place to be determined.

6.  Both AA and OWD affirm that they shall implement the project in good faith and shall take all necessary steps to see the project through expeditiously. They shall not negotiate with any other parties for a similar project, and the negotiations in progress, if any, shall be terminated forthwith.

7.  This Memorandum of Understanding shall be valid up to the execution of the License Agreement and both the parties hereto shall be free thereafter from their obligations herein written, if the progress achieved until then is not found satisfactory by either of them.

For Overwatch Defense LTD        For Ascent AeroSpace Inc

.............................               .............................

.............................               .............................

Title                                    Title