**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| ASCENT AEROSYSTEMS INC.,<br>　　　　　　　Plaintiff,<br><br>　　　vs.<br><br>JEFFREY T. HILL<br>ANDREW G. MICHAEL<br>OVERWATCH AEROSPACE LLC<br>OVERWATCH AEROSPACE LTD<br>OVERWERX LTD,<br><br>　　　　　Defendants. | Civil Action No.: 3:24-cv-01075-OAW |

**<u>DECLARATION OF ANDREW GEORGE MICHAEL</u>**

I, ANDREW GEORGE MICHAEL, do hereby under penalty of perjury, pursuant to 28 U.S.C.

§1746, that the following is true and correct:

1.　　　My name is Andrew George Michael, one of the named defendant herein.

2.　　　I make this Declaration based on personal knowledge and upon my

review of records obtained from the sources described herein and upon

information and  belief where so indicated.

3.　　　In the declaration I respond to allegations the Plaintiff made in the Complaint initially

filed in this law suit on June 21, 2024: Case 3:24-cv-01075-RNC,  Document 1

("Complaint") and in the Motion for Preliminary Injunction, the Memorandum of Law

in Support of Plaintiff's Motion for Preliminary Injunction and the Declaration of the Founders of Ascent AeroSystems Inc. in support thereof, all also filed on June 21, 2024: Case 3:24-cv-01075-OAW, Documents 8-1, 8-2 and 8-3. I also discuss herein my personal background, my involvement (if any) in the companies called Overwatch Optics, LLC and Overwatch Defense, LLC, and my involvement in Overwatch Aerospace LLC, and the two defendant companies registered in England & Wales: Overwatch Aerospace Ltd and Overwerx Ltd.

**Personal Background**

4.      I currently live in London, England. I am not a US Citizen. Nor do I reside in any state in the United States. I own no property in the United States and maintain no office for conducting business there.

5.      I am the Chief Executive Officer of Overwerx Ltd ("Overwerx"), a company incorporated under the laws of England & Wales on January 14, 2020.  Overwerx is a non-trading group holding company and wholly owns Overwatch Aerospace Ltd, its immediate subsidiary, which in turn wholly owns Overwatch Aerospace LLC.

6.      Overwerx has no office or employees in the United States and does not presently do business in the United States or anywhere else.

7.      I am the Chief Executive Officer of Overwatch Aerospace Ltd., which is an operating company in the business of designing, making and selling unmanned systems. Overwatch Aerospace Ltd. has not sold any products or services in the United States and has no employees and no offices in the United States.

8.      I am the sole manager of Overwatch Aerospace LLC, a Florida LLC. I became a manager of that company at the time of its formation on August 19, 2021 along with Jeffrey T. Hill ("Mr. Hill") who resigned from the position of manager on or around

2

25 May 2023 as shown by the filing made on August 17, 2023 in the records of the Florida Secretary of State. See www.sunbiz.org.

9. Overwatch Aerospace LLC is wholly owned by Overwatch Aerospace Ltd., a UK company which is managed in the U.K. Overwatch Aerospace LLC was created by attorney Perry West in August 2021 in connection with having a U.S. Company by that name in order to preserve that corporate name in a key territory for the business of its immediate parent company, Overwatch Aerospace Ltd.

10. Overwatch Aerospace LLC has no employees or customers and has not engaged in business in the United States or anywhere else in the past or presently. It does not presently own or sell any services or products anywhere. Overwatch Aerospace LLC is not presently in the business of making or selling any munitions-related drone technology in the United States or anywhere else. Overwatch Aerospace LLC has no office in Connecticut and has never engaged in any business with the Plaintiff anywhere in the world.

11. Overwatch Aerospace LLC may pursue business in the United States at some future time if it makes sense to do so, which is a decision I will make in conjunction with Overwatch Aerospace Ltd., its UK parent company.

12. For the avoidance of any doubt, none of Overwerx, Overwatch Aerospace, Ltd. or Overwatch Aerospace LLC has any business in or employees or offices in Connecticut and never has.

13. I specifically and categorically deny the claim made at Par. 17 of the Complaint that Overwatch Aerospace, LLC, Overwatch Aerospace Ltd and Overwerx have as a purpose to "misappropriate and commercially exploit Ascent's technology and intellectual property". After reading the pleadings filed by Plaintiff I find no basis for

3

the claim made at Par. 17 of the Complaint and find this claim to be a mere unsupportable conclusion that is false in every respect. Neither Overwerx nor Overwatch Aerospace LLC use the name "Overwatch Group" as a means of identifying Overwatch Aerospace, LLC, whether as a source of goods or services or otherwise.

**Education and Early Career**

14.    I am a graduate of the University of Nottingham, England, with a Bachelor of Arts in History.

15.    I am an officer veteran of the British Armed Forces in which I held the command position of Captain in the 3rd Battalion Rifles Regiment.  After my discharge from the British Army in 2010 I began a business career.

16.    I have held a number of business roles since 2010, as employee, director (executive and non-executive), consultant and business owner and would consider myself to be an entrepreneur and investor in businesses.  From 2015 to 2019, I held the primary position of Managing Director of Nura Energy Ltd in the UK.

**My Association with Overwatch Optics and Overwatch Defense**

17.    It is not true that "*Hill and Michael owned and controlled Overwatch Defense*" as asserted at the Plaintiff's Document 8-2, p. 16.

18.    Mr. Hill, a named co-defendant in the Complaint, founded Overwatch Optics, LLC in 2016 and, to the best of my knowledge, he was the only manager thereof, consistent with the records of the Florida Secretary of State, attached hereto as Exhibit **AGM/1**. Overwatch Optics, LLC was dissolved, effective September 27, 2019 according to the records of the Florida Secretary of State for failure to file an annual report. See, again, Exhibit **AGM/1**.

19. To the best of my knowledge, Mr. Hill was also the sole founder and sole manager of Overwatch Defense, LLC, founded in 2017 and dissolved in 2020 for failure to file an annual report, consistent with the records of the Florida Secretary of State attached hereto as Exhibit **AGM/2**.

20. Regarding Mr. Hill's former companies, Overwatch Optics, LLC and Overwatch Defense, LLC, I was never a member, a manager, a director or an employee in either of these companies and have never held any position relating to management of or employment by Overwatch Defense, LLC. Nor did I ever have an informal role in managing or directing either of these companies.

21. I first met Mr. Hill in or around 2012 when I was introduced to him in London through a former British special forces military contact where we connected over our military backgrounds and our enduring sense of duty to keep supporting our respective armed force colleagues in any way we could. Based on my personal knowledge I confirm that Mr. Hill is a disabled veteran of the U.S. military and is also the sole and original inventor named in United States Patents 11,940,251 B2 and 11,067,374.

22. I can recall the first detailed conversations Mr. Hill and I had on the development of an armed unmanned system that could be launched by an individual soldier from a position of cover, which took place when we were both in London providing consultancy services for the law firm Gowling WLG. That would have been about 2014 to 2015.

23. In the time since that first meeting Mr. Hill and I have had many conversations about the development of new technologies for military use, whether involving precision optics or munitions concepts or both.

24. Also, at some time after that first meeting, Mr. Hill commenced work to develop a prototype of his inventive concept, researching potential industry partners and approaching investors, all of which eventually led to the incorporation by Mr. Hill of Overwatch Defense, LLC in October 2017.

25. I do not wish to overstate my role in the development efforts to demonstrate Mr. Hill's loitering munition concept or in assisting Mr. Hill in efforts of his company Overwatch Defense, nor take away any credit from Mr. Hill for driving the idea forward. Mr, Hill was the sole driving force in the US to realize a physical embodiment of his invention.  As mentioned above, I was never an owner, manager or employee in Overwatch Defense (nor Overwatch Optics). I have never lived in the US and so was not in a position to be able to provide on-the-ground support to Mr. Hill there. I was and remain an entrepreneur with various business interests and, at the relevant times, I was fully employed and engaged as Managing Director of Nura Energy Ltd in the UK (2015 – 2019) along with other business interests and roles in the UK.  What I was able to do for Mr. Hill, to develop the new Overwatch Defense business was to provide early funding, make business connections within the industry through my contacts and networks, and, from time to time, support Mr. Hill in business development and marketing and providing general commercial advice. Whilst my involvement had no formal legal association with Overwatch Defense, I was happy for my name to be associated with Overwatch Defense and to help market the business when it was considered that I could add value.  On business marketing materials I recall I was referred to as a "chief operating officer", but that was a title in name only and primarily for use with potential customers. I agreed to use of the title for the purposes of adding some gravitas and experience to the Overwatch Defense

team which was a start-up business. Mr. Hill arranged for me to have my own Overwatch Defense email address on June 11, 2018 (see Exhibit **AGM/36**) to support those efforts in the name of the company. I had been considering possibly acquiring an interest in Overwatch Defense, LLC at some point when the loitering munition project gained traction, e.g. with a settled product and first customer sales, and then I could possibly take on a paid role when the business could afford to do so, but nothing was ever formalized between Mr. Hill and me in that respect. That may seem unusual to have proceeded with such an informal arrangement, but it was important that any entrepreneurial support I provided to Mr. Hill and Overwatch Defense did not conflict with or unduly impinge on my work for Nura Energy.

26.    There was a strong relationship of trust between myself and Mr. Hill with a tacit understanding between us that if this venture made progress that the investment of my time, expertise and finance would be rewarded. It was understood that I could possibly be commensurately compensated at a later date, perhaps in a paid role and/or with an ownership interest.

27.    I was experienced in working with munitions and had a strong tactical understanding of their military applications, including anti-tank guided munitions having served as a Fire Support Group Commander in the UK Armed Forces. This coupled well with Mr. Hill's experience as an explosives operator. For these reasons I was interested in determining whether I should enter into business with Mr. Hill and his company Overwatch Defense, possibly as an investor or in another capacity. In order to prove the Overwatch Defense loiter munition concept, Mr. Hill and I therefore spent a lot of effort researching industry expertise and doing our due diligence on munition and aerospace engineering companies and consultants that could assist with the detailed

7

design, testing and build of the munition-carrying UAV for which Mr. Hill coined the name "Pholos". My efforts included considerable dialogue under non-disclosure agreements with various European munitions contractors. This contributed to building my knowledge base of proprietary supplier information some of which I shared with Mr. Hill and some of which was transferred to Ascent during the term of the Commercial Teaming Agreement ("CTA") up to the time Peter Fuchs ("Mr. Fuchs") abruptly terminated the CTA during November of 2018.

28.    Prior to any discussions with anyone with Ascent during 2017, Mr. Hill had already assessed that the coaxial design would be the preferred solution as the advantageous performance characteristics from a thrust to weight ratio perspective were well known, thereby enabling designs able to lift heavier payloads and operate for longer time periods, but with a lower acoustic signature relative to quadcopters, this aiding stealthy approach. My more recent tactical experience supported this assessment and validated its suitability for dismounted infantry operations due to increased ruggedness and portability over conventional quadcopters.

29.    Ideally, if there had been a coaxial UAV on the market that could have been readily adapted "as is" to lift and deploy the required anti-tank munition capabilities Overwatch Defense would have sought to partner with the source. During 2017 Mr. Hill looked at the limited options in the global market, first considering but then discounting the Chinese-made T-Drone (see Exhibits **AGM/3** and **AGM/30**), before seeing the Backcountry Drones' "First Ascent" and the Ascent AeroSystems, LLC "Sprite" on drone-specialist websites where drone hobbyists could share their designs / products on an open-source basis (see Exhibits **AGM/4 a**nd **AGM/5**).

8

30.    In collaboration with Mr. Hill, I could see that neither the First Ascent nor the Sprite were sufficiently capable of the performance required to carry the size of munition required for the Overwatch Defense loitering munition concept. Nor were these products in any way commensurate with the physical demands of military operations necessitating a Technology Readiness Level (TRL) 7/8 system. Nonetheless, Mr. Hill and I considered the potential for advancing and modifying a scaled version of one or the other of these platforms to meet the required lift and military specification. As later made clear to Ascent, more than simple incremental scaling would be required to meet the demands of military operations.

31.    It was very clear to see from the nature of the Plaintiff's products and their marketing materials (and their earlier incarnation as Backcountry Drones) that they were solely focused on commercial, non-military exploitation of their products, principally aimed at outdoor pursuits enthusiasts. The Meringer brothers were climbers and wanted a vehicle that could help them plot safe routes mid-climb and allow them and their fellow climbers to be more easily videoed while climbing.  From what I have seen, there was no suggestion whatsoever in either the Backcountry Drones or Plaintiff's literature during the time frame of October 2014 to at least September 2017 that they had contemplated or had any interest of note in military capabilities. Nor, based on the knowledge about Ascent that I received from Mr. Hill, did Ascent express any such interest in the early conversations between Ascent and Mr. Hill until after the non-disclosure agreement ("NDA") between Ascent and Overwatch Optics, LLC was signed and after Mr. Hill introduced his specific loitering munition concept. During my later discussions with Mr. Fuchs in June 2018 there was a very obvious lack of

9

military understanding which required explanation by me on the proposed tactical deployment of armed unmanned aerial systems.

32.  To demonstrate this, I have looked back at previous versions of the Plaintiff's website https://ascentaerosystems.com/ using the not-for-profit internet website archiving tool "Wayback Machine" (see https://web.archive.org/) and you can see at Exhibit **AGM/20** from July, 13 2017 that the general get-up and presentation of the homepage has no obvious defense specific imagery or language, showing images mainly of the Sprite UAV in its high visibility livery.  Whilst I can see that there may have been a tabbed page called "Military" I could not access that using this archiving tool.  The point being that the Plaintiff's marketing at this time was evidently commercially focused, not defense focused. I selected this image as it was the archive page shortly prior to when the Plaintiff and Mr. Hill made contact. However, this emphasis almost immediately starts to shift once the Plaintiff and Overwatch Defense start collaborating such that by October 15, 2017 (see Exhibit **AGM/21**) the homepage includes images more resonant with military end users, such as a khaki backpack and darker, lower-profile coloring of the UAVs.  By the time the Plaintiff unilaterally terminates the collaboration under the CTA in November 2018 Ascent's transformation into a defense focused business seems nearly complete, starkly evident when the Plaintiff launched its new product, the Spirit, in March 2019 (see Exhibit **AGM/22**). There is no doubt in my mind that the metamorphosis of the Plaintiff into a defense-focused UAV business was initiated as a result of all of the confidential military business intelligence and know how gleaned from Overwatch Defense and myself during 2017 and 2018; this went even as far as Ascent offering to customers a "weaponized payload" solution as can be seen in Exhibit **AGM/23** from June 2019.

10

To my knowledge, as at end November 2018, the Plaintiff had no UAV products that could carry a kinetic payload, had no munition product, munition license or partner and had certainly not integrated a certified munition onto any of its UAVs. Nearly six years later, and to my knowledge the Plaintiff still does not have such a capability within its business, although I have seen and heard evidence that it may be trying to do so in secret in collaboration with a defense industry partner.

33.  It was also obvious that the Meringer brothers were not particularly focused on commercially exploiting their First Ascent or the Sprite platform. That perhaps changed during the period in which the incorporation of Ascent AeroSystems, LLC occurred, coincident with the appearance and influence of Mr. Fuchs.  Rather, up to that period, the Meringers were uploading comprehensive designs and product descriptions onto open-source websites, such as *DIY Drones, Adafruit*, *UltiMaker Thingiverse* and *YouTube*, inviting the world at large to use those design details to build their own coaxial drones and provide feedback, including any enhancements. This public disclosure is evident from the following published references I have since located on the Internet: Exhibits **AGM/4**, **AGM/5** and **AGM/6**. The Meringers were also readily displaying in intimate detail at the InterDrone trade show in September 2017 (See Exhibit **AGM/37**) a "demonstration unit" of what I suspect was the conceptual model for what evolved into Ascent's direct drive configured Sprite 2 and/or the Spirit.

**My First Contacts with Ascent and Mr. Fuchs**

34.  I was aware of Mr. Hill's interest in exploring the possibility of creating a heavily modified and scaled-up version of one of the Plaintiff's coaxial drone designs for proof of concept of Mr. Hill's design innovation:  a drone equipped with a munition

11

payload. I recall that Mr. Hill had made contact with Ascent in the late summer or early fall of 2017 and that a teaming agreement had been entered into. I have seen Exhibit **AGM/10** which shows that Mr. Hill did make an early e-mail introduction with Mr. Fuchs in November 2017 but I confess that I had no recollection of that introduction whatsoever until Mr. Hill showed me that exhibit and must conclude that it cannot have been of any significance for it not to have registered with me. The reference to us being "business partners" I believe to be merely a reference to us being involved in previous businesses together and was not referencing that I was somehow a partner in Overwatch Defense at that time in any legal sense, although I probably did have in mind that in the future I would consider participating in that business in some capacity or other. I can see that the email address is an "effra-int.com" domain which was a UK-based risk consultancy business that I owned and managed at that time and which was not in any way connected to Overwatch Defense.

35.    In any event, it is clear from Exhibit **AGM/7** that I had completely forgotten about it and Mr. Fuchs when on June 8, 2018 I was introduced afresh by email to Mr. Fuchs, which introduction signaled the commencement of my limited involvement in Mr. Hill's collaborative effort with the Plaintiff. I recall that from June 2018 I participated in discussions with the Meringer brothers and also Mr. Fuchs, the CEO of the Plaintiff for the purposes of providing tactical awareness and some moral support to Mr. Hill in his general dealings with Mr. Fuchs and also in the context that I might provide assistance in sourcing any required funding for any future work with the Plaintiff or paying for license fees and needed an intimate understanding of the program of works involved. Aside from this focused contribution, I remained at arm's length from Mr. Hill's businesses, and I had no role in their operations at any location.

12

36.    As Mr. Hill and I got to know the Meringers and Mr. Fuchs better, myself only during the second half of 2018, I experienced firsthand the tension between them, with Mr. Fuchs, the CEO, appearing very frustrated not only at the Meringers' lack of commercial experience but also because they had already made publicly available enabling information for fabricating the Sprite and First Ascent designs. That included sharing details of the torsion spring folding blades technology, which I understand eventually formed the heart of the Plaintiff's patent US 10,093,417 B2 ('417 Patent) which was issued on October 9, 2018, referred to as the "**Ascent Patent**".

37.    I have read the '417 Patent (attached as **Exhibit AGM/8**) which was granted. It is directed to a drone or UAV which is coaxial. It is my understanding that the patent concerns rotor blades which collapse or fold upon a decrease in or absence of rotor blade rotation about the device's body, thereby minimizing damage to the device during a landing without the need for using landing gear. (See e.g. Exhibit **AGM/8** at Col. 2:13-30, as to the spring loading of the blades). It is also my understanding that this patent has been assigned to the Plaintiff.

38.    I can confirm that Overwatch Aerospace Ltd. has never adopted the torsion spring folding blade technology described in the '417 Patent because it would be superfluous and expensive over-engineering on a loitering munition drone that would never be expected to return to its operator or be re-used. It is also my understanding that, if desired, the same effect can be achieved with software by programming the blades to stop spinning on impact or at a certain altitude.

39.    Operationally, a one-way effect UAV does not necessarily need to have a safe landing to protect the blades from damage, which is apparently the only novel feature of the '417 Patent. For training and demonstration activity, since 2021, Overwatch

13

Aerospace Ltd. initially landed a Pholos UAV of its own design safely into a ground-based recapture device that would protect the vehicle and blades from damage but, more recently (i.e. since late 2022), it has devised a range of landing gears.

40. I am not able to comment further on the novelty of the Plaintiff's '417 Patent or prior art and must leave that to other experts, but auto-folding blades does not seem to be a particularly radical invention. Nor is it a design for which Overwatch Aerospace attached any value in relation to its business. I have been advised that the disclosed torsion spring component is a readily available "commercial off the shelf" product. Perhaps of greater import, it is my understanding that, except for the feature of collapsing or folding the rotor blades to minimize damage to an unmanned flying device during a landing, the '417 Patent does not protect detailed design features of the coaxial UAV illustrated in that patent (which features seem to be very similar or identical to features in the First Ascent). I believe it is important to ensure that there is no confusion on this point as it could be misleading as presented in the Complaint.

41. Mr. Hill and I shared our surprise that the US Patent office had not rejected the Meringers' application given that they had proactively made that limited technology known to the world at large on drone hobbyist websites (e.g. Exhibit **AGM/4** *DIY Drones* in October 2014) before the provisional patent application was filed on November 10, 2014.

42. The earliest publications that I have seen of the "innovation" that ended up as the Plaintiff's '417 Patent were made by the Merringer brothers in their earlier business venture doing business as "Backcountry Drones" and what they referred to as "The Backpacker Drone Project". You can see from on-line posts such as this YouTube video https://www.youtube.com/watch?v=82phDhYGT_0 first posted on 28 October

14

2014 that the Merringers' had made publicly available the complete internal workings of their "First Ascent" drone, including the torsion spring idea for auto-folding blades.

43. I am informed and believe that a 12-month grace period is permitted under US patent law, a rule that protects an inexperienced inventor that inadvertently shares an invention publicly before applying for a patent. It is by virtue of this grace period rule that the Plaintiff seems to have been able to make its application for the '417 Patent. But the important fact to me is that, aside from the single inventive feature of the '417 Patent, i.e., rotor blades, which collapse or fold upon a decrease or absence of rotor blade rotation, much other design information unrelated to the single inventive feature was publicly disclosed and clearly can no longer be trade secret information. At the time any such information was included in any designs or embodiments disclosed or delivered to me or Mr. Hill it was not trade secret information.

44. Going forward I doubt that the Plaintiff will make any more public disclosures of trade secret information as did the Meringer brothers, as I recall Mr. Fuchs verbally informing Mr. Hill and me that he was frantically trying to remove all publicly available materials revealing that the Meringer brothers had published trade secret information in order to extinguish as much evidence as possible of public disclosures and avoid invalidating any Ascent patent applications or voiding any claim of trade secret status. We may never learn of the extent to which Mr. Fuchs has successfully "scrubbed" the public records and, absent an understanding of what was actually removed from public access after publication, it is difficult or impossible to definitively understand just what information asserted in the Complaint is truly trade secret information. Based at least on the foregoing information, I must confess that I am very unclear as to what technical information, if any, could be categorically considered to be confidential

15

and/or trade secret information supposedly belonging to Ascent or its inventors and disclosed or delivered to myself or Mr. Hill. What is absolutely certain is that detailed technical information about the 417' Patent, the First Ascent and the Sprite were publicly available and made open source by the Plaintiff or the Ascent Founders long before the NDA was entered into between the Plaintiff and Overwatch Defense. Accordingly, my understanding is that all such publicly available information is specifically excluded from protection under the NDA and or the subsequent CTA and, by its very nature, could never be considered secret.

45.    Unless I am completely missing something, in its Complaint the Plaintiff has signally failed whatsoever to: (i) describe what trade secret information it claims to have disclosed to Overwatch Defense, (ii) demonstrate that the claimed trade secrets are indeed secret and proprietary to the Plaintiff, (iii) demonstrate that the information was actually shared with Overwatch Defense and in a manner that wholly satisfied the conditions of clause 2 of the NDA, and/or (iv) identify where the Plaintiff's trade secret information has somehow been utilized in Overwatch Aerospace Ltd's Pholos UAV.   In the absence of this information, presumably the Complaint must be dismissed for failure on the Plaintiff's part to have made any semblance of a substantive claim.

46.    Without wishing to labor this point, I am not able to distinguish between the alleged trade secret information belonging to Ascent and other "information" disclosed to me by Ascent, including information present in the mockups provided by Ascent. In part this is because Mr. Hill provided his design information to Ascent when instructing Ascent on how to create the mockups according to his specifications. The Complaint does not seem to distinguish the information Ascent claims as trade secrets from other

16

previously known information already in the public domain provided to Mr. Hill or myself. Nor do I understand how to bound the scope of Mr. Hill's "promise" quoted in Par 46 of the Complaint to: "not use any information provided by Ascent or derived from Ascent's disclosures in any manner in the future". Given the apparent lack of a clear distinction between what was a trade secret and what was not a trade secret, I am quite skeptical that there was ever a mutual understanding of what was meant by "information" nor that there had ever been a proper and thorough cataloguing and classification exercise undertaken to verify that the referenced "information" was subject to the terms of the NDA or CTA at all.

47.    Thus, in my mind it was not possible for me to have sufficiently understood what, if any, information ever disclosed by Mr. Fuchs or the Meringer brothers to myself or Mr. Hill remains or, at the time of disclosure was, protectable as a trade secret. In part this is because the alleged but imprecisely defined trade secret information (i) may have included information that had already been publicly disclosed, including but not limited to information published by the Meringer brothers, and (ii) may have included technical information or know how commonly known to others (e.g., including but not limited to persons skilled in the art) and, (iii) was so broadly described that it was never sufficiently defined by Ascent during the pendency of the 2019 law suit brought against Overwatch Defense LLC and was not sufficiently defined in the present law suit to have informed Mr. Hill or me, with clarity and particularity, exactly what information Ascent has, correct or not, considered to be trade secret information allegedly used by a defendant in violation of applicable contract provisions or trade secret laws. That is, after carefully reading the Complaint, the associated preliminary injunction motion, and both the memorandum and declaration in support of an

injunction, I am at a loss as to what specific information which the Plaintiff may have disclosed to Mr. Hill or to me is truly trade secret information of the Plaintiff as to be the basis of a contract breach by Overwatch Defense, LLC or a liability under the applicable trade secret laws; and, even if there truly was some such genuine trade secret information disclosed to Mr. Hill or myself or otherwise to Overwatch Defense, LLC. I am also at a complete loss as to what basis there is to believe that Overwatch Defense, LLC (now dissolved) had or that any named defendant has ever had possession of, or has made use of, any trade secret information in breach of the terms of the non-disclosure agreement or the Commercial Teaming Agreement (CTA) made effective during 2017; or that any named defendant has ever breached these agreements or possibly applicable laws or that such information continues to meet the requirements for retaining trade secret status some seven years after the alleged disclosure of questionable trade secret information occurred.

48. Clearly, clause 1 of the NDA provides that information is no longer confidential after becoming publicly known to others or if developed by the receiving party without use of information of the disclosing party. As far as I understand, the receiving party could have been Overwatch Optics, LLC or possibly Overwatch Defense, whilst to my knowledge neither Overwerx Ltd. nor Overwatch Aerospace Ltd. has had any access to trade secret information of Ascent and has not otherwise received any trade secret information disclosed by Ascent to Overwatch Defense LLC.

49. I was not a party to the NDA between Overwatch Optics and Ascent and cannot state that I had any awareness of any obligation to protect information disclosed directly to me or to Overwatch Optics under the NDA; and no information disclosed directly to me by Ascent appears to be within the literal scope of the protections afforded Ascent

under the NDA; and, even if I were a party to the NDA, absent clear identification of trade secret information to provide informed notification thereof to me, I have no evidence of the extent to which Ascent did comply with the "Designation" requirements under clause 2 of the NDA. That is, there is no evidence in my possession that Ascent provided informed notice to me that any information provided directly to me included trade secret information. This is especially relevant because I am aware that the mockups which I received were prepared by Ascent under the directions and specifications created by Mr. Hill, whilst Ascent has not and does not distinguish its alleged trade secret information from the information Mr. Hill provided to Ascent.

**Coaxial technologies for aircraft**

50. I am not an expert in the history of coaxial technologies but I do know that the Coaxial rotary technology used in aircraft is old technology with prior use in crewed or uncrewed aircraft; and I offer some context here to counter any false impressions, implied or stated, in the Complaint and Declaration that the Plaintiff has some form of proprietary claim to anything disclosed to the defendants on or after 27 September 2017 in the engineering field of coaxial flight other than to the inventive rotor blades which collapse or fold under the '417 Patent.

51. Based on a simple internet search of coaxial flight this Wikipedia page is very helpful – *https://en.wikipedia.org/wiki/Coaxial-rotor_aircraft* – as it states that the first known coaxial helicopter was designed and made in July 1754 in Russia. The first British patent for a coaxial aircraft was granted in 1859. There is particularly helpful explanation as to the advantages and disadvantages of the coaxial system which I shall not repeat here, other than to note the features of the technology that Mr. Hill and I

19

were most interested in for a man-portable loitering munition: a sufficiently high power to lift ratio to carry a heavy kinetic payload and low acoustic signature (for stealthy approach).  About thirty coaxial helicopters and UAVs (i.e. known since 1900) are listed in the article, including NASA's "Ingenuity" Mars lander dated 2021. At Exhibit **AGM/3** I provide a non-exhaustive suite of examples of those.

52.    The coaxial UAV in an overtly "stack" configuration (to be distinguished from the configuration of a helicopter or a multi-rotor coaxial system) is not new either and an earlier example of that is the "micro-rotorcraft surveillance unit". See Exhibit **AGM/9**, US patent application 2005/0051667 A1, first filed in 2001, some thirteen years before Ascent and/or the Meringers decided to design their own version.  I believe that this earlier patent application may have formed the conceptual basis for a coaxial UAV called the Voyeur (see Exhibit **AGM/4**), apparently tested by the US Air Force in 2008 (see Exhibit **AGM/29**).  The Tiger Moth UAV in 2012 seems to be a further evolution of the Voyeur, see Exhibit **AGM/35**.

53.    I have discussed with Overwatch Aerospace Ltd.'s engineers the coaxial design on many occasions, and they have always advised that the coaxial stack design is not inherently complex or sophisticated and often featured on standard quadcopters where four sets of coaxial stacks are utilized (see Exhibit **AGM/3** showing a Malloy Aeronautics T400 as an example). With coaxial systems there are only a very limited number of configurations through which they can successfully operate.  In short, you have two propellers that each require to be driven by a motor (or sometimes two motors, one for each blade set) in opposite rotating directions. The blade, motor and power units can only be ordered in a limited number of different ways. Further, all

UAVs have modularity at the core of their design so that they can interface with third party equipment.

54. The primary trade secret information in the development of aircraft, whether UAVs or otherwise, are the results of the engineering and scientific effort that go into determining with absolute precision the configuration and specifications of components, including defining and calculating the vehicle's center of gravity, e.g., to safely perform the required lift and flight characteristics to fulfill a pre-defined performance specification, and all of the accompanying test and evaluation data.

55. However, the mechanical aspects of an aircraft design are merely only one aspect of the capability resulting from the engineering and scientific effort. The design also requires development of specialized software, radios, payloads and a custom power solution unless there are compatible "commercial off the shelf" products, all of which may vary for differing operational tasks such as surveillance, mapping, security, defense, logistics, re-foresting, transport or otherwise. The true value to our customers (and why they may buy our products over another similar UAV) is the combining of a specialized task-specific vehicle design with integrated task-specific payloads, sensors and software which together create a capability integrated within one platform. For example, a UAV loitering munition could have the best range, speed, precision, kinetic effect and endurance, but would be useless on the battlefield if it does not have signal-jamming countermeasure capabilities. Otherwise, the enemy will simply knock each UAV out before it reaches the front-line.

**First dealings with Ascent: The NDA and Teaming Agreement**

56. I do not know when Overwatch Optics or Overwatch Defense made first contact with Ascent in 2017 and must defer to Mr. Hill for that. I can see from Exhibit **AGM/7**

21

that my first contact was when I was introduced by email on 8 June 2018, and I recall that I was present with Mr. Hill at an in-person meeting with them at their Syracuse offices on 16 October 2018. As evidenced from my comments preserved in Exhibit **AGM/7** I was aware of the trusted collaborative relationship under the CTA for a strategic partnership involving Mr. Fuchs by which I did not hesitate to disclose personal knowledge key to building product awareness within UK Ministry of Defence end user stakeholder communities, such as arranging product demonstrations, all with the objective of securing sales. I have no reason to think Mr. Hill was any less open about sharing with Mr. Fuchs his proprietary marketing knowledge and making business introductions to significant stakeholder contacts at the US Department of Defense to build a solid initiative among partners to secure funding and orders to benefit both parties as contemplated under the CTA.

57.    However,  I should reiterate that when I traveled to Syracuse to first meet in person the Ascent founders on October 16, 2018, I continued to disclose sensitive marketing information to Mr. Fuchs about Overwatch Defense and in support of Mr. Hill's goals, which information I would not have disclosed to Mr. Fuchs or otherwise in the presence of Mr. Fuchs had there not been a confidentiality undertaking in the CTA or in an NDA to protect disclosure of my confidential information which was of strategic value to Overwatch Defense and which was disclosed for the purpose of helping Overwatch Defense succeed in developing and selling loitering munitions with Ascent under the CTA.

58.    It was in this context that when I traveled to meet the Ascent founders in Syracuse my role was primarily that of an informed unpaid advisor to, and potential investor in Overwatch Defense, ready to disclose valuable market-related insights in confidence

to Mr. Fuchs and the other founders, but not as an owner, manager or representative with respect to either of Mr. Hill's companies and not as an employee or paid consultant of either of them. My primary motivation was to assess the caliber of the Ascent management team and their suitability as partners for the defense sector focused activity we had briefed them on during the course of my engagements from June 2018. I never met with Ascent in Connecticut, and I never traveled there or otherwise participated in any activity there in relation to a drone or in reference to Ascent. I therefore deny any contact with Connecticut as the forum.

59. I am aware that the NDA signed by Overwatch Optics and the Plaintiff on 27 September 2017 was to enable exploratory discussions to take place around forming a collaboration to develop the weaponized coaxial loitering munition first conceived by Mr. Hill, who first disclosed his munition concepts to the Plaintiff during those exploratory discussions which were initiated by Overwatch Defense because the Plaintiff appeared to possess some UAV design experience potentially useful for future design work, but, in hindsight and with the specific UAV knowledge I have acquired since 2020, I may have underestimated the drawback of working with developers, program managers or company executives having no experience in designing a military grade vehicle capable of carrying the necessary payload requirements.

60. I do not recall being a party to any discussions about the NDA which preceded its signing, whether with Mr. Hill or otherwise in the presence of Mr. Fuchs, and I cannot even say with certainty that I was aware of the NDA back when it was signed.

61. Having now read that NDA I would observe that, in addition to the provisions in it that the Plaintiff drew attention to in the Complaint, it is also worth highlighting

23

certain of the qualifications as to what information is not covered by the NDA, including information: (i) not marked as confidential and proprietary at the time it is disclosed; (ii) wholly and independently developed by the receiving party; (iii) that is or has become generally known to the public; or (iv) at the time of disclosure was known to the receiving party free of restriction. Although I cannot suggest that I was aware of these terms during 2017 and 2018, I do not recall any information disclosed directly to me during 2018 by Ascent that was marked or flagged in any manner as being confidential or secret.  On the contrary, regarding the Sprite UAV, I knew from the outset that it was freely available as open-source content on the internet and was never regarded as anything beyond hobby grade amateur technology. For example, you can read at Exhibit **AGM/32** that Ascent arranged to deliver a "Sprite 2 Static Demonstrator" to me in the UK on June 22, 2018 and there was no suggestion in any of that communication that it or any documentation sent with it was to be treated in any way as confidential.

62.    I have noted the suggestion by the Ascent Founders that Mr. Hill had somehow misled them as to having been working on the project for some time and having a patent in the loitering munition concept as early as September 23, 2017. I would consider the Plaintiff's characterization of having been misled as misleading and incorrect in the context that Mr. Hill was well on his way in an effort to secure patent rights in his invention, as he had already prepared drawings of his concept in early September 2017 (see Exhibit **AGM/24**) and at about the time he signed the NDA I understand he was already working with an attorney to substantively prepare his first provisional patent application which was actually filed less than two weeks later. I have never known Mr. Hill to be highly legalistic or of a "hair-splitting" nature during casual

24

conversations. As a lay person I would think that a patent application an attorney is preparing to file imminently might informally be referred to as a patent or as a patent filing. Loosely describing the paperwork as a patent is not a far stretch because the paperwork was an early version of the patent which would hopefully, and eventually, become enforceable. If Mr. Hill did indeed so choose his words, I am certain that he would have done so with two objectives in mind, first to ensure a successful first pitch with the Plaintiff and second to ensure that the Plaintiff, an unknown quantity at this stage in the relationship, would not be immediately inclined to misappropriate, i.e., steal, his ideas.  In that context, some latitude should be afforded to Mr. Hill in interpreting his words rather than insisting on holding him to a legal standard inconsistent with what he meant. In any event, well in advance of when the Commercial Teaming Agreement (CTA) was signed (about five weeks later) the Patent application had been filed.

63.    Just as I was not personally involved to my recollection in the discussions leading to the NDA, I have no recollection of being personally involved in discussions leading to the CTA.  I can see that the CTA was signed by Mr. Hill on or about November 12, 2017 on behalf of Overwatch Defense and that it unequivocally defines the first "Business Initiative" as the development of a "Kinetic UAS Coaxial Weapon System", that being the specific concept that Mr. Hill first conceived, later disclosed to me and, still later, introduced to the Plaintiff during their earlier exploratory discussions which occurred under the NDA during September, October and early November of 2017.

64.    The CTA expressly and unambiguously defines the workshare split between the Plaintiff (responsible for providing a UAV platform including flight control software

25

capable of carrying a munition as specified by Overwatch Defense) and Overwatch Defense (responsible for the munitions, and providing the warhead hardware, imaging system, ground station, and mission and munition specific software). In detail, the Plaintiff was to create a new coaxial UAV design in accord with a "to-be-defined" specification (i.e. a specification that Overwatch Defense would prepare) and assemble the complete UAV.

65. To my knowledge Mr. Hill had been very clear with the Plaintiff from the start that Overwatch Defense did not own a proprietary munitions solution and that Overwatch Defense was in the process of identifying potential partners for designing, testing and building a specific munition for these purposes, which I recall Mr. Hill desired it to be an anti-armor high explosive shape charge in the first instance.

66. Given the above-described workshare split under the CTA, I am struggling to understand how the Plaintiff can now be claiming that the concept of the weapons system or the design of the weapons system is theirs. In all events I deny any knowledge of any contribution by Ascent or its personnel to any of the concepts Mr. Hill was then working on.  It makes no logical sense given the complete absence of any technical knowledge amongst the Ascent Founders relating to munitions nor any tactical employment experience necessary to understand the capability gap Mr. Hill so rightly sought to remedy. If the Plaintiff truly had ownership of the concept and owned inventorship rights in Mr. Hill's patents, why didn't the Plaintiff early on simply reject the initial co-development approach proposed by Mr. Hill and swiftly confirm that they already had such a concept or design and did not need to enter into the CTA with Overwatch Defense? The Meringer brothers had always been clear in their intent to service the hobbiest and sport climbing market and it was, in my view,

26

the personal ambition of Mr. Fuchs at hearing Mr. Hill describe the size of the defense opportunity and the need to demonstrate his value added as CEO to the Meringer brothers that led to a departure from the workshare split and termination of the CTA. Furthermore, during our in-person meetings with Mr. Fuchs there was an awkwardness that I attributed to Mr. Fuchs' 'know it all mentality' and the inferiority complex he exhibited, particularly when dealing with Mr. Hill as a former senior at the US DoD which, in my view, further motivated Mr. Fuchs' desire to terminate the CTA. Towards me Mr. Fuchs would often patronize, perhaps given my younger age, which I found odd given my military and business career to date, and which certainly meant no loyalty was present between us.

67. To my knowledge, the Ascent Founders, who I met and spoke to had no military experience among them and no understanding of weapons systems and all the various different types of munitions and kinetic effects (e.g. anti-armor, area effect, anti-structure etc). They appeared to be clueless in this subject area and never displayed an awareness of the strict regulatory environment that governs munitions in the US or elsewhere. Nor was I aware of them having, prior to meeting Mr. Hill, any military business connections with the US Department of Defense or with any other Sovereign defense customer. If anything, I would have observed that the Meringer brothers were more reticent to enter the defense sector, perhaps for ethically minded reasons, but they were impressed by Mr. Hill's exemplary service record and my own military service in Afghanistan and the associated justifications we provided for the need for such a weaponized system.

**Overwatch Defense Patent US 11,067,374 A1 and US 11,940,251 B2 (Overwatch Patents)**

68. Given all of the above, I am incredulous that Ascent now claims ownership in the Overwatch Patents (reference Exhibits **AGM/26** and **AGM/27**), the subject of which was disclosed to the Plaintiff in good faith by Mr. Hill (as inventor) during 2017 on behalf of Overwatch Defense.

69. I am also surprised that Ascent chose to wait nearly seven years since the first provisional application filing date to suddenly make this claim of ownership in the Overwatch Patents, a timing that points me towards the Plaintiff having an ulterior motive for initiating this litigation, perhaps related to their recent acquisition by Robinson Helicopters at a time when the growing success of Overwatch Aerospace, including recent support to a US military exercise, has grown in publicity.

70. To my knowledge the Plaintiff contributed no design or conceptual input into the weaponized coaxial loitering munition concept, which was wholly conceived by Mr. Hill and documented through efforts of Overwatch Defense in the form described to the Plaintiff's Mr. Fuchs in confidence on April 30, 2018 (see Exhibit **AGM/33**). To my knowledge the Plaintiff did not develop any design information based on or that otherwise contributed to the weaponized coaxial loitering munition concept during the term of the CTA.

71. For the avoidance of any doubt, at the time of first contact between Mr. Hill and Ascent, by September 23, 2017 drawings for the provisional patent application had already been procured by Mr. Hill on or about September 3, 2017 in order to expedite moving forward with his patent attorney to file his first provisional patent application (see Exhibit **AGM/24**).

72.   Prior to entering into the CTA the Plaintiff was not and, to my knowledge, had never been in the business of designing, manufacturing or selling munitions or military related equipment and had no known technical or commercial expertise in this field or the necessary relevant military knowledge or experience.

73.   Presumably if Ascent already had its own coaxial UAV loitering munition concept or design Ascent would have declined to enter into any discussions with Overwatch Defense or sign the CTA.

74.   The Overwatch Patents accurately record the novel concept of a coaxial loitering munition, specifically with a downward facing camera to enable precision remote targeting.  The drawings used to represent the coaxial aerial vehicle (as opposed to only the munition component) are merely schematic in nature and non-technical, intended solely for the purposes of illustrating the inventive concept.

75.   If there was any passing resemblance between subject matter disclosed in any of the Overwatch Patents and trade secret information embodied in an existing Plaintiff platform, which I cannot see myself, it was coincidental.  The diagram in the Plaintiff's '417 Patent (which seems to be one of the earliest of the Plaintiff's platform designs, the "First Ascent") is markedly different from the outline drawing of the coaxial munition-containing embodiment shown in the Overwatch Patents. I am not a technical expert, but the illustrations which appear in the Overwatch Patents are wholly conceptual in nature and bear no outward resemblance whatsoever to the shape of either the First Ascent or the Sprite, other than that they are all coaxial UAVs in a stack configuration.

76.   It is therefore signally and manifestly untrue the Plaintiff's statements at paragraphs 81 and 82 of the Complaint in which it is falsely alleged, first that "*Hill and Overwatch*

29

*Defense…falsely claimed that Hill was the inventor of Ascent's coaxial drone with an explosive component and imaging system*" and second, that "*Two of Ascent's founders, however, conceived of and reduced that claimed invention to practice before Hill, and Hill wrongly misappropriated it and then fraudulently claimed it as his own*". Nowhere in the Overwatch Patent is it claimed that Mr. Hill was the inventor of Ascent's coaxial drone. Instead, in the Overwatch Patent (Exhibit **AGM/8**, p.27) I can clearly read in unambiguous terms that Mr. Hill diligently made reference to Ascent's US patent 10,093,41 solely in the context of it being an exemplar of the type of coaxial drone that could potentially be modified to achieve the invention. Mr. Hill could equally have referred to other coaxial drones for this purpose (see for example, Exhibits **AGM/9** and **AGM/30**), but perhaps he referenced the Ascent Patent out of courtesy given the blossoming collaboration under the NDA and with the CTA on the near horizon. I can attest that the Ascent's Founders did not conceive of and reduce to practice Mr. Hill's patented invention before Mr. Hill, because I know that Mr. Hill conceived of the invention and reduced it to practice before Ascent disclosed anything to Mr. Hill or to me. I also know that Ascent disclosed nothing to us that evidenced any pre-existing design of their own even after the NDA or CTA was signed. For example, the Ascent Founders did not claim to have been inventing in the field of Mr. Hill's invention before Mr. Hill or disclose any information to us that indicated they believed they had invented what was claimed in Mr. Hill's patent application before Mr. Hill. Furthermore, if they had done so, I would have expected them to tell us that after the NDA or CTA had been signed.

77. It is worth stressing that the Overwatch Patents do not lay claim to the broad and general idea of having an explosive payload delivered by a drone or even by a coaxial

drone. Put bluntly, any moving platform, whether in air, at sea or over land, could be adapted to carry explosives to a target. The Overwatch Patents instead describe a very specific configuration of a coaxial weapons system, including how the munition would be able to be delivered to a target with precision and as part of the entire coaxial weapons system which is delivered to the target.

**The Plaintiff's reliance on Overwatch Defense for securing Private Funding**

78. Given the very evident and undeniable lack of military experience, tactical battlefield knowledge and doctrinal understanding among all of the Ascent Founders, it is important to make of record the extent to which the Plaintiff had been assimilating know how and knowledge about the defense industry and battlefield capability requirements from Mr. Hill and myself throughout the collaboration activity under the guise of pursuing the CTA objectives, for which Ascent made minimal progress during the12 month period culminating with an uncalled for and abrupt termination in November 2018.

79. This is perhaps best evidenced from the Plaintiff's self-described "Private Placement Memorandum" at Exhibit **AGM/17** that I understand was prepared in or about June 2018 for the purposes of the Plaintiff actively pursuing fundraising from private investors, this representing a dramatic shift, whereby Plaintiff transformed its offering, having gone from a recreational hobbyist outfit in 2017 to one that is heavily defense-focused despite having no suitable pedigree within the management team for defense related applications. It is therefore possible in my view that the only party to the NDA and/or CTA who acquired information of competitive value that was confidential was the Plaintiff and not Mr. Hill or Overwatch Defense.

31

80. Slide 17 of Exhibit **AGM/17** is dedicated to the "partnering" with Overwatch Defense. The image of a coaxial UAV in this slide is a mockup and does not represent an operational product. I can see too the silhouettes of the "guided grenade" and "smart mortar" which reflected the different sizes and capabilities of products that Overwatch Defense had conceived and specified. Also, the background rendering of troops hand launching a drone was produced and provided by Overwatch Defense.

81. Elsewhere in this document, Overwatch Defense's concepts and ideas are littered, including for example: (i) at slide 13 the three CAD images on the left hand side of the page are in essence CAD mockups of the Overwatch Defense scaled Pholos 1, 2 and 3; (ii) at slide 18 the launch tube concept, whilst not inherently novel, was one that we introduced to the Plaintiff as a desirable launch system for military requirements; and (iii) at slide 20 the "Vehicle Roadmap" shamelessly presents multiple Overwatch Defense novel concepts.

82. I believe that this Private Placement Memorandum not only shows the extent to which the Plaintiff had been dependent on Overwatch Defense in developing and disclosing to Ascent under the CTA credible military capability concepts for coaxial UAVs, but also evidences that the Plaintiff understood the importance of misappropriating or otherwise acquiring those as Ascent's knowledge and capabilities for convincing investors to invest in the Plaintiff.

83. As a corollary to this presentation, I would recall again Exhibit **AGM/13** and the report in September 2018 of the Plaintiff's "Binding LOI" with an investor business based in Canada, Universal mCloud, for an equity stake in the Plaintiff. Whilst I do not know for a fact that the Private Placement Memorandum or similar document with Overwatch Defense slides and concepts embedded were shared with Universal

mCloud as part of any investor roadshow or presentations, it would be surprising for these to have been removed.

84.     I was not consulted by the Plaintiff about the content of the Private Placement Memorandum which was shared with me for information only by Mr. Fuchs on June 25, 2018 by email (Exhibit **AGM/32**). I am not aware that the Plaintiff approached Mr. Hill for his consent to Overwatch Defense materials and concepts being included in it. It is my opinion that by this stage Mr. Fuchs had already committed to pursuing the defense market without Overwatch and continued in bad faith to engage merely to acquire whatever knowledge, both technical and commercial, possible to support his search for defense contracts, industry partners and funders.

**Miscellaneous**

85.     I note how the Ascent Founders have tried to spin the Tactical World Magazine article to their advantage, but the record must be corrected on that as it was Mr. Hill that approached and engaged the journalist to write the article. The journalist clearly identified that the revolutionary aspect of the system was its precision-strike loitering munition capability, with the downward facing camera in the warhead, not the UAV. There were already intelligence, surveillance and reconnaissance ("ISR") UAVs in service in the UK and US in 2017 and so the Plaintiff's UAVs were not offering any unique capability without the ability to deliver kinetic effect. I am confident that General Mullholand, Comd. SOCOM, would certainly not have been impressed and motivated to make the comments contained in the article by a capability as rudimentary as the Sprite.

33

**The origin of the "Pholos" name**

86.    I have noted with incredulity the repeated assertion and/or implication in the Ascent Founders' declaration that the Plaintiff had some form of ownership in the name "Pholos".

87.    I can categorically confirm that Mr, Hill first came up with the "Pholos" as the name for the Overwatch Defense loitering munition UAV system, with reference to a Greek mythological creature known as the Arkadian Kentauros (Centaur) who made his home in a cave on Mount Pholoe. Part of that myth was that Pholos (sometimes spelt "Pholus") died from dropping a poisoned arrow on his foot, which resonated with Mr. Hill's thought of the Overwatch Defense munition being dropped on the enemy and my own Greek heritage.

88.    Whilst Mr. Hill and Overwatch Defense was happy for Pholos to be used as the name for the new anticipated weapons system, that was only intended in the context of the agreed terms of the CTA and there had not been any agreement or intention to pass rights in use of that name to the Plaintiff.

89.    This is all perhaps a moot point, as I have seen the Plaintiff's lawyer's letter from January 29, 2019 (Exhibit **AGM/12**) which the Plaintiff neglected to reference as part of its Complaint. In that letter the Plaintiff's lawyers expressly confirm that the name "Pholos" was provided by Overwatch Defense and they go on to unequivocally confirm on behalf of the Plaintiff, with reference to the name Pholos: "*Ascent has absolutely no interest in using ……….. this name*".

90.    Given this confirmatory statement by Carmody law firm on behalf of the Plaintiff, I assume that this matter is closed and do not propose to comment any further on it, nor on Overwatch Aerospace Ltd.'s ongoing use of the "Pholos" mark, (a registered

trademark in the UK) for its proprietary UAV product. I would only question why the Plaintiff suddenly has an interest in the name Pholos many years after formally disclaiming any ownership of it.

91. I attach copies of the four UK registrations containing the word mark "Pholos" as composite Exhibit **AGM/25**.

**The draft "License Agreement"**

92. I have seen the Ascent Founders' Declaration regarding the license agreement that was being negotiated between Ascent and Overwatch Defense and I must provide some context to what the content of that license agreement demonstrates regarding the extent of the Plaintiff's technological coaxial designs at that time and what the license fee structure represents.

93. Turning first to the headline quantum of the license fee and the payment structure under the license agreement, it is important to note that Mr. Hill and I had been seeking for Overwatch Defense a royalty-only fee structure based on unit sales. This made best commercial sense to Overwatch Defense as it meant that the limited available funds could be better directed at munition product development and business development activity. An upfront license fee meant that Overwatch Defense would need to source third-party funding.

94. We eventually and reluctantly conceded that a license fee component was the only way forward at Mr. Fuchs' insistence, on the basis that the Plaintiff needed funding themselves to procure and pay for the resources needed to undertake the design and development activity necessary to design the new coaxial UAVs that would meet Overwatch Defense's specifications. These were very challenging requirements as

the UAV needed to be able to lift a certain payload type (the focus at the time was on complex anti-armor shape charge munition capabilities.

95.     To ensure there is no confusion on this point, the Plaintiff did not have a coaxial UAV design that met Overwatch Defense's requirements and one would need to be designed afresh. The Spirit did not yet exist. The Sprite was not capable of lifting the desired payload nor was there sufficient on-board space and computer power to meet the munition engineering interface requirements. The First Ascent had a poorer specification than the Sprite.

96.     It is therefore not true and is misleading as alleged at Plaintiff's document 8-2, p.20, that "*Overwatch Defense offered to license Ascent's know-how and secrets for over $5 Million*". Overwatch Defense was willing to find US$5 Million in funding to pay on a product-by-product deliverables basis at some point in the future for the license of commercially viable military-grade loitering drones that met our specifications to deliver an acceptable munitions payload to a battlefield target, but none of that had yet been designed by Ascent. The know-how and secrets to which Ascent allege to refer did not yet exist. Accordingly, it would be more accurate to describe the draft agreement as a "product development and license agreement". I know this because I am the person who would have assisted Mr. Hill in raising the necessary funding to pay Ascent.

97.     You can see at clause 2 of the draft agreement which is Plaintiff's exhibit G that the payment structure of the license fee is comprised of an advance payment of US$1 Million, followed by milestone payments upon delivery of the designs and other deliverables for "Pholos II", "Pholos I" and "Pholos III", in that order. Those

deliverables for the three different UAV requirements, including the know-how and designs in them, **did not yet exist**.

98.   The value against which the US$5 Million "license fee" would be secured was for deliverables yet to exist and yet to be delivered to Overwatch Defense, i.e., it was not a payment for UAV designs or know how that already existed. Accordingly, any claim that the Plaintiff's know how had any value to Overwatch Defense by reference to the negotiated license fee is not true and makes no sense to me as the person who would have assisted in getting funding. Similarly, any assertion such as made in the January 19, 2019 letter to Mark Ledwell (Exhibit **AGM/12**) that any current negotiation by Overwatch Defense for introducing a coaxial UAV "*would represent a serious breach…*" is also inconsistent with what I know to be the facts at the time. Ascent did not have the capability of manufacturing to the specifications required of a Pholos loitering munition, and there was no such restrictive covenant in either the NDA or the CTA preventing Overwatch Defense from developing its own coaxial UAV or sourcing an alternate third party solution to meet the required specification.

99.   **To reiterate, and as stated elsewhere in this declaration, to my knowledge at the time the Plaintiff has no exclusive rights anywhere in the world in the concept of coaxial UAVs (whether in a stack configuration or otherwise) and I know of no legal basis on which Ascent has sought to assert the same.**

100.  Reluctantly I concurred with Mr. Hill's agreement to accept this payment structure, recognizing that would mean that I would need to assist Mr. Hill in finding investors for Overwatch Defense to fund the same, hence the need for entering into the Memorandum of Understanding (MoU) as an interim step before entering into the development and license agreement which could only be made effective after funding

37

had been secured. We knew that fund raising would be a challenge given: (i) the absence of a readily available UAV capability, (ii) Ascent's lack of experience in designing a battlefield hardened UAV, (iii) the Plaintiff's required development program identified in Exhibit I of the CTA, and (iv) the license fee structure, as Overwatch Defense would also be funding all of the design and development work that the Plaintiff needed to undertake to design the three UAVs as minimum viable products for delivering munitions but without any ownership interest in the foreground intellectual property that would be created in them.

101.  You can see from the covering email dated September 24, 2018 from Mr. Hill to Mr. Fuchs that we were close to closing negotiations on the MoU and the accompanying draft license agreement. However, before we had done so, in the days leading up to November 7, 2018, in a display of particularly sharp practice, Mr. Fuchs informed us by telephone that the license fee must be doubled to US$10 Million, an amount that was prohibitive for us and one that we could never justify to ourselves or to potential investors. In essence, Mr. Fuchs killed the effort, possibly with intentions of misappropriating the proprietary information Mr. Hill and I shared with him, which information is key to marketing a loiter munition capability, for the commercial gain of Ascent.

102.  There is no doubt in my mind that this eleventh hour reneging on the agreed fee structure was a cynical move by Mr. Fuchs to create the conditions for a withdrawal from negotiations on the basis that he had assessed that, with confidential information received by Ascent from Overwatch Defense under the CTA, the Plaintiff did not need Overwatch Defense to tap into the defense market and loitering munitions, particularly as Mr. Fuchs had been benefiting from our hard work in developing

38

defense focused customer relationships. In hindsight I would characterize it that Mr. Fuchs may have been unable to resist the financial allure of the defense market and sought to string Overwatch Defense along, casting Mr. Hill adrift only after extracting as much defense customer and market intelligence he could but before becoming bound to the terms of a product development contract. I later learned (Exhibit **AGM/13**) that, prior to the termination, Ascent had been in negotiations with an investor business based in Canada, Universal mCloud. In a follow-up report in March 2019 (Exhibit **AGM/14**) it was reported that the Plaintiff had also been negotiating a defense contract without our knowledge and had entered into a defense contract in December 2018 – i.e., almost immediately after terminating the CTA. I am confident that this is no coincidence.

103.  Overwatch Defense could not accept Mr. Fuchs' revised license fee proposal.  The draft MoU and the draft license agreement were therefore abandoned and not signed or entered into by either party and accordingly never took legal effect.

104.  Mr. Fuchs informed me by telephone on November 7, 2018 that the Plaintiff was preparing to terminate the CTA, a date I remember given Mr. Fuchs insistence on knowingly calling me during my birthday celebrations.  The Plaintiff unilaterally terminated the CTA in writing in a formal letter from Mr. Fuchs on November 26, 2018.

105.  As far as I am aware, at the time of the Plaintiff's termination of the CTA the Plaintiff still had not commenced the technical design and development of the new coaxial UAV systems that met Overwatch Defense's requirements.  In the absence of those designs, I fail to understand what trade secrets Ascent refers to that they could claim

were subsequently used by Overwatch Defense and that could be considered to be worth the seemingly exorbitant license fee.

106. For completeness, if and to the extent that a "Spirit" UAV was in development by the Plaintiff in or around November 2018, to my knowledge the Plaintiff disclosed no technical information about it to me or to Overwatch Defense. I may have seen an early-stage prototype being flown at Ascent's Syracuse facility on October 16, 2018 when I visited, but that was a cursory arm's length demonstration and I would categorize what I saw as perhaps TRL3 or TRL4 as it was not a mature vehicle and was flight-unstable.

107. Given all of the above, none of the following claims at the Plaintiff's Document 8-2, page 19, is true or could ever have been true: "*Ascent will suffer: (a) a loss of goodwill and damage to its reputation: (b) a loss of business and market share due to Defendants' unlawful competition; (c) price pressure from a competitor who stole its technology, and (d) the divergence of substantial profits and gains from the unauthorized uses of Ascent's Information. For all of these reasons, Ascent is likely to succeed on the merits of its breach of contract claim*". In fact, there was no breach, Ascent withdrew from the CTA, knowing it did not have the funding or the expertise to bring to the market a commercially viable loitering weapon in accordance with the Overwatch Patents. Ascent chose to hastily withdraw its first Connecticut complaint, moreover, because it knew it had no proof of the use or exploitation of any Ascent technology or "disclosures" made to Overwatch Defense and perhaps also knew that very little if any of it would have satisfied the NDA's definition of being confidential "Information".

40

**The First Connecticut Lawsuit 2019 Which Ascent Quickly Dropped**

108.  Both Mr. Hill and I were shocked when the Plaintiff filed its lawsuit on February 12, 2019 against Overwatch Defense in the District Court for the District of Connecticut. I was aware of a divergence in views as to what was rightfully the property of Overwatch Defense, and that which the Plaintiff believed was its property, and one item that had been irretrievably destroyed during testing. The First Connecticut complaint, Filed in District Court Case Number 3:19-cv-00210 on February 12, 2019, which is Doc. 8-16 in the pending Motion for Injunction in the present case, sued only Overwatch Defense, not Mr. Hill, alleging breach of the mutual NDA and the CTA. It also asserted that Overwatch Defense had, without explanation, breached the Ascent patent by breaching patent claims "directed to a method of landing an unmanned flying device." Id., ¶42 in connection with the use of and landing of "Ascents UAV" devices.

109.  I know that the CTA provided that disputes were to be resolved through escalation to CEO level, and thereafter an effort to pursue mediation or some similar method of private dispute resolution, but the Plaintiff made no such proposal and leapt direct straight to pursuing a court claim.  From my perspective this was a low-level dispute around the return of non-confidential materials and hardware worth not much more than about US$10,000.

110.  I have reviewed again the 2019 list of items that the Plaintiff sought the return of, and it is a reminder of how disingenuous the Plaintiff was being by bringing the lawsuit. The Sprite was a commercially available product that anyone could buy or make themselves from open-source materials made available by the Plaintiff. The Sprite had not been enhanced for the purposes of the CTA activity and was not fit for the

41

purposes of the loitering munition.  I am not able to comment on the extent to which they were embellished First Ascent vehicles, but my limited understanding is that the general configurations were broadly the same.  The Sprite 2 was also a commercially available product and when in June 2018 I received one unit from Ascent to trial it I could see that there were some subtle differences between this variant and the Sprite, but in essence it seemed to offer similar performance characteristics and was therefore also not fit for the purposes of the loitering munition requirement that Mr. Hill had specified. The two versions of "mockups" were resin 3D conceptual mockups of a more militarized-looking vehicle than the Sprite (see Exhibit **AGM/18**), which the Plaintiff had prepared based on Overwatch Defense's specifications and Mr. Hill's direct guidance given to Ascent in oral conversations, but they did not represent in outline or dimensions a viable aircraft for deployment.  I have seen an email dated October 23, 2018 from Jon Meringer to Mr. Hill in which he advised that it would take Ascent about 8 to 10 months to create a working prototype of the smaller "Pholos 1" mockup (see Exhibit **AGM/19**). From an engineering perspective, if the mockup did have any mechanical parts, these would simply not have been enabled to achieve the required flight capabilities for carrying a munition.  The mock-ups (see Exhibit **AGM/18**) bore no resemblance to what became the Spirit, but in the Ascent Spirit I can see where the Plaintiff has adopted our specifications.

111. I would have considered those two mockups to be Overwatch Defense property because they were made for Overwatch Defense to specifications that had been defined for the Plaintiff.  I was always uncomfortable that the return of those had been permitted in order to get Ascent to drop the lawsuit, as I still consider them to have been Overwatch Defense's property, and certainly not items that the Plaintiff would

have had the authority to present as its own. All that aside, I can confirm that the mockups bear no relationship whatsoever to any Overwatch Aerospace Ltd. designed UAV and did not contain any technical merit that would have justified any future design effort based thereon.

112. Overwatch Defense called upon a Canadian law firm, Gowling WLG, for assistance in the Connecticut suit. After negotiation, Mr. Hill signed a document as manager for Overwatch Defense in what became Exhibit M to Doc 8-17 in Ascent's Motion for Injunction in the present case, an alleged "settlement agreement." This document undertook to return or destroy a Sprite UAV, the two mock-ups for each of the "Pholos 1" and "Pholos 2", and a Sprite 2 UAV w/ground controller, along with a "Pelican case." Id., p.3 of Doc. 8-17. To note that the inclusion of reference to a "Spirit warhead static mockup" was erroneous as no such mockup was received by Overwatch Defense and the footnote records this fact. Also, for the record, I would dispute that these items were in fact "Information" as such term is defined in the NDA and at most this hardware could merely be classified as non-confidential free-issue loan equipment. In this document, Mr. Hill "verified" that he as CEO of Overwatch Defense had already or would destroy "all printed and electronic information" he had received from Ascent under the Mutual NDA. Id., p. 4. Mr. Hill also promised Ascent that "Overwatch will not use any information provided by Ascent or derived from Ascent's disclosures in any manner in the future." Id., p. 5. Finally, at page 6 Mr. Hill agreed on behalf of Overwatch Defense that "Overwatch will not infringe U.S. Patent no. 10, 093, 417 B2 at any time during the patent term." On March 22, 2019, a Gowling attorney wrote to the lawyer for Ascent a letter declaring that Overwatch Defense "is now in full compliance with the NDA and has satisfied every one of your

43

client's additional requests" and he demanded that Ascent "withdraw federal complaint no. 3:19-cv-00210 (KAD) immediately and, in any event, no later than Monday, March 25, 2019 by 5;00 pm." Doc 8-18 p. 2. This demand was followed up with another letter advising Ascent that its ongoing threats of legal action "violates Section N of the Teaming Agreement" and it gave Ascent a deadline for dismissing the Connecticut suit else it would turn the matter over to U.S. lawyers for a lawsuit against Ascent for damages for breach of the Teaming Agreement. Doc. 8-19 at 2. Ascent complied with this demand by filing a notice of dismissal under Rule 41(a)(1)(A)(1) on April 24, 2019. See Exhibit **AGM/34**, attaching doc. 9 in civil case number 3;19-cv-00210. To my knowledge, Mr. Hill received no subsequent communications from Ascent or its counsel advising of any failings on his part, or that of Overwatch Defense, in the promises made leading to the dismissal of the Connecticut lawsuit. Seeing no such communications, I understand that Mr. Hill reasonably believed that the dispute between the parties had been resolved.

113.    What this shows is that this 2019 lawsuit was dressed up as a breach of contract claim for the return of low value publicly available non-confidential Sprite UAVs and technically worthless mockups. In my opinion now and then it was a cynical strategy to hinder Overwatch Defense in its effort to raise the necessary third-party funding required to pursue a different coaxial UAV solution for its loiter munition concept and to derail partnership discussions with various munitions manufacturers. Mr. Fuchs knew that Overwatch Defense was fundraising, and a lawsuit would be the cheapest and most effective means of undermining those efforts. No experienced investor would want to be associated with a company that had a lawsuit filed against it based on alleged misappropriations of Intellectual Property and Mr. Fuchs and the Plaintiff

44

would have known that. This is in part why I believe Mr. Fuchs to be pursuing a disingenuous and dishonest course of action as Plaintiff in this lawsuit.

114. In settling the lawsuit so readily, the Plaintiff not only achieved its objective of interfering with and delaying a potential competitor from entering the market with its own loiter munition solution but also avoided the Plaintiff incurring significant additional costs and the chances of having the sham nature of their claim exposed.

115. The Complaint falsely implies that "only months" passed between the so-called "Settlement Agreement" and Mr. Hill's involvement in the UK companies Overwerx Ltd. and Overwatch Aerospace Ltd. In truth, over a year was consumed between Mr. Hill's signature on Exhibit M, in February 2019 and his execution of the papers agreeing to transfer Overwatch Defense's interest in his patents to Overwerx Ltd. As Mr. Hill's declaration shows, Hill had no reason to anticipate any further claims from Ascent: the matter was resolved; the parties had no claims against each other; and Ascent said and did nothing to advise Mr. Hill that it was pursuing the development of a drone loiter munition capability of its own or that it was likely to perceive the commercial development of Mr. Hill's patented technology into a viable weaponized drone system as a matter interfering with Ascent's plans, let alone a basis for a lawsuit. Moreover, neither party was under a non-compete restrictive covenant and so both of them were free to develop whatever drone technology they wished, within whatever limits remained under the NDA and CTA.

116. Overwatch Defense remained a Florida LLC attempting to develop a commercially suitable loiter munition capability after Mr. Hill signed Exhibit M in February 2019. However, financing from other sources was not forthcoming and with dwindling finances Mr. Hill eventually agreed that I should pursue prospective investors in the

45

UK willing to fund the development activity required to achieve a commercially viable drone loiter munition system.

**The Sierra Nevada Corporation Mission Systems UK Ltd (Sierra) claim of suspected reverse engineering**

117. It is reported by the Plaintiff that Sierra "*began collaborative discussions*" with the Plaintiff in Spring 2023. During those discussions the Plaintiff claims that the subject of "Overwatch" was discussed and that the Managing Director of Sierra advised an unnamed employee of the Plaintiff, first verbally and then in writing, that Overwatch Aerospace Ltd. ("OWA UK") had approached Sierra at some unspecified time and that Sierra had stopped all discussions with OWA UK because Sierra had "*concerns around reverse engineering*" (email from Hywel Baker to Paul Fermo on May 23, 2023 at 10.52am; Plaintiff's Exhibit Y). In that same email Mr. Baker also reports that Sierra is "*not under NDA with Overwatch*".

118. Further, Ascent has claimed that OWA UK directly requested Sierra to reverse engineer and replicate an unspecified Ascent coaxial drone, a representation that, it would appear, could only have come from a Sierra employee source, unless it is otherwise a fabrication on the part of Ascent.

119. I would like to correct Sierra's incorrect assertion that there was no non-disclosure agreement between OWA UK and Sierra and provide at Exhibit **AGM/15** a copy thereof signed by both parties: Mr. Lee Hasse on behalf of Sierra on August 6, 2021 and countersigned on behalf of OWA UK by myself on August 11, 2021 (the "Sierra NDA"). Mr. Hasse acknowledged safe receipt of that Sierra NDA by email on August 11, 2021 at 6.11pm. The confidentiality obligations under that Sierra NDA remain in force until August 6, 2027.

120. In summary of the business dealings that OWA UK had with Sierra, OWA UK made contact with Sierra on or about August 2021 for the purposes of exploring whether Sierra had a viable ground control station (GCS) solution for use with OWA UK's Pholos UAV.  OWA UK did not proceed with an order for Sierra's GCS products because, unfortunately, Sierra could not achieve a challenging delivery schedule.

121. At no point during OWA UK's discussions/negotiations with Sierra were they anything other than collaborative and enthusiastic about the potential sales opportunity; indeed, our recollection is that Mr. Baker was pushing very hard, along with his colleague Mr. Hasse, for the order from OWA UK as a means of stepping up their new production facility in Wales. No mention was ever made by Mr. Baker to any member of OWA UK staff of any concerns over OWA UK's product as regards reverse engineering, whether verbally or in writing.

122. Further, no technical information about the Pholos UAV was shared with Sierra.

123. Our records show that all communications with Sierra were concluded around April 2022, ultimately concluding with the return of a GCS unit to Sierra that OWA UK had taken on loan for test and evaluation purposes.

124. I would wish to reserve judgment on what Mr. Baker of Sierra may have been referencing in his email to ensure that further confusion is avoided if the Ascent Founders have willfully presented Sierra's position inaccurately in their declaration filed in support of obtaining a Preliminary Injunction.

125. It is imperative that we understand Sierra's position on these matters before I comment any further. On which note, upon receiving the Complaint, I have since written to Sierra seeking their explanation of the content of that email, together with the Plaintiff's allegation that an OWA UK representative requested that Sierra reverse

engineer an Ascent product. Whilst Sierra's response was wholly unsatisfactory and evasive, they did give a qualified confirmation that they have identified no one with knowledge of the alleged OWA UK request to reverse engineer an Ascent product. Regarding the content of the email reproduced as Plaintiff's Exhibit Y, Sierra have advised that the written statement related only to the existence of Sierra's "concerns" over future reverse engineering (i.e. they were not commenting on having identified evidence of reverse engineering having taken place). Sierra signally failed to address my concerns that Sierra may have breached the terms of the Sierra NDA, and we reserved our rights with Sierra in respect thereof.

126. Having an objective to receive a more full and frank explanation, I must make the following observations regarding the subject email. The only reasonable explanation for Mr. Baker to have any need whatsoever to check whether he was bound by an NDA was that Sierra knew that they had OWA UK confidential information and that they were preparing to share that with the Plaintiff and wanted to check whether they could lawfully do so. I would also observe that by virtue of that email, the Plaintiff was expressly placed on notice by Sierra that it may be about to receive sensitive OWA UK information and may have been seeking to procure a breach of the Sierra NDA by Sierra. Whether or not any OWA UK confidential information was subsequently disclosed will form part of further discovery, but the possible ill intent of the Plaintiff, acting in concert with Sierra in such an endeavor, is starkly supportable as revealed by this short communication.

**Background to the formation of the Overwatch Group**

127. Understanding that Mr. Hill fully expected to grow the business through Overwatch Defense, LLC in the US, I was committed to support this effort through fundraising

48

activity. The termination by the Plaintiff of the CTA and therefore collaboration with Overwatch Defense, and the prospect of the Plaintiff designing a new UAV to the specification that Overwatch Defense was seeking to be able to carry a loitering munition did not change that expectation to grow the business. What did precipitate the end of Overwatch Defense was the Plaintiff's vexatious claim against it for breach of the NDA and CTA in 2018 and filing the lawsuit in 2019 as a contrived effort to hinder efforts to grow the business of Overwatch Defense.

128. Mr. Fuchs knew that we were in discussions with potential investors in Overwatch Defense to enable it to survive and grow and as described elsewhere, I remain convinced that the 2019 lawsuit was no more than a cynical strategy to prevent Overwatch Defense from raising that funding and pursuing a different coaxial UAV solution. No experienced investor would want to be associated with a company that had a court claim filed against it and Mr. Fuchs and the Plaintiff would have known that.

129. During 2019 Mr. Hill's ill health had started to become a concern and it was agreed with Mr. Hill that I would start afresh with a new business away from the US in part due to the toxic after effect of the Plaintiff's 2019 lawsuit. It made sense to establish a new business in the UK where I am based and have a deep network of fellow veterans and industry partners and had also been sourcing investors. Also, the regulatory environment was slightly more favorable for doing business in munitions in the UK. I agreed that the new business would take on the patented loiter munition concept, and intellectual property disclosed in the two Overwatch Patents and other inventive concepts of Mr. Hill in consideration for a minority shareholding in the parent company, Overwerx Ltd and a consultancy arrangement. To achieve successful

49

fundraising from sophisticated investors they were always going to need to see the patent assets owned by and underpinning the business that they were investing in. There was no formal assignment of the name "Pholos" from Overwatch Defense to Overwerx Ltd, but that name was a trade name for Mr. Hill's technology and belonged to Overwatch Defense and Mr. Hill tacitly consented to Overwatch Aerospace Ltd., the UK company, using that name and he raised no objection to the continued use of the name "Overwatch".

130.    I incorporated Overwerx Ltd on January 14, 2020 as a group holding company and at inception I owned 100% of the stock in it, my intention being that this new company with a new name that I had devised would act as a holding company for successive business ventures that I would establish. The first of those was newly named by me as "Overwatch Aerospace" and on February 7, 2020 I incorporated that company in the UK as a direct wholly owned operating subsidiary of Overwerx Ltd.  It was at least 18 months later on August 19, 2021 that I decided to incorporate the US company Overwatch Aerospace, LLC as a direct subsidiary to Overwatch Aerospace Ltd to preserve the same corporate name in the US and prevent brand squatting.  The US subsidiary Overwatch Aerospace, LLC, a Florida LLC, as noted above has never traded and remains dormant to this day but would be used if it made commercial sense for doing future business in the US.

131.    I agreed with Mr. Hill to structure Overwerx Ltd so that he received some equity in this UK holding company, rather than the operating company, and for his contribution he would procure that Overwatch Defense would transfer the Overwatch Patents to Overwerx.  Accordingly, on January 31, 2020, Mr. Hill took ownership of 42% of the stock in Overwerx, simultaneously with three other UK private investors who together

subscribed for 15% of the stock in the company for a cash capital contribution, thereby reducing my holding to 43%. It was agreed with the new investors that Mr. Hill would have a right to nominate a representative as a statutory director of Overwerx Ltd, and he proceeded to nominate himself and was subsequently appointed on March 17, 2020, on the same day as he procured the transfer of the Overwatch Patents from Overwatch Defense LLC to Overwerx.

132. Whilst Mr. Hill did become a statutory director in Overwerx Ltd, it was not an executive role and could at best be considered a non-executive position with no executive or management responsibilities whatsoever. He did not participate in any board meetings. Mr. Hill was not a salaried employee and did not have a job title. Eventually, Mr. Hill resigned his role as statutory director on September 22, 2021, by which time his stock interest in Overwerx Ltd. had dropped below 10%. Mr. Hill had fully divested himself of all his stock in Overwerx Ltd. by May 21, 2023.

133. Mr. Hill was not and has never been a statutory director of Overwatch Aerospace Ltd, nor has he ever been an employee of that company. On a practical level he was simply not in any position to have day-to-day involvement in the operational business at Overwatch Aerospace Ltd. given that he was based permanently in the US.

134. Some months after Mr. Hill had become a shareholder in Overwerx Ltd., on July 1, 2020, I did see the merit in engaging Mr. Hill's services as an overseas consultant to Overwatch Aerospace Ltd for the principal purpose of ensuring a successful outcome in the final steps with the US Patent Office in respect of the award of the Overwatch Patents given that he was closest to those as inventor. If he was required for any other ancillary support services from time to time, that would have been requested on a case-by-case basis, but I do not recall that being called upon.

51

135. It is therefore simply not true that "*there is continuity in ownership, management, and assets*" between Overwerx Ltd. and/or Overwatch Aerospace Ltd and either of Overwatch Defense and/or Overwatch Optics as asserted at Plaintiff's Document 8-2, p. 16. It was instead the case that I found investors and arranged for the acquisition of the Overwatch Patents, and convinced Mr. Hill that it was a good business decision for him since the UK investors were willing to invest in a new company and were willing to finance the development of a commercially viable loitering drone with an appropriate munitions payload, which neither Mr. Hill and his companies nor Ascent had the financial means to do. Once this was accomplished the new UK registered operating company, Overwatch Aerospace Ltd., devoted the funds under independent management to develop the technology necessary to make a commercially viable product. Mr. Hill had some input into the specification and scope of that development, but little active role in it. A multi-disciplinary team comprised of employee engineers and managers and external consultants in other countries outside of the US managed this project. There was no continuity in ownership, management or assets.

136. It was a crucial business decision at the outset of the new business in the UK as to whether I pursued Overwatch Defense's strategy of identifying a UAV partner or whether the new business looked to design its own UAV solution. Still smarting from the bad faith behaviors displayed by Mr. Fuchs and the Plaintiff in terminating the collaboration with Overwatch Defense, and with a strong desire to control my own destiny with the new business, I took the decision to design and develop our own loiter munition capability and our own coaxial UAV platform in which Overwerx Ltd. would wholly own all new intellectual property.

52

137.    By this time, I had calculated the cost of engaging expert UAV and weapons engineers and starting from scratch would also be significantly more cost effective than seeking a license arrangement with third parties, and this also proved a better sell with third party investors given the increased control of the entirety of the product.  It also remained the case that there was still no coaxial drone manufacturer that had a pre-existing UAV that met our precise requirements.

138.    We started from first principles in preparing the specification for our new coaxial design and quite properly named it the "Pholos" with Mr. Hill's blessing.  In late 2020, Overwatch Aerospace Ltd. recruited a senior aerospace and weapons engineer who specializes in UAVs and munitions to lead the project, including defining the performance specifications that would be required of the new UAV to be able to deliver a heavy kinetic payload at distance to a target.  We identified and engaged a specialist UAV aerospace engineering consultancy in July 2021 to accelerate that effort, and they immediately undertook an independent "state of the art" review of publicly available technologies. Ironically, it was the publicly available open-source Chinese T-Drone (see Exhibit **AGM/28**), the vehicle that Mr. Hill had originally considered back in early 2017 before meeting Ascent, that proved to be the most useful coaxial UAV reference point in that review.  For the avoidance of any doubt, the purpose of the independent review by the engineering consultancy represented best engineering practice to identify what needed to be designed differently and improved upon from publicly available sources in order to create a superior UAV that could achieve or exceed the desired performance specification; it was not to copy or enable them to reverse engineer any prior art.  I would be willing to share that report for review with the Court or an independent expert, but only under appropriate

53

conditions of confidentiality that ensure that the Plaintiff is not given any access whatsoever to its contents, as it contains Overwatch Aerospace Ltd. trade secrets.

139.   The design was completed in or around the first quarter of 2022 when we had prototypes flying in the UK including at UK Ministry of Defence training facilities, although I would note that the Overwatch Aerospace engineers continually improved it as a capability since then. Within this timeframe we also sourced a munitions partner in Europe and it was Overwatch Group engineers that integrated that weapons system into the Pholos.

140.   Externally I can see that the Overwatch Pholos is markedly different in configuration to the Plaintiff's First Ascent, Sprite and now the Spirit and this is well demonstrated at Exhibit **AGM/16**. It does not require an expert eye to identify that the dimensions, relative positioning of the two sets of blades, the locations of the motors, batteries and cameras, all differ noticeably.

141.   I do not believe that the Plaintiff continues to build or sell First Ascent or Sprite drones; as at today's date they are not listed as Products on the Plaintiff's website which is limited to the Spirit and a new coaxial UAV that Ascent have called the "NX30". To my knowledge the Spirit was only released by the Plaintiff in about March 2019 (see Exhibit **AGM/22**), long after the Plaintiff terminated the CTA. I cannot therefore see how the Overwatch Pholos and the Ascent Spirit can have had any common genesis, save that it is obvious that the Plaintiff has adopted the darker color schemes for its Spirit vehicles that Overwatch Defense had earlier introduced and mandated for the original display mockups that Ascent prepared for Overwatch Defense under the CTA. Overwatch Defense knew that the darker color scheme would resonate with defense customers.

54

142. Mr. Hill did not participate in the day-to-day running of the new business but remained supportive and connected with us, although he soon resigned as a director in 2021. Over time, he also reduced his minority shareholding and by 2023 he had fully exited the business.

143. As regards whether the Overwatch Group has used any of the Plaintiff's confidential information, to my knowledge none of the information listed as purportedly being confidential, proprietary and/or trade secret information that the Plaintiff purports to have provided to Overwatch Defense under the NDA or CTA has ever been received or used by the Overwatch Group and I can confirm that the Overwatch Group's coaxial UAV known as the Pholos was designed from first principles without any reliance whatsoever on either Ascent trade secrets or, for that matter, Ascent open source information. Specifically, Overwatch Aerospace Ltd. has never had or used any 3D CAD STEP files as have been referenced. I do not have the expertise to comment on what the Plaintiff is claiming is evidence of Overwatch Aerospace wrongdoing, but I suspect that what is being claimed represents: (i) standard engineering construction and/or best practice (e.g. modular design is standard), or (ii) a "fit form and function" solution (e.g. a radial bolt pattern); or (iii) a publicly available non-confidential engineering design (e.g. a tripod design). Take for example the accusation that a tripod leg design somehow represents the Plaintiff's trade secret. Firstly, I feel reasonably confident in suggesting that a tripod is considered to be one of the most common designs for creating a stable platform for many purposes. Secondly, an operational Pholos that we would sell to customers does not have any landing gear, as they are built solely to be single-use munitions, once they take-off they are not expected to return intact. Thirdly, I have seen US patent applications for

55

coaxial UAVs from 2001 that show a tripod landing gear (see Exhibit **AGM/9**) and therefore cannot be claimed as a trade secret or somehow proprietary by the Plaintiff. Finally, I can confirm that Overwatch engineers have designed from scratch different types of landing gear and launch pad solutions over the years for our test and training vehicles, including a variety of tripod designs.

144. I note too that the Plaintiff has also alleged or implied that the Overwatch Group has utilized its "bill of materials" for one of the Plaintiff's unspecified UAVs but without the Plaintiff providing any evidence thereof relative to a product marketed or sold by the Overwatch Group. Accordingly, I cannot make an informed comment except to confirm that I am not aware that Overwatch Aerospace Ltd. has used a bill of materials of any Plaintiff vehicle and cannot conceive why we would have had any use whatsoever for it. The Overwatch designed Pholos has its own bill of materials.

145. In summary, the Overwatch Group in the UK was an entirely new business and not a continuation of or a successor to Overwatch Defense LLC beyond the use of the names "Overwatch" and "Pholos" in respect of which Mr. Hill raised no objections. It would be entirely fair to observe that the decision to start afresh in the UK was initiated as a direct consequence of the Plaintiff's vexatious lawsuit in 2019, but not as a convoluted corporate mechanism to misappropriate the Plaintiff's information.

146. The corporate structure, shareholdings and operational management of Overwatch Group in the UK is very different from those of Overwatch Defense, LLC. I am not familiar with the US law of successor liability nor the extent to which that could ever apply to a foreign legal entity, particularly where there is not common ownership, but I fail to see how it is possible to portray the context within which Overwatch Defense ceased doing business in the US as a consequence of the Plaintiff's bad faith actions

56

as some form of corporate conspiracy to avoid liability. For the same reason, I would also consider it perverse if the Plaintiff succeeded with their accusation that the establishment of the new business in the UK was somehow to avoid a US liability.

147. I dispute the assertion at Plaintiff's Document 8-2, pages 17-18, that fraud was involved and that there was a "*plan to continue to use Ascent's information, including trade secrets, to directly compete with Ascent*". The truth is quite the opposite to that as I had absolutely no desire or need to utilize any Ascent information, whether confidential or publicly available, in the future business endeavors of Overwatch Aerospace Ltd. I must repeat again that when Ascent terminated the CTA, Ascent had not designed or developed or manufactured a UAV that met any of our requirements or specifications for a loiter munition capability.  From my perspective there was nothing of value in their capabilities nor in their management team.  I include in that statement the Ascent Spirit UAV, which was released in 2019, well after Overwatch Defense and Ascent had parted company under the CTA.  From what I know of the specification of the Spirit from publicly available information, it too does not meet our requirements.

148. Following on from that point, it is not true as alleged at the Plaintiff's Document 8-2, p.21, that there was any acquisition or disclosure of Ascent trade secrets. There is no proof whatever that Mr. Hill or Overwatch Defense used any information, secret or otherwise, of Ascent to develop any technology or that either of them disclosed any trade secrets or know-how to Overwatch Aerospace Ltd. or its engineers.

149. It is worth bearing in mind that, once Mr. Hill had reached closure with the Plaintiff in respect of its vexatious 2019 complaint, as far as I was concerned the matter was fully closed and I did not even contemplate that there could be any future claim made

57

against Overwatch Defense by Ascent.  From my perspective, not only had all materials to which the Plaintiff had claimed ownership been returned or destroyed but also, I knew from our assessments that the Plaintiff's existing technologies were wholly inadequate for what we needed. Moreover, prior to receiving this Complaint I had no awareness that Ascent had or would ever have any belief or contend that any defendant was using its trade secret information. To my knowledge, this was not an issue raised during the 2019 lawsuit and, if it were raised, it was dropped when the suit was withdrawn by Plaintiff. In the time that has elapsed since the termination of the CTA in 2018, UAV technology has advanced exponentially rendering the Plaintiff's rudimentary UAV designs and its sole patent obsolete and of no value.

150.    Also, as an entrepreneur and investor, I have no interest in being involved in lawsuits of that nature and, given the Plaintiff's predisposition to readily run to court as a vexatious litigant for its own strategic commercial gains, I was on notice that it could do so again when considering ongoing partnership.  It would be fair to say that Mr. Hill and I had no desire whatsoever to have anything further to do with the Plaintiff. From my perspective, that chapter for Overwatch Defense had closed, although the entire sorry experience did certainly inform the future strategy for Overwatch Aerospace Ltd. and my preference going forward to design and own our own proprietary coaxial UAV.

**Marketing Materials and Marketing**

151.    It is not true the allegation made in the Ascent Founders' declaration at paragraph 73 that "*Overwatch Defense used confidential information provided by Ascent under the Teaming Agreement to create images of the PHOLOS drone for marketing and promotional purposes*". Before I address which party conceived of or generated each

58

of these images, it is disputed that any of the imagery prepared solely for marketing purposes in the course of the CTA could be deemed confidential by either party, Ascent or Overwatch Defense, because all such images were developed wholly and exclusively for the purpose of sharing it with third parties for promotional activities and would therefore be made generally publicly available.  Furthermore, none of the marketing imagery reveals any trade secrets, as all of the images of coaxial drones in a loiter munition configuration are merely conceptual and not actual technologies.

152.    Exhibit D is alleged by the Ascent Founders (declaration, paragraph 74) to be evidence of Overwatch Defense using the images to "*market a replicated PHOLOS drone…and confirms that the defendants have knowingly misappropriated Ascent's unique drone technology*".  This allegation is denied because all that Exhibit D appears to show is that a jointly branded presentation was prepared for the purposes of promoting Overwatch Defense's loiter munition concept.  There can be no evidence of replication or misappropriation of any Ascent technology imputed into the likes of Exhibit D because, as I previously stated, Ascent had yet to design any such capability that could meet the required loiter munition specification and so it did not actually exist.

153.    Mr. Hill procured from a third party the preparation of the "virtual" situational scenarios depicted in Exhibit D, pages 13-15 and 17-21.  I can see that there is a hotch-potch of cartoon-like coaxial drones represented in those situational images and certainly nothing that would enable any engineer to discern a specific product. In fact, I understand that the imagery depicts aircraft that would not be aeronautically viable from an engineering perspective. If and to the extent that the imagery of the drones themselves in those scenario images were adapted from drawings prepared by Ascent

then I would understand that this was done so as part of the collaborative activity for the purposes of preparing promotional materials. However, it is my understanding that, to the extent that any coaxial drone concept imagery was prepared by the Meringers, they were wholly based on Mr. Hill's specifications and drawings that he had shared with them.

154.    I confirm that Overwatch Aerospace does not use any of the situational imagery that Mr. Hill procured for Overwatch Defense in any of its current marketing materials, including on its website https://www.overwatch-group.uk/. If and to the extent that it ever did, it cannot have used that imagery for many years as I have no recollection of it.

155.    Finally, I address briefly Overwatch Aerospace's attendance at the UK's DSEi 2021 defense trade show to which the Ascent Founder's declaration makes reference at paragraph 63.  I cannot comment on why the *Soldier System* website posting dated September 23, 2021 refers incorrectly to "Overwatch Defense" given that the photograph very clearly shows branding for Overwatch Aerospace.  The coaxial UAV in the upper photo on the Edgar Brothers stand was an early working prototype of one that Overwatch Aerospace had specified and had designed and incorporated no Ascent trade secrets.  As it so happens, that particular design of coaxial was never developed beyond prototype to a production standard and accordingly Overwatch Aerospace has not sold any units of that vehicle, which was mothballed at about the same time as this DSEi show.  The lower image in the *Soldier System* website posting I believe to be a digital image of a loiter munition concept only and one that Mr. Hill had procured. It bears no hallmarks of any Ascent product.

**Malevolent commercial motivations behind Ascent's vexatious complaint**

60

156.   I am not party to the Plaintiff's decision making regarding this current complaint (and their 2019 lawsuit) and therefore do not know for a fact why they have made it and why now. However, in light of our recent success on US military exercises and the Overwatch Patents limiting the ability for the Plaintiff to compete with the Pholos design, I have considered the context and timing of it carefully and have formed the view that the true motive of the Plaintiff is to eliminate their strongest competitor from contesting for sales to Sovereign defense customers, in particular, the US Department of Defense through PC-C4 and to eliminate the impediment of the Overwatch Patents that would inhibit the Plaintiff in developing its own loiter munition capability.

157.   Superficially the current Complaint concerns the false allegation that Overwatch Defense has misappropriated the Plaintiff's trade secrets, albeit that the Plaintiff has provided no evidence of this whatsoever, including that the Plaintiff has not demonstrated what if anything shared with Overwatch Defense represented a trade secret of the Plaintiff or was in fact confidential at all.

158.   I believe that the following context is crucial in understanding what the real purpose of the Complaint is.

159.   Firstly, I understand that the Plaintiff's sales focus for the Spirit capabilities has been with US law enforcement customers, but that its sales efforts have not progressed beyond modest test and evaluation contracts and low-volume orders. Certain of the capabilities the Plaintiff has developed and the predominant ISR function I would consider to be better achieved and at a lower price-point using different drone platforms to the coaxial stack configuration and I suspect that has been the view of Sovereign customers also.

160.    As yet, I am not aware that the Plaintiff has developed a weaponised loitering munition capability in a variant of the Spirit. However, I have only recently been shown on the Plaintiff's website that it has developed a new coaxial UAV product called the "NX30" and can see from its specification sheet (Exhibit **AGM/38**) that it has been developed for the purpose of it being weaponized.   Specifically, the specification: (i) states that the NX30 has an "abort" function, which is a term and capability that would generally only be used in the context of aborting a kinetic strike mission; and (ii) details a no-return mission profile when detailing its "service area" where it states "From point A to B" only – Ascent are overtly referencing a single-use one-way effect capability – i.e. a kamikaze drone. That being so, the Plaintiff is in a position to exploit those market opportunities with defense customers, opportunities that have rapidly expanded as a direct consequence of the Ukraine war in which the use and effectiveness of "kamikaze drone" capabilities has brought it to the fore of Sovereign defense strategies globally. This is something myself and Overwatch Aerospace Ltd. have experienced having been one of the first companies in the UK to directly gift a number of our Pholos UAVs to UAV specialist units within the Ukrainian Armed Forces in their fight for democracy.

161.    If the Plaintiff wishes to integrate a weapons system onto a coaxial UAV, it must devise a solution that does not infringe the Overwatch Patents, which have been assigned to Overwerx Ltd.  Without doing so the Plaintiff could be at risk of a claim for infringement.

162.    That leaves the Plaintiff three options: (i) do not develop a coaxial loitering munition product and lose out on lucrative global defense opportunities; (ii) develop at significant expense a munition solution for a Plaintiff-designed coaxial UAV

platform, always at risk of challenge for infringement of the Overwatch Patents from Overwerx Ltd; or (iii) find a cheap way of eliminating the primary competitor, including claiming ownership rights in their patented invention, thereby removing the main obstacle to future sales. I am firmly of the view that, with this Complaint, the Plaintiff has decided to pursue the third of these options to enable it to weaponize its NX30 and Spirit platforms without impediment.

163. To my knowledge, the Plaintiff and/or Robinson Helicopters do not have in-house weapons engineering expertise of the nature required for sub 25kg armed UAS and therefore, in respect of the option at paragraph 162(ii) above, Ascent would need to outsource that effort and work with a third-party designer and munitions manufacturer UNLESS the Plaintiff invested in creating a weapons engineering team in-house. Having done the latter myself I can confirm that it is a costly business and comes with a high degree of regulatory compliance and commercial risk.

164. As to timing, it would appear to be no coincidence that the Plaintiff has recently been acquired by Robinson Helicopters. Whilst I have no insight as to what the Ascent Founders may have disclosed to Robinson Helicopters as part of pre-acquisition due diligence, it seems safe to assume that the strategy to bring the Complaint was one defined during the acquisition or as a direct consequence thereof and with the express approval of Robinson Helicopters. For a well-funded group such as Robinson Helicopters, funding the Complaint to attack Overwatch UK would represent a modest overhead spend, knowing that it could wreck a competitor whether or not it was successful or the claims in the Complaint had any merit.

165. I do not believe it was a merry coincidence for the Plaintiff (and Robinson Helicopters) that Overwatch UK's participation in the US DoD hosted Project

Convergence Capstone 4 (PC-C4) in May 2024 occurred shortly after Robinson Group's acquisition of the Plaintiff.  What is important to note about PC-C4, is that it will be one of the key US DoD projects through which future loiter munition capabilities will be launched and funded.  There is no doubt that the Plaintiff will be wanting to access those opportunities unfettered by stiff competition and Robinson Helicopters will have been unnerved to discover that their new acquisition may not be worth as much as they had been led to believe. It is worth also noting that veteran owned and supported businesses communities in both the US and UK are highly supportive of each another, and the actions of the Plaintiff are entirely at odds with the supportive culture enjoyed in veteran communities and are, in my view as a decorated veteran, wholly expressive of a less honorable set of values and standards. Overwatch Group's participation in the PC-C4 demonstration event was as part of the official UK Ministry of Defence delegation. Overwatch continues to enjoy the support of both the UK and US special forces user community having built hard earned and trusted relationships and will continue to support both user groups in the global fight for democracy.

166.    In the Complaint at paragraphs 69-71 I also note the reference to Overwatch Aerospace Ltd.'s attendance at the US "SOF Week 2024" defense trade show held in Tampa in May 2024, and suspect that this too unnerved Ascent, encouraging them further to try and attack my business. For the record, I did attend this event and held a visitor pass but Overwatch Aerospace Ltd. did not have a stand or booth or any other reserved space at the conference center and accordingly we did not display the Pholos at that event, nor for that matter did we distribute any marketing materials about the Pholos there.  Our attendance at the event was primarily a fact-finding exercise for

smart technologies and capabilities that could be integrated into our UAV platforms, as well as discussing collaborative opportunities with US and global industry partners. Whilst one does have many impromptu conversations with other attendees when walking the floors of a trade show such as SOF Week 2024, I can confirm that I had no meetings with any US Department of Defense or other US government officials during it, nor did we make or secure any sales of our products. I would categorize the information and quotations that we placed on our UK website prior to attending the show to which the Plaintiff refers at its Exhibit Z no more than the usual opportunistic profile-raising announcement that any business would make.

167.  I must also recall here that in 2022, whilst attending AUVSI Xponential in Orlando, the US premier drone industry trade show, I was informed by a senior trusted Sovereign customer contact (an army veteran) that a representative of the Plaintiff had verbally informed them whilst at their exhibition booth (number 1849) that they were partnering with another industry partner to weaponize the Spirit, but that this activity could not be publicly marketed.

168.  It is therefore obvious to me that the Complaint, and the overt attempt to take ownership of the Overwatch Patents, is a blatant attempt to steal Overwatch's valuable intellectual property assets for the purposes of financial gain and eliminating fair competition in the US defense market. Likewise, the bizarre attempt by the Plaintiff to claim the name "Pholos" as its own, even when it had overtly and expressly disclaimed any such interest in 2019 legal correspondence evidences the bad faith commercial strategy lying behind the Complaint.

**The Complaint and any associated injunction not in the Public Interest**

169.  In respect of the Plaintiff's attempt to expunge Overwatch and the Pholos from doing business, it is not in the US public interest (for taxpayers and for national defense & security) to eliminate fair competition, as doing so would only serve to create an effective supply-side monopoly, thereby reducing choice for meeting US military capability requirements and driving up the cost of acquisition. If the Plaintiff believes that it has a superior capability, it should harbor no concerns with healthy competition from Overwatch Aerospace's products. Also, the US DoD operates under a regulated formal procurement process that already prioritizes indigenous US suppliers. It appears to me that the Plaintiff is seeking to abuse the US legal system to achieve an unfair commercial advantage, to the detriment of a potential competitor, whilst eliminating choice for the US Armed Forces.  I would also draw attention to the US Government's endorsement of the AUKUS Enhance Trilateral Security Partnership, in force since April 2024 (see Exhibit **AGM/31**), that liberalized certain military trading and technology transfers between the AUKUS allied nations, a relaxation that would present the Plaintiff with more sales opportunities beyond the US, but equally improves the sales opportunities for Ascent's competitors in the US.  I would speculate that the AUKUS agreement is further motivation for the Plaintiff in bringing this Complaint, to the detriment of the US public interest.

170.  I contradict as false the following allegations of the Complaint, based upon my personal knowledge:

   a.  Paragraph 17: There was no misappropriation nor commercial exploitation of the Plaintiff's technology, none of which is confidential to my knowledge, and there was no such "purpose" behind the establishment of a new business in the UK;

66

b. Paragraph 20: it is not true that the Overwatch Aerospace Ltd designed UAV known as the Pholos was created by the Plaintiff. Nor is it true that the Plaintiff owns any of the rights in or subject matter of the Overwatch Patents;

c. Paragraph 25 is an entirely false set of accusations as there were no torts committed in Connecticut and defendants breached no contract in Connecticut and did not engage in business in Connecticut whatsoever at any time;

d. Paragraph 26 is not true as no defendant has waived venue or consented to venue in Connecticut, which has no obvious connection to this dispute and is not the proper venue. Nor are the Defendants properly viewed as successors to Overwatch Defense or Overwatch Optics;

e. Paragraph 27 is full of false statements as no disclosures of confidential matters have been made by or otherwise used by Defendants, nor has the Plaintiff's '417 Patent ever been infringed and is not used in the Overwatch Pholos;

f. Paragraph 37 is false as the parties did not develop or make a weaponized drone;

g. Paragraph 39 and its subparts does not list any confidential information or trade secret of Plaintiff and the same was not used or incorporated into the technology of Defendants;

h. Paragraph 46 is full of conclusions about a settlement agreement which are not supported by the facts or the emails between the parties;

i. Paragraphs 53-55 are false in implying the name "Pholos" and/or that Overwatch's UAV named Pholos was the property of the Plaintiff and in implying there were any misappropriated drones or elements of any trade secret or confidential design of the Plaintiff in Overwatch's Pholos UAV;

67

68

j.   All subsequent allegations from paragraphs 65 to 92 are entirely or largely false and deceptive as no contract was breached, no secrets existed, no secrets were misappropriated, no inventive contributions were made by the Plaintiff, no correction of any Overwatch Patent is necessary or appropriate, and no unfair or deceptive trade practices were perpetrated by Defendants.

Pursuant to 28 U.S.C. §1746, I have signed this Declaration on this the 24th August 2024, under penalty of perjury and I declare that the foregoing Declaration to be true and correct, except where I am relying upon information from others, as indicated herein, in which case I believe the same to be true as stated herein.

……………………………………
Executed by Andrew George Michael