**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

ASCENT AEROSYSTEMS INC.,
                    Plaintiff,

      vs.

JEFFREY T. HILL
ANDREW G. MICHAEL
OVERWATCH AEROSPACE LLC
OVERWATCH AEROSPACE LTD
OVERWERX LTD,

          Defendants.

Civil Action No.: 3:24-cv-01075-OAW

**DECLARATION OF JEFFREY T. HILL**

I, JEFFREY T. HILL, do hereby declare under penalty of perjury, pursuant to 28 U.S.C. §1746, that the following is true and correct:

1.    My name is Jeffrey T. Hill, one of the named defendants herein.

2.    I make this Declaration based on personal knowledge and upon my review of records obtained from the sources described herein and upon information and belief where so indicated.

3.    In this declaration I will respond to certain allegations of the Plaintiff made in the complaint and in the motion for injunction and supporting declarations. I will also discuss my personal background, my involvement in the companies called Overwatch Optics, LLC ("OOL") and

1

Overwatch Defense, LLC ("ODL"), my more recent involvement in Overwatch Aerospace LLC ("OWA US"), Overwerx Ltd. ("OWX"), a UK Company and Overwatch Aerospace Ltd ("OWA UK"), also a UK Company.

**Personal Background**

4. I currently live in Fredericksburg, Virginia, my primary domicile since January 13, 2022. I am a registered voter in Fredericksburg and do not own property in Florida.

5. I am a 100% Service-Disabled Veteran of the United States Army, having graduated from the United States Army Intelligence School (1991) and United States Army Air Defense School (1992) with my date of discharge 01/10/1996. My rank was Specialist E4(P). Prior to my military service I served as a Deputy Sheriff in Vermont for approximately four years (1986 to 1991). After my military service I served as the Senior Deputy Advisor for Counterterrorism and Special Operations in Iraq for the Department of Defense as a Civilian Senior Executive (2004 – 2005). From 2008 to 2010 I served as a US Army Federal Employee as a Senior Strategist in the US Army Africa/Africa Command (AFRICOM). I have had no formal training in the operation of drones or their technology but have had field experience in directing drone targeting of enemy combatants.

6. I attended Army Management Staff College (2008 - 2009) and the Inter-American Defense College (2009) and specialized in National Security Studies. I attended Southern Vermont College Criminal Justice Program (1986 – 1988) and the Vermont Police Academy (1987). From 2008 to 2010 I received specialized   government training from the John F Kennedy Special Warfare Center and School, the Joint Intelligence University, Naval Postgraduate School African Studies Program and the Joint Counterintelligence Training Academy.

7. My munitions and missile experience comes from my certification at US Army Air Defense School on the MANPAD Stinger Missile System and the Avenger Platforms. Having been

2

in combat involving drone technology and being experienced in munitions, I often reflected on how drone technology could be used to more precisely target in the battlefield without collateral damage in order to keep troops in the field safe.

8.   I founded OOL, a Florida limited liability company, on May 10, 2016, [Exh 20] as the sole owner thereof for the purpose of designing and building its only products, these being limited to thermal optic scopes and devices. The company had limited sales because of tariffs imposed on importation of Chinese components. OOL was created as part of my participation in the Department of Veterans Affairs Vocational Rehabilitation and Employment Program (VR&E). As a severely disabled veteran, I qualified for benefits to assist me in creating a business. I pursued the entrepreneur program by starting a Thermal Optics business which received laudatory reviews and I succeeded in applying for a large grant which I was awarded in or about 2017 from the Department of Veterans Affairs. At the time I was the only Veteran to receive this grant. The grant allowed me to purchase equipment and to start both OOL and, on October 2, 2017, ODL another Florida limited liability company.

9.   Prior to forming ODL, in good faith I signed a mutual non-disclosure agreement ("NDA") on behalf of OOL with Ascent on September 27, 2017, as referenced at Par. 35 of the Complaint for the purposes of exploring a business collaboration with Ascent to determine if they could deliver a coaxial drone capable enough to enable me to prove my inventive concept of a new type of loiter munition for battlefield applications that I had conceived a few years prior to meeting Ascent's founders. Ascent had no familiarity with loitering munitions and had nothing to offer regarding that technology, but they did have a potentially useful hobby-level coaxial drone platform that I thought could be re-designed for my purposes.

3

10. After some initial exploratory discussions with Ascent, mainly with its CEO Peter Fuchs ("Fuchs"), that occurred between late September and early November 2018 during which I disclosed details of my inventive concept, we agreed that there was merit in us expending joint effort in pursuing the technical and commercial viability of my loiter munition concept through some self-funded collaborative development and marketing activity, all of which was captured in a Commercial Teaming Agreement ("CTA") entered into on November 14, 2017.  In between the signing of the NDA and the CTA, on October 2, 2017, I founded ODL as the sole owner thereof to provide a corporate vehicle through which I could develop and exploit my loitering drone weapon concept.  Accordingly, it was ODL and not OOL that took the collaboration forward with Ascent under the CTA.

**My business relationship with Andrew Michael ("Mr. Michael")**

11. Mr. Michael and I first met in or around 2012 when we were introduced to each other through a mutual contact from the British military and we immediately connected in our passion for providing technological solutions in support of our armed forces.  We stayed in touch and by 2014 we were working closely together in providing consultancy services to the law firm Gowling WLG.  I trusted Mr. Michael and during 2014 I shared with him my inventive concept for a loitering munition with precision targeting optics, which we discussed on a number of occasions. Once I moved on from Gowling WLG in 2015, we remained in touch and, when I decided to get on with materializing my invention, I kept Mr. Michael appraised of what I was doing and always valued his input and guidance, not only on operational military matters, but also because of the strength of his business and entrepreneurial acumen. We never agreed that Mr. Michael would participate in my new venture, but I knew that if I could demonstrate the technical viability of my invention that Mr. Michael would be prepared to support it, whether as an investor himself or by helping

4

me fundraise.  It was on that tacit understanding that Mr. Michael maintained a watching brief on the collaborative activity with Ascent, and latterly from June 2018 became more closely involved as the concept inched closer to being realized.

12.    Mr. Michael was neither an owner, officer of, employee nor a contractor of OOL and had no involvement in the business, Exh 20, save that he did once assist me as a personal favor through his presence at a US National Rifle Association trade show during 2018 when I needed an extra pair of hands that I could trust.

13.    At no time was Mr. Michael an owner, officer or employee of ODL. Exh 18.

**Purpose of this statement**

14.    As more fully discussed herein, after reading the Ascent complaint as well as the memo and declaration in support of an injunction, I am making this statement to: (a) correct misunderstanding in the Complaint as to what PHOLOS refers to and the ownership of that name, (b) refute false claims concerning my inventorship in U.S. Patents 11,067,374 (the '374 Patent) and 11,940,251 (the '251 Patent), (c) demonstrate that allegations of misappropriating confidential, proprietary and trade secret information are unfounded, and (d) identify untruthful allegations and fraudulent mischaracterizations perpetrated to claim non-existent damages and equitable remedies by creating misconceptions or misunderstandings and impressions there are good reasons to grant an otherwise unwarranted preliminary injunction.

15.    Further, I make of record that there appears to be misappropriated proprietary information disclosed by OOL and ODL to Ascent, separate and unrelated to that information which Ascent has alleged and incorrectly characterized as its misappropriated trade secrets. The misappropriated proprietary information includes information disclosed at least by myself in confidence, first under the NDA between Ascent and OOL, effective September 23, 2017

5

and then under the terms of the CTA between Ascent and ODL, effective November 12, 2017, i.e., shared in confidence primarily with Fuchs, but not to the exclusion of Jonathan and Nathaniel Meringer (the "Meringers"), over the course of the nearly fourteen month period ending with Ascent's unilateral termination of the CTA. Information exchanges between ODL and Ascent, including disclosure of my inventive concepts to Ascent and Ascent's information provided to me was by emails and other means, including oral communications, from my office in Florida and were sent to Fuchs and the Meringers (from hereon, the "Ascent Founders") in Syracuse, New York.  Some of the Ascent information was provided to Mr. Michael and me without markings indicative of confidential, proprietary or trade secret information as required under the NDA and/or CTA to invoke protections under the NDA and/or CTA as applicable. I have come to believe that this proprietary information was misused at least by Fuchs in violation of the NDA and/or CTA, apparently to pursue business opportunities in disregard to Ascent's pre-existing obligations: (i) to limit Ascent's use of Information to predefined purposes under the NDA and/or CTA; and (ii) to use Ascent's best efforts to perform under the CTA. In fact, as a precursor to terminating the CTA it appears that Ascent took measures to kill an otherwise viable development and license agreement in order to move forward with one or plural relationships initiated while under the CTA - with other companies and customers in the defense space.

**A. PHOLOS:**

16. I am using the name PHOLOS herein as originally coined and used by myself, and it continues to be so used with my consent by Mr. Michael and, generally, OWA UK. That is, PHOLOS as a product only refers to enabled embodiments of a coaxial drone consistent with my inventive concept as taught and claimed in U.S. Patents 11,067,374 (the '374 Patent) and 11,940,251 (the '251 Patent).  There is no evidence that the term PHOLOS was

ever used by Ascent without reference to ODL or that any drone of that type was "created" by Ascent prior to termination of the CTA.

17. Except for the contrived efforts presented for the first time in the Complaint, i.e., to mischaracterize both inventorship of the PHOLOS and what the PHOLOS has always been intended to refer to, I have never encountered a characterization that the name PHOLOS, when referring to a coaxial drone, would refer to a design that does not and cannot meet the specification requirements for its intended battlefield use, nor has Ascent ever disclosed to me any allegation that my inventive concepts which resulted in the '374 and '251 Patents were already "independently developed", i.e., conceived by Ascent, prior to September 27, 2017. More specifically and contrary to what is falsely stated at Par. 37 of the Complaint, the PHOLOS never was and never became "Ascent's coaxial drone adapted for a military application" because no Ascent coaxial drone I am familiar with could meet the specification requirements for the PHOLOS. However, for a limited time, I did pursue exploratory discussions with Ascent to determine if it was possible to redesign a pre-existing Ascent drone design to meet the military grade battlefield specifications required for the PHOLOS, including all embodiments disclosed in my '374 Patent and my '251 Patent. As far as I understand, and as evidenced by the Statement of Work in Exhibit I of the CTA, it was acknowledged by Ascent that the PHOLOS could not be created with any existing platform of Ascent. Ascent did not have anything more than drone designs which could not be modified to meet the PHOLOS Specifications or the Design Specifications called for in the CTA Statement of Work. Given that Ascent did not have a workable means of customizing an existing drone platform design to create a PHOLOS, Overwatch Defense was willing to work with Ascent under the CTA to co-develop an entirely new platform but, after agreeing on a development cost for doing this, Ascent abruptly demanded millions of dollars more to perform the

development work. In hindsight I believe Ascent intended to breach its "Best Efforts" obligations under the CTA in order to secure US Department of Defense funding or pursue one or multiple relationships with other parties in conflict with the CTA.

18. Whilst I permitted the name "PHOLOS" to be used for the limited purposes of the CTA, including for any joint marketing effort during its life, I granted no ownership rights in it to Ascent and would note that Section G of the CTA provides: "No transfer, grant or license of rights under any patent of copyright or to any proprietary information or trade secret is made or to be implied by this Agreement."

19. I have seen Ascent's lawyer's letter of January 29, 2019 as exhibited by Mr. Michael in his declaration at Exhibit AGM/12, which Ascent neglected to reference as part of its Complaint. In that letter Ascent's lawyers expressly confirm that the name "Pholos" was provided by OOL and they go on to unequivocally confirm on behalf of Ascent, with reference to the name PHOLOS: "Ascent has absolutely no interest in using ……….. this name". Having disclaimed ownership in it, I must question why the Plaintiff suddenly has a renewed interest in the name PHOLOS many years later.  From my perspective this is a closed matter and I do not propose to comment any further on it, nor on OWA UK's ongoing use of the "PHOLOS" mark, (a registered trademark in the UK) for its proprietary UAV product.

20. The initiative under the CTA to design a PHOLOS came about no earlier than September 27, 2017, when the NDA was signed by OOL (not ODL) and ended on or before November 26, 2018, when Ascent formally terminated the CTA. Doc.1, ¶42. During this short time, to the best of my knowledge, neither I, as owner and manager of ODL, nor Mr. Michael, ever traveled to Connecticut, or entered into any contract in Connecticut or transacted any business in Connecticut personally or through an agent. I did all my work of reviewing and

sending emails with Ascent personnel from Florida, while communicating via telephone or video conferencing with Fuchs and other Ascent personnel in Syracuse, New York. To the best of my knowledge Mr. Michael, a UK citizen, communicated from the UK, where he resides, with Fuchs and Ascent personnel and reviewed such things as a fundraising memo with Ascent's Syracuse, New York office. Notably Mr. Michael never signed any agreement with Ascent, not even the CTA or the NDA.

**B. Invention:**

21. I am the sole creator of the remotely controllable weaponized aeronautical ordnance referred to as the PHOLOS i.e., a loitering munition, but mischaracterized at Par 37 of the Complaint as one of Ascent's coaxial drones which could not be adapted for the intended military application, i.e., weaponization wherein the design enables the entire drone to be dropped on a target. I solely conceived the entire design of the PHOLOS as illustrated and described in my '374 Patent and in my '251 Patent. This ordnance was both conceived and named PHOLOS prior to my ever having communicated with any of the Ascent Founders and prior to my having first known about any of their businesses. There was no collaboration with any of the Ascent Founders in the conception of any claim in either my '374 Patent or my '251 Patent.

22. In my invention I conceived, for example, the combination of a co-axial drone having a "downward looking" camera enabling a person on the ground and remote from the drone to view features in an image of the scene directly below the airborne drone as it travels along the ground plane, then steer the drone to hover directly above a chosen target; and then cause the drone to fall downward to explode over, or on impact with, the target. Unlike other munitions which are sent from an aircraft to a target, the entire drone is flown to the target to ensure precision of strike. As described by others familiar with the PHOLOS, my

9

invention is a unique type of loitering munition because it enables flight to a target directly below an aircraft in a static hover. Once the drone flies to a position above the target, the drone functions as the bomb, i.e., the entire drone is propelled downward to destroy the target.  Mr. Fuchs did not appreciate the importance of this, and I clearly recall his inclination to revert to his proposal of using a reusable drone to drop a munition such that the drone could be redeployed.

23. Notwithstanding the foregoing, i.e., that my invention was fully conceived before ever meeting with any of the Ascent Founders: in Count four of the Complaint, Ascent wrongfully and dishonestly alleges the following false contentions in order to deceptively claim a completely unsupported cause of action:

(i)    at Par. 81 that my non-provisional patent application SN 62/568,518 ('518 Application) *falsely* claimed that I am the inventor of "*Ascent's* coaxial drone with an explosive component and imaging system" [Emphasis added];

(ii)    at Par. 82 that two of Ascent's founders "conceived of and reduced that invention claimed in my non-provisional patent application to practice before I did and that I "wrongly misappropriated it and then fraudulently claimed it as my own.; and

(iii)    at Par 84 that I, Jeffrey T. Hill assigned ... *fraudulent* patents "to Overwatch Defense … [Emphasis Added]".

24. Notwithstanding the large number of appendices or exhibits accompanying the Complaint, a detailed declaration of the Ascent founders accompanying the Motion, and an assertion at Par. 82 of the Complaint that two of the Ascent founders "conceived of and reduced my claimed invention to practice before I did: not one of these contentions (i), (ii) and (iii) is supported by any evidence in the record or the even the objective chronology of the events.

10

25. Other than the above-referenced recent claims alleged at Pars 81 to 84 in the Complaint, I have no awareness of any information or claims, credible or not, of any person other than myself contributing to any part of the PHOLOS design prior to filing my first provisional patent application SN 62/568,518 ('518 Application) on October 5, 2017, which provisional patent application discloses at least one of my designs for the PHOLOS.

26. I filed my second provisional patent application SN 62/726,926 ('926 Application) on September 4, 2018 and my first non-provisional United States utility patent application 16/153,696 ('696 Application) on October 5, 2018. Each of the '926 Application and the '696 Application describes designs or applications of the PHOLOS in addition to those disclosed in my first provisional patent application, all of which were conceived by no one other than me. I do not have any awareness of any information or claims, credible or not, of any other person than myself having contributed to the PHOLOS design prior to filing the '926 provisional Patent Application; and I do not have any awareness of any information or claims, credible or not, of any other person contributing to the PHOLOS design prior to filing the '696 non-provisional Patent Application on October 5, 2018.  U.S. Patent Nos. 11,067,374 and 11,940,251 issued based on the '696 Application.

27. Simply put, as the originator of the PHOLOS concept and design, I am the sole inventor of all concepts claimed in the '374 Patent and the '251 Patent, each having an earliest priority date of October 5, 2017.  Each invention claimed in the '374 Patent and the '251 Patent was conceived solely by me and without any assistance of, or collaboration with, anyone else.

28. I can say with absolute certainty, all of the embodiments described in my '518 Application was conceived by me alone. Like my first application, the '926 Application were conceived by me alone several years before I first communicated with any of Mr. Fuchs or the

11

Meringers during September or October of 2017. This fact is evidenced by the declaration of Mr. Michael to whom I orally disclosed one or more embodiments of the PHOLOS.

29. The embodiment(s) of the PHOLOS described in my '518 Application were documented in a set of drawings specified under my direction and ordered on August 31, 2017 from Mr. Esiri Toneh (Exh 1), a 3D CAD specialist who delivered the drawings shown in Exhibit 2 to me on August 31, 2017, weeks before I first communicated with any of the Ascent Founders during September 2017 and more than three weeks before the September 23, 2017 effective date on which the NDA, referenced at Par. 35 of the Complaint, was entered into. No information concerning the PHOLOS was disclosed by me to Ascent until after the NDA on 27 September 2017 was signed.

30. I subsequently retained Mr. Esiri Toneh to prepare a 3-D STL file in order for me to 3D print a life size static unit of the PHOLOS design which file was delivered to me on September 3, 2017. An image of the 3D life size 3-D STL file was provided to me on September 3, 2017 Exh 3. PHOLOS design created with the 3-D STL file is shown in Exhibit 4.

31. On September 4, 2017, per the receipt of Exhibit 5 I ordered and received from Mr. Esiri Toneh a drawing of the remote control for operation of the PHOLOS shown in Exhibit 6. After receiving the drawings of Exhibits 1 through 6 from Mr. Toneh, I retained Fiverjohnny, a layout designer, to create the data brochure of Exhibit 8 based on the artwork received from Mr. Toneh. The brochure was ordered on September 5, 2017 and delivered to me the next day, on September 6, 2017. I directly or indirectly provided all content for the brochure. The receipt of Exh 7 confirms the order and delivery dates.

32. Exhibits 1 through 8 are a corroboration that my conception of the PHOLOS as described in the '374 Patent and the '251 Patent occurred before I ever spoke to any of the Ascent

12

Founders. I did not show any of these persons, or any other persons associated with Ascent, any of the drawings referenced and shown in Exhibits 1 through 6 prior to October, 5 2017, the date my first provisional patent application (the '518 Application) was filed. To the best of my recollection, Ascent was never shown any of the drawings of Exhibits 1 through 6.

**First Drawings of My Invention.**

33.     On September 27, 2017, as now more fully described, Patent Drawings for my yet-to-be filed '518 Application (my first provisional patent application), were ordered and were then delivered to me on September 28, 2017 but, first, on September 26, 2017 I contracted with Mr. Vane Stoev, an engineer, through Fiverr.com, to prepare a set of concept drawings to illustrate my invention as shown in Exhibit 9. I provided detailed information about the PHOLOS to Mr. Stoev in order for him to prepare the concept drawings immediately. On September 26, 2017, I also advanced payment for Mr. Stoev's efforts to prepare the concept drawings as shown by the receipt presented as Exhibit 10, and the concept drawings were thereby provided to me for my approval on September 27, 2017.

34.     Next, also on September 27, 2017, upon receipt, I immediately approved the concept drawings and then authorized Mr. Stoev to proceed with preparing a more formal set of drawings for use as my patent drawing figures based on the completed concept drawings of Exhibit 9; and I advanced payment for his additional services at that time as confirmed by the receipt provided as Exhibit 11. In turn Mr. Stoev provided me with the patent drawings shown in Exhibit 12 and 13 on September 28, 2017. These drawings were then filed as part of the '518 Application on October 5, 2017 and substantially the same drawings were filed with my regular '696 Application on October 5, 2018.

35.     I consider the patent drawings of Exhibit 12 and 13, illustrating my inventive concept(s), substantially consistent with the earlier representations shown or referred to in Exhibits 1

13

through 10. I have no recollection of disclosing the Patent Drawings of Exhibit 12 and 13, or any other portions of my first provisional patent application (i.e., the '518 Application filed on October 5, 2017) to any of the Ascent Founders prior to April 30, 2018. By that time, however, I had described in confidence to these persons the nature of my inventive concept(s) in order to explore a co-development and licensing relationship as evidenced by the CTA entered into by Ascent and ODL on November 12, 2017. To the extent I did eventually disclose any of the drawings shown or referenced in the Exhibits 1 through 13 to Ascent, to my recollection this was limited to no more than the Patent Drawings of Exhibit 12 and 13, these being first shown to Ascent on or about April 30, 2018.

36. My above-cited exhibits establish that my date of invention occurred prior to meeting Ascent. Specifically, prior to my having made information in my '518 Application available to Ascent and, before I first communicated with any of the Ascent Founders, the foregoing cited evidence shows that drawings of my inventive concepts existed in sufficient detail to refute unsupportable claims of prior inventorship as alleged in Count Four of the Complaint. Doc. 1, Paragraph 80. I also offer statements from multiple witnesses who attest that during 2014 and 2015 I shared with each of them the same inventive concepts for which I established my patent priority date of October 5, 2017.

**(C) All Allegations of Misappropriating Confidential, Proprietary and Trade Secret Information are Unfounded**

37. The misappropriated proprietary information includes information disclosed by Mr. Michael and myself under either the NDA and/or the CTA, i.e., shared in confidence primarily with Mr. Fuchs (but not to the exclusion of the Meringers) over the course of the nearly fourteen month period ending with Ascent's unjustified unilateral termination of the CTA. I have come to learn that this proprietary information may have been misused at least by Mr. Fuchs

14

in violation of both the NDA and the CTA, apparently to pursue business opportunities in disregard to Ascent's pre-existing obligations, i.e.,: (i) to limit Ascent's use of Information to predefined purposes under the NDA and the CTA; and (ii) to use Ascent's best efforts to perform under the CTA.

38. In fact, as a precursor to terminating the CTA it appears that Ascent took measures to kill an otherwise viable development and license agreement in order to move forward without any future involvement by Mr. Michael and myself, i.e., to further relationships with one or multiple companies in the defense space, which relationships were initiated during the term of the CTA.

**Allegations of Misappropriating Confidential, Proprietary and Trade Secret Information are Unfounded**

39. To the best of my knowledge, I specifically and categorically deny that there is any basis to the claim made at Par. 17 of the Complaint Doc. 1, ¶17 that OWA US, OWA UK and OWX are entities whose purpose is to misappropriate and commercially exploit Ascent's technology and intellectual property.  I am addressing the details known to me about the identified information at Doc.1, ¶39 while managing ODL in Florida.

    a. <u>STEP Files</u>, I did receive in Florida CAD STEP[1] files for PHOLOS 1 and PHOLOS 2 drone mockups, These were conceptual models of the external appearance of a drone specified by me to Ascent and merely rendered by Ascent. To my knowledge, neither Mr. Michael nor I had the CAD software necessary to view these files and so we never opened or used them. I later deleted these files from my computer(s), as I had agreed to do after Ascent unexpectedly terminated the CTA. After I was served with process in

---

[1] The term refers to Standard for the Exchange of Product Data, ISO 10303 for exchanging 3-D Data among users of CAD tools and software. A STEP file is a type of CAD file and can be delivered to a 3D printer.

15

Virigina in this case, having moved there after ODL ceased operations, I used a forensic tool to recover what appear to be some portion of the files, but which still have never been opened, and I proposes to submit them to an agreed custodian for possible forensic examination by both sides. I have not ever viewed the contents of these files and to my knowledge, there has been no use of these files by ODL or Mr. Michael or myself himself at any time.

b. <u>CAD Files for Bulkhead payload module and mounting ring</u>: I have never used these files. I believe they are useless. However, to the extent these CAD Files are for a payload module and a mounting ring for a commercially available Ascent UAV, which appears to be what Ascent is claiming, these CAD files merely describe nonconfidential parts for a publicly accessible and commercialized drone, and thus parts that are not confidential are alleged to be proprietary or trade secrets. What is more, with regard to what I wanted to build, I had no use for static drone models with no functional components or mere visual representations of the exterior of a drone. My goal was to build a real working PHOLOS. To my knowledge, neither Mr. Michael nor I had the CAD software necessary to view these files and so we never opened or used them. I later deleted these files from my computer(s), as I had agreed to do after Ascent unexpectedly terminated the CTA.

c. <u>The CAD Files for Modular Attachment Ring</u>: Doc.1, ¶39 c. To my knowledge, neither Mr. Michael nor I had the CAD software necessary to view these files and so we never opened or used them. I later deleted these files from my computer(s), as I had agreed to do after Ascent unexpectedly terminated the CTA. I believe the referenced attachment rings are of a type commonly used in cylindrical drones and other tubular technologies

16

for decades, and the images and designs Ascent otherwise provided were unmarked and non-proprietary.

d. <u>The "Bill of Material" or Parts Lists for each module of a Sprite</u>: Doc.1, ¶39d. No parts list received by me was used by me or any other Defendant to design or engineer the PHOLOS.

e. <u>The Pinout of the Connector Board of an Ascent drone</u>: Doc. 1, ¶31 e. I did receive pinout connector files and images, but, like the CAD files, they were of no practical utility. This is because a drone designed to carry a munition launched by a human operator would need a restructured electrical system incorporating redundancies for safety and failure prevention, and this level of engineering was lacking from the then-known Ascent design, which was at that point engineered for the hobby-level users. The Ascent design had not yet progressed to accommodate a miliary level requirement.

f. <u>The Sprite Drones</u>: ODL did receive Sprite drone vehicles, fully assembled and with no restrictive legends. These vehicles were publicly available and already in the public domain, accessible to hobbyists for download and construction. These units, unmarked and lacking any confidential or trade secret designations, were of little value except for show and tell because they could not meet the required specifications for battlefield readiness. That is, beyond basic flight practice, they were wholly inadequate for what Overwatch Defense needed. The Ascent Sprite and the Sprite 2 drones were suitable for hobbyists only; they could neither support the payload or weight I specified, nor carry an explosive payload with the necessary safety redundancies, long-range capabilities, or speeds required for a combat version of PHOLOS.

40. <u>Post Ascent</u>: After the abrupt termination of the CTA and with no technology partner, I faced low prospects for acquiring investment funds in the U.S. We experienced the

difficulties of partnering with a technology company and weighed the risks and costs of forming our own development effort Mr. Michael and I made a focused effort to find necessary investment funds for an internal development of the PHOLOS.  Mr. Michael was able to find willing investors in the UK and this led to him forming Overwerx Ltd. and a new strategy to design and develop the PHOLOS in-house with a new engineering team working to create a design in accord with out PHOLOS specifications and my patent teachings. This effort resulted in a first production worthy PHOLOS loitering munition that we could not acquire by customizing an existing design. Hill ¶41.

**About Ascent's Patent:**

41.  I have reviewed Ascent's U.S. Patent No. 10,093,417 (the "'417 Patent") concerning a coaxial drone. The patent describes a spring-loaded blade assembly designed to collapse or fold upon rotor deceleration, thereby reducing damage during landing. The innovation disclosed is a minor improvement to a "blade collapsing assembly," which bears no relevance or interest to our PHOLOS or any defendant involved.  The '417 Patent has been of no use for the PHOLOS applications because a drone employed in combat as a weapon would have no return and landing.

42.  Going forward I doubt that the Plaintiff will make any more public disclosures of trade secret information as did the Meringer brothers, as I recall Fuchs verbally informing Mr. Michael and me that he was frantically trying to remove all publicly available materials revealing that the Meringers had published trade secret information in order to extinguish as much evidence as possible of public disclosures and avoid invalidating any Ascent patent applications or voiding any claim of trade secret status.  We may never learn of the extent to which Fuchs has successfully "scrubbed" the public records and, absent an understanding of what was actually removed from public access after publication, it is difficult or

impossible to definitively understand just what information asserted in the Complaint is truly trade secret information. What is absolutely certain is that detailed technical information about the 417' Patent, the First Ascent and the Sprite were publicly available and made open source by the Plaintiff or the Ascent Founders long before the NDA was entered into between the Plaintiff and ODL. Accordingly, my understanding is that all such publicly available information is specifically excluded from protection under the NDA and or the subsequent CTA and, by its very nature, could never be considered secret.

43. Without wishing to labor this point, I am not able to distinguish between the alleged trade secret information belonging to Ascent and other "information" disclosed to me by Ascent, including information present in the mockups provided by Ascent. In part this is because I provided my own design information to Ascent when instructing Ascent on how to create the mockups according to my specifications. The Complaint does not seem to distinguish the information Ascent claims as trade secrets from other previously known information already in the public domain provided to Mr. Michael or myself. Nor do I understand how to bound the scope of my "promise" quoted in Par 46 of the Complaint to: "not use any information provided by Ascent or derived from Ascent's disclosures in any manner in the future". Given the apparent lack of a clear distinction between what was a trade secret and what was not a trade secret, I am quite skeptical that there was ever a mutual understanding of what was meant by "information" nor that there had ever been a proper and thorough cataloguing and classification exercise undertaken to verify that the referenced "information" was truly subject to the terms of the NDA or CTA or at all.

44. Notwithstanding that the design of Ascent's Sprite drone was already published on the Internet, and subject to an exception noted below (referred to as the "L272-C Exception Information") I don't recall there being any useful information which Ascent specifically

identified as a trade secret, or which Ascent could have specifically identified as trade secret information and which ODL received from Ascent during the in-person, on line and telephonic discussions before the November 2018 date on which the CTA was terminated. Rather, our discussions, both before and after the in-person meeting in Syracuse, New York focused on mutual interests and Ascent's ability or inability to modify an existing drone design to accommodate our payload requirements or other features for a battlefield ready product. In other words, subject to the L272-C exception consisting of (1) a "Pholos 2" parts list for Diligence 2018-09-08, and (2) a L272-C Vehicle Interface Drawing, my conclusion is based on the combination of what I can recall and what is documented in email correspondence occurring as recently as May 2019, about the time that Ascent sought dismissal of the 2019 lawsuit which, to the best of my knowledge was never served on ODL. I am not aware of any basis on which to allege that any Ascent-owned trade secret information was provided to ODL and then made available to OWX or OWA UK directly or indirectly from ODL.

**The L272-C Exception**

45. The L272-C exception **arose with regard to** (a) a L272 drone parts list (also temporarily referred to as the "Pholos 2" Parts List for Diligence 2018-09-08), and (b) a L272-C Vehicle Interface Drawing, both of which were provided to Mr. Michael under the CTA only for the purpose of making information available to show potential investors, i.e., indicating that designs of potential interest to investors were under development, although discussions between ODL and Ascent never reached a conclusion to modify the L272 drone to create the PHOLOS. In hindsight, the designs were mislabeled "Pholos" and had no relation to any kind of co-development effort between Ascent and ODL, i.e., the corresponding L272-C drone was not at all designed to meet the specifications I listed in the work statement of

20

Exhibit 1 to the CTA. Although information relating to the L272-C drone design may have been confidential and trade secret information, given that the drone design was entirely unsuitable for my PHOLOS loiter munition concept, neither ODL nor Mr. Michael nor I had any interest in this L272-C Exception Information in relation to development of any PHOLOS product(s). Accordingly, these files were deleted upon termination of the CTA. For at least this reason, I have no belief that this file information was ever provided to OWX or to OWA UK which companies did not come into existence until at least January 2020, more than 13 months after the CTA was terminated. To summarize, although Ascent may have disclosed some limited trade secret information, i.e., the L272-C exception information as trade secrets while the CTA was pending, this file information was timely deleted and I don't recall there ever being any trade secret information received from Ascent which was ever misappropriated by any defendant. Therefore, to the best of my knowledge, no known proprietary information, including trade secrets was ever transferred from ODL, Mr. Hill or Mr. Michael to OWX or to OWA UK.

46. However, through numerous discussions with Fuchs, two things became apparent. First, after explaining to Fuchs many details about the PHOLOS requirements and the reasons for these, in my opinion he still did not understand the important features of the invention. For example, he would mention to me possibilities of simply "dropping" the payload from the drone, and we had to make it clear that the PHOLOS must deliver the payload and the vehicle via precision targeting with a thermal camera looking at the ground directly below the warhead. Nor did he appreciate why it was too dangerous to have any munition return to the sender, e.g., to reuse the drone. Once armed it was not safe to return the drone. There was a learning curve for the Ascent Founders as none of them had any military knowledge or experience and they had little understanding of the battlefield or battlefield tactics. So, it

would not have been possible for persons at Ascent, as contended in the pleadings, to have conceived of my invention. And, after many discussions about military sales, requirements, possible other payloads and uses, we started to realize that Fuchs was very heavily focused on the money and he later began making the financial terms of our proposed relationship more difficult, perhaps because he wanted to advance the PHOLOS opportunity with the knowledge we shared but without us. Specifically, Fuchs kept changing the terms of a proposed product development agreement with an accompanying exclusive license heavily in Ascent's favor, making it commercially impossible for ODL to agree to and find funding for.

47. Referring to the email of Exh 14, Fuchs acknowledged the April 30, 2018 receipt of technical parts of my '518 Application for review by Ascent, and thanked me for releasing that information for him to review under the NDA. I believe that each of the Ascent Founders understood the importance of reviewing the technical parts of the '518 Application because, as one of the parties to the CTA, they and ODL adopted as an express purpose of the CTA: "pursuing specific Business initiatives" as defined in Section B of the CTA and the Statement of Work of Exhibit 1 thereof. It seems highly unlikely that Ascent would not have recognized its obligation to make good faith efforts under the terms of the CTA to study the technical parts of my '518 Application and apply the enabling but confidential information to satisfy its pledge under Paragraph B of the CTA "to expend effort to research, develop, and otherwise pursue the Business Initiative", i.e., to perform its obligations under the Statement of Work. In other words, it is difficult to imagine that, more than 12 months into performance under the CTA, none of the signatories (Fuchs, Jonathan Meringer and Nathaniel Meringer) to the Declaration of the Ascent Founders (Doc 8-3) took the time to

22

review the technical parts of the '518 Application which is the only documentation that would have enabled fabrication and operation of my PHOLOS design under the CTA.

48. Based on the working relationship I had with Jonathan Meringer and Nathaniel Meringer, I believe that at least one of them did so read those technical materials and should thereby have recognized, contrary to Par 80 of the Complaint, that I, not a principal of Ascent, first conceived of a "coaxial drone with an explosive component and imaging system; and that my disclosure was the only enabling embodiment. But for my provision of the confidential and trade secret Statement of Work in Exhibit I of the CTA, and the technical parts of my '518 Application sent on April 30, 2018, none of the signatories to the Declaration of the Founders (Doc 8-3) could have contemplated: a co-axial drone which contains an explosive, an imaging system that enables positioning of the drone directly above a target, and a switch connected to drop the entire drone on the target.

49. Also, regarding the split of tasks to be performed under the Statement of Work in the CTA, I cannot make sense as to on what basis Ascent can now claim ownership or trade secret rights to the design of any loitering munition offered by any of the Defendants.  Clearly, if Ascent claims to have preconceived my invention, I ask why Ascent would not have simply rejected my proposed relationship under the CTA and respond that they already have such a design concept, in which case perhaps they need not work with ODL under the CTA.

**Mock-ups of PHOLOS**

50. In late July 2018 or in the month of August 2018, during the term of the CTA, I requested assistance from staff at Ascent to prepare four three-dimensional mock-up static units of drones ("mock-ups") to be used for marketing the PHOLOS at an upcoming key international defense industry trade show called "MSPO". I received two PHOLOS 1 mock-ups (Exh 15) and two PHOLOS 2 mock-ups (Exh 16). The mock-ups were to be created

23

based on appearance specifications I discussed with Jonathan Meringer and to my knowledge they did not incorporate any design information associated with Ascent products. I received the mock-ups on or about August 28, 2018.

51. The MSPO trade show took place from September 4 to September 7, 2018 in Poland. The mockups were, essentially, fake units having the appearance of weaponry without any of the real functionality of an operable drone, e.g., without interior functional components. I do not believe that the exterior dimensions and proportions of the mock-ups were suitable for flight applications or consistent with those associated with actual drone designs.

52. The mock-ups certainly were not intended to look like derivatives of any of the Ascent coaxial drones and I'm not aware of any similarities to Ascent products other than that the mock-ups were co-axial designs.  To add an element of realism, the mock-ups did include blades which could be rotated, e.g., as though they could be powered to turn with a motor. However, the blades were simply mounted, perhaps with ball bearings, to rotate by hand turning.

53. To summarize, the drone mock-ups were primarily intended to portray the appearance of a missile-like drone to attract the attention of attendees at the show. The ability to turn a rotor blade was intended to add a sense of realism to the mock-up. Moreover, I don't know that any of the visible features, including dimensions or proportions, comported at all with necessary operating specifications for a flyable and co-axial drone. It was my intention to use the drone mock-ups to generate interest and conversation with show attendees, at which time I could discuss the features of the real PHOLOS design.

54. I have compared the mock-ups to the Ascent products I am aware of and I do not see any aspect of the mock-ups that might be construed as trade secret information. Moreover, since Jonathan Meringer was involved with creating the mock-up, I do not believe he would

24

knowingly include in the mock-ups any Ascent proprietary design information, whether or not it was trade secret information.

55.  On November 26, 2018 Ascent unilaterally terminated the CTA without giving prior notice to ODL and without discussion between the parties.  I do not believe there is any disagreement that, during 2017 and 2018, Ascent did not have a coaxial UAV design that met ODL's requirements and that Ascent products did not comprise any technology which would make it worthwhile to "customize" the designs they had at the time to meet these requirements. Fuchs expressly confirmed this in his email to me on June 11, 2018 in which he advises in respect of the Ascent UAVs that "Nothing we show them is fit-for-purpose in military applications."   Exh 17. For clarity, I note that customizing means a process involving mere adjustments or modifications to the existing platforms, but not changing the structure or core components (i.e., by providing a new motor, bigger blades, changing to a IP64/65 weather resistant case, adding new US DOD compliant computer components and gyroscopes, incorporating battlefield compliant capabilities, such as resistance to anti drone weaponry, a redundant environment to support explosives, and auto arming capabilities).

56.  I do not believe Ascent has incurred any injury to justify making me a defendant in Connecticut due to any activity, including commercialization of the PHOLOS. After reading the Complaint I cannot agree that any tort was or could have been committed in Connecticut or elsewhere by me or OOL or ODL because: (i) the '374 Patent and the '251 Patent were "independently conceived by me and filed solely by me and the invention was commercialized independent of any Ascent trade secret information, and (ii) nothing identified as confidential from Ascent was ever used or needed by me or by the subsequently created UK entities, or by Mr. Michael, a UK citizen who never set foot in Connecticut, for any PHOLOS product; and no PHOLOS product was ever sold in the United States. Further,

no tort was or could have been committed in Connecticut or elsewhere resulting in injury to Ascent from any location, in part because no license or permission was required by me or my assignee, Overwerx Ltd., a UK Entity, or by Overwatch Aerospace Ltd., also a UK company, to commercialize the '374 and '251 Patents with the loitering munition independently designed by parties other than and to the exclusion of Ascent in a country other than the United States and manufactured and sold in a country other than the United States. Between September 27, 2017 and November 26, 2018, neither myself nor Mr. Michael ever traveled to Connecticut, or entered any contract in Connecticut or transacted any business in Connecticut personally or through an agent.

57.  The commercially viable version of my PHOLOS loiter munition invention, complete with weapon, did not exist during the life of ODL, owing in part to the inability of any Ascent drone design to meet combat specifications which could precisely deliver the ordinance to a target, but the relationship came to an abrupt and unexpected termination of the CTA by Ascent while ODL was negotiating a product development agreement in good faith with Ascent. I had hoped to develop such a device with the assistance of Ascent, but for whatever reason they apparently lost interest overnight.

**Incorrect Statements made in the Memorandum in Support of Plaintiff's Preliminary Injunction Motion (Doc. 8-2), hereafter the "Ascent Memo"**

58.  At page 6 of the Ascent Memo the existence and value of Ascent's confidential, proprietary and trade secret information is NOT demonstrated by ODL attempting to buy and/or license it for millions of dollars as the sums being negotiated were to fund future development and did not correspond whatsoever to existing Ascent technologies.

59.  At page 16 of the Ascent Memo the Plaintiff incorrectly states: "The undisputed corporate record shows that Hill and Michael owned and controlled Overwatch Defense …" Exh 18

26

contains the following documents for ODL, all available on the Florida Division of Corporations website: Detail Sheet, Electronic Articles of Organization, the 2018 Reinstatement, and the 2019 Reinstatement. None of these documents mention the name of Mr. Michael or in any way suggest Mr. Michael ever owned or controlled ODL. It is not true that Mr. Michael had any ownership interest or control in ODL. At all times since its formation on October 2, 2017, I was the sole manager and owner of ODL until it was dissolved on September 25, 2020. And with regard to OWX and OWA UK, I was not an employee of either company and I had no active role in their management.  At some point in July 2020 I agreed to provide some consultancy services, primarily to continue to support the patent application process in the US.

**No Trade Secret Misappropriation or Fraudulent Transaction Occurred in Overwatch Defense Activities**

60.   I have read Ascent's Memorandum in Support of an Injunction and understand: (a) Ascent claims not only that that several trade secret misappropriations occurred (Section H at p. 10] but that the PHOLOS sold by OWA UK is a replica of one of Ascent's coaxial drones that was the subject of discussion under the CTA; and (b) Ascent claims that the "Overwatch Group": "knows that it replicated Ascent's drone because it has used images of the Teaming Agreement's PHOLOS drone to market its replicated PHOLOS drone. (Founders Dec., 174.) Specifically, Overwatch Defense used information provided by Ascent under the CTA to create images of the PHOLOS drone for marketing and promotional purposes. (Founders Dec., 175.)" Id p. 12. and (c) Ascent claims that a "transaction was entered into fraudulently to escape liability".

61.   None of Hill's PHOLOS teachings or patent teachings had been identified by Ascent as an Ascent trade secret to me or ODL or, to the best of my knowledge, to Mr. Michael. No Ascent-owned

27

confidential or trade secret information, if there was any, was provided to OWX or OWA UK directly or indirectly from ODL. I had already destroyed anything that Ascent was claiming to be a secret and I never provided any of this to OWA UK or OWX. Mr. Michael had no interest in Ascent provided information at all, nor did I. I agree with Mr. Michael's declaration that he was intent on having independent designs and independent consultants and engineers involved in the development of the PHOLOS.

62. With regard to subparagraph 60(2), above, although Ascent has apparently been non-specific and somewhat evasive or misleading, Ascent is only claiming, and at best can only truthfully claim that the Overwatch Group of companies "knows that it replicated [an image of ] Ascent's drone because it has used images of the Teaming Agreement's PHOLOS drone to market its replicated PHOLOS drone." To this point the Ascent Memo next, more explicitly, states in a more limiting manner: "Specifically, Overwatch Defense used information provided by Ascent under the Teaming Agreement to create images of the PHOLOS drone for marketing and promotional purposes." This is far different from claiming that Defendants manufactured and sold a replica of an Ascent drone.

63. With regard to subparagraph 60(c), above, when Ascent states that a "transaction was entered into fraudulently to escape liability" and then suggests the following broad meaning for fraudulent conduct: "any 'surprise, trick, cunning, dissembling [or] any unfair way' that allows a party to obtain its objective, constitutes fraudulent conduct" but in the context of the facts pled by Ascent and under Ascent's explanations of the doctrine of successor liability, the only transaction I am aware of is the assignment of rights in my '374 Patent and '251 Patent from ODL to OWX and surely there was nothing fraudulent about that. Nor does Ascent suggest otherwise.

64. During 2015, while in attendance at a US National Rifle Association convention in Texas, I met up with Mr. Michael and disclosed to him my above-described invention, including my ideas for the development of an armed unmanned system that could be launched by an individual soldier from a position of cover. Following this meeting we collaborated to advance development of my concepts and investigated potential partners from industry and investors, during which time period I established ODL with the strong interest in developing a man-portable loitering munition: having a sufficient power to lift ratio to carry a heavy kinetic payload while emiting a low acoustic signature for stealth operations.

65. By 2015 I identified the manufacturer of a Chinese T-drone as a potentially suitable partner for foreign defense sales (not for US Military customers) if their design could be modified to increase the power. However, optimal communications and productive face-to-face meetings for a manufacturer's redesign could have been risky and unduly difficult due to language differences and my not being able to meet in person. My clear preference would have been to find a domestic manufacturer of co-axial drones with the ability to meet with design staff in-person and suitably qualified for U.S. defense sales and regulations.

66. So, at the time I considered it fortunate that I found a YouTube video the Meringers had produced, showing their homemade hobbyist cylindrical coaxial drone. It was available on Thingiverse to build your own drone by 3d printing. In my efforts to meet the Meringers I found out about Ascent and met Peter Fuchs.  On or about September 26, 2017 I sent Peter Fuchs an introductory email [Exh 19] describing my interest in discussing some defense related business with Ascent. I do not recall providing to or receiving from Fuchs any confidential information until after the NDA was signed on September 27, 2017 at which time we could begin having exploratory discussions about a collaborative effort to develop my ideas for a weaponized coaxial loitering munition.

29

67. I signed the NDA and CTA in Florida and was not in Syracuse at any time before October 14, 2018. I never met up with the Ascent Founders in Connecticut or traveled to Connecticut; and no part of my performance under the NDA or CTA, as the sole owner and member of the companies OOL and ODL was performed in New York or in Connecticut. All of my obligations under the NDA and CTA were performed in Florida.

68. My inventive ideas were first disclosed to Ascent during those discussions occurring after signature of the NDA on September 27, 2024. I pursued those discussions because Ascent had some UAV design experience, although Ascent had no experience in designing a vehicle capable of carrying an explosive payload and none of Ascent's existing designs metr specification to carry the payload. This deficiency, as it turned out, combined with Ascent's impractical and excessive financial demands were the causes of our inability to work together successfully.

69. None of the founders of Ascent had an interest in or an understanding of loitering munitions at the time I first met with them during September 2017. The Plaintiff's products and marketing materials, including their earlier project "Backcountry Drones," were clearly focused on commercial, non-military applications, primarily targeting outdoor enthusiasts. From October 2014 to at least September 2017, there was no indication in their literature that they had any interest in or contemplation of military capabilities. This lack of military focus was evident even in the early conversations between Ascent and me, only changing after the NDA was signed and I introduced my loitering munition concept. My discussions with Fuchs in June 2018 further highlighted their limited understanding of military applications.

70. It is not true that "Hill and Michael owned and controlled Overwatch defense" as asserted at Doc. 8-2, p. 16.

30

71. It is also not true that "there is continuity in ownership, management, and assets" between ODL and OOL as asserted at Doc. 8-2, p. 16. In truth, Mr. Michael found investors in the UK, arranged for the purchase of the Hill patents by means of an exchange of stock in OWA UK and convinced me that it was a good business decision for me and my inventions since the UK investors were willing to invest in a new company and were willing to finance the development of a commercially viable loitering drone with an appropriate munitions payload, which neither I or my companies nor Ascent had the financial means to do. Once this was accomplished the new company OWA UK devoted the funds under independent management to develop the technology necessary to make a commercially viable product. Whilst I had input into the development, but little active role in it. An entire team of internal engineers and managers and outside consultants in other countries outside of the United States managed this project. There was no continuity in ownership, management or assets.

72. Whilst I did serve for a short time as a statutory director of OWX it was not an executive role and I had no executive or management responsibilities in any of the new companies in the UK. I was not required to participate in any board meetings or take any board level decisions and I eventually resigned that position on September 22, 2021.

73. Even more off the point is the assertion at DOC. 8-2, page 17 that fraud was involved and that there was a "plan to continue to use Ascent's information, including trade secrets, to directly compete with Ascent." This will require a couple of paragraphs of text from both Jeff and Drew.

74. None of the following claims at Doc. 8-02 page 19 is true: Ascent will suffer: (a) a loss of goodwill and damage to its reputation: (b) a loss of business and market share due to Defendants' unlawful competition; (c) price pressure from a competitor who stole its technology, and (d) the divergence of substantial profits and gains from the unauthorized

uses of Ascent's Information. For all of these reasons, Ascent is likely to succeed on the merits of its breach of contract claim." In point of fact, there was no breach, Ascent withdrew from the CTA, knowing it did not have the funding or the expertise to bring to the market a commercially viable loitering weapon in accordance with my patents. Ascent chose to withdraw its first Connecticut complaint, moreover, because it knew it had no proof of the use or exploitation of any Ascent technology or "disclosures" to ODL.

Pursuant to 28 U.S.C. §1746, I have signed this Declaration on this August 26th, 2024, under penalty of perjury and I declare the foregoing Declaration to be true and correct, except where I am relying upon information from others, as indicated herein, in which case I believe the same to be true as stated herein.

………………………………………

Executed by Jeffrey T. Hill