**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

ASCENT AEROSYSTEMS INC.,

                              Plaintiff,                  5:25-cv-00275 (BKS/MJK)

v.

MARYNA TROST, Administrator of the Estate of Jeffrey
T. Hill,[1] OVERWATCH AEROSPACE LLC,
OVERWATCH AEROSPACE LTD., and OVERWERX
LTD.,

                              Defendants.

---

**Appearances:**

*For Plaintiff:*
John R. Horvack, Jr.
Fatima Lahnin
Damian K. Gunningsmith
Carmody Torrance Sandak & Hennessey, LLP
195 Church Street
P.O. Box 1950
New Haven, CT 06509

*For Defendants Maryna Trost, Administrator of the Estate of Jeffrey T. Hill, Overwatch*
*Aerospace LLC, Overwatch Aerospace Ltd., and Overwerx Ltd.:*
Thomas J. Rechen
Snigdha Mamillapalli
McCarter & English, LLP
CityPlace I, 36th Floor
185 Asylum Street
Hartford, CT 06103

Gregory J. Mascitti
McCarter & English, LLP
250 West 55th Street, 13th Floor
New York, NY 10019

---

[1] Maryna Trost, Administrator of the Estate of Jeffrey T. Hill was substituted for Defendant Jeffrey T. Hill, who died on April 23, 2025. (Dkt. Nos. 110, 136).

**Hon. Brenda K. Sannes, Chief United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.    INTRODUCTION

Plaintiff Ascent Aerosystems Inc. filed the Complaint and a motion for a preliminary injunction in the United States District Court, District of Connecticut on June 21, 2024. (Dkt. Nos. 1, 8). Plaintiff alleges that that Defendants Overwerx Ltd., Overwatch Aerospace LLC, Overwatch Aerospace LTD, (the "Corporate Defendants"), and Defendant Maryna Trost, Administrator of the Estate of Jeffrey T. Hill, are unlawfully using Plaintiff's proprietary coaxial drone information. (*See generally* Dkt. No. 1). Plaintiff brings: two breach of contract claims, a trade secret misappropriation claim under 18 U.S.C. § 1836 and Connecticut state law, an inventorship correction claim under 35 U.S.C. § 256, and an unfair and deceptive trade practices claim under Connecticut state law. (*Id.* at 10–16). On February 20, 2025, finding venue in Connecticut improper, United States District Judge Omar A. Williams transferred this action to the Northern District of New York under 28 U.S.C. § 1406(a). (Dkt. No. 80). In evaluating venue, Judge Williams concluded that the Northern District of New York would have personal jurisdiction over the Corporate Defendants "through a theory of . . . successor liability." (*Id.* at 13–20). Presently before the Court is the Corporate Defendants' motion for reconsideration of the issue of personal jurisdiction, arguing that dismissal is required under Federal Rule of Civil Procedure 12(b)(2) because the Complaint fails to adequately allege personal jurisdiction, and, in the alternative, that Plaintiff fails to meet the heightened burden for showing personal jurisdiction created by its preliminary injunction motion. (Dkt. No. 109). The motion is fully briefed. (Dkt. Nos. 115, 125). For the reasons that follow, the Corporate Defendants' motion is denied.

## II.    FACTS[2]

### A.    The Parties

Plaintiff has been engaged in the business of designing, making, and selling Unmanned Aerial Vehicles ("UAVs"), or "drones," since 2014 and is an innovator in the field of a particular type of UAVs referred to as "'coaxial' drones." [3] (Dkt. No. 8-3, ¶¶ 4–5). During the time relevant to this action, Plaintiff was a Delaware corporation, (Dkt. No. 54-1, ¶ 5), with a principal office in Syracuse, New York. [4] (Dkt. No. 54-1, at 7). Peter Fuchs, Plaintiff's co-founder and Chief Executive Officer, "maintained the Connecticut business location for Ascent," where he worked from his home office. (Dkt. No. 54-1, ¶¶ 3, 7). Plaintiff also maintained an office in Syracuse, New York, where co-founders, Nathaniel Meringer and Jonathan Meringer were located "as part of an 'in residence' period of the CenterState 'GeniusNY' technology accelerator."[5] (*Id.* ¶ 7). According to Plaintiff, this action arises from an attempted collaboration in 2017 and 2018 between Ascent, and Jeffrey Hill, a Florida resident, Hill's LLCs—Overwatch Optics, LLC and Overwatch Defense, LLC (Florida limited liability companies), and Andrew Michael, a British citizen,[6] (Dkt. No. 1, ¶¶ 6–8, 14), to develop a "coaxial weapon system" using Plaintiff's coaxial drones to carry an explosive warhead, (Dkt. No. 8-5, at 8). Plaintiff alleges

---

[2] The Court is considering the Corporate Defendants' motion as part of Plaintiff's motion for a preliminary injunction. *See supra* Part IV. The Court therefore considers the evidence the parties' have submitted to date in this case. *See Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010). The "findings are provisional in the sense that they are not binding on a motion for summary judgment or at trial and are subject to change as the litigation progresses." *trueEX, LLC v. MarkitSERV Ltd.*, 266 F. Supp. 3d 705, 720 n.108 (S.D.N.Y. 2017); *see also Fair Hous. in Huntington Comm. Inc. v. Town of Huntington*, 316 F.3d 357, 364 (2d Cir. 2003). To the extent there are factual disputes, none are material to the Court's analysis.

[3] According to Plaintiff, "[m]ost drones do not have a coaxial configuration, but instead use a multirotor helicopter or fixed wing configuration." (Dkt. No. 8-3, ¶ 7).

[4] The Connecticut Secretary of State was designated as agent for service of process and authorized forwarding of service to "Ascent's business address" in Sandy Hook, Connecticut. (Dkt. No. 54-1, ¶ 6).

[5] The record does not provide further information about the "CenterState 'GeniusNY' technology accelerator."

[6] Michael was dismissed as a defendant for lack of personal jurisdiction. (Dkt. No. 80, at 26).

that the Corporate Defendants, Overwerx and Overwatch Aerospace, Ltd. ("OA UK"), which were incorporated in the United Kingdom in 2020, and Overwatch Aerospace LLC ("OA US"), which was formed in Florida in 2021, are successors to Overwatch Defense. (Dkt. No. 1, ¶¶ 10, 12, 13, 57).

### B.    Background

#### 1.    Attempted Collaboration

In 2016, Hill, a service-disabled veteran of the United States Army, established Overwatch Optics LLC, which focused on "thermal optics scopes and devices." (Dkt. No. 47-38, ¶¶ 5, 8). Hill had formed a "strong interest in developing a man-portable loitering munition: having a sufficient power to lift ratio to carry a heavy kinetic payload while emitting a low acoustic signature for stealth operations." (*Id.* ¶ 64). Hill states that he discovered Plaintiff after viewing "a YouTube video the Meringers had produced, showing their homemade hobbyist cylindrical coaxial done." (*Id.* ¶ 66). On or about September 19, 2017, Hill sent Plaintiff "an introductory email" "discussing [his] interest in discussing some defense related business" and indicating that Overwatch Optics had "use for the [Plaintiff's] Sprite drone." (*Id.*; Dkt. No. 47-58, at 2).

On September 27, 2017, Plaintiff and Overwatch Optics LLC entered into a Nondisclosure Agreement ("NDA") prohibiting the reverse engineering, disassembling, compiling, or otherwise analyzing "the physical construction of" "any equipment, component software, or other items delivered to the Receiving Party from the Disclosing Party." (Dkt. No. 8-6, at 2). It also required all information received under the NDA to be held in "strict confidence." (*Id.*). The NDA provided that it would be governed by New York law, that the parties consented "to the jurisdiction of any State or Federal court located within or with

jurisdiction over Sandy Hook, Connecticut," and that any "notice or other communication" as to

be sent to Plaintiff at its Syracuse, New York address. (*Id.* at 4–5).

On October 2, 2017, Hill formed Overwatch Defense, LLC in Florida. (Dkt. No. 47-38, ¶

8). In his declaration, Hill stated that he was the "sole owner," that he formed Overwatch

Defense in order "to provide a corporate vehicle through which [he] could develop and exploit

[his] loitering drone weapon concept." (*Id.* ¶ 10). Hill also described Overwatch Defense as "a

patent start-up, primarily involved in the development of thermal optics, special operations

construction equipment, and the creation of the . . . patent" for a weaponized drone. (Dkt. No.

62-5, ¶ 14). On October 5, 2017, Hill filed a provisional patent application SN62/568,518

"disclos[ing] at least one of [his] designs for the" weaponized drone. (Dkt. No. 47-38, ¶ 25).

On November 12, 2017, Plaintiff and Overwatch Defense entered a Commercial Teaming

Agreement ("Teaming Agreement"), regarding a project identified as the "'PHOLOS' Kinetic

UAS Coaxial Weapon System."[7] (Dkt. No. 8-5, at 8). The Teaming Agreement placed the

development of "[a] customer-ready Vehicle capable of carrying the Payload," on Plaintiff and

the development of a "Warhead" on Overwatch Defense. (*Id.* at 8–9). The Teaming Agreement

also reflected the parties' agreement to be bound by the NDA and specified that New York law

would govern and that any notice or other writing was to be sent to Plaintiff at its Syracuse, New

York address. (*Id.* at 5–6).

Plaintiff asserts that it sent Overwatch Defense the following "confidential, proprietary,

and/or trade secret information . . . under the Teaming Agreement": "3D CAD STEP files for the

Pholos 1 and Pholos 2 coaxial drone mockups," "the bulkhead payload module and the payload

---

[7] Hill stated that he "coined" the name "PHOLOS" and explains that "as a product," PHOLOS "refers to enabled embodiments of a coaxial drone consistent with [his] inventive concept." (Dkt. No. 47-38, ¶ 16). It appears that PHOLOS is the name for the complete product the parties were endeavoring to develop: a coaxial drone with a warhead.

mounting ring of one of Ascent's functional coaxial drone models," and "the modular attachment ring of another operational Ascent drone model"; "[a] pinout of the connector board of Ascent's drone"; a "bill of materials"; and a "specification sheet for one of Ascent's drone models." (Dkt. No. 8-3, ¶ 26). In addition, between October 30, 2017 and October 15, 2018, Plaintiff provided Overwatch Defense with three operational coaxial drones and "four PHOLOS mockups." (*Id.* ¶ 28).

Hill first introduced Michael to Plaintiff, via email on November 15, 2017, as "a good friend and business partner." [8] (Dkt. No. 47-13, at 2). In June 2018, Michael began "participat[ing] in discussions" with Plaintiff. (Dkt. No. 47-2, ¶ 35). The parties dispute the nature of Michael's involvement. Michael states that he remained at "arm's length from Mr. Hill's businesses" and that he engaged with Plaintiff "for the purposes of providing tactical awareness and some moral support" "in the context that [he] might provide assistance in sourcing any required funding for any future work with the Plaintiff," and that he saw his role was "an informed unpaid advisor to, and potential investor in, Overwatch Defense." (*Id.* ¶¶ 35, 58). Fuchs states that Michael held himself out as Overwatch Defense's "Chief Operating Officer" and as the "Managing Director, Overwatch Group," that Plaintiff "received at least 60 email communications from [Michael's] Overwatch email account: drew@overwatch-defense.com, and approximately 41 of those email communications reference[d]" the title of COO or Managing Director. (Dkt. No. 54-1, ¶ 17). Michael acknowledges being "referred to as a 'chief operating officer,'" but maintains "that was a title in name only and primarily for use with

---

[8] The record indicates that Hill, who was, as noted above, a service-disabled veteran of the United States Army, (Dkt. No. 47-38, ¶ 7), and Michael, an "officer veteran of the British Armed Forces," (Dkt. No. 47-2, ¶ 15), met in London in or around 2012, where they "connected over [their] military backgrounds," (*id.* ¶ 21).

potential customers," and that he "agreed to use of the title for the purposes of adding some gravitas and experience to the Overwatch Defense team." (Dkt. No. 47-2, ¶ 25).

In August 2018, Hill advised Plaintiff that Overwatch Defense would "be keen on owning some IP and would like to discuss the development/design option" as well as a "perpetual license." (Dkt. No. 8-3, ¶ 31). The parties exchanged a draft license agreement and draft memorandum of understanding in September 2018. (*Id.* ¶¶ 32–35 (citing Dkt. Nos. 8-10, 8-11)).

On September 4, 2018, Hill filed a second provisional patent application SN62/726,926, and on October 5, 2018, a non-provisional United States utility patent Application, 16/153/696. (Dkt. No. 47-38, ¶ 26). Both applications describe "designs or applications of the PHOLOS." (*Id.*).

On October 16, 2018, Hill and Michael met the Meringers and Fuchs in person at Plaintiff's business premises in Syracuse, New York. (Dkt. No. 62-1, ¶ 3; Dkt. No. 62-5, ¶ 8). However, "[t]he parties failed to reach agreement" and on November 26, 2018, "Ascent provided Overwatch Defense written notice that it was terminating the [Teaming Agreement]." (Dkt. No. 8-3, ¶ 39).

### 2.    Plaintiff's 2019 Lawsuit Seeking Return of Property

Following the termination, Plaintiff "demanded that [Overwatch Defense] return the drones and mockups and all confidential and proprietary information." (Dkt. No. 8-3, ¶ 40; Dkt. No. 8-13, at 2). In a letter dated December 11, 2018, Overwatch Defense responded that "the intellectual property for the UAV and mock-ups, belong to Overwatch" and stated that the UAVs "have been destroyed as a result of testing" and that, in any event, "there was no agreement between Ascent and Overwatch to return materials." (Dkt. No. 8-13, at 2). After further correspondence, Overwatch Defense agreed to return three of Plaintiff's drones, certain other

7

equipment, including a camera, and the "[f]light wreckage" of one of Plaintiff's drones. (Dkt. No. 8-14, at 3; Dkt. No. 8-15, at 3). However, Overwatch Defense, refused to return the PHOLOS 1 and 2 "mockups" on the ground that they "were exclusively created for the purpose of attaching explosive devices (which is our Client's intellectual property)." (Dkt. No. 8-15, at 3; Dkt. No. 8-3, ¶ 45).

On February 12, 2019, Plaintiff filed a complaint against Overwatch Defense in the United States District Court for the District of Connecticut, alleging, inter alia, breach of contract, conversion, and trade secret misappropriation. (Dkt. No. 8-3, ¶ 46; Dkt. No. 8-16 (complaint)). Following the filing of the complaint, Overwatch Defense advised Plaintiff that it was returning two of the drones and the PHOLOS 1 and 2 mock-ups but that it would not be possible to return the "flight wreckage" of the remaining drone because the "wreckage ha[d] already been disposed of" and, because the battery "melted into the unit," shipping was "impossible even if the wreckage could be recovered." (Dkt. No. 8-18, at 3; Dkt. No. 8-17, at 3). According to Plaintiff, "as a result of these promises and representations, Ascent filed a dismissal without prejudice of the lawsuit on April 24, 2019." (Dkt. No. 8-3, ¶ 53).

### 3.    Overwatch Defense's Continued Operations

In December 2019, Hill, as CEO of Overwatch Defense was communicating via email with the CEO and Co-Founder of Hush Aerospace in Virginia. (Dkt. No. 115, at 17). Plaintiff has submitted evidence indicating that Hill was continuing PHOLOS development efforts: in a December 11, 2019 email to Hush, Hill stated that Overwatch Defense was ██████████

████████████████████████████████████████████████████

███████████████████████████████ (HUSH000050–51). ██████████████████████

███████████████████████████ (HUSH000057–61). ██████████████████

███████████████████████████████████████

(HUSH000061).

### 4.    Formation of the Corporate Defendants

According to Michael, the 2019 lawsuit "precipitate[d] the end of Overwatch Defense." (Dkt. No. 47-2, ¶ 127). Still, Hill "fully expected to grow the business" and Michael "was committed to support this effort through fundraising activity." (*Id.*). However, Michael believed "no experienced investor would want to be associated with a company that had a court claim filed against it" and, in 2019 Hill's "ill health had started to become a concern." (*Id.* ¶¶ 128–29), Hill and Michael therefore "agreed . . . that [Michael] would start afresh with a new business away from the US in part due to the toxic after effect of the Plaintiff's 2019 lawsuit." (*Id.* ¶ 129). Michael states that he agreed that the new business would take on the patented loiter munition concept, and intellectual property disclosed in the two Overwatch Patents and other inventive concepts of Mr. Hill in consideration for a minority shareholding in the parent company for a consultancy arrangement." (*Id.*). On January 14, 2020, Michael incorporated Overwerx in the United Kingdom "as a group holding company and at inception . . . owned 100% of the stock in it" and intended that it "would act as a holding company for successive business ventures that [he] would establish." (*Id.* ¶ 130). On January 31, 2020, Hill took ownership of 42 percent of the stock in Overwerx and became a statutory director. (*Id.* ¶ 131 (stating that Michael held 43 percent of the stock and private investors held 15 percent of the stock)).

On February 7, 2020, Michael incorporated Overwatch Aerospace Ltd. ("OA UK") "as a direct wholly owned operating subsidiary of Overwerx Ltd." (Dkt. No. 47-2, ¶ 130). OA UK "devoted the funds under independent management to develop the technology necessary to make a commercially viable product. (*Id.* ¶ 135). Instead of seeking a license arrangement with third parties, Michael decided to "design and develop our own loiter munition capability and our own

coaxial UAV platform, and named the "new coaxial design" "'Pholos' with Mr. Hill's blessing." (*Id.* ¶¶ 137–38). Although there was no "formal assignment of the name 'PHOLOS' from Overwatch Defense to Overwerx Ltd.," Hill "tacitly consented to [OA UK] using the name and he raised no objection to the continued use of the name 'Overwatch.'" (*Id.* ¶ 129).

On March 17, 2020, Overwatch Defense entered a patent assignment agreement with Overwerx, assigning Overwatch Defense's four patent applications to Overwerx. (Dkt. No. 109-2, at 2–3). Hill signed the patent assignment agreement on behalf of both parties: as "Manager" for Overwatch Defense and as "Director" for Overwerx. (*Id.* at 3). Hill had received the 42 percent "minority shareholding in . . . Overwerx and a consultancy arrangement" in exchange. (Dkt. No. 47-2, ¶ 129; Dkt. No. 62-5, ¶ 14).

According to Michael, on August 13, 2020, Overwatch Aerospace Ltd., engaged Hush Aerospace "to design a coaxial unmanned aerial vehicle" and the two entities entered a "Development Agreement." (Dkt. No. 125-3, ¶ 6).

On September 25, 2020, Overwatch Defense was dissolved. (Dkt. No. 47-38, ¶ 59).

On August 19, 2021, Michael incorporated Overwatch Aerospace, LLC ("OA US") as a direct subsidiary to OA UK "to preserve the corporate name in the US and prevent brand squatting." (Dkt. No. 47-2, ¶ 130). At the time of OA US's formation, both Hill and Michael became managers. (*Id.* ¶ 8). Hill resigned from the position of manager on May 25, 2023. (*Id.*). OA US "has no employees or customers and has not engaged in business in the United States or anywhere else." (*Id.* ¶ 10).

## III.    CAUSES OF ACTION

In the first cause of action, Plaintiff asserts that Overwatch Defense, and its successors–the Corporate Defendants–breached the NDA (between Ascent and Overwatch Optics), the

Teaming Agreement (between Ascent and Overwatch Defense), and the Settlement Agreement

(between Ascent and Overwatch Defense) by:

> (1) Misappropriating Ascent's confidential, proprietary and/or trade secret information concerning its coaxial drones,
> (2) Engaging in and/or causing others to reverse engineer, disassemble, decompile, or otherwise analyze the physical construction of Ascent's drones,
> (3) Pursuing the business initiative of making and selling a Pholos coaxial drone after termination of the Teaming Agreement,
> (4) Fraudulently pursuing and securing patents on Ascent's intellectual property before the United States Patent Office,
> (5) Using information provided by Ascent under the NDA and/or Teaming Agreement, or derived therefrom, to make and sell a Pholos coaxial drone,
> (6) Commercially exploiting Ascent's confidential, proprietary and/or trade secret information without Ascent's authorization, grant, or license,
> (7) Failing to destroy information provided by Ascent under the NDA and/or Teaming Agreement,
> (8) Using images of Ascent's coaxial drones provided under the NDA and/or Teaming Agreement in marketing and promotional materials, and/or
> (9) Copying Ascent's product specification sheet to create a product specification sheet for the replicated PHOLOS drone.

(Dkt. No. 1, ¶ 59).

In the second cause of action, Plaintiff asserts a breach of contract claim against Maryna

Trost, as Administrator for the Estate of Jeffrey Hill. (*Id.* ¶¶ 62–66).

In its third cause of action, Plaintiff alleges that all of the Defendants "have

misappropriated Ascent's trade secret information by using the trade secrets without Ascent's

consent, after Hill, Michael and Overwatch Defense derived and secured the information and

equipment under circumstances that explicitly limited their use, including" the provision

prohibiting the reverse engineering, disassembling, decompiling, or otherwise analyzing to

determine the physical construction of Plaintiff's coaxial drones, in violation of 18 U.S.C. § 1836

and Connecticut General Statutes § 35-51 et seq. (*Id.* ¶¶ 67–79).

In its fourth cause of action, Plaintiff seeks inventorship correction of U.S. Patent Nos. 11,067,374 and 11,940,251 under 35 U.S.C. § 256, alleging that the patent applications filed by Hill and Overwatch Defense "falsely claimed that Hill was the inventor of Ascent's coaxial drone with an explosive component and imaging system." (*Id.* ¶¶ 80–86). Plaintiff alleges that Hill "assigned these fraudulent patents to Overwatch Defense" and that "Hill then caused Overwatch Defense to assign them to Overwerx." (*Id.* ¶ 84).

In its fifth cause of action, Plaintiff alleges that Defendants engaged in unfair and deceptive trade practices against Plaintiff, in violation of Connecticut General Statutes § 42-110a et seq. (*Id.* ¶¶ 87–92).

## IV.    STANDARD OF REVIEW

In their motion, the Corporate Defendants seeks "reconsideration as to lack of personal jurisdiction." (Dkt. No. 109-1, at 1). However, Judge Williams' Order transferring this action to the Northern District of New York considered personal jurisdiction in the context of venue and did not decide Defendants' original motion to dismiss for lack of personal jurisdiction. (*See generally* Dkt. No. 80 (Order); *see also* Dkt. No. 47 (motion to dismiss)). Further, as the Court advised the parties during the April 10, 2025, video conference, (*see* Dkt. No. 104, at 3–4), and as the parties acknowledge in their submissions, (Dkt. No. 109-1, at 8; Dkt. No. 115, at 20), the standard of review applicable to personal jurisdiction in the context of a motion for a preliminary injunction differs from the standard applicable in the context of venue or a motion under Rule 12(b)(2). The Court therefore finds no basis for "reconsideration" and instead considers the parties' arguments in the context of Plaintiff's motion for a preliminary injunction.

In general, to survive a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(5), a "plaintiff need make only a prima facie showing that the court has jurisdiction." *Visual Sciences, Inc. v. Integrated Commc'ns Inc.*, 660 F.2d 56, 58 (2d Cir. 1981). But a

"[p]laintiff faces a higher burden" when seeking a preliminary injunction, *Homeschool Buyers Club, Inc. v. Brave Writer, LLC*, No. 19-cv-6046, 2020 WL 1166053, at *7, 2020 U.S. Dist. LEXIS 42702, at *24–25 (S.D.N.Y. Mar. 11, 2020), because a "district court has no power to grant an . . . injunction against a party over whom it has not acquired valid jurisdiction," *Weitzman v. Stein*, 897 F.2d 653, 659 (2d Cir. 1990) (quoting 7–Pt. 2 Moore's Federal Practice ¶ 65.03 [3], at 65–28 (2d ed.1989)). Thus, "'[a] prima facie showing of jurisdiction will not suffice'" and a plaintiff must instead "establish[] at least a reasonable probability of ultimate success on the question of the court's in personam jurisdiction" when seeking preliminary injunctive relief. *Id.* 659 (quoting *Visual Sciences*, 660 F.2d at 59); *see also Twin Beauty LLC v. NR Interactive LLC*, No. 24-cv-7412, 2024 WL 5108153, at *2, 2024 U.S. Dist. LEXIS 226367, at *7 (E.D.N.Y. Dec. 14, 2024) (explaining that reasonable probability of ultimate success "is a higher standard than the 'prima facie showing of jurisdiction' a plaintiff must make to defeat a Rule 12(b)(2) motion to dismiss" (quoting *Homeschool Buyers Club*, 2020 WL 1166053, at *7, 2020 U.S. Dist. LEXIS 42702, at *24–25)).

## V.    DISCUSSION

As relevant here, in Defendants' original motion to dismiss, Overwerx, OA UK, and OA US argued that they were not subject to personal jurisdiction in Connecticut on Count One's successor-liability breach of contract claims, (*see* Dkt. No. 47-1, at 21–32), and that to the extent Counts Three, Four, and Five purported "to allege tort type claims (misappropriation of trade secrets, inventorship correction, and deceptive trade practices), Connecticut's long arm statute, Conn. Gen. Stat. § 52-59b(a)(2), (3), was inapplicable, (*see* Dkt. No. 47-1, at 32–37). Following Judge Williams' issuance of an order to show cause why the action should not be transferred to the Northern District of New York, Defendants argued, generally, that there was no basis for

personal jurisdiction in New York and asserted that the arguments in their motion to dismiss "are equally applicable to New York." (Dkt. No. 76, at 26).

Judge Williams determined that Overwatch Defense lacked sufficient minimum contacts with Connecticut to satisfy the due process requirements for personal jurisdiction and that "it would offend 'traditional notions of fair play and substantial justice' to exercise personal jurisdiction over the defendants by virtue of their relation to Overwatch Defense." (Dkt. No. 80, at 12–13 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945))). Upon concluding that personal jurisdiction was unavailable, and thus venue improper, in Connecticut, Judge Williams considered whether "venue is proper and personal jurisdiction of Defendant exists in the Northern District of New York." (*Id.* at 13). Judge Williams' analysis, however, focused almost entirely on Overwatch Defense's alleged breach of the Teaming Agreement. (*See, e.g.*, *id.* at 15 (finding "Overwatch Defense entered into a teaming agreement governed by New York law with Plaintiff), 16 (noting that Hill and Michael traveled to Syracuse, New York "to meet with Plaintiff's leadership in furtherance of the teaming agreement" and that Plaintiff alleges that Overwatch Defense breached the [teaming agreement] by misappropriating Plaintiff's confidential trade secret information, and that the Corporate Defendants are successors in interest to Overwatch Defense and therefore are liable for the violation")).

"A plaintiff 'must establish the court's jurisdiction with respect to each claim asserted.'" *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 83 (2d Cir. 2018) (quoting *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004)). In connection with the present motion however, the parties have provided a general discussion of the basis for personal jurisdiction in relation to the alleged breach of the Teaming Agreement (which incorporated the NDA), but do not specifically address personal jurisdiction with respect the alleged breach of the "settlement

agreement," which stems from a case brought in the District of Connecticut. Further, as the Corporate Defendants note, Plaintiff has not attempted to establish personal jurisdiction with respect to its trade secret misappropriation claim, inventorship correction claim, or unfair and deceptive trade practices claims. (Dkt. No. 109-1, at 20). Nor does Plaintiff address how personal jurisdiction might operate in connection with its claims that the Corporate Defendants violated *Connecticut's* trade secret misappropriation and deceptive trade practices statutes. (*See* Dkt. No. 1, ¶¶ 76 (alleging violations of Connecticut General Statutes § 35-51 et seq.), ¶ 88 (alleging violations of Connecticut General Statutes § 42-110a et seq.)). In addition, it appears that Plaintiff is not proceeding on a successor liability theory in connection with these claims, but on a theory that the Corporate Defendants themselves engaged in misconduct. (*See*, *e.g.*, *id.* ¶¶ 75 (alleging that the Corporate Defendants "have misappropriated Ascent's trade secret protected information by using the Ascent trade secrets without Ascent's consent"), 88 (alleging that the "actions of defendants, alone and combined, constitute unfair and deceptive trade practices")); *see also Lelchook v. Société Générale de Banque au Liban SAL (Lelchook III)*, 41 N.Y.3d 629, 633 (N.Y. 2024) (noting that the plaintiff would have to establish that the defendant-successor "independently had contacts sufficient to satisfy [New York's long-arm statute] wholly apart from predecessor's contacts with New York" if the plaintiff "sought to exercise personal jurisdiction based on the [defendant-successor's] own conduct"). Absent briefing that adequately addresses these issues, the Court concludes that Plaintiff has not shown a reasonable probability of success as to personal jurisdiction in connection with these claims. The Court is not suggesting any outcome as to personal jurisdiction as to these three claims; it simply finds that it would be inappropriate to address them without briefing.

A.      Personal Jurisdiction

"Specific [personal] jurisdiction exists when 'a [forum] exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum.'" *O'Neill v. Asat Trust Reg. (In re Terrorist Attacks on September 11, 2001)*, 714 F.3d 659, 673–74 (2d Cir. 2013) (quoting *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567–68 (2d Cir. 1996) (internal quotation omitted)). A district court may therefore "exercise specific personal jurisdiction over a defendant only if three requirements are satisfied: '(1) the plaintiff's service of process upon the defendant must have been procedurally proper; (2) there must be a statutory basis for personal jurisdiction that renders such service of process effective; and (3) the exercise of personal jurisdiction must comport with constitutional due process principles.'" *Lelchook v. Société Générale de Banque au Liban S.A.L. (Lelchook IV)*, 147 F.4th 226, 236 (2d Cir. 2025) (quoting *Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*, 40 F.4th 56, 69 (2d Cir. 2022)). As the Corporate Defendants do not dispute that they were properly served, the Court turns to the second and third requirements.

The "statutory basis" for personal jurisdiction in this case is Federal Rule of Civil Procedure 4(k)(1), which provides that "[s]erving a summons or filing a waiver of service establishes personal jurisdiction over a defendant . . . who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located." Fed. R. Civ. P. 4(k)(1)(A).[9]

---

[9] In its opposition to the present motion Plaintiff contends, for the first time, in a one-paragraph argument, that the Corporate Defendants are subject to personal jurisdiction under Federal Rule of Civil Procedure 4(k)(2) because the Complaint alleges a claim under the Federal Defend Trade Secrets Act, 18 U.S.C. § 1836. (Dkt. No. 115, at 32). Rule 4(k)(2) "generally authorizes service of a complaint alleging federal claims when (1) the defendant is not subject to jurisdiction in any state's court of general jurisdiction and (2) exercising jurisdiction comports with constitutional principles." *Lelchook v. Société Générale de Banque au Liban SAL (Lelchook II)*, 67 F.4th 69, 75 n.7 (2d Cir. 2023) (citing Fed. R. Civ. P. 4(k)(2)). Plaintiff asserts that the "Corporate Defendants indisputably have contacts with the United States through their development work with [a company] in Virginia," and that "[i]f there is no jurisdiction in New York, plaintiff certifies that based on the information readily available to it and its counsel, the Corporate Defendants are not subject to suit in the courts of general jurisdiction of any state." (Dkt. No. 115, at 32). Plaintiff's argument wholly fails to address the requirements for jurisdiction under Rule 4(k)(2)(B) or any Fifth Amendment due process inquiry regarding the Corporate Defendants' activities in the United States. *See, e.g., Lensky v. Turk Hava*

16

As this is not seriously disputed, the Court "therefore ask[s] next whether the law of the forum state here, New York, and in particular the New York long-arm statute–permits the exercise of personal jurisdiction" over the Corporate Defendants in New York. *Lelchook IV*, 147 F.4th at 236. "New York's long-arm statute, CPLR 302, sets forth the acts of a non-domiciliary that may give rise to specific personal jurisdiction." *Lelchook III*, 41 N.Y.3d at 633. Again, it is not seriously disputed that Overwatch Defense would be subject to specific jurisdiction in New York; nor does any party argue that there was any error in Judge Williams' thorough analysis of this issue. (Dkt. No. 80, at 14–17). Nonetheless, because personal jurisdiction originates with Overwatch Defense, the Court briefly addresses the factors that weigh in favor of finding that New York's long-arm statute reaches Overwatch Defense.

Section § 302(a)(1) of New York's long-arm statute permits the exercise of jurisdiction over a nondomiciliary who "transacts any business within the state or contracts anywhere to supply goods or services in the state." N.Y. C.P.L.R. § 302(a)(1). In determining whether personal jurisdiction may be exercised under this provision, "a court must decide (1) whether the defendant 'transacts any business' in New York and, if so, (2) whether this cause of action 'aris[es] from' such a business transaction." *Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 60 (2d Cir. 2012) (citation omitted); *see also Beacon Enters., Inc. v. Menzies*, 715 F.2d 757, 764 (2d Cir. 1983) (observing that "[s]ection 302(a)(1) is typically invoked for a cause of action against a defendant who breaches a contract with plaintiff, or commits a commercial tort against

---

*Yollari, A.O.*, No. 21-cv-2567, 2023 WL 6173334, at *3, 2023 U.S. App. LEXIS 25138, at *6 (2d Cir. Sept. 22, 2023) (remanding for district court to consider, under Rule 4(k)(2)(B), whether "exercising jurisdiction is consistent with the United States Constitution and laws") (citation omitted). Accordingly, the Court declines to consider this contention further.

plaintiff in the course of transacting business or contracting to supply goods or services in New

York") (citations omitted).

The Court of Appeals of New York has identified a non-domiciliary's commission of

"'an act by which it purposefully avails itself of the privilege of conducting activities within

[New York]'" as the "overriding criterion necessary to establish a transaction of business within

the meaning of CPLR 31(a)(1)." *Paterno v. Laser Spine Inst.*, 24 N.Y.3d 370, 377 (2014)

(alteration in original) (quoting *Ehrenfeld v. Bin Mahfouz*, 9 N.Y.3d 501, 508 (2007)). However,

"it is not the quantity but the quality of the contacts that matters under [the] long-arm jurisdiction

analysis," *id.* at 378, and "[a] court must have regard for the 'totality of the circumstances,'"

*Licci*, 673 F.3d at 62 (quoting *Farkas v. Farkas*, 36 A.D.3d 852, 853 (N.Y. App. Div. 2007)).

The Second Circuit has "identified four non-exclusive factors that bear on" the analysis:

> (i) whether the defendant has an on-going contractual relationship
> with a New York corporation; (ii) whether the contract was
> negotiated or executed in New York and whether, after executing a
> contract with a New York business, the defendant has visited New
> York for the purpose of meeting with parties to the contract
> regarding the relationship; (iii) what the choice-of-law clause is in
> any such contract; and (iv) whether the contract requires [parties to
> that contract] to send notices and payments into the forum state or
> subjects them to supervision by the corporation in the forum state.

*Sunward Elecs., Inc.*, 362 F.3d at 22 (quotation omitted).

### 1.    Personal Jurisdiction Over Overwatch Defense

As it is undisputed that the Corporate Defendants have no contacts with, and have not

conducted any activities in, the State of New York, there is no basis for finding that the long-arm

statute would provide personal jurisdiction. Plaintiff instead argues that the Corporate

Defendants inherited personal jurisdiction from their predecessor, Overwatch Defense, over

which (the parties appear to agree) the Court would have personal jurisdiction. Indeed, as Judge

Williams found: the first and third factors "weigh in favor of finding personal jurisdiction" as

"Overwatch Defense had entered into a teaming agreement governed by New York law with Plaintiff, whose principal place of business was in Syracuse, New York," (Dkt. No. 80, at 15); "the second factor . . . weighs in favor of personal jurisdiction, because Overwatch Defense's CEO and founder, Defendant Hill, along with Defendant Michael, travelled to Syracuse, New York in October 2018 to meet with Plaintiff's leadership in furtherance of the teaming agreement," (*id.* at 16); and that "while there is no evidence that the CTA required Overwatch Defense to send notices or payment to [New York], according to Defendant Hill, Overwatch Defense engaged in extensive communications via telephone or video conference with Ascent personnel in furtherance of the agreement," (*id.*) (citation omitted). Judge Williams therefore concluded that Overwatch Defense "engaged in purposeful activities in New York, invoking the protections and benefits of New York law by entering the CTA with Plaintiff." (*Id.*). The parties identify no error in, or evidence contradicting, this aspect of Judge Williams' analysis. Thus, even applying the higher standard, the Court concludes that Plaintiff has satisfied its burden of showing Overwatch Defense purposefully engaged in and availed itself of the privilege of conducting business in New York when it entered the Teaming Agreement.

Nor is there any ground on which to question Judge Williams' conclusion regarding the second step of the analysis—"whether this cause of action arises from such a business transaction." *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246 (2d Cir. 2007). Judge Williams found that "[t]he answer is unequivocally yes" in light of Plaintiff's allegation that "Overwatch Defense breached the CTA by misappropriating Plaintiff's confidential trade secret information." (Dkt. No. 80, at 16).

Judge Williams' conclusion regarding the final consideration—whether the exercise of personal jurisdiction over Overwatch Defense "would comport with due process," (*id.*), is also

uncontested. Looking to the "quality and nature of" Overwatch Defense's contacts with New York, including its "extensive contacts with New York throughout its partnership with Plaintiff" and agreement to a teaming agreement with a corporation that maintained its principal place of business in New York, and whose terms were governed by the laws of New York, Judge Williams found the exercise of personal jurisdiction over Overwatch Defense would comport with due process. (*Id.* at 16–17). Again, the parties raise no objection or argument regarding this conclusion and the Court is aware of no evidence presented in conjunction with the motion for a preliminary injunction that would undermine it. Accordingly, the Court finds personal jurisdiction over Overwatch Defense pursuant to New York's long-arm statute is warranted.

Overwatch Defense, however, was dissolved on September 25, 2020, and is not a defendant in this case. Plaintiff argues that the Corporate Defendants are Overwatch Defense's successors and thus inherited Overwatch Defense's jurisdictional status.

## 2. Successor Jurisdiction

Successor jurisdiction under New York law permits "imputation" of a predecessor's jurisdiction "whenever the forum state's law would hold the successor liable." *Lelchook III*, 41 N.Y.3d at 637. Thus, the Court must determine whether Plaintiff has shown a reasonable probability of its ultimate success as to personal jurisdiction over the Corporate Defendants on the theory of successor or inherited jurisdiction, which arises from successor liability principles. *See id.* In the context of successor liability, New York has recognized certain exceptions to the general rule that "a corporation that purchases the assets of another corporation is generally not liable for the seller's liabilities." *Lelchook II,* 67 F.4th at 76 (citation omitted). These exceptions allow "buyer of a corporation's assets" to be held

> liable as its successor if: (1) it expressly or impliedly assumed the predecessor's tort liability, (2) there was a [de facto] consolidation or merger of seller and purchaser, (3) the purchasing corporation

was a mere continuation of the selling corporation, or (4) the transaction is entered into fraudulently to escape such obligations.

*Id.* (quoting *New York v. Nat'l Serv. Indus., Inc.*, 460 F.3d 201, 209 (2d Cir. 2006) (Sotomayor, J.). As the Court of Appeals of New York has explained, "[a]lthough liability and jurisdiction are distinct legal concepts the principles animating one may inform the other. *Lelchook III*, 41 N.Y.3d at 635 (internal citation omitted) (citing *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 470 (1988)). Here, Plaintiff argues that there was a de facto merger of Overwatch Defense and the Corporate Defendants, that the Corporate Defendants are a mere continuation of Overwatch Defense, and that the Corporate Defendants are "subject to successor jurisdiction under the fraud theory of successor liability." (Dkt. No. 115, at 27–30).

### a.    De Facto Merger

"The relevant inquiry under the *de facto* merger doctrine is whether a 'transaction, although not in form a merger, is in substance a consolidation or merger of seller and purchaser.'" *Priestley v. Headminder, Inc.*, 647 F.3d 497, 505 (2d Cir. 2011) (quoting *Nat'l Serv. Indus., Inc.*, 460 F.3d at 209). Relevant factors in assessing whether there has been a de facto merger include "(1) continuity of ownership; (2) cessation of ordinary business and dissolution of the acquired corporation as soon as possible; (3) assumption by the purchaser of the liabilities ordinarily necessary for the uninterrupted continuation of the business of the acquired corporation; and (4) continuity of management, personnel, physical location, assets, and general business operation." *Id.* (quoting *Nat'l Serv. Indus., Inc.*, 460 F.3d at 209). "Although the court examines all of the foregoing factors, 'continuity of ownership is the essence of a merger'" and "critical" to the analysis. *Id.* at 505–06 (quoting *Nat'l Serv. Indus., Inc.*, 460 F.3d at 211).

Here, there is evidence of continuity of ownership between Overwatch Defense and Overwerx, cessation of Overwatch Defense, and continuity of assets and general business

operations. The evidence shows that Hill owned Overwatch Defense and that Michael and Hill owned Overwerx, (*see* Dkt. No. 47-2, ¶ 131 (explaining that Hill owned 42 percent of the stock in Overwerx, Michael held 43 percent of the stock, and private investors held 15 percent of the stock)), and that Overwerx acquired Overwatch Defense's patent applications, the only Overwatch Defense asset of which there is evidence, with shares of its own stock, (Dkt. No. 62-5, ¶ 14). In light of Hill's ownership interest[10] in both Overwatch Defense and Overwerx, and Overwerx's acquisition of the Overwatch Defense patent applications, the Court concludes there is a reasonable probability of continuity of ownership. *Priestly*, at 647 F.3d at 506 (explaining that "[t]he continuity of ownership element typically is satisfied where the purchasing corporation pays for the acquired assets with shares of its own stock. The seller therefore continues to own the assets it has sold through its ownership of shares in the purchasing corporation." (quoting *Nat'l Serv. Indus., Inc.*, 460 F.3d at 210 n.2)). Overwatch Defense was dissolved on September 25, 2020. As to continuity of management and personnel, although Hill denied being an employee of Overwerx or performing "any management responsibilities," Hill did not dispute being a director, there is evidence that Hill continued to participate in developing relationships for purposes of developing a UAV that would carry a warhead, the same role he performed through Overwatch Defense. There is also evidence that Michael acted as Overwatch Defense's COO and is the Chief Executive Officer of Overwerx. (Dkt. No. 54-1, ¶ 17; Dkt. No. 47-2, ¶ 5). The physical location changed insofar as Overwerx was incorporated in the United Kingdom, not the United States, but there is no evidence that either Hill or Michael worked from

---

[10] Although Michael held himself out to Plaintiff as an officer of Overwatch Defense, there is no evidence that Michael owned any portion of that company.

locations different than those they worked from in connection with Overwatch Defense, i.e.,

Florida and London.

Although Overwerx disputes continuity of ownership, noting that Michael did not own

any part of Overwatch Defense and that Hill had resigned as director on September 22, 2021, and

divested himself of all stock in Overwerx by May 21, 2023, (Dkt. No. 47-2, ¶ 132), Plaintiff has

shown that Hill owned Overwatch Defense and that there is evidence that Hill acquired an

ownership interest in Overwerx through the assignment of Overwatch Defense's patent

applications, even if that role dissipated or evolved over time. *Long Side Ventures LLC v.

Hempacco Co.*, No. 22-cv-08152, 2023 WL 6386888, at *11, 2023 U.S. Dist. LEXIS 175750, at

*34–35 (S.D.N.Y. Sept. 29, 2023) (explaining that "[c]ontinuity of ownership 'exists where the

shareholders of the predecessor corporation become direct or indirect shareholders of the

successor corporation as the result of the successor's purchase of the predecessor's assets, as

occurs in a stock-for-assets transaction.'" (quoting *Van Nocker v. A.W. Chesterton, Co. (In re

N.Y. City Asbestos Litig.)*, 15 A.D.3d 254, 256 (N.Y. App. Div. 2005))).

Overwerx argues that de factor merger principles are inapplicable because there was no

purchase or transaction. However, the Court is not aware of any legal support for this argument,

Overwerx does not cite any, and at least one court has rejected such an argument. *See Time

Warner Cable, Inc. v. Networks Grp.*, LLC, No. 09-cv-10059, 2010 WL 3563111, at *7, 2010

U.S. Dist. LEXIS 93855, at *21 (S.D.N.Y. Sept. 9, 2010) (observing that while  discussion of de

facto merger exception often "speak[s] in terms of a 'purchaser' and a 'seller,'" the exception

"can be established absent some type of corporate reorganization or other transaction,"

explaining that "the absence of formalities is at the heart of the de facto merger exception, which

is why a de facto merger is 'analyzed in a flexible manner that disregards mere questions of form

and asks whether, in substance, it was the intent of the successor to absorb and continue the operation of the predecessor.'" (quoting *Nettis v. Levitt*, 241 F.3d 186, 194 (2d Cir. 2001)).

Further, the Second Circuit has cautioned that "for personal jurisdiction, we look through form to substance," *Lelchook IV*, 147 F.4th at 247 (quoting *Oklahoma Firefighters Pension & Ret. Sys. v. Banco Santander (México) S.A. Institución de Banca Multiple*, 92 F.4th 450, 456–57 (2d Cir. 2024)), and discouraged any ruling that "would require [a] [c]ourt to close its eyes to the reality of the relationship between" the entities at issue, *id.* Overwerx also argues that unlike *Lelchook*, there is no indication that any Defendant expressly assumed Overwatch Defense's assets and liabilities. (Dkt. No. 125, at 12). *Lelchook*, however, concerned the successor's acquisition of the predecessor's assets and liabilities, in a transaction that was not a merger. 147 F.4th at 232. A de facto merger describes the "assumption by the purchaser of the liabilities ordinarily necessary for the uninterrupted continuation of the business of the acquired corporation" as one of the "hallmark[s] of a de facto merger." *Nat'l Serv. Indus., Inc.*, 460 F.3d at 209, and though there is no evidence that the Overwerx expressly assumed Overwatch Defense's liabilities, there is evidence that Overwerx (via Hill and Michael) was aware of potential liabilities stemming from Overwatch Defense's contractual relationship with Plaintiff after the 2019 lawsuit and continued to pursued the assignment of Overwatch Defense's patent applications and development of the PHOLOS.

But even if Overwerx's continued pursuit of Overwatch Defense's business initiatives was insufficient to show an assumption of liability, its pursuit of those initiatives and continued efforts to build an UAV with munitions, continued use of the name "PHOLOS," Hill's continued ownership, the transfer of the patent applications—the only assets Overwatch Defense appeared to own, and the continued involvement at Overwerx of the only two individuals with any

connection to Overwatch Defense, Hill and Michael, are sufficient to show a reasonable probability of de facto merger. *See DoubleLine Cap. LP v. Construtora Norberto Odebrecht, S.A.*, 413 F. Supp. 3d 187, 214–15 (S.D.N.Y. 2019) (observing that "New York law requires courts to apply [the de facto merger] test[] 'in a flexible manner . . . disregard[ing] mere questions of form,' recognizing "the realities of the transaction that took place") (citation omitted) (first quoting *Tap Holdings, LLC v. Orix Fin. Corp.*, 970 N.Y.S.2d 178, 184 (N.Y. App. Div. 2013); and then quoting *Miller v. Forge Mench P'ship Ltd.*, No. 00-cv-4314, 2005 WL 267551, at *8, 2005 U.S. Dist. LEXIS 1524, at *26 (S.D.N.Y. Feb. 2, 2005)).

The above analysis solely concerns Overwerx. OA UK and OA US argue that there is no evidence of any continuity of ownership, or any other hallmark of a de facto merger, with Overwatch Defense. (Dkt. No. 109-1, at 26–28). The Court agrees. Plaintiff does not meaningfully differentiate the entities in its briefing, but, in general, refers to them collectively, (*see, e.g.*, Dkt. No. 115, at 27 (arguing that there is "continuity of ownership between Overwatch Defense and the Corporate Defendants"). The only assertions Plaintiff makes concerning OA UK is that it "understood itself to be a successor to Overwatch Defense" and assumed its obligations based on evidence that, at some point, it informed ███████████████████████████ ████████████████████████████████████████████████████ and that in a statement of work OA UK identified "Hill as the 'Overwatch Manager'" with contractual authority to bind OA UK. (Dkt. No. 115, at 28). Plaintiff's assertions regarding OA US are even thinner: according to the Complaint, Hill was a "member/manager." (Dkt. No. 1, ¶ 13). Michael asserts that OA US is "wholly owned by" OA UK and "has no employees or customers and has not engaged in business in the United States or anywhere else." (Dkt. No. 47-2, ¶ 10). Thus, absent any evidence or assertion suggesting a continuity of ownership, the Court concludes

Plaintiff has failed to establish a reasonable probability of successor jurisdiction based on de facto merger between Overwatch Defense and OA UK or OA US.

### b.    Mere Continuation

"In New York, '[a] continuation envisions a common identity of directors [and] stockholders and the existence of only one corporation at the completion of the transfer.'" *Tommy Lee Handbags Mfg. Ltd. v. 1948 Corp.*, 971 F. Supp. 2d 368, 380 (S.D.N.Y. 2013) (quoting *Societe Anonyme Dauphitex v. Schoenfelder Corp.*, No. 07-cv-489, 2007 WL 3253592, at *6, 2007 U.S. Dist. LEXIS 81496, at *14 (S.D.N.Y. Nov. 2, 2007)). "[C]ourts have observed that the mere-continuation and de-facto-merger doctrines are so similar that they may be considered a single exception." *Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d 41, 45 n.3 (2d Cir. 2003) (citing cases). However, the New York Court of Appeals has made clear that "mere continuation" refers "to corporate reorganization," and it requires actual dissolution of the seller. *Schumacher v. Richards Shear Co.*, 59 N.Y.2d 239, 245 (1983). "The mere continuation exception . . . is only available where 'it is not simply the business of the original corporation which continues, but the corporate entity itself.'" *Tommy Lee Handbags Mfg. Ltd.*, 971 F. Supp. 2d at 380 (quoting *Colon v. Multi–Pak Corp.*, 477 F. Supp. 2d 620, 626–27 (S.D.N.Y. 2007).

Here, there is evidence of a common identity of directors and stockholders between Overwatch Defense and Overwerx: Hill was owner of Overwatch Defense and owner and director of Overwerx and Michael was COO of Overwatch Defense and became CEO Overwerx. Further, Overwatch Defense's dissolution followed the formation of Overwerx. *See Colon v.*, 477 F. Supp. 2d at 626 ("A continuation envisions a common identity of directors, stockholders and the existence of only one corporation at the completion of the transfer.") (citation omitted). There is also a common identity of directors or officers between Overwatch Defense and OA UK as Michael was COO of Overwatch Defense and is the CEO of OA UK, as well as a director.

(Dkt. No. 47-2, ¶ 8; Dkt. No. 76-2, ¶ 5). Further, given the alleged sequence of events, including Michael's formation of Overwerx on January 14, 2020, as "a group holding company . . . for successive business ventures," and his formation of OA UK, shortly thereafter (on February 7, 2020), "as a direct wholly owned operating subsidiary of Overwerx Ltd.," (Dkt. No. 47-2, ¶ 130), as well as the subsequent dissolution of Overwatch Defense, (Dkt. No. 47-38, ¶ 59), the Court concludes that the evidence suggests that OA UK's formation was in the nature of a corporate reorganization of Overwatch Defense into Overwerx as holding company, and OA UK as its operating subsidiary. Thus, the Court finds Plaintiff has established a reasonable probability of successor jurisdiction as to OA UK as a "mere continuation" of Overwatch Defense.

The Court likewise concludes Plaintiff has adequately shown a reasonable probability that OA US was a mere continuation of Overwatch Defense. OA US was formed in Florida on August 19, 2021, was wholly owned by OA UK, and was formed "to preserve the corporate name in the US and prevent brand squatting." (Dkt. No. 47-2, ¶ 130). Notably, Overwatch Defense, Hill and Michael's only business presence in the United States, has been dissolved less than a year earlier. Further, Hill and Michael were OA US's "managers" at the time of its formation. (Dkt. No. 47-2, ¶ 8). Accordingly, the Court concludes Plaintiff has shown "mere continuation" as to Overwerx, OA UK, and OA US.

### c.    Fraud

"To evaluate actual intent to defraud, courts look to 'badges of fraud,' including:

> (1) the lack or inadequacy of consideration; (2) the family, friendship, or close associate relationship between the parties; (3) the retention of possession, benefit, or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of the events and transactions under inquiry."

*Anhui Aido Garment Co., Ltd. v. Stern*, No. 24-cv-1572, 2025 WL 1663860, at *7, 2025 U.S.

Dist. LEXIS 111398, at *20 (S.D.N.Y. June 12, 2025) (quoting *Ford Motor Credit Co. v. Orton-*

*Bruce*, No. 14-cv-5382, 2017 WL 1093906, at *9, 2017 U.S. LEXIS 41577, at *26–27

(S.D.N.Y. Mar. 22, 2017)).

Here, there is evidence that: Hill and Michael were friends and associates; Hill "expected

to grow the business" of Overwatch Defense; that Michael was "committed to support this

effort" but that that Plaintiff's 2019 lawsuit "precipitated the end of Overwatch Defense"; that

Michael believed "no experienced investor would associate" with a company that had been sued;

and that Michael sought to "start afresh . . . away from the US in part due to the toxic after effect

of the Plaintiff's 2019 lawsuit," (Dkt. No. 47-2, ¶¶ 127–29), which ended on April 24, 2019,

(Dkt. No. 8-3, ¶ 53); that Michael formed Overwerx on January 14, 2020, (Dkt. No. 47-2, ¶ 130;

and that on January 31, 2020, Hill took ownership of 42 percent of the stock in Overwerx and

became a statutory director, (*id.* ¶ 131); and that on March 17, 2020, Hill executed a patent

assignment agreement assigning all interest in Overwatch Defense's patent applications to

Overwerx, (Dkt. No. 109-2, at 3). Although there is no evidence that the consideration

Hill/Overwatch Defense received for the assignment of patent applications was inadequate, in

light of the evidence of other badges of fraud, including the relationship between Hill and

Michael, the formation of Overwerx and OA UK in another country to carry on the business of

Overwatch Defense less than a year after the 2019 lawsuit, followed by the formation of OA US

after Overwatch Defense's dissolution, Hill/Overwatch Defense's assignment of the patent

application to Overwerx in exchange for a 42% ownership interest and director position, are

sufficient to show a reasonable probability of fraud, i.e., the avoidance of Overwatch Defense's

contractual obligations to Plaintiff, for purposes of successor jurisdiction as to Overwerx, OA

UK, and OA US. *See SungChang Interfashion Co. v. Stone Mountain Accessories, Inc.*, No. 12-cv-7280, 2013 WL 5366373, at *16, 2013 U.S. Dist. LEXIS 137868, at *46–47 (S.D.N.Y. Sept. 25, 2013) (finding that the plaintiff "alleges with adequate specificity the facts of the alleged fraud" for purposes of successor liability based on allegations that new company "was formed to frustrate and evade the creditors of its predecessor entity, and "the public auction and subsequent sale to [new company] were effectuated by [another defendant], to legitimate the scheme"); *see also Silverman Partners LP v. Verox Grp.*, No. 08-cv-3103, 2010 WL 2899438, at *6, 2010 U.S. Dist. LEXIS 71977, at *17 (S.D.N.Y. July 19, 2010) (denying motion to dismiss where the plaintiff sufficiently alleged that the successor corporation was created "to avoid the debts and obligations which [the defendant] owed to Plaintiff"); *Staudinger+Franke GMBH v. Casey*, No. 13-cv-6124, 2015 WL 3561409, at *15, 2015 U.S. Dist. LEXIS 73912, at *41 (S.D.N.Y. June 8, 2015) (denying summary judgment on successor liability based on fraud, finding "at least three badges of fraud are present-a close relationship between the parties, retention of control, and suspicious timing").

Accordingly, for the reasons stated, the Court concludes that Plaintiff has established a reasonable probability as to the successor jurisdiction of the Corporate Defendants.

### B.    Due Process

The Court next considers whether the exercise of personal jurisdiction over the Corporate Defendants, "comports with Fourteenth Amendment due process principles." *Lelchook IV*, 147 F.4th at 238. "Due process permits a court to exercise personal jurisdiction over a non-resident where the maintenance of the suit would not 'offend traditional notions of fair play and substantial justice.'" *Porina v. Marward Shipping Co.*, 521 F.3d 122, 127 (2d Cir. 2008) (*quoting Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). The Second Circuit has instructed that although it has "not generally 'suggested that due process requires something

more than New York law,'" courts must "independently ensure that the constitutional requirements are satisfied." *Lelchook IV*, 147 F.4th at 238 (quoting *Spetner v. Palestine Inv. Bank*, 70 F.4th 632, 645 (2d Cir. 2023)). In the context of corporate entities, the seminal principle dictates that "where the Fourteenth Amendment's protections apply, 'a tribunal's authority depends on the defendant's having such 'contacts' with the forum State that the maintenance of the suit is reasonable . . . and does not offend traditional notions of fair play and substantial justice." *Id.* at 239 (quotation marks omitted) (quoting *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358 (2021)).

The Second Circuit recently laid out the due process analysis applicable to a "corporate defendant that is not incorporated in or primarily doing business in the State" as follows:

> a court must first determine that a corporate defendant's in-state acts reflect its "purposeful availment" of opportunities within the State, and that the asserted claims arise out of or relate to its contacts with the State. The corporate defendant's in-state acts must further make it reasonably foreseeable that it would be subject to suit in courts sitting in that State. In other words, it must receive "fair warning" that it might be called to answer claims in the forum. The exercise of jurisdiction in the State as to the related claims over the defendant must be "reasonable"—that is, consistent with "traditional notions of fair play and substantial justice" that the Court referred to in *International Shoe*.

*Id.* (citations omitted).

### 1.    Minimum Contacts and Purposeful Availment

The Corporate Defendants argue that they are foreign entities (of the United Kingdom and Florida) and that there is no evidence or allegation of their own contacts with, or purposeful availment of, the State of New York. (Dkt. No. 109-1, at 17–20). However, "[s]tate and federal courts alike have consistently permitted the jurisdictional contacts of a predecessor to be imputed to its successor, reasoning that if forum law could also hold the successor liable for its predecessor's actions, its related jurisdictional actions should also attach to the successor."

*Lelchook IV*, 147 F.4th at 239–40. Here, Plaintiff has established a reasonable probability on its breach of contract claim with respect to the Teaming Agreement, on a theory of successor jurisdiction. The Court therefore imputes Overwatch Defense's forum contacts to the Corporate Defendants for purposes of the due process analysis. *See id.* at 240 (imputing the predecessor's forum contacts to successor in analyzing due process aspect of personal jurisdiction where plaintiffs alleged "sufficient facts to establish successor liability under New York law").

Analyzing Overwatch Defense's contacts with New York, which, as discussed, are imputed to the Corporate Defendants, the evidence is sufficient to support a reasonable probability that Overwatch Defense engaged in activity "*purposefully directed toward the forum State*." *Asahi Metal Indus. Co. v. Superior Ct. of California*, 480 U.S. 102, 112 (1987); *see also Lelchook IV*, 147 F.4th at 241 (analyzing the predecessor's contacts with New York to determine whether purposeful availment is satisfied for purposes of personal jurisdiction over the successor). The contacts must be the defendant's own choice and not "random, isolated, or fortuitous." *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984). They must show that the defendant deliberately "reached out beyond" its home—by, for example, "exploi[ting] a market" in the forum State or entering a contractual relationship centered there. *Walden v. Fiore*, 571 U.S. 277, 285 (2014) (internal quotation marks and alterations omitted).

Here, even assuming Hill's initiation of contact with Plaintiff in September 2017 and entry into the NDA is irrelevant since the contract was on behalf of, and the NDA bound, Overwatch Optics, which is not alleged to be a predecessor of Overwatch Defense, there is evidence that Overwatch Defense not only entered a Teaming Agreement with Plaintiff, which it understood to be a New York-based company, but that it subsequently initiated a discussion regarding the possibility of entering a licensing agreement, provided a draft agreement, and

actively negotiated its terms. After entering the NDA, Hill founded Overwatch Defense on October 2, 2017 "to provide a corporate vehicle through which [he] could develop and exploit my loitering drone weapon concept" and used Overwatch Defense to take "the collaboration forward with Ascent under the [Teaming Agreement]." (Dkt. No. 47-38, ¶ 10). The Teaming Agreement specified that it would be governed by New York law and required Overwatch Defense to send any notices necessary under the Teaming Agreement to Plaintiff's Syracuse, New York address. Overwatch Defense later pursued a second contract with Plaintiff: on August 18, 2018, Hill emailed Fuchs to notify Plaintiff that Overwatch Defense was interested in "owning some IP" and a "perpetual license" and stating that its IP attorney would be "sending over the agreement." (Dkt. No. 8-9, at 2). The draft licensing agreement in the record, which both parties appear to have actively engaged in editing, specified that it would "be construed in accordance with the substantive laws of New York," (Dkt. No. 8-10, at 27), and that Overwatch Defense send any requisite notices to Plaintiff in Syracuse, New York, (*id.* at 26).[11] The Court finds Plaintiff has shown a reasonable probability that Overwatch Defense purposefully availed itself of the laws and privileges of New York. Overwatch Defense chose to engage with Plaintiff for the purpose of furthering its efforts to develop a loitering munition. Plaintiff was a company whose office was, to Hill's knowledge at least, physically located in New York. Overwatch Defense entered a Teaming Agreement that not only contemplated an ongoing, collaborative relationship with Plaintiff's New York office, but specified that it would be governed by New York law. In addition to the Teaming Agreement, there is evidence that Overwatch Defense initiated discussion of, and pursued, a second contract with Plaintiff—a contract which, per the

---

[11] The draft agreement requires that Plaintiff send any required notice Overwatch Defense at its Florida address, and provides Hill's Overwatch Defense email address, but also that Plaintiff send "a copy to: Overwatch Defense, LTD" in London, to the attention of "Chief Operating Officer drew@overwatch-defense.com." (Dkt. No. 8-10, at 26).

draft, would also be governed by New York law, and would allow Overwatch Defense to license Plaintiff's IP. Hill, Overwatch Defense's owner, and Michael, traveled to Plaintiff's Syracuse, New York office, for the purpose of engaging in further negotiations. *See MacDermid, Inc. v. Canciani*, 525 F. App'x 8, 11 (2d Cir. 2013) ("by choosing to invest in a privately held Connecticut corporation, MacDermid purposefully availed himself of the laws and privileges of the state."); *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 171–72 (2d Cir. 2010) ("the Supreme Court has noted that 'parties who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other State for the consequences of their activities.'" (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 (1985)).

Moreover, the claims in this case center on Overwatch Defense's alleged misappropriation of among other things, CAD files, Plaintiff's coaxial drones, and PHOLOS mockups from Plaintiff under the Teaming Agreement (which incorporated the NDA) and use of that information in furtherance of its efforts to "develop and exploit [Hill's] loitering drone weapon concept," (Dkt. No. 47-38, ¶ 10), and the concept and development efforts Overwatch Defense had achieved as a result of that relationship, including the patent applications Overwatch Defense filed, were then carried on by Overwerx, essentially picking up where Overwatch Defense left off. The Second Circuit has recognized, though "[i]n a somewhat different context . . . that the actions of a third party can properly support the exercise of specific jurisdiction over a defendant where the defendant's exploitation of forum opportunities through that third party is intentional." *Lelchook IV*, 147 F.4th at 241 (citing *Oklahoma Firefighters Pension & Ret. Sys.*, 92 F.4th at 457–58). Further, like the successor-defendant in *Lelchook IV*, there is evidence that the owners of Overwerx (Hill and Michael), were able to assess, on a firsthand basis, Overwatch

Defense's jurisdictional contacts and contracts with Plaintiff regarding the development of PHOLOS prior to forming Overwerx, which continued to pursue the development of PHOLOS, because they were the individuals interacting with Plaintiff on behalf of Overwatch Defense. *See id.* at 242 (finding where successor was "able to assess transaction with the predecessor before assuming predecessor's liabilities" as well was "'where jurisdiction over such liabilities may lie,'" that successor's "summons to a New York-based court to answer Plaintiff's claims [was] attributable neither to serendipity nor to Plaintiffs' will" (quoting *Lelchook III*, 41 N.Y.3d at 637)). Since the Corporate Defendants knew "[t]he potential reach of [Overwatch Defense's] liabilities, and its jurisdictional contacts," the Court finds there is a reasonable probability that due process would not bar personal jurisdiction over the Corporate Defendants based on Overwatch Defense's conduct, which allegedly generated the foundation for their ongoing efforts to develop a loitering munition using a coaxial drone. *Id.* at 243.

The Court concludes that the Corporate Defendants had fair warning that they may be subject to New York's authority: even if certain aspects of successor jurisdiction may be unsettled, "as early as 1990," "the 'great weight' of authority" held "a successor subject to personal jurisdiction based on the actions of its predecessor" and "even then permitted 'imputation of a predecessor's actions' to its successor '*whenever* forum law would hold the successor liable for its predecessor's actions.'" *Lelchook IV*, 147 F.4th at 243 (quoting *City of Richmond, Va. v. Madison Mgmt. Grp., Inc.*, 918 F.2d 438, 454 (4th Cir. 1990)).

The Court further concludes that liability for breach of the Teaming Agreement was apparent at the time of the merger. The possibility of liability for Overwatch Defense's conduct in relation to the Teaming Agreement was apparent at the time of its merger with Overwerx in January 2020 and at the time of its assignment of its patent applications and Hill's acquisition of

42 percent of Overwerx in March 2020. Michael and Hill were well aware of the Connecticut litigation arising from the termination of the Teaming Agreement, which had occurred the year before. The Corporate Defendants therefore had fair warning that Overwatch Defense's contacts might subject it to suit related to the Teaming Agreement. Though the prior litigation was in Connecticut, "[w]hen a successor company adopts liabilities that are 'no secret' and for which the predecessor has already been subject to public legal battles, the successor has ample notice that it might become liable 'in any venue' where liability accrued." *Lelchook IV*, 147 F.4th at 244 (quoting *Stein v. E. I. du Pont de Nemours & Co.*, 382 N.C. 549, 563 (N.C. 2022)).

Accordingly, the Court finds sufficient evidence, at the preliminary injunction stage to satisfy the minimum contacts and relatedness requirements.

### 2.    Fair Play and Substantial Justice

Due process also requires that the exercise of personal jurisdiction over a defendant "comport with fair play and substantial justice." *Lelchook IV*, 147 F.4th at 245 (quoting *Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 170 (2d Cir. 2013)). To determine "whether exercising jurisdiction comports with fair play and substantial justice," courts consider five factors:

> "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies."

*Am. Girl, LLC v. Zembrka*, 118 F.4th 271, 279 (2d Cir. 2024) (quoting *In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 273 (2d Cir. 2023)). "Although [courts] consider a variety of factors, the 'primary concern' is 'the burden on the defendant.'" *U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 151 n.5 (2d Cir. 2019) (quoting *Bristol-Myers Squibb*

*Co. v. Superior Ct. of California, San Francisco Cnty.*, 582 U.S. 255, 263 (2017)). "[O]nce minimum contacts and the claims' relationship to the forum are sufficiently established," "[i]t is only in an 'exceptional situation'" that court will "find the exercise of specific personal jurisdiction 'unreasonable.'" *Lelchook IV*, 147 F.4th at 245 (quoting *In re Platinum*, 61 F.4th at 274).

The Court concludes the evidence in the record suggests that the first factor—the burden that the exercise of jurisdiction will impose on the defendant—weighs in the Corporate Defendants' favor. *See id.* (finding first factor weighed in the defendant's favor where successor was based in Lebanon, attacks at issue occurred in Israel and the plaintiffs lived outside New York). No Defendant is native to New York: Overwerx and OA UK are based in the United Kingdom and OA US is based in Florida. It also appears that Plaintiff's current places of business are located in Massachusetts and California. (Dkt. No. 1, ¶ 3). However, as no party has suggested that the burden of litigating in New York is unmanageable, and as "the convenience of modern communication and transportation ease any burden the defense of this case might impose," the Court concludes that requiring the Corporate Defendants to appear in New York would not pose an undue burden. *Lelchook IV*, 147 F.4th at 245–46 (quotation marks omitted).

As to the second factor, the Court finds New York's interest in the dispute is strong: the Teaming Agreement specifies that it is governed by New York law, Plaintiff's Founders, Hill, and Michael met and negotiated in New York, where Plaintiff maintained an office from which two of its three Founders worked, and the products the Corporate Defendants' predecessor allegedly kept in violation of the Teaming Agreement, were to be returned to Plaintiff in New York. *See Kernan v. Kurz-Hastings, Inc.*, 175 F.3d 236, 244 (2d Cir. 1999) (finding interest of forum state strong where, among other things, there was "no dispute that New York product

liability and negligence law apply in this case"); *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 130 (2d Cir. 2002) (Sotomayor, J.) ("New York, as the center of the loan transaction and home to the BBL branch which disbursed the funds, has an unquestionable interest in adjudicating the claim").

The Court concludes that the third factor—Plaintiff's interest in obtaining convenient and effective relief—weighs in Plaintiff's favor. *See Bank Brussels Lambert*, 305 F.3d at 130 ("[The third and fourth factors both implicate the ease of access to evidence and the convenience of witnesses."). Plaintiff has a strong interest in obtaining relief and while the parties, witnesses, and evidence appear to be located in several places, New York appears to be the most appropriate and efficient forum. Indeed, the Corporate Defendants do not argue to the contrary. And while many of the documents and witnesses are likely located in the United Kingdom or in other states, (*See*, *e.g.*, Dkt. No. 49-1 (Declaration of Jeffrey Paul Keene, Surrey, England); Dkt. No. 47-2 (Declaration of Andrew Michael, London, England)), there is no indication that a New York forum will impair access to evidence or inconvenience witnesses. *See Lelchook IV*, 147 F.4th at 247 (finding concerns about the possible inconvenient location of witnesses and of evidence "are adequately abated by modern technology").

Neither party has taken a position with respect to the fifth factor, thus the Court has no basis on which to find "the shared interest of the states in furthering substantive social policies" would be furthered or hindered by permitting the present case to be heard in the Northern District.

Based on the above analysis, the Court finds that the exercise of jurisdiction over the Corporate Defendants in connection with the Teaming Agreement comports with fair play and substantial justice. There is no question that this Court would have personal jurisdiction over

Overwatch Defense, the Corporate Defendants' predecessor. Further, having concluded that

Overwatch Defense purposefully availed itself of the New York forum and that its contacts with

New York are properly imputed to the Corporate Defendants under the circumstances of this

case, and in light of the minimal burden on the Corporate Defendants in litigating this case here

and Plaintiff's interest in obtaining convenient and effective relief, the Court finds due process

permits the exercise of personal jurisdiction over the Corporate Defendants.

## VI.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that the Corporate Defendants' motion for reconsideration as to personal

jurisdiction, (Dkt. No. 109), is **DENIED**; and it is further

**ORDERED** that the Clerk file this Memorandum-Decision and Order under seal in

accord with this Court's prior order in this case, (*see* Dkt. No. 146), and file a redacted version

for public view.

**IT IS SO ORDERED.**

Dated: <u>February 24, 2026</u>
       Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge