**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

ASCENT AEROSYSTEMS INC.,

|  |  |  |
|---|---|---|
| | Plaintiff, | 5:25-cv-00275 (BKS/MJK) |

v.

MARYNA TROST, Administrator of the Estate of Jeffrey
T. Hill, OVERWATCH AEROSPACE LLC,
OVERWATCH AEROSPACE LTD., and OVERWERX
LTD.,

Defendants.

---

**Appearances:**

*For Plaintiff:*
Christopher A. Suarez
Joseph F. Ecker
Steptoe LLP
1330 Connecticut Avenue NW
Washington, DC 20036

*For Defendants:*
Thomas J. Rechen
Snigdha Mamillapalli
McCarter & English, LLP
CityPlace I, 36th Floor
185 Asylum Street
Hartford, CT 06103

**Hon. Brenda K. Sannes, Chief United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.    INTRODUCTION

Plaintiff Ascent Aerosystems Inc., filed this action alleging that Defendants Maryna

Trost, Administrator of the Estate of Jeffrey T. Hill, Overwerx Ltd., Overwatch Aerospace LLC,

and Overwatch Aerospace Ltd., misappropriated and commercially exploited confidential,

proprietary, and trade secret information regarding Ascent's coaxial drones. (*See generally* Dkt. No. 1). Plaintiff brings two breach of contract claims, a trade secret misappropriation claim under state law and the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, an inventorship correction claim, and an unfair and deceptive trade practices claim under state law. (Dkt. No. 1, at 10–16). Presently before the Court is Plaintiff's motion for a preliminary injunction to enjoin Defendants Overwerx Ltd., Overwatch Aerospace LLC, and Overwatch Aerospace Ltd., (the "Corporate Defendants")[1] from using or disclosing confidential, proprietary, and trade secret information regarding Plaintiff's coaxial drones. (Dkt. No. 8). The Corporate Defendants oppose Plaintiff's motion. (Dkt. No. 49). The Court held a two-and-a-half-day evidentiary hearing, at which six witnesses, including two experts, testified and the Court later heard summations from the parties. (*See* Text Minute Entry, Apr. 10, 2025; Text Minute Entry, July 8, 2026). For the reasons that follow, Plaintiff's motion is granted. The following constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a).

## II.    FACTS[2]

### A.    Overview

This action arises from a failed teaming arrangement between Plaintiff Ascent, an "innovator in the field of a particular type" of Unmanned Aeriel Vehicles ("UAVs") or drones,

---

[1] Ascent does not seek preliminary injunctive relief as to Defendant Maryna Trost, Administrator of the Estate of Jeffrey T. Hill.

[2] The facts are drawn from the complaint, the evidence presented at the evidentiary hearing, and the declarations and exhibits submitted by the parties in connection with Plaintiff's motion. (*See generally* Dkt. Nos. 8, 10, 49, 60, 61). The Court has also included, for background purposes, facts from exhibits and declarations the parties filed in support of other dispositive motions. (*E.g.*, Dkt. No. 47). The "findings are provisional in the sense that they are not binding on a motion for summary judgment or at trial and are subject to change as the litigation progresses." *trueEX, LLC v. MarkitSERV Ltd.*, 266 F. Supp. 3d 705, 720 n.108 (S.D.N.Y. 2017); *accord Fair Hous. in Huntington Comm. Inc. v. Town of Huntington*, 316 F.3d 357, 364 (2d Cir. 2003).

"referred to as 'coaxial' drones"[3] and Overwatch Defense LLC ("Overwatch"),[4] which was seeking to build a "loiter munition" for "battlefield applications," and required a coaxial drone capable of carrying an "explosive warhead." (Dkt. No. 8-3, ¶ 5; Dkt. No. 47-38, ¶ 9; Dkt. No. 8-5, at 8). Ascent alleges that after the teaming arrangement ended, Overwatch and its successors unlawfully used the confidential information it received from Ascent to build and sell its own coaxial drones.

**B.     Development of the "Sprite 1" Coaxial Drone and Founding of Ascent Aerosystems Inc.**

In or about 2007, twin brothers Nathaniel and Jonathan Meringer graduated from Syracuse University with degrees in aerospace engineering. (T. 16–17, 129). In 2009, the Meringers were hired as "design integration and test engineers" by Orbital Sciences, a "rocket company" in Arizona, where they "worked on different stages of the rockets, buil[t] out bills of material," designed and analyzed hardware, and worked with technicians on assembly. (T. 17–18).

Avid rock climbers, the Meringers explored the canyons in the Arizona outback on the weekends but found, "after getting lost a lot . . . that an aerial perspective would be really helpful." (T. 18–19). In 2012, the Meringers began to "ideate around some sort of device" that would give them an aerial perspective but that would also be "rugged" and "easily transportable" with rock-climbing equipment. (T. 19–20). Jonathan, who had taken a "rotor dynamics class" at Syracuse, proposed a "stacked coaxial drone design," which unlike a traditional drone that has "a bunch or arms with the rotors," was a "cylinder" with "two counter-rotating propellers that stack

---

[3] While "[m]ost drones" have a "multirotor, helicopter or fixed wing configuration," coaxial drones "resemble cylinders with two counter-rotating rotors that share the same central axis." (Dkt. No. 8-3, ¶¶ 5, 7).

[4] The Corporate Defendants' alleged predecessor.

over each other." (T. 19–20). Nathaniel testified that a coaxial structure was "particularly challenging . . . because it was . . a new frontier in drones" and there were few "reference designs or things to look at or talk to people about" and described the area of coaxial drones as "a blue sky design space." (T. 20). The Meringers were skilled in aerodynamics and mechanical design, but as they had "gaps" in the areas of electrical engineering and programming, they began reading books on helicopter dynamics and learning to program, "how to edge circuit boards," "different coding languages," "computer-aided design" ("CAD"), and 3D printing. (T. 20–21). They began "designing and testing," and "trying . . . different materials" and "configurations with the CAD software and [with] the 3D printing and things" they bought from a "hobby store." (T. 21). The Meringers tested and "iterate[d]" on their coaxial drone "as fast as [they] could," often working eight to nine hours a day in addition to their full-time jobs. (T. 21–22).

In or about 2014, the Meringers developed "proof of concept" and "posted a thread to" their "go-to community website called DIY drones." (T. 23). They received "a lot of positive feedback" from investors and others, including Peter Fuchs, who had been working on a drone project of his own and who "reached out" with "a business plan." (T. 23). In April 2014, the Meringers and Fuchs (collectively "the Founders") "signed a partnership agreement and formed Ascent AeroSystems." (T. 23–24).

Ascent's first coaxial drone, "the Sprite" or "Sprite 1," was a "nonindustrial grade hobby-type [coaxial] drone" that Nathaniel described as "an absolute minimum viable product," made with "cheap material" and "lots of commercial off-the-shelf components" ("COTS"). (T. 25–26). However, as relevant here, there were two aspects to Sprite 1's internal ███████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████ (T. 91–92, 155). In general, a

coaxial drone has ████████████████████ (T. 153; Dkt. No. 10, at 4). ████

████████████████████████████████████████

because ████████████████ leaves nothing ████████

████████ (T. 154–55). ████████████████████

████████████████████████████████████████

████████████████████ (T. 154–55). Jonathan explained that one

of their (the Meringers') "earlier designs" had a ████████████████

████████ (T. 155–56), but that they ████████████████

████████████ (T. 156). ████████████████████

████████████████████████████████████

████████████████████████████ (T. 156). ████

████████████████████████████████████

████████████████████ (T. 156). Thus, the Sprite 1's final

████████████ *see infra* Figure 1 ("Design 1"), ████████████

████████████

Figure 1: Design 1 (Sprite 1)



(Dkt. No. 10, at 4).

In April 2015, Ascent launched a Kickstarter campaign and quickly raised approximately $400,000 by selling 350 Sprite 1 coaxial drones. (T. 24–25). Because much of the interest the campaign generated was from commercial, military, and industrial users (as opposed to consumer users), (T. 27), the Meringers began to iterate on the Sprite 1 to develop a "more robust" coaxial drone for the industrial market. (T. 28). "Around mid-2016," Ascent "did [its] first trade study for a major defense contractor." (T. 29). And in January 2017, Ascent moved to the "Tech Garden" in Syracuse, New York for a two-year residency as part of a "business competition" involving "drone startups" where investments were available depending on competition placement. (T. 29–30).

The Meringers' efforts to iterate on the Sprite 1 led to the development of the Spirit, the Sprite 2, and the ████ [5] (T. 158). Jonathan testified that in developing the new models, they abandoned the █████████████████████████████████████████████████████ ████████████████████████████████████████ (T. 143). The Meringers also realized that because their ██████████████████████████████████ █████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████ (T. 143). Ascent "tried a few vendors" to ██████████████████████████████████████████████ ████████ (T. 144).

Like the Sprite 1, the new models had a ██████████████████████████ *see infra* Figure 2 ("Design X"), ████████████████████████████████████ ████████████████ (Dkt. No. 10, at 4). However, unlike the Sprite 1, ████████████ ████████████████████████████████████████████████ ████████████████████████ (Dkt. No. 10, at 4; T. 143).

---

[5] As the record does not contain a clear chronology of the development of the above-referenced models, and the chronology is immaterial for purposes of the present motion, the Court has grouped the drone iterations together for convenience.

Figure 2: Design X (Spirit, Sprite 2, ▮ )



(Dkt. No. 10, at 4); *see supra* Figure 1 for color key.

## C.     Teaming Agreement to Develop a Loitering Munition (the "Pholos")

As Ascent "pivot[ed] into th[e] industrial space," it began to receive "more inbound interest from the customers [it was] looking to attract, one of which" was Jeffrey Hill and his companies—first Overwatch Optics LLC and later Overwatch Defense LLC. (T. 30; Dkt. No. 47-38, ¶¶ 8, 10). Hill[6] was a service-disabled veteran of the United States Army with "field experience in directing drone targeting of enemy combatants," certifications and experience in munitions and missiles, and experience working in a civilian capacity for the Department of Defense. (Dkt. No. 47-38, ¶ 5). Following his military service, Hill formed a "strong interest" in developing a "loitering munition," which he described as a portable, "armed unmanned system

---

[6] Hill actively participated in these proceedings until his death and filed five declarations in connection with various motions. (Dkt. Nos. 47-38, 49-30, 62-5, 67-1, 76-1). Maryna Trost, Administrator of the Estate of Jeffrey T. Hill, was substituted as a defendant following Mr. Hill's death.

that could be launched by an individual soldier from a position of cover." (*Id.* ¶ 64). Hill began

investigating "potential partners from industry and investors" in order to "advance development

of [his] concepts" and in or about 2017, Hill "found a YouTube video the Meringers had

produced, showing their homemade hobbyist cylindrical coaxial drone."[7] (*Id.* ¶¶ 64, 66).

In September 2017, Hill contacted Ascent, "inquiring about Ascent's coaxial drones."

(Dkt. No. 8-3, ¶ 11). At the time, Hill was Chief Executive Officer of Overwatch Optics, a

Florida limited liability company he had founded the year before.[8] (Dkt. No. 47-38, ¶ 8; Dkt. No.

47-58, at 3). In a September 19, 2017, email to Nathaniel, Hill wrote that "[w]e have a use for the

Sprite drone and would like to use it to develop this project. We would be buying upwards of

1000 units at a time if it goes the way we have seen with feedback on our proposals with the

government." (Dkt. No. 47-58, at 2). Nathaniel responded that while they still had Sprite units,

they were "winding down the production" in order to "focus on completing our second

generation vehicle," which they were "calling 'Spirit,'" and which "incorporate[d] feedback"

they had "received over th[e] last few years, especially from customers in government and

defense." (*Id.*). Nathaniel indicated that he had "attached some marketing material" on the Spirit

to the email. (*Id.*). ██████████████████████████████████████

(Dkt. No. 59-4, at 3–4). ████████████████████████████████████████████

████████████████████████████████████████████████████ (*Id.* at

3). ████████████████████████████████████████████████

(*Id.* at 4). Neither Nathaniel's email nor the attachments are marked confidential. However,

neither party asserts that this information revealed Design X.

---

[7] Hill asserted that the Meringers' Sprite 1 coaxial drone "was available on Thingiverse to build your own drone by 3D printing." (Dkt. No. 47-38, ¶ 66).

[8] Hill stated that Overwatch Optics was in the business of "thermal optic scopes and devices." (Dkt. No. 47-38, ¶ 8).

In a September 23, 2017 email to Fuchs with a subject line of "Spirit Collaboration – Confidential," Hill explained that his company was "a supplier of a weapon system that could be incorporated into Ascent's coaxial drones," that he had "been working on this project for some time and ha[d] patented it, but the development of a coaxial drone with a decent payload" was not "easy," and that Ascent's "unit fits the bill for what we need." (Plaintiff's Exhibit 2 ("PX-2"); Dkt. No. 8-3, ¶¶ 12–13).

On September 27, 2017, Ascent and Overwatch Optics entered into a non-disclosure agreement ("NDA"). (Dkt. No. 8-6 (NDA signed by Fuchs and Hill)). The NDA provided "for the protection of confidential, proprietary and/or trade secret information shared by the parties, so that a possible business relationship could be explored." (Dkt. No. 8-3, ¶ 15; Dkt. No. 8-6, at 2). The NDA also ensured that "equipment, components, software, or other items would not be reverse engineered, disassembled, [] decompiled," or "otherwise analyzed to determine its physical construction." (Dkt. No. 8-3, ¶ 15; Dkt. No. 8-6, at 2). Hill stated that he signed the NDA "for the purposes of exploring a business collaboration with Ascent to determine if they could deliver a coaxial drone capable enough to enable [him] to prove [his] inventive concept of a new type of loiter munition for battlefield applications." (Dkt. No. 47-38, ¶ 9). According to Hill, although Ascent "had no familiarity with loitering munitions and had nothing to offer regarding that technology," it "did have a potentially useful hobby-level coaxial drone platform that [Hill] thought could be re-designed for [his] purposes." (Id.).

On September 27, 2017, Fuchs sent Hill (at Hill's request) "the bulkhead payload module STP file and payload mounting ring STP file."[9] (T. 206; PX-4; PX-5; PX-6). From late

---

[9] STP or STEP refer to "Standard for the Exchange of Product Data, ISO 10303 for exchanging 3-D Data among users of CAD tools and software." (Dkt. No. 47-38, ¶ 39.a n.1). "A STEP file is a type of CAD file and can be delivered to a 3D printer." (Id.).

September to November 2017, Hill provided Fuchs with "details of [his] inventive concept," and they "agreed that there was merit" in pursuing "the technical and commercial viability of [Hill's] loitering munition concept," through "collaborative development and marketing activity." (Dkt. No. 47-38, ¶ 10; Dkt. No. 8-3, ¶ 16). On or about October 30, 2017, Ascent provided Hill with "a Sprite 1." (Dkt. No. 8-3, ¶ 28.a).

On or about November 12, 2017, Fuchs and Hill signed a "Commercial Teaming Agreement" ("CTA") to "pursue the business initiative of making and selling a weaponized UAV"; Hill signed in his capacity of "President and CEO" of Overwatch.[10] (Dkt. No. 8-3, ¶ 16; Dkt. No. 47-38, ¶ 10; *see also* Dkt. No. 8-5 (CTA)). Attached to the CTA is an exhibit describing the contracting parties' "Business Initiatives." (Dkt. No. 8-5, at 8). "Initiative 1" is the "'PHOLOS' Kinetic UAS Coaxial System,"[11] which is described as a "Small Unmanned Aerial System (UAS) including a coaxial vehicle [and] explosive warhead." (*Id.*). The Founders state that the "Pholos initiative comprised Ascent's coaxial drone armed with an explosive warhead provided by" Overwatch. (Dkt. No. 8-3, ¶ 20). The parties agreed that Ascent would develop "the hardware and software" necessary for a "customer-ready Vehicle capable of carrying the Payload," which was defined as the "hardware attached to the Vehicle for the purpose of completing a mission." (Dkt. No. 8-5, at 8), and that Overwatch would develop the hardware and software for the "[w]arhead, including all trigger, fuse, and safety components," (*id.* at 9).

On or about June 8, 2018, Hill brought Andrew Michael, "an entrepreneur and investor in businesses," who had provided "early funding" to Overwatch and supported Hill "in business

---

[10] Hill founded Overwatch Defense, LLC on October 2, 2017, "to provide a corporate vehicle through which [to] develop and exploit [his] loitering drone concept." (Dkt. No. 47-38, ¶ 10).

[11] Hill "originally coined and used" the name PHOLOS and it "continues to be so used with [Hill's] consent by [Overwatch Aerospace, Ltd.]." (Dkt. No. 47-38, ¶ 16).

11

development and marketing," into the collaboration with Ascent and introduced Michael and Fuchs, via email. (Dkt. No. 47-2, ¶¶ 16, 25; Dkt. No. 47-10, at 4–5). Michael, like Hill, had a military background, having served in the British Armed Forces, and in recent years, Michael and Hill had discussed creating a loitering munition. (Dkt. No. 47-2, ¶¶ 15, 21). Michael stated that he had "no legal association" with Overwatch, but was referred to "chief operating officer" on Overwatch's "business marketing materials" and in communications with Ascent.[12] (Dkt. No. 47-2, ¶ 25; *see* Dkt. No. 47-35, at 2–3 (signing June 25, 2018, email sent via Overwatch Defense email address as "Andrew Michael, Chief Operating Officer")).

On or about June 11, 2018, in response to Hill's requests for specific information about Ascents' drones' weight, range, battery life, speed, and payload weight capability, Fuchs sent Hill Sprite 2 and ███ specification sheets, which provided the information Hill requested along with many other details, including, for example ████████████████████ ████████████ (PX-19, PX-88, T. 209–10).

On or about June 22, 2018, Ascent sent a "Sprite 2" to Michael in London. (Dkt. No. 8-3, ¶ 28; Dkt. No. 47-35, at 4–5; PX-24; T. 147–48). Michael avers that "there was no suggestion in any . . . communication that [the Sprite 2] or any documentation sent with it" was confidential. (Dkt. No. 47-2, ¶ 61).

### D.    Request for Licensing Agreement and Syracuse Visit

On August 8, 2018, Hill advised Ascent that Overwatch would "be keen on owning some IP and would like to discuss the development/design option" and stated that they "would also like to know what a perpetual license (defense only) would be." (Dkt. No. 8-3, ¶ 31; PX-35).

---

[12] Michael stated that he agreed to "the use of the title for the purpose of adding some gravitas and experience to the Overwatch . . . team which was a start up business." (Dkt. No. 47-2, ¶ 25).

On or about August 30, 2018, Ascent gave Overwatch two Pholos I mockups and two Pholos II mockups. (Dkt. No. 8-3, ¶ 28; PX-39 (pictures of mockups)). Nathaniel testified that designing and building the physical "mockups" was a "months" long process that involved sketching, aesthetic and ergonomic design decisions, e.g., any drone would need to be easy for a "soldier with gloves" to handle, finding "vendors to machine" parts, "create the plastics," and "anodize [the mockup] all black," (T. 42–43), and becoming "an expert model maker" in order to construct the mockups. (T. 44). Nathaniel explained that a mockup was not only useful as "something that you can put into a customer's hand" to show the customer the "endpoint" product, but that a mockup provided a "design reference" from which they could work moving forward. (T. 43). Nathaniel described a final mockup as "the most valuable asset of [a] company," because it is the "endpoint[] of a design" and provided the foundation of the design they were "looking to achieve." (T. 43–44).

Ascent also gave Overwatch the 3D CAD STEP files for both mockups, which are digital files containing engineering models of the fully assembled drones, including each module of each drone configuration.[13] (Dkt. No. 1, ¶ 39.a; PX-40a; PX-41a; T. 39). Nathaniel explained that the CAD STEP files "convey[ed] all the geometry of the parts" included in the mockups, including the geometry necessary "to have the part manufactured by a vendor, create the part yourself, [and] see how the parts assemble." (T. 39; *see also* T. 49 (Nathaniel explaining that the 3D CAD STEP files provide "a referenced blueprint to start looking at to build your drone")). Nathaniel further explained that although the physical mockups do not reveal how the internal connections are made because they are covered by the exterior, with the CAD STEP files "you

---

[13] Ascent asserts that it also gave Overwatch the 3D CAD files of the "bulkhead payload module and the payload mounting ring of a functional Ascent's [sic] coaxial drone" (Dkt. No. 1, ¶ 39.b), and the "3D CAD files of the modular attachment ring of a functional Ascent's [sic] drone that includes a particular radial bolt pattern," (*id.* ¶ 39.c.).

[can] suddenly look under the hood" and "can see all the connections, all the screw choices, all the decisions that were made from an engineering perspective." (T. 46). Nathaniel stated that it took "a very long time" to construct the CAD STEP files, noting that it "can take months" to develop "the parts in CAD," and that because they were "built on previous experience . . . [y]ou could say this took years." (T. 47–48).

In a September 2018, the parties exchanged a draft "License Agreement" and draft "Memorandum of Understanding," (Dkt. No. 8-10; Dkt. No. 8-11), proposing that Overwatch "would pay Ascent a License Fee of $5 million for Ascent's know-how and licenses, with $1 million paid at signing of the License Agreement."[14] (Dkt. No. 8-3, ¶¶ 32–35 (citing Dkt. Nos. 8-10, 8-11, at 8)).

In a September 7, 2018 email to Fuchs, Michael referred to Hill's anticipated handling of a "flight demo" and requested a "bill of materials" ("BOM") for the Pholos II, including a "general list of components" so that he could "quash the questioning surrounding hard to source or controlled components." (PX-44). On September 8, 2018, Fuchs emailed Michael the Pholos II BOM. (PX-45; PX-46). Jonathan stated that while the BOM took "probably a couple weeks" to put together, it was "a culmination of years and years of experience and dead ends and making the wrong call." (T. 142).

On or about October 15, 2018, Hill and Michael[15] visited the Tech Garden in Syracuse "to meet in person the Ascent founders." (Dkt. No. 47-2, ¶¶ 56–57; T. 149). During the visit,

---

[14] The proposed "License and Manufacturing Agreement" defined "know-how" as "all unpatented technical information, knowledge, know-how and data, including trade secret information, owed [sic] by or under the control of [Ascent], useful or necessary to enable [Overwatch] to manufacture Licensed Products in accord with all manufacturing specifications or product specifications provided by [Ascent]." (Dkt. No. 8-10, at 4).

[15] Michael states that his role at this time "was primarily that of an informed unpaid advisor to, and potential investor in Overwatch" and that his "primary motivation" in meeting the Founders "was to assess the caliber of the Ascent management team and their suitability as partners for the defense sector focused activity." (Dkt. No. 47-2, ¶ 58).

14

Jonathan, Nathaniel, and Fuchs gave Hill and Michael a second Sprite 2. (T. 148–49). Jonathan and Nathaniel talked Hill "through the assemblies, describing the aircraft," and gave Hill "a full tour of the shop." (T. 163). Specifically, Jonathan explained to Hill ███████████████████ ██████████████████████████, Ascent's "recent development with █████████████ ███████ and its reliance on ████████████████████████ (T. 162–63). Jonathan also shared with Hill the vendor they used ████████████████████████ for the Sprite 2, and spent "several hours going over the technical details of the drone." (T. 144–45). The Meringers took Hill to a nearby field to demonstrate the drones, while Michael remained with Fuchs for "business discussions." (T. 163).

In a letter to Fuchs dated October 26, 2018, counsel to Overwatch wrote to again "express" Overwatch's "interest in exploring a long-term exclusive license with Ascent . . . involving the exclusive use of Ascent's defense-related assets, including intellectual property." (PX-76). However, "[t]he parties failed to reach agreement" and on November 26, 2018, "Ascent provided Overwatch Defense written notice that it was terminating the [CTA]." (Dkt. No. 8-3, ¶ 39; Dkt. No. 8-12, at 2).

### E.    Ascent Sues Overwatch for Return of Drones and Confidential Information

After terminating the CTA, "Ascent demanded that Overwatch return the drones and mockups and all confidential and proprietary information." (Dkt. No. 8-3, ¶ 40; Dkt. No. 8-13, at 2; T. 225). In a letter dated December 11, 2018, counsel for Overwatch responded that "the intellectual property for the UAV and mock-ups, belong to Overwatch" and stated that the UAVs "have been destroyed as a result of testing" and that, in any event, "there was no agreement between Ascent and Overwatch to return materials." (Dkt. No. 8-13, at 2).

In a letter dated January 17, 2019, Overwatch stated that it was "willing to return certain materials to Ascent" and that it would provide "a further update as to what Overwatch is willing

15

to return in due course." (Dkt. No. 8-14, at 3). In a letter dated February 4, 2019, Overwatch took the position that the intellectual property Ascent was asking Overwatch to return "involve[d] information that was already available in the public domain from an open-source project the Merringer [sic] brothers started, which Ascent has now attempted to scrub from public sources." (Dkt. No. 8-15, at 2). Nonetheless, Overwatch stated it was "willing to return" the Sprite 1, both Sprite 2s, one of which had been destroyed during testing in Cyprus, but that it would "endeavor to recover" the "wreckage." (*Id.*). Overwatch further stated that the Pholos 1 and 2 mockups "were exclusively created for the purpose of attaching explosive devices (which is [Overwatch's] intellectual property)," (*id.*), and "refused to return them," (Dkt. No. 8-3, ¶ 45).

On February 12, 2019, Ascent filed a complaint against Overwatch in the United States District Court for the District of Connecticut, alleging, inter alia, breach of contract, conversion, and trade secret misappropriation. (Dkt. No. 8-3, ¶ 46; Dkt. No. 8-16). In a letter dated February 15, 2019, Overwatch acknowledged the complaint and stated that it would return the Sprite 1, the Pholos 1 and 2 mock-ups, and the "Sprite 2 UAVs w/ground controller & accessories" but that the "Sprite 2 UAV (vehicle only)" "which was a non-flying model, was destroyed during electrical testing internationally." (Dkt. No. 8-17, at 3). Overwatch stated that the wreckage was "located internationally," but that Overwatch could "endeavor to recover if so desired." (*Id.*). Hill attested, under oath, as Overwatch's CEO, that all printed and electronic information Ascent provided, as defined in the NDA, "has been or will be destroyed," (*id.* at 4), and "promise[d]" that Overwatch would "not using any information provided by Ascent or derived from Ascent's disclosures" in the future, (*id.* at 5).

16

In a letter dated March 22, 2019, Overwatch advised Ascent that the items referenced in its previous letter had been shipped but that the retrieval of the "Sprite 2 (vehicle only)" "will not be possible." (Dkt. No. 8-18, at 2). Overwatch explained that it:

> endeavored to recover [the Sprite 2] . . . but the wreckage has already been disposed of. In addition, due to the destruction during testing . . . the battery melted into the unit, rendering shipping impossible even if the wreckage could be recovered.
>
> [T]he destruction was caused during a test involving an illumination warhead; as power was being supplied through a tether, [and it] assumes the unit was overloaded and, as a result, caught fire and was destroyed.

(Dkt. No. 8-18, at 2).

Ascent "challenge[d]" Overwatch's representation regarding the destruction of the Sprite 2 and appears to have asked for photographic evidence of the wreckage. (Dkt. No. 8-3, ¶ 52). In a letter dated April 11, 2019, Overwatch responded that it was "impossible to provide 'photographic evidence'" because the "UAV in question has been destroyed and cannot be retrieved." (Dkt. No. 8-19, at 2). Overwatch further stated that "no other parties were involved in the testing or destruction of the UAV in question."[16] (*Id.*). "[A]s a result of these promises and representations, Ascent filed a dismissal without prejudice of the lawsuit on April 24, 2019." (Dkt. No. 8-3, ¶ 53).

### F. Development of PHOLOS and Incorporation of Overwerx and Overwatch Aerospace Ltd.

According to Michael, in 2019, he and Hill "made the strategic decision to move away from the Ascent relationship." (T. 321). However, Hill continued efforts to "develop a

---

[16] The Corporate Defendants have provided different accounts regarding the destruction and location of the Sprite 2, including that: it "was destroyed during electrical testing internationally," (Dkt. No. 8-17, at 3); the wreckage is located at Cyprus Army Range, (Dkt. No. 8-15, at 2), that it was destroyed during a test involving an illumination warhead, which overloaded the unit, caused it to catch fire; (Dkt. No. 8-3, ¶ 51); and that the testing was in Florida, (T. 386–89; Dkt. No. 210-3, at 4).

commercially suitable loiter munition capability." (Dkt. No. 47-2, ¶ 116). As Hill's finances were "dwindling," Hill agreed that Michael "should pursue prospective investors in the UK willing to fund the development activity required to achieve a commercially viable drone loiter munition system." (*Id.*). Michael stated that Hill had "identified Hush Aerospace in Virginia Beach," and that they "were incredibly impressed with the young co-founder," who had been "NASA's youngest test engineer for drones." (T. 321). At the same time, Michael's work in the UK "focused on the warhead." (T. 321). In a December 11, 2019 email to Hush, Hill stated that Overwatch was ███████████████████████████████████████████ ████████████████████████████████████████ (Dkt. No. 115-13, at 3–4).

On January 14, 2020, Michael incorporated Overwerx Ltd., as a private limited company in the United Kingdom. (Dkt. No. 47-2, ¶ 5; Dkt. No. 8-20). At inception, Michael owned 100 percent of Overwerx's stock, but on January 31, 2020, in exchange for Overwatch's patents, Michael agreed to "to structure Overwerx so that [Hill] received 42% of the stock in Overwerx."[17] (Dkt. No. 47-2, ¶¶ 130–31). Michael intended "this new company . . . would act as a holding company for successive business ventures that [he] would establish." (Dkt. No. 47-2, ¶ 130). One of those business ventures was Overwatch Aerospace Ltd. ("OA UK"), which Michael incorporated in the UK on February 7, 2020, as a private limited company and wholly owned subsidiary of Overwerx. (Dkt. No. 8-21, at 1, 6). The business of OA UK is "[p]redominantly coaxial loitering munitions." (T. 291).

---

[17] Hill transferred Overwatch's patents to Overwerx on March 17, 2020, and Hill became a "statutory director" of Overwerx the same day. (Dkt. No. 47-2, ¶ 131). On September 22, 2021, Hill resigned as statutory director, and by May 21, 2023, Hill had "fully divested himself of all his stock" in Overwerx. (*Id.* ¶ 132).

Once it acquired the Overwatch patents,[18] OA UK "devoted" funds from "UK investors" "to develop the technology necessary to make a commercially viable" loitering drone. (Dkt. No. 47-2, ¶ 135). According to Michael, "Mr. Hill had some input into the specification and scope of that development, but little active role in it." (*Id.*). Instead, "[a] multi-disciplinary team comprised of employee engineers and managers and external consultants in other countries outside the US managed this project." (*Id.*).

In early-to-mid-2020, Michael took on an in-house engineer, █████, who had "an extensive weapons background" and had worked for "the best part of 20 years in ████." (T. 335–36). ███ was OA UK's chief technology officer and led OA UK's engineering effort with respect to Pholos. (T. 336).

On August 13, 2020, OA UK and Hush Aerospace, LLC entered into a development agreement and a "statement of work." (T. 321; Defendants' Exhibit 83 ("DX-83"); DX-84). According to Michael, Hush had a "north of 20" engineers, was "set up to build drones" and had "specialists in software and mechanical engineering, electrical engineering, materials, [and] fabrication." (T. 322–23). Michael testified that the "first phase of work" with Hush involved building "a number of prototype demonstrative vehicles, so we started progressing with that." (T. 325). Michael stated that neither he nor "anyone on behalf of the Corporate Defendants" provided any Ascent information to Hush.[19] (T. 326). Although Hush did not build a drone capable of carrying a munition, (T. 325), Hush delivered two Pholos prototypes, which OA UK took back to the UK. (T. 417–18, 420; *see also* Dkt. No. 115-12, at 2). The record does not indicate when the Corporate Defendants' relationship with Hush ended, but Michael testified that

---

[18] On September 25, 2020, Hill dissolved Overwatch. (Dkt. No. 47-38, ¶ 59).

[19] Michael testified that Overwerx and OA UK maintained "servers" for UK data and the rest of the world, except the United States, and that his U.S. data was held on his U.S. server. (T. 295–96).

because the "vehicles that Hush had built for us remained below" the International Traffic in Arms Regulations ("ITAR") standard, in 2021, Overwerx and OA UK began to shift their focus away from the US and toward a "European development program." (T. 326–27).

Michael testified that Overwerx and OA UK had decided to "re-baseline[] all of our work to the same start point that we started Hush at," and in July 2021, engaged a ██████████ ████████████████████████████████████████████████████ ████████████████ (T. 326–27). The consortium was led by ████████████████ company that represented to Michael that it had worked on "air, land, and amphibious drones." (T. 331). However, as the consortium never "matured," Overwerx and OA UK's "commercial [] interact[ions]" were limited to ████████████. (T. 331). To "bid the work," ████ ████████ commissioned an ████████████████████████████ ████████████████ (T. 326–27; Dkt. No. 47-2, ¶ 138). ████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████ (DX-76).[20] ████████████████████████ ████████████████████████████████████████████████ ████████████████████[21] (DX-76).

---

[20] The review indicated that ████████████ specialized in, among other things, "the design and production of electronic devices" and that its products include "a trained presence sensor" and a "roof construction bend sensor used in monitoring of roofs in warehouse, office buildings, [and] stadiums." (T. 421). Michael acknowledged that there was no indication that ████████████ had "prior experience developing a coaxial drone" and that although Michael was shown drones ████████████ had worked on, he did not recall seeing any examples of coaxial drones it had developed. (T. 421–22).

[21] The review does not appear to contain any of Ascent's trade secret information and its references to the Sprite and Spirit drones appear to have been gathered from a public blog and Ascent's website. (DX-76; *see also* T. 329 (Michael testifying that the authors gathered information for the review "from their own public searches")).

On July 9, 2021, following the review, ▮▮▮▮▮▮▮▮ submitted a "delivery offer" to OA UK to build Pholos units. (DX-87; T. 332). Michael stated that ▮▮▮▮▮▮▮ built four Pholos units that were capable of carrying a two-kilo payload. (T. 332).

On August 19, 2021, Michael incorporated Overwatch Aerospace, LLC ("OA US") as a direct subsidiary to OA UK "to preserve the corporate name in the US and prevent brand squatting." (Dkt. No. 47-2, ¶ 130). OA US "has no employees or customers and has not engaged in business in the United States or anywhere else."[22] (*Id.* ¶ 10).

In early 2022, OA UK decided to bring the design and development of the Pholos in-house. (T. 335, 338). OA UK hired "between eight and ten engineers within the space of six to eight weeks." (T. 338). Michael testified that working "[f]rom the baseline ▮▮▮ vehicles that [they] had," OA UK "had the first demonstration units that we were showing the U.K. government" "within two-and-a-half to three months."[23] (T. 339). OA UK "engineers [have] continually improved [the unit] as a capability since then." (Dkt. No. 47-2, ¶ 139).

The Corporate Defendants ▮▮▮▮▮▮▮▮▮▮▮ but stopped producing it in May 2023. (T. 426). Although the Corporate Defendants have produced other coaxial drones, Pholos is the only product Overwatch has sold that "includes a military grade munition as a payload." (T. 426). OA UK also developed the ▮▮▮▮▮▮▮▮ which Michael described as a ▮▮▮ ▮▮▮ (T. 431). ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (T. 431).

---

[22] OA US was dissolved in 2025. (T. 291).

[23] Fuchs stated that Ascent had "spent more than six years to reach the point of evolution that we did when we connected with" Overwatch, and, in his experience "nobody else" had ever gone from "essentially no knowledge to the Pholos" in two years. (T. 233–34).

### G.    Ascent's Claim of Reverse Engineering and Replication of Design X

Ascent asserts that OA UK's Pholos is the result of Defendants' reverse engineering and replication of "Ascent's unique technology." (Dkt. No. 8-3, ¶ H). Ascent claims that OA UK must have replicated Ascent's Design X at some point before September 2021 based on a September 23, 2021 posting on the "Soldier Systems website," which reported that "Overwatch Defense showed their Pholos"[24] at a trade show in London and showed a picture of what the Founders believed to be a "replicated Pholos drone." (Dkt. No. 8-3, ¶ 63 (citing Dkt. No. 8-28)). In addition, on or about May 23, 2023, the managing director of Sierra Nevada Corporation Mission Systems UK, which was located in London and "makes the hand controllers that can control a drone," sent Ascent an email advising that "Overwatch had approached Sierra Nevada . . . at some unspecified time, and that Sierra Nevada . . . stopped all discussions with Overwatch because Sierra Nevada had 'concerns around reverse engineering.'" (Dkt. No. 8-3, ¶¶ 65–67; T. 229; *see also* Dkt. No. 8-29). Fuchs testified that the email contained two attachments, an Overwatch company brochure and a "Pholos II spec sheet," (T. 230; Dkt. No. 8-29), and that the Overwatch brochure included "a series of images" from a "graphic file" that Ascent had given to Overwatch "during the course of [the] teaming arrangement." (T. 232; *see also* Dkt. No. 10, App'x D). Fuchs described these images as one of Ascent's "asset[s]." (T. 232).

Michael testified that Sierra Nevada's allegation of reverse engineering is "a complete fabrication," and stated that Sierra Nevada "had no engineering capability to build a drone of any sort." (T. 337). Michael testified that "initially," there was "some communication with [Sierra Nevada] about the supply of the ground control station" but that because Sierra Nevada, was

---

[24] Although the record indicates that Hill had dissolved Overwatch on or about September 25, 2020, (Dkt. No. 47-38, ¶ 59), the website refers to "Overwatch Defense" at least twice, (Dkt. No. 8-28).

"trying to set up a facility to build ground control stations in the U.K," Overwatch "deemed them not to be ready" and "selected a Danish supplier," instead. (T. 337). Michael testified that he believed Sierra Nevada's actions were "commercially motivated" because it was " a very large contract" and Sierra Nevada would have made "considerable money" if appointed as the supplier. (T. 337–38).

According to Ascent, in a press release issued "on or about May 2, 2024, the [Corporate Defendants] announced that [they] [were] launching 'their unique drone technology' into the US market at" an "annual conference for Special Operations Forces, which took place in Tampa, Florida" in May 2024. (Dkt. No. 8-3, ¶¶ 69–70). The press release stated:

> Overwatch is a defence company that manufactures a pioneering coaxial drone and associated payload technology.
> . . .
>
> Since 2022, the company has delivered around 800 of their unmanned aerial precision strike systems in support of the UK's contribution to global defence and security.
> . . .
>
> For 2024, Overwatch [is] focusing heavily on bringing its next-generation coaxial drone systems to global markets and their solutions are particularly relevant to US military requirements. Producing drones that are agnostic of payload, Overwatch has also been able to develop an array of . . . payloads.

(Dkt. No. 8-30, at 2).

In further support of their claim that the Corporate Defendants' Pholos drone contains a replication of Ascent's drone technology, i.e., Design X, Ascent asserts that Overwerx and OA UK's "coaxial drone bomb is not only called 'Pholos'—the same name as the [CTA] initiative" but that the Pholos looked to be "a studied replica of" the coaxial drone Ascent developed as "part of the Teaming Agreement," (Dkt. No. 8-3, ¶ 72), and appeared to contain Design X, Ascent's proprietary "drone configuration" that is "found nowhere in the market," except in

Ascent's drones and the Pholos. (*Id.* ¶ 73). Ascent has filed a number of Appendices purporting to show: the similarities between its coaxial drone and the Pholos drones, including six different coaxial rotor system configurations, including its own "unique[]" "coaxial drone configuration," (Dkt. No. 8-3, ¶ 7 (citing Dkt. No. 10, App'x A)); a "comparison of Ascent's [Spirit 2] drone with other coaxial configurations and the replicated 'Pholos' drone," offered by Overwerx and OA UK, (*id.* ¶ 73 (citing Dkt. No. 10, App'x B)); that Overwatch "used confidential information provided by Ascent under the [CTA] to create images of the Pholos drone for marketing and promotional purposes," (*id.* ¶ 75 (citing Dkt. No. 10, App'x C)); that Overwerx and OA UK "now uses some of those very same images to market the replicated Pholos drone," (*id.* ¶ 76 (citing Dkt. No. 10, App'x D)); and that Overwerx and OA UK took the "non-public specification sheet" that Ascent provided to Overwatch and "copied it to create a specification sheet for [Overwerx and OA UK's] replicated Pholos drone," (*id.* ¶ 77 (citing Dkt. No. 10, App'x E (comparing "Ascent ▇▇▇" specifications to "Pholos 2" specifications)).

Ascent also cites to a "Special Operations Forces" trade show in Tampa, Florida in 2025, attended by Overwerx and/or OA UK and Ascent. (T. 237–38). Ascent introduced a video taken by one of Ascent's employees at the Overwatch kiosk which Fuchs testified shows a "coaxial drone" that seemed "to be an evolution of the product beyond the Pholos." (T. 237–38; PX-103 (video)).

### H.    Expert Testimony

#### 1.    James Earl

At the hearing, the Corporate Defendants presented expert testimony from James Earl, who has served as a helicopter pilot in the United Kingdom's Royal Air Force, where he flew the

CH-47 Chinook helicopter,[25] and as a maintenance test pilot for the Chinook platform with United States Army, the latter of which required "a comprehensive understanding of rotorcraft systems, including drivetrain architecture, propulsion systems, flight control systems, and the operational mechanics underlying rotorcraft performance." (Dkt. No. 209-5, at 1–2). Earl has spent the last six years working in venture capital conducting "due diligence on aerospace technology companies, including startup . . . companies involved in the design and development of UAVs." (*Id.* at 2). Earl acknowledged at the hearing that he is "not a qualified engineer with an aerospace degree," that he has no training or experience with coaxial drones, that he has never worked for a company that makes coaxial drones, and that he has not been "a pilot of coaxial drones." (T. 473–74, 527–28, 530). Earl nevertheless maintained that his helicopter training and experience is still relevant to coaxial drones because they are both rotorcrafts. (T. 474).

As an initial matter, Earl agreed at the hearing that the Pholos, which he examined in person at the Corporate Defendants' facility in the UK, (T. 464), ███████████████

██████████████████████████████ shown in Design X," specifically that the

Pholos has a ███████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████ (T. 542). However, Earl opined that because Design X's

structure and its components, specifically, ███████████████████████████████

████████████████████████████████████████████████

█████████████ are already in the public domain, and because uncontrolled top rotors are used

in helicopters, it would have been a simple, logical step from Design 1 or the T-Drone to Design

---

[25] For purposes of the present motion, it is undisputed that while vastly different in size, as rotorcrafts, there is some overlap between helicopters and coaxial drones. (T. 474).

X. (T. 477–78, 541–43; *see also* T. 541 ("[Y]ou can arrive at Design X with very little knowledge.")).

Earl opined that to the extent the Pholos was based on the ███████████ ████████████████████████████████████████████████████████████████ ██ "dealing with a fundamental problem that existed in . . . the T-Drone." (T. 497–99). Earl explained that the T-Drone failed "because it had ███████████," causing "lift dissymmetry." (*See* T. 479 (explaining that although it was "reasonably okay in the hover," "once you pass through lift dissymmetry . . . you're highly unlikely [to] be able to control it")). Earl opined that the use of a ████████████████████████████████ ████████████████████████████████████████ "are everywhere." (T. 491). Earl listed, as examples, a number of helicopters and "[r]emote controlled" helicopters ("RC helicopters") ████████████████████████████████████ ████████████████████████████████ (T. 491-92, 495–96). Earl acknowledged, however, that the helicopters and RC helicopters he listed all ███████████ ███████████████████████ (T. 492, 499).

Earl opined that the Pholos' use of ████████████████████████████ ████████████████████████████████████████████████ ███████████ was based on publicly available information and attributable to a "technological shift that happened across the entire industry." (T. 502–03, 509). Earl stated that when the industry moved from ████████████████████████████████████████ ███████████████ (T. 482–83, 509; *see* T. 502 (testifying that "you would never come to the conclusion that ████████████████████████████████ ████████████████████████████)). Earl noted that ██████████████ was also

disclosed in the Arlton coaxial drone patent, and thus publicly available. (T. 509; *see* Dkt. No. 49-13, at 8). Earl further explained that in 2012 and 2013  (T. 482–83). Earl opined that the use of ▮▮▮▮▮ to manufacture the motor for the Pholos, was entirely logical because ▮▮▮▮▮ was the only ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*See* T. 511 (stating that if a ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ was "responsive" and "produced really good, high quality ▮▮▮▮ "))._

### 2.    Paul Arlton

At the hearing, Ascent presented expert testimony from Paul Arlton, who graduated from the University of Colorado in 1985 with a degree in aerospace engineering, and received an MBA from Stanford in 1987. (T. 560). Arlton has broad experience within the aerospace engineering, computer software (gaming), RC helicopter, and coaxial drone industries and throughout his career, has worked extensively with "software and electronics," "computational fluid dynamics and modeling of systems," "computer-aided design" ("CAD"), "computer-aided manufacturing" ("CAM"), and computer numerically controlled equipment ("CNC"). (T. 561, 563). After college, Arlton and his brother founded a company named "Lite Machines" and developed and sold more than 15,000 small RC helicopters. (T. 562–63; PX-159). In the "late 1990s," after receiving a request from an intelligence officer at a trade show for a helicopter that could carry a camera, but that could fit into a tube, Arlton and began working to build a coaxial drone." (T. 566). In 2008, Arlton completed the "first operable prototype" of their coaxial drone, and, in 2011, obtained a patent on the drone (referred to as the "Voyeur" or "Tiger Moth drone"). (T. 567, 573; DX-43). Arlton continued to develop the Tiger Moth drone for several customers,

including the United States Navy and Air Force, and his coaxial drone technology was the "enabling technology" of the Ingenuity, NASA's Mars helicopter. (T. 573–74).

Arlton testified that he developed the "basic technology" for the coaxial drone, that this technology is "the de facto standard" for coaxial drones, and that there are "very few coaxial drone[s] . . . out there." (T. 584). Arlton explained that "the rotor system on a coaxial rotor helicopter . . . is the core technology to flight" as "[i]t provides not only the lift, but the stability and control." (T. 582). The two rotors on Arlton's coaxial drone are controlled rotors. (T. 592–93).

Artlon testified that, in his opinion, Design X, with its ████████████████ ██████████████████████, "is counterintuitive" and "goes against the teachings in the art and it goes against [his] personal experience." (T. 583). Arlton explained that "the common wisdom and [his] experience" is that ████████████████████████████████ (T. 591). Arlton testified that he therefore not only disagreed with Earl's statement that ████ ████████████████████████████████████ but that he was "surprised" to find a ████████████████████████████████████ is the reason he never considered using a ████████████████████████████████ in the more than 20 years that he has been in the coaxial drone market. (T. 591–92). Arlton also rejected Earl's identification of helicopters and RC helicopters as examples that a ████████ ████████████████████████████████████████ was wholly and independently developed). (T. 590–91). Arlton explained that, in fact, these vehicles did not have ████████████ ████████████████████████████████████████ ████████████████████████████ (T. 590–91).



Arlton also disagreed with Earl's opinion that the use of ▮▮▮▮▮▮▮ in the Pholos was a logical progression from the ▮▮▮▮▮▮ in Design 1 and the T-Drone. (T. 600–01). Arlton explained that if ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ with a coaxial vehicle, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮ (T. 600). Arlton therefore opined that ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮ (T. 600).

Arlton also addressed Earl's testimony that ▮▮▮▮▮▮ "are industry standard." (T. 603). Arlton noted that Earl's ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (T. 603–04). However, Arlton disagreed that ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (T. 603).

Finally, Arlton testified that, in his opinion, ▮▮▮▮▮ was not the industry standard, that he had not used them ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and that he had not heard of ▮▮▮▮ until this litigation. (T. 613–14).

### 3.    Analysis of Expert Testimony

Having listened to, and having carefully considered, the testimony of both experts, the Court credits Arlton's testimony in its entirety and largely disregards, unless otherwise noted below, Earl's testimony. To be sure, Earl is an experienced and skilled helicopter pilot. (T. 465–66). Earl also has experience with drones: in 2022, he started a company building "long-way tech drones and smaller first-person view quadcopters." (T. 467). However, Earl acknowledged that

he does not have a university degree and that he has never had any involvement with, or even flown, coaxial drones. (T. 466, 473, 527–28, 530). The absence of any education or experience with coaxial drones is a sufficient reason to decline to credit Earl's opinion but even considering his testimony, the Court credits the testimony of Arlton over that of Earl.

Earl attempted to overcome this absence of education and experience with respect to coaxial drones by noting that "ultimately, the coaxial is a rotorcraft" as are helicopters and quadcopters. (T. 474). However, much of Earl's testimony lacked detailed technical explanation and consisted of the identification of similar parts in other coaxial vehicles, and opining that the use of that part (or design) in Design X "was a logical conclusion from Design 1." (T. 504). For instance, Earl opined that ███████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████ ████████████████████████████ (T. 479, 490–91). Earl's testimony fails to address ██████████████████████ ████████████████████████████████████████ ██████████████████████████████ (T. 591). Further undermining Earl's opinion regarding the ████████████████████████████ ████████████████████████████████████ ████████████████████████████████ (T. 590–91). Earl's opinion that the ████████████████████████████████████████ ████████████████████████████████████ ████████████████████████ (T. 482–83, 509). Unlike Arlton, who explained that the use of a ██████████████████████████████

██████████████████████████████████████████████████████████████

████████████ (T. 603–04), ███████████████████████████████████████

████████████ The Court therefore credits Arlton's thorough and well-supported opinion

over the opinions of Earl.

## III. STANDARD OF REVIEW

Rule 65 of the Federal Rules of Civil Procedure governs the issuance of preliminary

injunctions. In general, a party seeking a preliminary injunction must demonstrate: (1) a

likelihood of irreparable injury in the absence of an injunction; (2) a likelihood of success on the

merits or sufficiently serious questions going to the merits to make them fair ground for

litigation; (3) that the balance of hardships tips in the movant's favor or, if relying on the

presence of sufficiently serious questions, that the balance of hardships tips decidedly in the

plaintiff's favor; and (4) that the public interest would not be disserved by the issuance of an

injunction. *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015); *see also*

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018).

A showing of irreparable harm is "the single most important prerequisite for the issuance

of a preliminary injunction," *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118

(2d Cir. 2009) (quoting *Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999)); *see also Doe*

*v. Rensselaer Polytechnic Inst.*, No. 18-cv-1374, 2019 WL 181280, at *2, 2019 U.S. Dist. LEXIS

5396, at *4 (N.D.N.Y. Jan. 11, 2019), and "[i]n the absence of a showing of irreparable harm, a

motion for a preliminary injunction should be denied," *Rodriguez*, 175 F.3d at 234. "Irreparable

harm is 'injury that is neither remote nor speculative, but actual and imminent and that cannot be

remedied by an award of monetary damages.'" *New York ex rel. Schneiderman v. Actavis PLC*,

787 F.3d 638, 660 (2d Cir. 2015) (quoting *Forest City Daly Hous., Inc. v. Town of N.*

*Hempstead*, 175 F.3d 144, 153 (2d Cir. 1999)). "The relevant harm is the harm that (a) occurs to

the parties' legal interests and (b) cannot be remedied after a final adjudication, whether by damages or a permanent injunction." *Salinger v. Colting*, 607 F.3d 68, 81 (2d Cir. 2010) (footnote omitted).

As to the next requirement, "[t]o establish a likelihood of success on the merits, a plaintiff must show that he is more likely than not to prevail on his claims, or, in other words, that the 'probability of prevailing is better than fifty percent.'" *Doe v. Vassar Coll.*, No. 19-cv-9601, 2019 WL 6222918, at *7, 2019 U.S. Dist. LEXIS 203418, at *20 (S.D.N.Y. Nov. 21, 2019) (quoting *BigStar Ent., Inc. v. Next Big Star, Inc.*, 105 F. Supp. 2d 185, 191 (S.D.N.Y. 2000)). A party may also prevail by showing "a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiff's favor." *Id.*, 2019 WL 6222918, at *7, 2019 U.S. Dist. LEXIS 203418, at *21 (quoting *Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010)). This allows a district court to grant injunctive relief "where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction." *See Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010).

If, however, the injunction the plaintiff seeks is mandatory, as opposed to prohibitory, the plaintiff must make a heightened showing regarding success on the merits. *N. Am. Soccer League*, 883 F.3d at 37. "Prohibitory injunctions maintain the status quo pending resolution of the case; mandatory injunctions alter it." *Id.* at 36. The "status quo . . . is[] 'the last actual, peaceable uncontested status which preceded the pending controversy.'" *Id.* at 37 (quoting *Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014) (per curiam)). A party seeking a mandatory injunction "must meet a heightened legal standard by showing 'a clear or substantial

32

likelihood of success on the merits.'" *Id.* (quoting *N.Y. Civ. Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012)). "A heightened 'substantial likelihood' standard may also be required when the requested injunction (1) would provide the plaintiff with 'all the relief that is sought' and (2) could not be undone by a judgment favorable to defendants on the merits at trial." *Mastrovincenzo v. City of New York*, 435 F.3d 78, 90 (2d Cir. 2006) (quoting *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 33–34 (2d Cir. 1995)).

"[T]he balance of hardships inquiry asks which of the two parties would suffer most grievously if the preliminary injunction motion were wrongly decided." *Goldman, Sachs & Co. v. Golden Empire Schs. Fin. Auth.*, 922 F. Supp. 2d 435, 444 (S.D.N.Y. 2013) (alteration in original) (quoting *Tradescape.com v. Shivaram*, 77 F. Supp. 2d 408, 411 (S.D.N.Y. 1999)).

Finally, "the court must ensure that the 'public interest would not be disserved' by the issuance of a preliminary injunction." *Salinger*, 607 F.3d at 80.

## IV.    DISCUSSION

### A.    Prohibitory or Mandatory Relief

The Corporate Defendants assert that Ascent is seeking "both prohibitory and mandatory relief." (Dkt. No. 49, at 39). Ascent replies that "[t]he injunction sought here is prohibitory, not mandatory, as it seeks to preserve the status quo my preventing Defendants from further misappropriating and exploiting Ascent's trade secrets." (Dkt. No. 60, at 13 n.2).

"[A]s the Second Circuit has repeatedly observed, focusing on the semantics of whether the action itself is 'prohibitory' or 'mandatory' can obscure the purpose of the injunction, which is to maintain the status quo as it was between the parties prior to litigation. *Superb Motors Inc. v. Deo*, No. 23-cv-6188, 2023 WL 7181675, at *6, 2023 U.S. Dist. LEXIS 198355, at *19 (E.D.N.Y. Sept. 29, 2023). The focus is "on the status quo rather than the 'mandatory' and 'prohibitory' terminology because 'in borderline cases, injunctive provisions containing

33

essentially the same command can be phrased either in mandatory or prohibitory terms.'" *N. Am. Soccer League*, 883 F.3d at 36 n.4 (quoting *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 835 (1994)).

Here, insofar as Ascent seeks to prohibit Defendants from "[m]aking, marketing, offering to sell and/or selling the Pholos drone, any drone that is not more than colorably different from the Pholos drone, or any other drone that incorporates Ascent's proprietary Design X rotor configuration, (Dkt. No. 231, at 2), its request appears prohibitory in nature, *see, e.g.*, *Norbrook Lab'ys Ltd. v. G.C. Hanford Mfg. Co.*, 126 F. App'x 507, 508 (2d Cir. 2005) (finding the preliminary injunction entered preventing the defendant " from further producing and from marketing Penicillin G Procaine . . . using any part of Norbrook Laboratories Limited's in-situ process or any confidential information belonging to Norbrook" to be prohibitory). Such relief would place the parties in the position they were in after Ascent voluntarily dismissed the Connecticut action based on Overwatch's agreement to return Ascent property. *See N. Am. Soccer League*, 883 F.3d at 37 (describing the status quo as the "the last actual, peaceable uncontested status which preceded the pending controversy") (quotation marks omitted).

### B.    Irreparable Harm

Ascent contends it has sufficiently established irreparable harm on the following grounds: (1) Overwatch agreed that a violation of the NDA would constitute irreparable harm, (Dkt. No. 8-2, at 23; Dkt. No. 8-6, ¶ 10 (providing that "unauthorized disclosure or use of any information in violation of this agreement will cause the Disclosing Party irreparable injury for which it would have no adequate remedy at law")); (2) Overwatch's breach of contract threatens imminent injury to Ascents' core business and to the economic value of the goodwill and reputation of its coaxial drone technology, (Dkt. No. 8-2, at 23–24); (3) market confusion between Ascent's UAVs and the Pholos, (T. 681); (4) "[l]ost sales" due to the "[il]legitimate

34

competition" of the Pholos, (T. 681); and (5) the sale by Overwerx and OA UK of drones to

India, the components of which must shipped to India in parts and then be "locally assemble[d],"

████████████████████████████████████████████████████████████████

████████    (T. 311, 679–80).

Setting aside, for a moment, the language in the NDA, the Court notes that goodwill and

reputation, and loss of market share, given that both entities have pursued the use of their UAVs

for military purposes, would be difficult to quantify. *See Register.com, Inc. v. Verio, Inc.*, 356

F.3d 393, 404 (2d Cir. 2004) (explaining that because it was "impossible to estimate with any

precision the amount of" past and future "monetary loss" resulting "from the loss of [the

plaintiff's] relationships with customers and co-brand partners, by reason of [the defendant's

actions]," the district court did not abuse its discretion in finding that the defendant's actions

would cause irreparable harm to plaintiff "through loss of reputation, good will, and business

opportunities"). The Court credits Fuchs' testimony that Ascent "compete[s] across the world,"

and has customers in Europe and Asia, and has "always been in the military space." (T. 674).

Fuchs noted that approximately 95 percent of Ascent's sales are to the military market. (T. 675–

76). Finally, the Court notes that although the Corporate Defendants argue that they are no

longer selling the Pholos, Earl testified that there were "a number of Pholoses" when he visited

the Corporate Defendants' facility in May. (T. 464).

The above, together with Ascent's evidence that, until recently, Overwerx and OA UK

were competing internationally in the military market, and that they still possess Pholoses, (T.

464), appears sufficient to allege irreparable harm. *See Intertek Testing Servs., N.A., Inc. v.

Pennisi*, 443 F. Supp. 3d 303, 331 (E.D.N.Y. 2020) ("[P]laintiff submits evidence, inter alia, that

the individual defendants were disseminating its trade secrets to one of its competitors, which,

under the circumstances of this case, is sufficient to show a likelihood of irreparable harm absent a preliminary injunction."). Further, the provision in the NDA stating that unauthorized use of Ascent's information would constitute irreparable injury, (Dkt. No. 8-6, ¶ 10), while by no means dispositive, further supports a finding of irreparable harm. *See Intertek Testing Servs., N.A., Inc. v. Pennisi*, 443 F. Supp. 3d 303, 331–2 (E.D.N.Y. 2020) (finding the evidence that the defendants were disseminating the plaintiff's trade secrets to a competitor was sufficient to show a likelihood of irreparable harm and that the defendant's "acknowledgement in the Employment Agreement that a violation of the non-competition and non-solicitation restrictions would cause plaintiff irreparable harm entitling it to injunctive relief," while "not dispositive," further supported a finding of irreparable harm." (citing *IDG USA, LLC v. Schupp*, 416 F. App'x 86, 88 (2d Cir. 2011))).

### C. Likelihood of Success

#### 1. Breach of Contract

##### a. Successor Liability

As relevant here, Ascent contends that Overwatch breached the NDA and the CTA by misappropriating and continuing to use Ascent's confidential and proprietary information after the CTA was terminated and that the Corporate Defendants are liable under principles of successor liability. (Dkt. No. 1, ¶¶ 56–61). In its decision on personal jurisdiction, the Court extensively discussed the theory of, and the evidence submitted by the parties regarding, successor or inherited personal jurisdiction over the Corporate Defendants in connection with Ascent's breach of contract claim. (Dkt. No. 150, at 20–29). Although successor "liability and jurisdiction are distinct legal concepts, the principles animating one may inform the other," *Lelchook v Société Générale de Banque au Liban SAL*, 41 N.Y.3d 629, 637 (N.Y. 2024) (internal citation omitted). As the parties' arguments regarding successor liability and successor

jurisdiction are largely identical, both legally and factually, (*see* Dkt. No. 8-2, at 14–17; Dkt. No. 49, at 38; Dkt. No. 109-1, at 20–31; Dkt. No. 115, at 24–30), for the reasons articulated in its prior decision, which are incorporated herein, the Court finds that Ascent has shown a likelihood of success as to the successor liability of the Corporate Defendants in connection with Ascent's claim that Overwatch breached the CTA (which incorporated the NDA), (Dkt. No. 150, at 20–29).

### b.      Merits

"Under New York law, a breach of contract claim requires proof of (1) an agreement, (2) adequate performance by the [claimant], (3) breach by the [other party], and (4) damages." *Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011) (citing *First Invs. Corp. v. Liberty Mut. Ins. Co.*, 152 F.3d 162, 168 (2d Cir. 1998)).[26]

Here, Ascent claims that after the termination of the CTA, Overwatch used the information Ascent provided during their collaboration to create the Pholos, in violation of the CTA (which incorporated the NDA). (Dkt. No. 8-2, at 17–19). The Corporate Defendants respond that much of Ascent's information was available publicly, that the Pholos at issue was wholly and independently developed without Ascent's information, and that the drones and mockups Ascent provided to Overwatch were not marked confidential. (Dkt. No. 51, at 26–28). As there appears to be no dispute as to the first, second, and fourth elements of Ascent's breach of contract claim, the Court considers whether Ascent has shown a likelihood of success as to breach.

The NDA's prohibition on using or disclosing "Information" states, in relevant part:

---

[26] The NDA states that "[t]his Agreement shall be governed in all respects solely and exclusively by the laws of the State of New York." (Dkt. No. 8-6, at 4). It appears to be undisputed that New York law applies to Ascent's breach of contract claim.

> The Receiving Party shall handle, use, treat and utilize such Information as follows: (a) Hold all Information received from the Disclosing Party in strict confidence: (b) Use such Information only for the purposes of[] evaluating the possibility of forming a joint business; (c) Reproduce such Information only to the extent necessary for such purpose; . . . and (e) not disclose such Information to any third party, including, but not limited to, any affiliate, vendor, customer, manufacturer, overseas employee or independent contractor . . . . In addition, with respect to any equipment, component, software, or other items delivered to the Receiving Party by the Disclosing Party, the Receiving Party shall not reverse engineer, dissemble, decompile, or otherwise analyze the physical structure of, any such items.

(Dkt. No. 8-6, at 2). The NDA specifies "Information shall be subject to" the above prohibitions "if it is in writing or other tangible form and clearly marked as proprietary or confidential when discussed to the Receiving Party." (*Id.* at 3). The NDA also protects the content of oral disclosures. (*Id.*). The NDA offers, as relevant here, two exceptions to the above prohibition: "any Information which the Receiving Party can demonstrate" (1) "is or has become generally known to the public without breach of this Agreement by the Receiving Party" or (2) "is wholly and independently developed by the Receiving Party without the use of Information of the Disclosing Party." (*Id.* at 3).

### i.        Information Known to the Public

Coaxial drones (as a type of drone) have been available since at least 2004, (T. 568), and coaxial helicopters with ▮▮▮▮▮▮▮▮ were available long before drones, (T. 491). Further, there is evidence that the Meringers made virtually all aspects of the Sprite 1, which, ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ available to the public. (T. 23 (thread posted on DIY Drones)); T. 24–25 (approximately 350 Sprite 1 drones sold through Kickstarter campaign); Dkt. No. 47-8 (blog post dated November 13, 2014 about Ascent's first drone along with pictures of inside and outside of coaxial drone)). However, the evidence suggests that the Sprite 1 was a

"minim[ally] viable product," (T. 25), and that the Sprite 1's ███████████████

███████████████████████████████ (*see* Dkt. No. 10, at 4). ███████████

████████████████████████████████ (*See*, *e.g.*, T. 43 (Nathaniel testifying

that Ascent only sold Spirit 2s under NDAs)). The Court therefore concludes Ascent is likely to

succeed on its argument that the public availability of the Sprite 1's ██████████ does not bring

Overwatch's alleged use of Design X within the public availability exception to the NDA.

The Corporate Defendants have also adduced evidence that pictures and videos of the

Spirit coaxial drone, as well as a Spirit specification sheet, were made public, (Dkt. No. 47-25

(Spirit)); DX-68 (Spirit drone YouTube video); Dkt. No. 49-24 (Spirit specification sheet)), and

that the ██████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████ were publicly known and used in other coaxial drones, (*see*,

*e.g.*, T. 491–92 (Earl testifying about the use of ██████████ in helicopters); *see also* Dkt. No.

10, at 4 (███████████████████████████████████████████)). But

there is no evidence that the interior ███████████████████ has ever been available

to the public or that it is present ████████████████████████████. Indeed,

Ascent has presented evidence showing that the Meringers arrived at Design X independently,

and only understood *why* Design X worked, after years of iteration and trial and error. (T. 31–32,

34–35, 91–92, 155–56). In addition, as noted above, there is evidence that Ascent took steps to

ensure Design X remained confidential: both Nathaniel and Jonathan testified that Ascent only

sold Spirit and Sprite 2, and its other Design X coaxial drones, under NDAs. (T. 85, 132).

Together, this evidence supports Ascent's claim that it is the ███████████████████

██████████████████████ that makes it unique, that this combination is not present in

any drone ██████████████████████████████████,[27] and that the reason that Design X's free-teetering, uncontrolled upper rotor provides important flight benefits and that was known only to Ascent, and that this information was never shared publicly. (T. 155–56); *see, e.g., Big Vision Private,* 1 F. Supp. 3d at 271 (explaining in the trade secret context that a party may show a trade secret by demonstrating "that the way in which the publicly-available components fit together is unique and not publicly-known").

Here, Ascent has established a likelihood of success on its claim that the configuration of Design X is not publicly available, that Design X was provided to Overwatch in a number of different forms, including 3D CAD STP files, (Dkt. No. 1, ¶ 39.a; PX-40a; PX-41a), and that the Meringers explained the importance of ████████████ to Hill during his October 2018 visit to Ascent, (T. 164). Further, it is undisputed that this information is protected under the NDA.[28] The Corporate Defendants failed to adduce any evidence of any coaxial drone, other than ████████████████████████████████, that utilizes ██████████ ██████████████████████ illustrated in Design X.

Ascent is also likely to succeed in showing that the 3D CAD and STEP files and bill of materials it provided to Overwatch under the CTA and NDA were not publicly available. Indeed, the Corporate Defendants presented no evidence to the contrary. Although there was testimony at the hearing calling into question the overall value of the bill of materials, (T. 371 (Michael

---

[27] Although Earl, the Corporate Defendants' expert, testified ████████████████ are used on helicopters and RC helicopters, Earl failed to identify any that were not controlled by a ████████████.

[28] The Corporate Defendants argue that the physical Pholos mockups and Sprite 2 drones Ascent provided were not marked "confidential" and thus do not fall within the definition of "information" protected by the NDA. (Dkt. No. 51, at 33–36). However, as Ascent notes, the NDA specifically states that "with respect to any equipment, component, software, or other items delivered to the Receiving Party by the Disclosing Part, the Receiving Party shall not reverse engineer, disassemble, decompile, or otherwise analyze the physical construction of any such item." (Dkt. No. 59, at 6 (quoting Dkt. No. 8-6, at 2)). Further, it is undisputed that Ascent provided the Corporate Defendants with other highly specific information that reflected Design X, such as the 3D CAD STP files, (Dkt. No. 1, ¶ 39.a), and that these files were protected by the NDA.

testifying that he did not regard the bill of materials to be "of value" because it was "a parts list at best"); T. 516 (Defense expert Earl testifying that the bill of materials was "half-considered parts list" and stated that it was very different from a bill of materials created in "a typical engineering environment," which is "an incredibly complex, but very, very useful piece of information")), in view of the evidence that Ascent would not share bills of materials with third parties "unless an NDA was in place," (T. 139–40), the Court concludes Ascent is likely to show its bill of materials was not publicly available.

### ii.    Independently Developed

The Corporate Defendants argue that the Pholos was independently designed and developed by "independent consultants and engineers." (Dkt. No. 47-38, ¶ 61). Defendants vigorously maintain (1) that Ascent's coaxial drone was insufficient for the payload required for its loitering munition, (*id.* ¶ 39.f (explaining that "beyond basic flight practice," Ascent's Sprite drones "were wholly inadequate for what Overwatch . . . needed" because they could not "support the payload or weight" Overwatch specified and could not carry an explosive payload under the necessary conditions), and (2) that Overwatch never used any of Ascent's information and the Pholos was developed independently, (*see* Dkt. No. 51, at 31 (arguing that any

███████████████████████████████████████████████████████████

████████████████████████████████ )).

According to Michael, in 2019, after the relationship with Ascent failed, Hill, through Overwatch, engaged Hush Aerospace in Virgina to build a coaxial drone that would support a loitering munition. Michael testified that although Hush produced two Pholos prototypes, rather than moving forward with those prototypes, Overwerx and OA UK elected to start from "baseline" and engaged ███████████████████, a company that "design[ed] and

41

produc[ed] electronic devices," but that had no apparent coaxial experience, to build the Pholos. (T. 421–22). Despite this lack of experience, and purportedly without using any Ascent information, at some point between July 2021 and early 2022, ▮▮▮▮▮▮▮▮ produced four Pholos prototypes. (T. 338). Michael brought the prototypes back to the UK and "took the program in-house," where eight to ten newly hired engineers, working "[f]rom the baseline ▮▮▮▮▮ vehicles," "had the first demonstration units" ready to "show[] the U.K. government" "within two-and-a-half to three months." (T. 338–39).

The Court finds that the Corporate Defendants' account of their development of the Pholos, all of which stemmed from Overwatch's and its officers'—Hill and Michael's activities, fails to provide a credible explanation for the Pholos' identical configuration. The account, which lacks specifics and is not supported by any evidence showing the engineering process that led to Design X, is vague in comparison to the Meringers' detailed testimony regarding the lengthy process, trials and errors, and years of iteration that led to the Design X configuration. Moreover, having not credited Earl's expert testimony, the Corporate Defendants' argument that Design X is the result of logical evolution in coaxial design or employs standard coaxial configuration is not supported by any evidence.  Thus, in light of the evidence that Hill and Michael had access to information showing the internal configuration of Design X, including a bill of materials and 3D CAD and STP files demonstrating assembly, the evidence that the Meringers had explained to Hill why Design X worked, the evidence that Ascent's creation of Design X involved years of iteration and design decisions—decisions which even its own expert found "surprising," and the evidence that the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ the Court concludes Ascent has established a likelihood of success in rebutting the Corporate Defendants' claim of independent development and in establishing that

42

Overwatch used information Ascent provided under the CTA (and NDA) in creating the Pholos. *See Broker Genius, Inc. v. Zalta*, 280 F. Supp. 3d 495, 512 (S.D.N.Y. 2017) (explaining in the context of trade secrets that "copying can be established by showing that a defendant had 'access' to the alleged trade secrets and that there is a 'substantial similarity' between the original product which embodied those trade secrets and the alleged copy created by the defendant" (quoting *Fabkom, Inc. v. R.W. Smith & Assocs., Inc.*, No. 95-cv-4552, 1996 WL 531873, at *9, 1996 U.S. Dist. LEXIS 13686, at *24 (S.D.N.Y. Sept. 19, 1996)).

Accordingly, the Court finds that Ascent has shown a likelihood of success with respect to its claim that Overwatch failed to hold the Ascent's protected information it received in "strict confidence," (Dkt. No. 8-6, at 5), and used it in developing the Pholos, breaching the terms of the CTA, and by extension the NDA, and that Overwerx and OA UK are liable as Overwatch's successors.[29]

### 2.    Trade Secrets

As discussed above, Ascent also brings a misappropriation of trade secret claim under the DTSA. (Dkt. No. 1, ¶¶ 67–79). However, as the parties only recently briefed personal jurisdiction as to this claim, and the Court concludes that Ascent is entitled to a preliminary injunction with respect to its breach of contract claim, the Court declines to evaluate whether Ascent has established a likelihood of success as to its trade secret claim at this time.

---

[29] The Court notes that Ascent has adduced additional evidence that Overwatch provided to Overwerx and OA UK, additional Ascent documents, in violation of the CTA and NDA. For example, there is evidence that the "Pholos 2" specification sheet tracks, often word-for-word, Ascent's ▮▮▮ specification sheet, including its "mistakes," (PX-88; Dkt. No. 10, App'x E; T. 210–15), and that Overwatch's corporate brochure utilized a series of graphic images that look "exactly like" graphic images Ascent provided to Overwatch under the CTA, (Dkt. No. 10, App'x D; T. 232–33). Even if this evidence does not itself support a breach of contract claim, it is nonetheless evidence that Overwatch provided Overwerx and OA UK with materials it received from Ascent, and that undermines the credibility of Hill and Michael's assertions that no Ascent information was ever used in connection with the Pholos.

### D.  Balance of the Hardships

The balance of hardships weighs in favor of Ascent. At the hearing, Michael testified that the Corporate Defendants have not produced the Pholos since 2023 and that the ███, an iteration on the Pholos, is not being sold yet. (T. 426, 429). Ascent, on the other hand, asserts that the Corporate Defendants' coaxial drones incorporate information protected under the NDA, and that those drones have been sold internationally. *See FMC Corp. v. Taiwan Tainan Giant Indus. Co.*, 730 F.2d 61, 63 (2d Cir. 1984) (explaining, in trade secret context, that "[a] trade secret once lost is, of course lost forever."). In considering the balance of the hardships, the Court therefore concludes that a preliminary injunction will not impose an undue burden on the Corporate Defendants, who do not appear to be actively selling loitering munitions, at least at this time, and that Ascent's risk of "losing forever its [protected information] clearly outweighs the inconvenience and additional costs imposed on [the Corporate Defendants] by granting the preliminary injunction." *Flexible Techs., Inc. v. World Tubing Corp.*, 910 F. Supp. 109, 115 (E.D.N.Y. 1996).

### E.  Public Interest

"[W]hen a court orders injunctive relief, it should ensure that injunction does not cause harm to the public interest." *U.S. S.E.C. v. Citigroup Glob. Mkts. Inc.*, 673 F.3d 158, 163 n.1 (2d Cir. 2012). The Court finds no indication that an injunction in this case would harm the public interest. Further, injunctive relief may well serve the public interest by ensuring that the restrictive contracts parties enter voluntarily are enforced. *Uni-World Cap. L.P. v. Preferred Fragrance, Inc.*, 73 F. Supp. 3d 209, 237 (S.D.N.Y. 2014) (concluding that "[i]f anything, the public interest would be advanced by . . . an injunction, because, on the facts here, such an injunction would tend to encourage parties to abide by their agreements"); *see also Intertek Testing Servs., N.A., Inc. v. Pennisi*, 443 F. Supp. 3d 303, 347 (E.D.N.Y. 2020) (finding

44

injunctive relief would serve public interest by, inter alia, protecting the secrecy of the plaintiff's "trade secrets and confidential information").

Accordingly, having carefully considered the evidence and the parties' arguments, the Court concludes that all four factors weigh in Ascent's favor and grants Ascent's motion for a preliminary injunction.

### F.      Security

"A court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c) (emphasis added). In their response, the Corporate Defendants asserted that a substantial security, "in an amount not less than $60,478,489," was warranted in this case because they ███████████████ ████████████████████████████████████████████████ ████████████ (Dkt. No. 51, at 45, 47). However, at the hearing, Michael testified that the Corporate Defendants have laid off most employees, and presently employ less than five employees. (T. 316). During summations, the Court questioned the Corporate Defendants about the above sum and whether they continued to seek a security (they did), and noted that they could update the request for a security with additional evidence. The Corporate Defendants have not done so. Therefore, the Court declines to issue a security in this case.

### V.      CONCLUSION

For these reasons, it is hereby

**ORDERED** that Plaintiff's motion for a preliminary injunction (Dkt. No. 8) is **GRANTED**; and it is further

**ORDERED** that Defendants are **ENJOINED** during the pendency of this case from making, marketing, offering to sell and/or selling the Pholos drone or any other drone that

incorporates Ascent's proprietary Design X rotor configuration; and (2) using and/or disclosing

Ascent's confidential, proprietary information related to Ascent's coaxial drones, including but

not limited to Ascent's proprietary Design X rotor configuration; and it is further

**ORDERED** that the Clerk file this Memorandum-Decision and Order under seal in

accord with this Court's prior orders in this case, (*see, e.g.* Text Minute Entry (July 8, 2026);

Dkt. Nos. 146, 214, 215, 216, 226, 239), and file a redacted version for public view.

**IT IS SO ORDERED.**

Dated: July 29, 2026
        Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge